# 13-1708-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————

LEEWARD CONSTRUCTION COMPANY, LTD.,

*Petitioner-Appellee,*

— v. —

AMERICAN UNIVERSITY OF ANTIGUA-COLLEGE OF MEDICINE,

*Respondent-Appellant,*

MANIPAL EDUCATION AMERICAS, LLC, FKA GCLR, LLC,

*Respondent.*

—————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 2 of 2 (Pages A279 to A421)

LEWIS & GREER, P.C.
*Attorneys for Petitioner-Appellee*
510 Haight Avenue, Suite 202
Poughkeepsie, New York 12603
(845) 454-1200

SILLS CUMMIS & GROSS P.C.
*Attorneys for Respondent-Appellant*
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

## APPENDIX TABLE OF CONTENTS

Volume I

Docket Entries ..................................................................................... A1

Notice of Appeal.................................................................................. A12

Opinion Dated March 26, 2013 ......................................................... A13

Petition................................................................................................ A27

Agreement (Petition Ex. A) ............................................................... A35

Award dated June 22, 2019 (Petition Ex. B)..................................... A87

Disposition of Request for Modification (Petition Ex. C) ................ A121

Final Award dated August 8, 2012 (Petition Ex. D)......................... A126

Amended Petition ............................................................................... A161

AUA Cross-Motion to Dismiss .......................................................... A170

Lieb Declaration in Support of Cross-Motion to Dismiss ................ A172

Excerpt from Redfern & Hunter On International Arbitration
  (Lieb Decl. Ex. C) ........................................................................... A174

Sclafani Declaration In Support of Cross-Motion to dismiss ........... A178

Arbitrators' Preliminary Ruling (Sclafani Dec. Ex. B)...................... A188

Leeward Amended Demand For Arbitration (Sclafani Dec.Ex. C)... A192

AUA Proposed Findings of Fact and Conclusions of Law
  (Sclafani Dec. Ex. D)....................................................................... A217

Volume II

Leeward Proposed Findings of Fact and Conclusions of Law
  (Sclafani Dec. Ex. E) ....................................................................... A279

AUA Rebuttal Submission (Sclafani Dec. Ex. F)............................... A319

i

# APPENDIX TABLE OF CONTENTS
## (continued)

**Page**

AUA Motion to Modify and Correct Award (Sclafani Dec. Ex. G)................. A356

McMillan Declaration In Opposition to Cross-Motion to Dismiss................... A361

Leeward Rebuttal Submission (McMillan Dec. Ex. E)..................................... A368

Leeward Response To AUA Motion to Modify and Correct Award
(McMillan Dec. Ex. F) ................................................................................ A398

Judgment................................................................................................................ A403

Amended Judgment.............................................................................................. A404

Corrected Judgment............................................................................................. A407

Consent Order for Stay........................................................................................ A410

Stipulations Withdrawing Appeal ...................................................................... A418

Order Reinstating Appeal .................................................................................... A421

# EXHIBIT E

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES
-------------------------------------------------------------------x
LEEWARD CONSTRUCTION COMPANY, LTD.,

Claimant,

-against-

AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE C/O GCLR, LLC,

Respondent.
-------------------------------------------------------------------x

**CLAIMANT'S PROPOSED
FINDINGS OF FACTS AND
CONCLUSIONS OF LAW**

Case No. 50 110 T 00075 11

Claimant, Leeward Construction Company, Ltd. ("Claimant" or "Leeward") submits this Proposed Findings of Facts and Conclusions and Law in accordance with the Tribunal's Resolution dated March 2, 2012, and directive at the conclusion of the evidentiary hearing held on March 5 - 9, 2012.

<u>BACKGROUND</u>

a.   **Parties**

1.   Leeward is a corporation duly organized and existing under the laws of the Commonwealth of Antigua and Barbuda ("Antigua"), with an office and principal place of business at All Saints Road, St. Johns, Antigua.

2.   Leeward was formed in 2006 and is the progeny of Linde Antigua, Ltd., which was formed in 1992.

3.   The Respondent, American University of Antigua -- College of Medicine ("Respondent" or "AUA") is owned by the GCLR, LLC, which is a limited liability company organized and existing under the laws of the State of New York, with an office and principal place of business at 1 Battery Park Plaza, 33rd Floor, New York, New York; and University

1

Park, Jabberwock Beach Road, Coolidge, Antigua.  (On March 19, 2012, GCLR, LLC changed its name to Manipal Education Americas, LLC.)

### b.    Nature of the Dispute

4.    This dispute arises out of the construction of a medical school in Antigua (the "Project").

5.    Leeward, as general contractor, entered into a contract, dated September 25, 2008, with the AUA, as owner of the Project, for the construction of the medical school for a fixed sum of US $10,162,599.61/EC $27,436,824.00[1] subject to additions and deductions by change order as provided in the Contract documents (the "Contract").

6.    Leeward commenced this arbitration to recover damages from the AUA for breach of the Contract, including the AUA's failure to pay the contract balance when due.

### c.    The Arbitration

7.    The General Conditions to the Contract contain an arbitration clause that reads as follows:

§ 4.6 ARBITRATION

§ 4.6.1  Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration.

§ 4.6.2  Claims shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the

---

[1] As of April 17, 2012, the conversion rate for Eastern Caribbean dollars to United States dollars is 0.3704 United States dollars for each Eastern Caribbean dollar, and United States dollar to Eastern Caribbean dollar is 2.7000 Eastern Caribbean dollars for each United States dollar. *See* http://www.likeforex.com.

2

A281

Construction Industry Arbitration Rules of the American Arbitration
Association currently in effect. The demand for arbitration shall be
filed in writing with the other party to the Contract and with the
American Arbitration Association, and a copy shall be filed with the
Architect. Location of any Arbitration will be Antigua.

8.     Leeward commenced this arbitration on February 3, 2011, by filing a Demand for
Arbitration with the American Arbitration Association, International Center for Dispute
Resolution (the "AAA").

9.     On or about June 9, 2011, the AAA appointed a panel of three neutrals to hear and
determine this dispute: Jorge R. Jimenez, Esq. (Chairman), Hector M. Varela, P.E., MBA,
FASCE, and Jose Rafael Capo, Esq. (The arbitration panel is collectively referred to herein as
the "Arbitrators" or "Tribunal.")

10.    At the Preliminary Hearing on September 14, 2011, the Tribunal directed
Leeward to file an Amended Demand for Arbitration (the "Amended Demand") by October 14,
2011, and further directed the AUA to file a reply to the Amended Demand by November 30,
2011.

11.    On or about October 14, 2011, Leeward served and filed the Amended Demand
for Arbitration requesting an award for breach of contract in the amount of US $2,518,931.97/EC
$6,800,572.28; interest on late payments as provided in the Contract from the date the payments
were due until the date the payments were made at the legal rate of interest in Antigua as
determined by the Arbitrators; and legal fees and expenses, including the cost and expense of
arbitration, as determined by the Arbitrators in accordance with the laws of Antigua.

12.    Leeward's breach of contract claim alleges that the AUA repeatedly breached the
contract by failing to issue change orders/change directives for additional contract work; failing to
pay for additional work that the AUA authorized and directed Leeward to perform; failing to pay

3

Leeward's payment applications in accordance with the terms of the Contract; failing to certify the Project as substantially complete; failing to issue a final certificate of payment; failing to make final payment to Leeward in accordance with the terms of the Contract; failing to pay the mobilization fee as provided in the Contract; failing to authorize overtime as provided in the Contract; failing to coordinate the work of other contractors as required in the Contract; and failing to properly administer the Contract as provided in the Contract documents.

13.     On or about November 30, 2011, the AUA filed a reply to the Amended Demand that included counterclaims for liquidated delay damages in the amount of US $117,000.00 and in the alternative, actual delay damages in the amount of US $371,955.31/EC $1,004,199.00. (The AUA withdrew its counterclaim for actual delay damages on April 11, 2012.)

14.     At a hearing held on December 11, 2011, the parties stipulated to conduct the evidentiary hearing in San Juan, Puerto Rico, notwithstanding the venue provision in the Arbitration Agreement requiring that the Arbitration take place in Antigua.

15.     Also at the hearing on December 11, 2011, the parties represented that they did not intend to use an expert witness at the evidentiary hearing.

16.     On January 9, 2012, the Parties made a joint request to the Tribunal to submit direct witness testimony by witness statement, which the Tribunal granted by resolution dated January 10, 2012.

17.     The January 10, 2012 Resolution also scheduled the evidentiary hearing to take place in San Juan, Puerto Rico on March 5, 2012 through March 9, 2012.

18.     On or about February 3, 2012, the Parties exchanged witness statements and documents in support of the respective claims, and on February 24, 2012, the AUA served witness statements and documents in reply to Leeward's witness statements.

4

19.    On February 28, 2012, the Parties submitted a Joint Pre-Trial Report containing factual stipulations, document stipulations, exhibit lists, witness summaries, and a list of issues and interlocutory matters to be resolved.

20.    The evidentiary hearing was held at the Isla Verde, Marriott Courtyard in Isla Verde, Puerto Rico on March 5, 2012 through March 9, 2012 (the "hearing").

21.    Leeward submitted the following witness statements in support of it's claims and each of the witnesses submitted to cross examination in person or by Skype at the hearing:

- Neil Dickinson ("Dickinson");

- Robert Winwood ("Winwood");

- Eric Linde ("Linde"); and

- Andy Green ("Green").

22.    The AUA submitted the following witness statements in support of its counterclaims and defenses and each of the witnesses submitted to cross examination in person or by Skype at the hearing:

- Peter McLeod ("McLeod");

- Lt. Col. Roche Antony ("Antony");

- Prabhu Marudheri ("Marudheri"); and

- A.S. Nagesh ("Nagesh").

23.    During the hearing, Leeward submitted five binders of exhibits identified as LC 1 - LC 245 and the AUA submitted two binders of exhibits identified as AUA 1 - AUA 74.

24.    During the hearing, the Tribunal ruled that all exhibits are deemed admitted into evidence in the absence of an objection.

25.    At the close of the evidentiary hearing on March 9, 2012, the parties placed

stipulations on the record with respect to the withdrawal and/or amendment of certain exhibits and revisions to their respective exhibit lists, and the revised exhibit lists were submitted on April 12, 2012.

26.     The AUA admitted during the hearing that it owes Leeward retainage under the contract in the amount of US $218,566.74/EC $590,083.00.

27.     The AUA admitted during the hearing that it owes Leeward US $30,743.20/EC $83,000.00 due to an error in the calculation of Antigua and Barbuda Sales Tax ("ABST") on the Contract payments.

## FINDINGS OF FACT

28.     The Project was originally projected to include 325,000 square feet of classrooms, library, and amphitheater space, as well as the construction of a housing blocks (living quarters) for the students.

29.     Leeward initially began its work on the Project with the installation of deep foundations and building slabs.

30.     The installation of these foundations and slabs was done under a prior contract that Leeward entered into with the AUA on May 14, 2007 for the fixed price of US $937,121.63/EC $2,530,026.00, subject to additions and deductions by change order.

31.     The Project site required extensive engineering work because it is in a flood plain on reclaimed ground that was once a sugar plantation.

32.     The deep pile foundations that Leeward was contracted to install were required to maintain the structure on this type of ground, but the required piles were not manufactured in Antigua.

33.     To purchase the manufactured piles, Leeward would have to import them from

6

Trinidad, but the cost of importing the piles was prohibitive.

34.    Leeward's solution was to construct its own plant on site to manufacture the piles.

35.    Leeward understood that it could not recoup its investment in the plant from the construction of the deep foundations and building slabs, but Leeward made the investment because the AUA promised to retain Leeward for the construction of additional works, including the classrooms, laboratories, library, and housing blocks, which would allow Leeward to recoup the cost of the plant.

36.    Leeward commenced the installation of the deep foundation and building slabs on or about June 18, 2007 and completed the work on or about April 21, 2008.

37.    In the spring of 2008, the AUA began negotiating a contract with Leeward for the construction of the structural works portion of the Project.

38.    Although Leeward was reluctant to commence the construction of the structural works portion of the Project without a formal contract, the parties executed a Letter of Intent dated April 21, 2008, and Leeward commenced work on or about May 10, 2008.

39.    The April 21, 2008 Letter of Intent provided for the construction of 325,000 square feet including the structural works, finishing works, and pile castings for the library and administrative building, laboratory, and housing blocks at approximately US $110.00/EC $297.00 per square foot for a total value of US $35,750,000.00/EC $96,525,000.00.

40.    On May 10, 2008, the AUA issued a second Letter of Intent which further delineated the terms of the parties' agreement, including:

- Sundaram Architects Pvt., Ltd. ("Sundaram"), the Project architect, would provide the architectural, structural, mechanical, electrical and plumbing designs as well as all the Bills of Quantities for the entire Project, including Housing Blocks 1, 2 and 3 by July 15, 2008;

7

**A286**

- Sundaram's Bills of Quantities would be used to agree on "a Stipulated Sum contract for the entire project scope;"

- The form of agreement for the contract would be AIA Document A101, Standard Form of Agreement between Owner and Contractor where the basis of payment is a Stipulated Sum (1997 Edition); and

- A mobilization advance would be paid within seven days of receipt of an executed copy of the May 10, 2008 Letter of Intent.

41.    On September 25, 2008, Leeward and the AUA executed the Contract for Leeward's work on the Project for the fixed sum of US $10,162,599.61/EC $27,436,824.00 subject to additions and deductions by change order.

42.    The Contract included the structural works and finished works for the classroom and laboratory building, service block, library block and library amphitheater, but not the housing blocks as promised in the Letters of Intent.

43.    The Contract includes the following documents:

- Table of Contents (LC 1, p. LC000002-LC000003)

- AIA Document A101-1997: Standard Form of Agreement Between Owner and Contractor where the basis of payment is a stipulated sum. (LC 1, p. LC000005-LC000010)

- Supplementary Conditions (LC 1, p. LC000010-LC000015)

- AIA Document A201-1997: General Conditions of the Contract for Construction (LC 1, p. LC000016-LC000056)

- List of Drawings (LC 1, p. LC000057-LC000061)

- Pricing Schedules and Bill of Quantities (LC 1, p. LC000062-LC000105)

- Division One Specifications (LC 1, p. LC000106-LC000161)

- Project Drawings (LC 1, p. LC000162-LC000238)

8

44.    The first part of the Bill of Quantities is the "Statement of Contract Sum and Collections Page." (LC 1, p. LC000073)   The total preliminaries in the amount of US $1,358,491.63/EC $3,667,634.00, comes from the unit pricing (set forth at LC 1, p. LC000066-LC000072) based upon a weekly rate of US $26,124.68/EC $70,531.00 for 52 weeks.

45.    The second part of the Statement of Contract Sum and Collections Page are the measured works broken down into four areas: Classroom and Library Building, Service Block, Library Block, and Library Block-Amphitheater.

46.    The column on the far right entitled "Amount" reflects measured quantities as determined by the AUA's Quantities Surveyor multiplied by the agreed unit prices for each of the line items for work and material for each of the measured work works categories (LC 1, p. LC0000073), which comes from the Bill of Quantities itself.  For example, the second page of the Bill of Quantities is entitled "Construction of Classroom and Library Buildings" (top center).

47.    The next six pages lay out the measured quantities, unit prices, and pricing for each item of work for the construction of the classroom and laboratory buildings.  The total amount of those items, which is set forth in the bottom of "page 6 of 6" (LC 1, p. LC000079) is US $1,874,251.78/EC $5,060,075.00. This is the same number that appears on the Statement of Contract Sum and Collections Page, Measured Works, Line 2.1.

48.    The Bill of Quantities breakdown for the Service Block is set forth at LC 1, p. LC000080-LC000086; the Bill of Quantities breakdown for the Library Block is at LC 1, p. LC000087-LC000098; and the Bill of Quantities breakdown for the Library Block-Amphitheater is at LC 1, p. LC000099-LC000105.

49.    The measured work items summarized on the Statement of Contract Sum and Collections Page (LC 1, p. LC000073) and as determined in the Bill of Quantities (LC 1, p.

9

LC000073-LC000105) includes the work, labor and materials that Leeward provided to the AUA pursuant to the April 21, 2008 Letter of Intent (LC 69) and the May 10, 2008 Letter of Intent (LC 70), as re-measured by the AUA's Quantities Surveyor just prior to the execution of the contract, thereby incorporating the remeasured work into the fixed contract price of US $10,162,599.61/EC $27,436,824.00.

50.    The last item on the Statement of Contract Sum and Collections Page is "cash allowances" in the amount of US $370,400.00/EC $1,000,000.00 for scaffolding, craneage, and overtime.

51.    Article 7.3 of the contract identifies Lt. Col. Antony as the Owner's representative on the Project.

52.    Article 4.1.1 of the Contract defines the project architect as the person or entity lawfully licensed to practice architecture.

53.    Nagesh, a Civil Engineer, was the Architect's representative on the Project.

54.    Although Nagesh had a permit to work in Antigua, he did not have a license or authorization to practice engineering or architecture in Antigua.

55.    Neither Antony nor Nagesh had any prior experience with AIA Document A101-1997: Standard Form Agreement Between Owner and Contractor Where the Basis of Payment is a Stipulated Sum; or AIA Document A201-1997: General Conditions of the Contract for Construction.

56.    According to Article 3 of the Contract, the commencement date of the Contract work was May 1, 2008 and the substantial completion date was April 30, 2009.

57.    Leeward commenced the Contract work on or about May 10, 2008, substantially completed the Contract work on or about July 31, 2009, and finally completed the Contract work

10

on or about September 18, 2009.

58.     The AUA conducted a "soft opening" of the Project in October 2009 and has been occupying and using the Project for its intended purpose since no later than January, 2010.

59.     Article 5.1.3 of the Contract requires the AUA to pay Leeward's monthly payment applications by the twenty-second day of each month for applications submitted by the seventh day of the month.

60.     Leeward submitted requisitions and the AUA paid the requisitions as follows:

| Requisition | Date Submitted | Amount Demanded Excluding Retainage | Amount Paid | Date Paid |
|---|---|---|---|---|
| Application No.1 | 04/18/08 | EC $375,681.18 | EC $333,833.67 | 04/24/08 |
| Application No. 2 | 05/14/08 | EC $669,343.00 | EC $435,986.79 | 05/30/08 06/02/08 |
| Application No. 3 | 05/16/08 | EC $279,181.26 | EC $244,630.15 | 06/09/08 |
| Application No. 4 | 05/23/08 | EC $231,368.72 | EC $243,906.02 | 06/09/08 |
| Application No. 5 | 06/04/08 | EC $264,084.00 | EC $310,132.65 | 06/20/08 |
| Application No. 7 | 07/11/08 | EC $1,510,675.16 | EC $1,176,211.22 | 07/30/08 |
| Application No. 8 | 08/01/08 | EC $950,206.36 | EC $467,440.11 | 08/27/08 |
| Application No. 10 | 09/05/08 | EC $490,837.00 | EC $264,299.89 | 10/01/08 10/08/08 |
| Application No. 11 | 10/03/08 | EC $1,626,059.69 | EC $958,531.17 | 11/04/08 |
| Application No. 12 | 10/31/08 | EC $1,146,958.07 | EC $718,588.47 | 11/20/08 |
| Application No. 13 | 11/05/08 | EC $1,538,676.60 | EC $774,718.48 | 12/23/08 |
| Application No. 14 | 01/08/09 | EC $924,817.42 | EC $635,009.83 | 01/23/09 |
| Application No. 15 | 12/31/08 | EC $1,655,020.79 | EC $1,538,143.25 | 02/26/09 |
| Application No. 16 | 03/02/09 | EC $3,615,080.71 | EC $2,737,012.49 | 03/24/09 |
| Application No. 17 | 04/02/09 | EC $3,638,851.41 | EC $2,768,550.39 | 04/22/09 |
| Application No. 18 | 05/02/09 | EC $2,243,550.10 | EC $1,309,404.75 | 05/26/09 |
| Application No. 19 | 06/01/09 | EC $2,478,272.93 | EC $1,393,869.68 | 06/23/09 |
| Application No. 20 | 07/03/09 | EC $2,765,603.84 | EC $1,270,603.57 | 07/21/09 |
| Advance Payment | 07/10/09 | EC $1,000,000.00 | EC $500,000.00 | 07/20/09 |
| Application No. 21 | 07/31/09 | EC $2,765,603.84 | EC $840,947.85 | 08/21/09 |
| Payment No. 25 | | | EC $553,888.27 | 09/30/09 |
| Payment No. 26 | | | EC $57,244.40 | 10/01/09 |
| Interim     Final | 10/09/09 | EC $1,322,022.79 | EC $104,862.91 | 10/27/09 |

11

| Application | | | | |
|---|---|---|---|---|
| TOTAL | | | EC $19,637,816.01/ US $7,273,847.05 | |

61.     Article 5.1.9 of the Contract requires the AUA to pay Leeward an advance payment for mobilization equal to twelve percent (12%) of the Contract price US $1,219,511.92/EC $3,292,418.80 within seven (7) days of execution of the Contract, which occurred on September 25, 2008.

62.     Upon the signing of the Contract, the AUA paid the mobilization fees as follows:

| Mobilization Payments | Date Submitted | Amount Requested | Amount Paid | Date Paid |
|---|---|---|---|---|
| Mobilization Pmt. No. 1 | 06/04/08 | EC $806,460.00 | EC $806,460.00 | 06/19/08 |
| Mobilization/ Scaffolding | 07/29/08 | EC $222,000.00 | EC $150,000.00 | 08/01/08 |
| Mobilization Pmt. No. 2 | 10/01/08 | 12% of Contract sum less prior mobilization advances. | EC $1,000,000.00 | 11/06/08 (Due 10/02/08) |
| Mobilization Pmt. No. 3 | 10/01/08 | 12% of Contract sum less prior mobilization advances. | EC $1,335,900.48 | 12/22/08 (Due 10/02/08) |
| TOTAL | | | EC $3,292,360.48/ US $1,219,490.32 | |

63.     Article 5.1.6 of the Contract authorizes the AUA to withhold retainage in the amount of five percent (5%) of the Contract sum US $508,129.98/EC $1,371,841.20 and requires the AUA to release fifty percent (50%) of the retainage to Leeward at substantial completion.

64.     The AUA currently holds retainage in the amount of US $218,566.74/EC $590,083.00, and admits owing Leeward that amount.

12

A291

65.     Article 7 of the General Conditions and Section 1.7 of the Division 1 Specifications require the Architect to prepare and the Owner sign written change orders or change directives for changes to the Contract work that result in an increase or decrease in the Contract price.

66.     Leeward repeatedly requested the Architect and the AUA to issue written change orders for changes to the Contract work that increased or decreased the Contract price.

67.     The Architect and the AUA failed to issue a single change order on the Project with respect to the Contract.

68.     Article 9.8.4 of the General Conditions requires the Architect to issue a Certificate of Substantial Completion with respect to the Contract work.

69.     Upon substantial completion of the Contract work, Leeward requested the Architect to issue a Certificate of Substantial Completion.

70.     As of the commencement of the hearing, neither the Architect nor the AUA has issued a Certificate of Substantial Completion for the Contract work.

71.     Article 5.2 of the Contract and Article 9.10 of the General Conditions requires the Architect to issue a Final Certificate of Payment upon completion of the Project work.

72.     Leeward requested the Architect and the AUA to issue a Final Certificate of Payment for the Contract work.

73.     As of the commencement of the hearing, neither the Architect nor the AUA has issued a Final Certificate for Payment.

74.     Article 7.2 of the Contract and Article 13.6 of the General Conditions requires the AUA to pay interest on payments due and unpaid under the Contract at the "legal rate" in Antigua from the date the payment is due until the date the payment is made.

75.     According to the Pricing Schedules and the Bills of Quantities in the Contract,

13

Leeward is entitled to 18% overhead and profit on its own work and 5% overhead and profit on items of supply only.

76.     Under Section 01200, Part 1.9(A) of the Division 1 Specifications for the Contract, unit prices are inclusive of overhead and profit.

77.     Article 4.3 of the Contract provides that changes to the Contract sum based upon the unit prices are inclusive of overhead and profit, except as provided in Article 7 of the General Conditions.

78.     Under Article 7.3.7 of the General Conditions, changes to the Contract work that result in a net decrease in the Contract sum shall be "actual net cost," excluding overhead and profit.

79.     Leeward performed extra work under the Contract at the request of the AUA which increased the Contract sum by US $594,146.28/EC $1,604,066.62, from US $10,162,599.61/EC $27,436,824.00 to US $10,756,745.89/EC $29,040,890.62.

80.     The AUA paid Leeward for the extra work except, the AUA failed to pay for hurricane safety measures; works carried out to shut down and secure the site on October 23-24, 2008; customs storage charges; election day close down costs; Labour Day close down costs; Whit Monday close down costs, and other adverse weather costs in the total amount of US $67,350.93/EC $181,847.52.

81.     Neither the AUA nor the Project Architect issued change orders for the extra work.

82.     The AUA changed the Contract price as a result of design changes and the modification or omission of work from the Contract.  Omissions to the Contract work on the Project resulted in a decrease to the Contract price in the amount of US $594,302.59/EC

14

$1,604,617.00.

83.   Neither the Architect nor the AUA issued change orders for changes to the scope of work that reduced the Contract price.

84.   The AUA did not pay Leeward overhead and profit on work removed from the Contract as a result of the design changes, modifications, omissions, or removal of work from the Contract.

85.   On or about April 21, 2009, the AUA removed the following items of work from the Contract and put each item of work up for competitive bids: painting and finishes, flooring, doors and windows.

86.   These deletions resulted in a decrease in the Contract price in the amount of US $1,358,520.15/EC $3,667,711.00.

87.   Neither the Architect nor the AUA issued change orders for changes to the scope of work that reduced the Contract price.

88.   The AUA did not pay Leeward overhead and profit on work removed from the Contract and put up for competitive bids.

89.   The AUA removed these items of work from the Contract in an effort to reduce the cost of the works through competitive bidding and to avoid paying Leeward preliminaries for work performed after the substantial completion date set forth in Article 3.3 of the Contract, as extended by the AUA to the May 10, 2009 date.

90.   The AUA awarded the following additional works contracts for the work removed from the initial Contract as well as additional works required for the Project:

| Additional Work | Contract Amount |
| --- | --- |
| Doors & Windows | EC $419,932.68 |
| Tile Work | EC $610,206.58 |

15

**A294**

| | |
|---|---|
| Screed Work at Terrace | EC $48,020.00 |
| A/C Compressors Concrete | EC $40,462.50 |
| Screed Work on Blocks A, B, C and Walkways | EC $74,751.10 |
| Plyboard for Service Building Floor | EC $3,350.00 |
| Additional Plastering for Amphitheatre and Service Block Steps | EC $22,870.00 |
| Glazing | EC $48,770.00 |
| Downpipes | EC $12,464.46 |
| Civil Works in the Data Centre | EC $27,250.00 |
| Concrete Band Work | EC $74,491.12 |
| Toilet Fixtures | EC $130,523.75 |
| Porch Pavers | EC $28,792.00 |
| PVC Pipes | EC $9,250.00 |
| **TOTAL** | **EC $1,551,134.19/ US $574,494.14** |

91.     The AUA paid Leeward for the work under the additional works contracts except

US $79,443.43/EC $214,480.10 as follows:

| Additional Work | Contract Amount | Amount Paid |
|---|---|---|
| Doors & Windows | EC $419,932.68 | EC $424,106.83 |
| Tile Work | EC $610,206.58 | EC $448,054.30 |
| Screed Work at Terrace | EC $48,020.00 | EC $59,517.67 |
| A/C Compressors Concrete | EC $40,462.50 | EC $37,771.80 |
| Screed Work on Blocks A, B, C and Walkways | EC $74,751.10 | EC $74,751.10 |
| Plyboard for Service Building Floor | EC $3,350.00 | EC $3,350.00 |
| Additional Plastering for Amphitheatre and Service Block Steps | EC $22,870.00 | EC $22,870.00 |
| Glazing | EC $48,770.00 | EC $56,170.00 |
| Downpipes | EC $12,464.46 | EC $10,000.00 |
| Civil Works in the Data Centre | EC $27,250.00 | EC $27,250.00 |
| Concrete Band Work | EC $74,491.12 | EC $32,816.82 |
| Toilet Fixtures | EC $130,523.75 | EC $118,268.24 |

16

A295

| | | |
|---|---|---|
| Porch Pavers | EC $28,792.00 | EC $25,200.00 |
| PVC Pipes | EC $9,250.00 | EC $9,250.00 |
| **TOTAL** | **EC $1,551,134.19/ US $574,494.14** | **EC $1,349,376.76/ US $499,809.15** |

92.    Under Article 4 of the General Conditions, the Architect is responsible for administering the Contract, including, but not limited to review of Leeward's payment requisitions and certification of the amounts due Leeward; preparation of change orders and change directives; and the determination of claims initiated at the AUA or Leeward including Leeward's claims for additional compensation and/or additional time to complete the contract work.

93.    Although the Architect's representative, Nagesh, reviewed Leeward's payments and requisitions, the Owner's representative, Lt. Col. Antony, determined the amounts due Leeward.

94.    In making this determination, Lt. Col. Antony changed the unit prices in the Contract without Leeward's consent.

95.    In making this determination, Lt. Col. Antony changed the quantities in Leeward's payment requisitions without Leeward's consent with respect to the work performed.

96.    Leeward submitted the following payment requisitions to the AUA which were modified by Nagesh and then modified again, without Leeward's consent, by Lt. Col. Anthony.

| Requisition | Date Submitted | Requisitioned Amount | Amount Approved by Nagesh | Amount Paid as Approved by Antony | Date Paid |
|---|---|---|---|---|---|
| Application No. 1 | 04/18/08 | EC $375,681.18 | EC $333,833.67 | EC $333,833.67 | 04/24/08 |
| Application No. 2 | 05/14/08 | EC $669,343.00 | EC $435,986.79 | EC $435,986.79 Two Payments: EC $234,601.98 EC $201,384.81 | 05/30/08 06/02/08 |
| Application No. 3 | 05/16/08 | EC $279,181.26 | EC $244,603.12 | EC $244,630.15 | 06/09/08 |

17

| Application No. 4 | 05/23/08 | EC $231,368.72 | EC $243,906.96 | EC $243,906.02 | 06/09/08 |
|---|---|---|---|---|---|
| Application No. 5 | 06/04/08 | EC $264,084.00 | EC $310,132.65 | EC $310,132.65 | 06/20/08 |
| Mobilization | 06/04/08 | EC $806,460.00 | EC $806,460.00 | EC $806,460.00 | 06/19/08 |
| Application No. 7 | 07/11/08 | EC $1,510,675.16 | EC $1,176,211.22 | EC $1,176,211.22 | 07/30/08 |
| Mobilization Scaffolding | 07/29/08 | EC $222,000.00 | EC $150,000.00 | EC $150,000.00 | 08/01/08 |
| Application No. 8 | 08/01/08 | EC $950,206.36 | EC $467,440.11 | EC $467,440.11 | 08/27/08 |
| Application No. 10 | 09/05/08 | EC $490,837.00 | EC $64,446.50 approved on requisition. EC $199,853.39 added to payment for pre-contract preliminaries. | EC $264,299.89 Two Payments: EC $90,333.02 EC $173,966.87 | 10/01/08 10/08/08 |
| Application No. 11 | 10/03/08 | EC $1,626,059.69 | EC $1,120,766.52 | EC $958,531.17 | 11/04/08 |
| Mobilization | 10/01/08 | 12% of contract sum less prior mobilization advances. | EC $1,000,000.00 | EC $1,000,000.00 | 11/06/08 |
| Application No. 12 | 10/31/08 | EC $1,146,958.07 | EC $803,742.11 | EC $718,588.47 | 11/20/08 |
| Application No. 13 | 11/05/08 | EC $1,538,676.60 | EC $1,011,742.66 | EC $774,718.48 | 12/23/08 |
| Mobilization | 10/01/08 | 12% of contract sum less advances already issued. | EC $1,335,900.48 | EC $1,335,900.48 | 12/22/08 |
| Application No. 14 | 01/08/09 | EC $924,817.42 | | EC $635,009.83 | 01/23/09 |
| Application No. 15 | 12/31/08 | EC $1,655,020.79 | EC $1,562,060.21 | EC $1,538,143.25 | 02/26/09 |
| Application No. 16 | 03/02/09 | EC $3,615,080.71 | | EC $2,737,012.49 | 03/24/09 |
| Application No. 17 | 04/02/09 | EC $3,638,851.41 | | EC $2,768,550.39 | 04/22/09 |
| Application No. 18 | 05/02/09 | EC $2,243,550.10 | | EC $1,309.404.75 | 05/26/09 |
| Application No. 19 | 06/01/09 | EC $2,478,272.93 | | EC $1,393,869.68 | 06/23/09 |
| Application No. 20 | 07/03/09 | EC $2,765,603.84 | | EC $1,270,603.57 | 07/21/09 |
| Advance | 07/10/09 | EC $1,000,000.00 | EC $1,000,000.00 | EC $500,000.00 | 07/20/09 |
| Application No. | 07/31/09 | EC | | EC $840,947.85 | 08/21/09 |

18

| 21 | | $2,765,603.84 | | | |
|---|---|---|---|---|---|
| Payment No. 25 | | | | EC $553,888.27 | 09/30/09 |
| Payment No. 26 | | | | EC $57,244.40 | 10/01/09 |
| Interim Final Payment | 10/09/09 | EC $1,322,022.79 | | EC $104,862.91 | 10/27/09 |
| **TOTAL** | | | | **EC $22,930,176.49/ US $8,493,337.37** | |

97.  Leeward submitted written claims for additional time and/or compensation to Nagesh by email and/or hand delivery to Nagesh's office located approximately 150 yards from Leeward's office on the Project site.

98.  Leeward's claims included the AUA's unilateral reduction of preliminaries rates; failure to pay preliminaries, failure to timely pay mobilization and requisition payments; failure to adequately communicate; failure to coordinate the work of all trades on the Project; failure to timely process materials through customs; denial of overtime applications; additional holidays, shutdowns, adverse weather and election costs; AUA's refusal to settle outstanding payment issues at the conclusion of the Project; and AUA contracting directly with Leeward's subcontractors.

99.  Lt. Col. Antony decided the claims instead of Nagesh.

100.  Nagesh, as the Architect's representative and the administrator of the Contract, failed to issue any change orders for the project.

101.  Nagesh, as the Architect's representative and the administrator of the Contract, failed to issue the certificate of substantial completion.

102.  Nagesh, as the Architect's representative and the administrator of the Contract, failed to issue the final certificate.

103.  Nagesh, as the Architect's representative and the administrator of the Contract,

19

**A298**

failed to approve Leeward's requests for overtime expenses provided in the Contract.

104.    Nagesh, as the Architect's representative and the administrator of the Contract, failed to review and determine Leeward's claim, in good faith, for extra costs attributable to public holidays and weather, in the amount of US $67,350.93/EC $181,847.52, including hurricane safety measures; works carried out to shut down and secure the site on October 23-24, 2008; customs storage charges; election close down costs; labor day close down costs; Wit Monday close down cost; and other adverse weather costs.

105.    The AUA extended the substantial completion date set forth in Article 3.3 of the Contract from April 30, 2009 until May 10, 2009.

106.    Leeward was unable to substantially complete the project by May 10, 2009 and did not substantially complete the project until July 31, 2009 because of delays attributable to the AUA or other factors beyond Leeward's control.

107.    Leeward was delayed in the performance of the Contract work by unanticipated adverse weather conditions.

108.    Leeward was delayed in the performance of the Contract work by significant owner-initiated design changes, including delays in the issuance of and changes to the design of the mechanical, electrical and plumbing, toilet blocks, library, windows, doors, and tiling.

109.    Leeward was delayed in the performance of the Contract work as a result of the AUA's failure to timely pay mobilization fees.

110.    Leeward was delayed in the performance of the Contract work as a result of the AUA's failure to timely "endorse" customs documents and sign the warrants that Leeward required to clear and move materials from the Trade Free Zone.

111.    Leeward was delayed in the performance of the Contract work by the AUA's

20

failure to timely purchase windows and doors which were not delivered to the Project site until on or about July 14, 2009; and tiling, which were not delivered to the Project site until on or about July 29, 2009.

112.   As a result of these delays, Leeward incurred costs for preliminaries as set forth in the Contract pricing schedules and bills of quantities for an additional 19 weeks running from May 10, 2009, the substantial completion date in the Contract, as extended to September 18, 2009, when Leeward finally completed the Contracted work.

113.   The cost of the additional preliminaries for the extended period is EC $1,985,711.68.

114.   The AUA failed and refused to pay the additional preliminaries to Leeward.

## CONCLUSIONS OF LAW

a.   **Breach of Contract**

115.   A basic presumption of contract law is that a written contract contains all of the terms of the agreement. *See Jacobs v. Batavia & General Plantations Ltd.* [1924] 1 Ch 287. In the instance of a fully executed contract, the parties are bound by all the terms contained therein. *See Chua Chian Ya v. Music & Movements (S) Pte Ltd.* [2010] 3 LRC 506, ¶13; *L'Estrange v. F Graucob Ltd.,* (1934) 2 KB 394. (A copy of each case is submitted herewith as Appendix A.)

116.   Although parole evidence is generally not admissible, ambiguities in contract terms are construed to give effect to the parties' intentions from the standpoint of a reasonable person. *See* Antigua and Barbuda Unfair Contract Terms Act §12.

117.   Under Antigua law, a breach of contract may occur in any of the following ways:

(i)     by repudiating one's liability under the contract;

21

**A300**

    (ii)    by rendering the performance of the contract impossible;

    (iii)    by failing to fulfill the contractual obligations.

*See Christopher Wheatley et al. v. Waterpoint Caribbean Homes LTD.*, Antigua and Barbuda Suit No. ANUHCV 2010/0029, in the Eastern Caribbean Supreme Court in the High Court of Justice. (Appendix A)

118.    A breach of contract will not necessarily terminate the contract; the primary obligations of both parties may continue even after a breach has occurred. *See Id.*

119.    The party alleging a breach of contract is obliged to prove that a breach has occurred. *See Id.*

120.    The AUA breached the Contract with Leeward by, *inter alia*: failing to issue change orders for changes to the Contract work and for extra work; failing to issue a Certificate of Substantial Completion; failing to issue a Final Certificate of Payment; failing to pay Leeward overhead and profit on the deleted Contract works; failing to pay Leeward for extra works relating to various site closures and adverse weather; failing to release the remaining 50% of the retainage to Leeward; failing to have the Architect administer the Contract; and failing to pay Leeward what they were owed for preliminaries. (Dickinson Witness Statement, ¶¶38-64, 78-92; Green Witness Statement, ¶¶28-40, 42-53; Winwood Witness Statement, ¶¶17-22, 27-31)

121.    Leeward has demonstrated the AUA's numerous breaches of contract through the testimony of Dickinson, Winwood and Green as well as the 244 separate exhibits Leeward entered into evidence during the evidentiary hearings. Neither the AUA's cross-examination of Leeward's witnesses nor its own witnesses' testimony and exhibits has demonstrated otherwise. In fact, Leeward's cross-examination of Antony and Nagesh further illuminated the significant nature and breath of the AUA's breaches.

**b.    Damages**

122.    When a breach of contract has been proven, the non-breaching party is entitled to general damages: Actual damages that are the natural consequence of the breach. The purpose of general damages is to put the non-breaching party in the same position as if the contract had been performed perfectly. *See Christopher Wheatley et al. v. Waterpoint Caribbean Homes LTD.,* [2010], *supra.* (Appendix A)

### (i). The Contract

123.    On or about April 21, 2009, the AUA removed portions of work from the Contract and put those items of work up for competitive bids.    The items of work included painting and finishing, flooring, doors and windows originally included in the Contract's Bill of Quantities.    The deletion of these work items resulted in a decrease in the Contract price in the amount of EC $3,667,711.00. (LC 1, pp. LC 000072-LC 000105, AUA 26, AUA 30, pp. AUA 000267-AUA 000295)

124.    The AUA removed these items of work from the Contract in an effort to reduce the cost of the works through competitive bidding and to avoid paying Leeward preliminaries for work performed after the substantial completion date for the Contract as modified by the AUA to May 10, 2009. (Dickinson Witness Statement, ¶¶78-90; Green Witness Statement, ¶¶42-43; Winwood Witness Statement, ¶¶27-29)

125.    According to the Pricing Schedules and the Bill of Quantities in the Contract, Leeward is entitled to 18% overhead and profit on its own work. (LC 1, p. LC 000072)  Under Section 01200, Part 1.9(A) of the Division 1 Specifications for the Contract, unit prices are inclusive of overhead and profit. (LC 1, p. LC 000119)

126.    Article 4.3 of the Contract provides that changes to the Contract sum based upon

23

the unit prices are inclusive of overhead and profit, except as provided in Article 7 of the General Conditions. (LC 1, pp. LC 000034-LC 000035)  Article 7.3.7 of the General Conditions provides that changes to the Contract work that result in a net decrease in the Contract sum shall be "actual net cost," excluding overhead and profit. (LC 1, p. LC 000040)

127.   Pursuant to Article 4 of the General Conditions, when the AUA deleted these items of work from the Contract, it should have issued change orders reducing the Contract sum by the amount included in the Bill of Quantities for these items, but still compensate Leeward for its overhead and profit. (LC 1, p. LC 000033, p. LC 000039, p. LC 000117)  The AUA breached the Contract because neither the AUA nor the Architect issued change orders for these reductions in the scope of the work that reduced the Contract price.  Further, the AUA did not pay Leeward overhead and profit on this deleted work removed from the Contract and put up for competitive bid.

128.   In addition to overhead and profit on work deleted from the Contract's scope, Leeward is also entitled to be fully compensated for extra work performed under the Contract that should have resulted in change orders increasing the Contract sum had the AUA and its Architect upheld the Contract's terms.   In all, Leeward performed US $594,146.28/EC $1,604,066.62 in "change order" work under the Contract, most of which was paid for by the AUA.  However, Leeward was not paid for hurricane safety measures; works carried out to shut down and secure the site on October 23-24, 2008; customs storage changes; election day close down costs; Labour Day close down costs; Whit Monday close down costs, and other adverse weather costs in the total amount of US $67,350.93/EC $181,847.52. (Green Witness Statement, ¶51; Winwood Witness Statement, ¶21; AUA 30, pp. AUA 000297-AUA 000308)

129.   Leeward was also entitled to be compensated for the entire amount of

preliminaries it incurred while constructing the Project. There is no basis in Antigua Law or under the Contract for the AUA to adjust the preliminaries prices. Yet, throughout the Project the AUA routinely forced Leeward to accept reductions in its preliminaries costs, including arbitrary reductions in the preliminaries rates. Had the AUA paid the preliminaries as incurred (US $2,182,344.08/EC $5,891,857.68), Leeward would have been paid US $735,507.61/EC $1,985,711.68 more than the originally projected amount for preliminaries and site set up costs as provided for in the Bill of Quantities (US $1,446,836.48/EC $3,906,146.00). (LC 1, p. LC000073; AUA 30, pp. AUA 000260-AUA 000261) Paying Leeward the full amount of preliminaries incurred on the Project also adjusts the Project's costs to account for the delays Leeward experienced on the Project because the preliminaries were actual on-site costs that were being incurred on a week-to-week basis.

130. As a result of the AUA's breach of the Contract, Leeward is entitled to general damages in the amount of US $1,847,627.88/EC $4,988,196.21 as follows:

| | | |
|---|---|---|
| Original Contract Sum | EC $27,436,824.00 | US $10,162,599.61 |
| Deleted Work | EC $ 3,667,711.00 | US $ 1,358,520.15 |
| Overhead and Profit (18%) on Deleted Work | EC $ 559,481.40 | US $ 207,231.91 |
| Revised Contract Sum | EC $24,328,594.40 | US $ 9,011,311.37 |
| Extra Work Under Contract | EC $ 1,604,066.62 | US $ 594,146.28 |
| Additional Preliminaries/General Conditions | EC $ 1,985,711.68 | US $ 735,507.61 |
| Total | EC $27,918,372.70 | US $10,340,965.25 |
| Payments Received | EC $22,930,176.49 | US $ 8,493,337.37 |
| TOTAL: | EC $ 4,988,196.21 | US $ 1,847,627.88 |

131. The AUA has argued that the Collections Page included with the Interim Final Payment (AUA 22, p. AUA 002855) is an accurate accounting of what the AUA paid for each category listed therein. If the Tribunal accepts the AUA's contention then, Leeward is entitled to general damages in the amount of US $1,466,057.15/EC $3,958,037.67. The only difference

25

A304

between this damages calculation and the one in Paragraph 130 above is that the preliminaries are calculated by deducting what the AUA claims it paid for preliminaries on the Collections Page (US $1,828,406.85/EC $4,936,303.60) (AUA 22, p. AUA 002855) from the total amount of preliminaries Leeward calculated for the Project (US $2,182,344.08/EC $5,891,857.68) (AUA 30, pp. AUA 000260-AUA 000261) as follows:

| Original Contract Sum | EC $27,436,824.00 | US $10,162,599.61 |
| Deleted Work | EC $ 3,667,711.00 | US $ 1,358,520.15 |
| Overhead and Profit (18%) on Deleted Work | EC $   559,481.40 | US $   207,231.91 |
| Revised Contract Sum | EC $24,328,594.40 | US $ 9,011,311.37 |
| Extra Work Under Contract | EC $ 1,604,066.62 | US $   594,146.28 |
| Additional Preliminaries/General Conditions | EC $   955,554.08 | US $   353,937.23 |
| Total | EC $26,888,215.10 | US $ 9,959,394.87 |
| Payments Received | EC $22,930,176.49 | US $ 8,493,337.37 |
| TOTAL: | EC $ 3,958,038.61 | US $ 1,466,057.50 |

132.   In addition to the work that was deleted from the Contract's scope and put out for competitive bidding, there was also work included in the Contract's scope that was not performed.  As with the deleted work, a change order was never issued removing the omitted work from the scope of the Contract.

133.   In the event that the Tribunal concludes that Leeward is not entitled to payment for this omitted work, Leeward is still entitled to be paid its overhead and profit on this omitted work pursuant to Article 7.3.7 of the General Conditions. (LC 1, p. LC 000040)  As such, Leeward would be entitled to general damages in the amount of US $962,370.95/EC $2,598,193.71 as follows:

| Original Contract Sum | EC $27,436,824.00 | US $10,162,599.61 |
| Omitted and Deleted Work | EC $ 5,272,328.00 | US $ 1,952,870.29 |
| Overhead and Profit (18%) on Omitted and Deleted Work | EC $   804,253.50 | US $   297,895.50 |
| Revised Contract Sum | EC $22,968,749.50 | US $ 8,507,624.82 |

| | | | |
|---|---|---|---|
| Extra Work Under Contract | EC $ 1,604,066.62 | US $ | 594,146.28 |
| Additional Preliminaries/General Conditions | EC $ 955,554.08 | US $ | 353,937.23 |
| Total | EC $25,528,370.20 | US $ 9,455,708.33 | |
| Payments Received | EC $22,930,176.49 | US $ 8,493,337.37 | |
| TOTAL: | EC $ 2,598,193.71 | US $ | 962,370.95 |

**(ii).   Additional Works Contracts**

134.   Throughout the course of the Project, Leeward was awarded additional works contracts for work that was deleted from the Contract's scope as well as additional works required for the Project. This work arose out of and relates to the Contract work on the Project. (Dickinson Witness Statement, ¶¶78-90; LC 228-241)

135.   In Section 4.6.1 of the General Conditions to the Contract, the parties agreed to submit to arbitration "[a]ny Claim arising out of or related to the Contract..." The contracts for the additional works arise out of and relate to the contract containing the arbitration clause, in that the additional works were initially part of the original contract, including design documents, specifications, and project schedule, that the AUA subsequently removed from that contract and gave back to Leeward under separate contracts. (LC 1, p. LC 000036)

136.   The total amount of additional works contracts was US $574,494.14/EC $1,551,134.19. To date, the AUA has paid US $499,809.15/EC $1,349,376.76 on the additional works contracts leaving a balance due and owing of US $74,730.95/EC $201,757.43. (Green Witness Statement, ¶51, LC 228-241, AUA 52-54)

**c.   Interest**

137.   Article 7.2 of the Contract provides "[p]ayments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence there of, at the legal rate prevailing from time to time at the place where the Project is

27

**A306**

located." (LC 1, p. LC 000009)

138.   Article 13.6.1 of the General Conditions similarly provides that "[p]ayments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located." (LC 1, p. LC 000052)

139.   The Parties did not agree to an interest rate on "payments due and unpaid" and therefore, Leeward respectfully requests the Tribunal to assess interest at the legal rate prevailing from time to time in Antigua on both (a) the payments the AUA made to Leeward after the due date set forth in Article 5.1.3 of the Contract (22nd day of the month if payment requisition received by the seventh day of the month or within fifteen days if received thereafter); and (b) the unpaid balance due under the Contract from the AUA to Leeward as the Tribunal may determine.

140.   Antigua does not have a "legal rate of interest" such as the maximum rate of interest that may be legally charged on a loan or a statutory rate of interest that applies to breach of contract claims prior to the entry of judgment. *Compare* New York General Obligations Law §5-501(1) (maximum legal rate of interest upon a loan or forbearance cannot exceed six per centum per annum or the rate prescribed in New York Banking Law §14-a); New York Civil Practice Law and Rules §§5001, 5004 (interest in an action for breach of contract shall be nine per centum per annum running from the earliest ascertainable date that the cause of action existed).

141.   Instead, the courts in Antigua have opined that prejudgment interest in commercial cases is the rate at which the "Plaintiff would have had to borrow the money to supply the place of that which was withheld." *Roxanne Frederich, as Administratrix of Steve*

*Fraser v. Richard Lam*, Antigua and Barbuda Suit No. ANUHCV 2008/0322, Eastern Caribbean

Supreme Court in the High Court of Justice (Civil) (2010), ¶45 n.33 (*quoting Tate & Lyle Food*

*and Distributor v G.L.C.* [1981] 3 All ER 716, 722 (Queen's Bench Division). (A copy of each

case is submitted herewith in Appendix B.)

142.   As the Court explained in *Tate & Lyle*:

> I do not think the modern law is that interest is awarded against the
> defendant as a punitive measure for having kept the plaintiff out of
> his money. I think that principle now recognized is that it is all
> part of the attempt to achieve *restitutio in integrum.* One looks,
> therefore, not to the profit which the defendant wrongfully made
> out of the money he withheld (this would indeed involve a scrutiny
> of the defendant's financial position) but at the cost to the plaintiff
> of being deprived of the money which he should have had. I feel
> satisfied that in commercial cases the interest is intended to reflect
> the rate at which the plaintiff would have had to borrow money to
> supply the place of that which was withheld. I am also satisfied
> that one should not look at the special position in which the
> plaintiff may have been; one should disregard, for instance, the fact
> that a particular plaintiff, because of his personal situation, could
> only borrow money at a very high rate or, on the other hand, was
> able to borrow at specially favorable rates. The correct thing to do
> is to take the rate at which plaintiffs in general could borrow
> money.

(3 All ER at 722) (Appendix B)

143.   Based upon information widely available on the internet, the commercial bank

prime lending rate in Antigua was 10.43 percent on December 31, 2008; 10.07 percent on

December 31, 2009; 11.025 percent on December 31, 2010; and 10 percent on December 31,

2011.   *See* http://www.exxun.com/afd_hy/AntiguaandBarbuda/ec_commercial_bank_rate.html

and http://www.cia.gov/library/publications/the-world-factbook/fileds/2208.html. (A copy of the

web pages is included herewith in Appendix B.) For purposes of simplicity, Leeward will accept

ten (10) percent per annum as the legal rate of interest prevailing from time to time in Antigua.

144.   Leeward is entitled to interest on the requisitions that the AUA paid late at 10%

per annum running form the 22nd of the month until the date that AUA made the payment as set

forth in the following summary:

| Application | Date Submitted | Amount Requested | Due Date | Amount Paid | Date Paid | Days Late | Interest |
|---|---|---|---|---|---|---|---|
| Application No. 1 | 04/18/08 | EC $375,681.18 | 05/03/08 | EC $333,833.67 | 04/24/08 | 0 | |
| Application No. 2 | 05/14/08 | EC $669,343.00 | 05/29/08 | EC $435,986.79 Two Payments: EC $234,601.98 EC $201,384.81 | 05/30/08 06/02/08 | 1 3 | EC $64.27 EC $165.51 |
| Application No. 3 | 05/16/08 | EC $279,181.26 | 05/13/08 | EC $244,630.15 | 06/09/08 | 9 | EC $603.18 |
| Application No. 4 | 05/23/08 | EC $231,368.72 | 06/07/08 | EC $243,906.02 | 06/09/08 | 2 | EC $133.64 |
| Application No. 5 | 06/04/08 | EC $264,084.00 | 06/22/08 | EC $310,132.65 | 06/20/08 | 0 | |
| Mobilization | 06/04/08 | EC $806,460.00 | 06/22/08 | EC $806,460.00 | 06/19/08 | 0 | |
| Application No. 7 | 07/11/08 | EC $1,510,675.16 | 07/26/08 | EC $1,176,211.22 | 07/30/08 | 4 | EC $1,289.00 |
| Mobilization Scaffolding | 07/29/08 | EC $222,000.00 | 08/13/08 | EC $150,000.00 | 08/01/08 | 0 | |
| Application No. 8 | 08/01/08 | EC $950,206.36 | 08/22/08 | EC $467,440.11 | 08/27/08 | 5 | EC $640.35 |
| Application No. 10 | 09/05/08 | EC $490,837.00 | 09/22/08 | EC $264,299.89 Two Payments: EC $90,333.02 EC $173,996.87 | 10/01/08 10/08/08 | 9 16 | EC $222.75 EC $762.72 |
| Application No. 11 | 10/03/08 | EC $1,626,059.69 | 10/02/08 | EC $958,531.17 | 11/04/08 | 13 | EC $3,413.93 |
| Mobilization | 10/01/08 | 12% of contract sum less prior mobilization advances. | 10/22/08 | EC $1,000,000.00 | 11/06/08 | 35 | EC $9588.95 |
| Application No. 12 | 10/31/08 | EC $1,146,958.07 | 11/22/08 | EC $718,588.47 | 11/20/08 | 0 | |
| Application No. 13 | 11/05/08 | EC $1,538,676.60 | 11/22/08 | EC $774,718.48 | 12/23/08 | 31 | EC $6,579.75 |
| Mobilization | 10/01/08 | 12% of contract | 10/02/08 | EC | 12/22/08 | 81 | EC |

30

**A309**

| | | sum less advances already issued. | 8 | $1,335,900.48 | 8 | | $29,646.00 |
|---|---|---|---|---|---|---|---|
| Application No. 14 | 01/08/09 | EC $924,817.42 | 01/23/09 | EC $635,009.83 | 01/23/09 | 0 | |
| Application No. 15 | 12/31/08 | EC $1,655,020.79 | 02/22/09 | EC $1,538,143.25 | 02/26/09 | 4 | EC $1,685.64 |
| Application No. 16 | 03/02/09 | EC $3,615,080.71 | 03/22/09 | EC $2,737,012.49 | 03/24/09 | 2 | EC $1,499.74 |
| Application No. 17 | 04/02/09 | EC $3,638,851.41 | 04/22/09 | EC $2,768,550.39 | 04/22/09 | 0 | |
| Application No. 18 | 05/02/09 | EC $2,243,550.10 | 05/22/09 | EC $1,309.404.75 | 05/26/09 | 4 | EC $1,434.96 |
| Application No. 19 | 06/01/09 | EC $2,478,272.93 | 06/22/09 | EC $1,393,869.68 | 06/23/09 | 1 | EC $381.88 |
| Application No. 20 | 07/03/09 | EC $2,765,603.84 | 07/22/09 | EC $1,270,603.57 | 07/21/09 | 0 | |
| Advance | 07/10/09 | EC $1,000,000.00 | 07/25/09 | EC $500,000.00 | 07/20/09 | 0 | |
| Application No. 21 | 07/31/09 | EC $2,765,603.84 | 08/22/09 | EC $840,947.85 | 08/21/09 | 0 | |
| Payment No. 25 | | | 08/22/09 | EC $553,888.27 | 09/23/09 | 32 | EC $4,856.00 |
| Payment No. 26 | | | 08/22/09 | EC $57,244.40 | 10/01/09 | 40 | EC $627.20 |
| Interim Final Payment | 10/09/09 | EC $1,322,022.79 | 10/22/09 | EC $104,862.91 | 10/27/09 | 5 | EC $143.65 |
| **TOTAL** | | | | | | | **EC $63,739.12/ US $23,608.97** |

145.   In addition, Leeward is entitled to interest at the rate of 10% per annum on the unpaid contract balance, as the Tribunal may determine, running from no later than October 23, 2009 (fifteen days after the submission of the Draft Final Account) (AUA 30) until the date of payment, as provided in Article 5.1.3 of the Contract (LC 1, p. LC 000007).

a.   If the Tribunal determines that Leeward is entitled to general damages as provided in Paragraph 130, *supra*, in the amount of US $1,847,627.88/EC $4,988,196.21, then Leeward

31

would be entitled to interest through May 31, 2012, in the amount of US \$508,097.66/EC \$1,371,753.94 with a per diem rate thereafter of US \$506.20/EC \$1,366.63.

b. If the Tribunal determines that Leeward is entitled to general damages as provided in Paragraph 131, *supra*, then Leeward would be entitled to interest through May 31, 2012, in the amount of US \$403,165.83/EC \$1,088,460.66 with a per diem rate thereafter of US \$401.66/EC \$1,084.39.

c. If the Tribunal determines that Leeward is entitled to general damages as provided in Paragraph 133, *supra*, then Leeward would be entitled to interest through May 31, 2012, in the amount of US \$264,652.00/EC \$714,503.23 with a per diem rate thereafter of US \$263.66/EC \$711.83.

**d.    Attorney's Fees and Arbitration Fees, Expenses, and Compensation**

146.    Construction Industry Rule R-45(c) states that the arbitrator, in the final award, "shall assess fees, expenses, and compensation as provided in Sections R-52, R-53, and R-54." R-45(c) further provides that the "arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines in appropriate."

147.    R-45(d)(ii) states that the arbitrator may include attorney's fees in the final award "if all parties have requested such an award or if it is authorized by law or their arbitration agreement."

148.    The Arbitration Agreement (LC 1, p. LC000036) does not provide for an award of attorney's fees. Leeward, however, requested the Tribunal, in paragraph 35 of its Amended Demand for Arbitration, to include attorney's fees in the award; and while the AUA alleges in paragraphs 144-146 of its Answering Statement and Counterclaim that Leeward is not entitled to an award of legal fees, the AUA itself requests legal fees in Paragraph 152 of its Answer

Statement to the extent the Tribunal decides to award attorney's fees to the prevailing party. Thus, while the Arbitration Agreement does not authorize an award of attorney's fees, both parties have requested attorney's fees in their respective pleadings.

149.   In addition, under the Eastern Caribbean Supreme Court Civil Procedure Rules that apply to all member states/territories in the The Organisation of Eastern Caribbean States, of which Antigua is a member, *see* http://www.oecs.org/about-the-oecs/member-states/antigua-and-barbuda, a court in Antigua is required to assess "prescribed costs" in an action between corporate entities in accordance with Part 65.5 of the Rules in accordance with the sliding scale set forth in Appendix B of Part 65 as follows:

**"APPENDIX B**
**Scale of prescribed costs**

| Column I | Column 2 | Column 3 |
|---|---|---|
| | Value of Claim | Percentage |
| (1) | Not exceeding $100,000 | 15% |
| (2) | Exceeding 100,000 but not exceeding $250,000 | 12.5% |
| (3) | Exceeding 250,000 but not exceeding 500,000 | 10% |
| (4) | Exceeding 500,000 but not exceeding $1,000,000 | 7% |
| (5) | Exceeding 1,000,000 but not exceeding $2,500,000 | 3% |
| (6) | Exceeding 2,500,000 | 0.5% |

Note: The costs for each stage of the scale are cumulative

| (Example | Claim for | $750,000 |
|---|---|---|
| First | $100,000 | $ 15,000 |
| Next | $150,000 | $ 18,750 |
| Next | $250,000 | $25,000 |
| Last | $250,000 | $17,500 |
| Total | $76,250)"; and | |

(Eastern Caribbean SC Civ. Pro.(2000) Rules, Rule 65.5; Eastern Caribbean Supreme Court Civil Procedure (Amendment) Rules 2011, Appendix B to Part 65) (A copy of Rule 65.5 and

33

Appendix B to Part 65, as amended, is submitted herewith in Appendix C.)

150.  Should the Tribunal issue an award in Leeward's favor, Leeward respectfully requests the award to assess the AUA 100% of the arbitration fees, expenses, and compensation as provided in R-45(c), and Leeward's legal fees and expenses as provided in R-45(d)(ii).

151.  An assessment of arbitration fees, expenses and compensation as well as attorney's fees is particularly appropriate in the present case given the undisputed fact that Leeward had to commence this arbitration to recover contract retainage and an overpayment of ABST totaling US $249,309.94/EC $673,083.00, even though the AUA admitted owing Leeward that amount in its opening statement at the hearing.  In addition, Leeward had to defend against the AUA's counterclaim for actual delay damages in the amount of US $371,955.31/EC $1,004,199.00, which the AUA withdrew by email dated April 12, 2012,[2] even though Leeward requested the AUA in December, 2011, to withdraw the Counterclaim because it sought consequential damages in violation of General Conditions Section 4.3.10 (LC 1, p. 000035), but the AUA refused.  Indeed, as a result of the AUA's refusal to withdraw the counterclaim Leeward expended (a) legal fees and expenses on a motion to strike the Counterclaim; (b) legal fees and expenses preparing for and addressing the Counterclaim during the evidentiary hearing; and (c) legal fees and expenses addressing the Counterclaim in its Proposed Findings of Fact and Conclusions of Law prior to the AUA's withdrawal of the Counterclaim on April 12, 2012.  In addition, while Leeward was content to proceed before a single arbitrator in an effort to reduce the cost of arbitration, the AUA insisted, under Construction Industry Rule L-3(a), on a panel of three arbitrators despite the significant increase in cost.

---

[2] Under Construction Industry Rule R-50, the AUA does not have the unilateral right to withdraw its Counterclaim without Leeward's or the Tribunal's consent.  Although Leeward does not object to the withdrawal of the Counterclaim, with prejudice, the withdrawal of the Counterclaim should have no impact on Leeward's request for arbitration costs, expenses, and corporate legal fees and expenses.

152.    In the event the Tribunal issues and award in Leeward's favor, Leeward respectfully requests an opportunity to submit proof of actual legal fees and expenses as opposed to use of the sliding scale under Antiguan Law.

153.    In the alternative, Leeward consents to the determination of legal fees and expenses using the sliding scale for "prescribed costs" as provided in Appendix B to Part 65 of the Eastern Caribbean Supreme Court Civil Procedure (Amendment) Rules 2011, as set forth in ¶149 herein.

e.    **Expert Testimony**

154.    Leeward has moved to strike the witness statement of AUA's Peter McLeod to the extent it constitutes an expert testimony in contravention of the AUA's representation to the Tribunal during a telephone conference on December 15, 2011 that it did not foresee the use of expert witness testimony at the hearing.

155.    Specifically, Leeward objects to Mr. McLeod's witness statement because he gives opinions based upon his experiences in the construction industry as a professional quantities surveyor and project manager, as opposed to facts that are based upon his personal observations during his limited involvement with the Project form the Spring of 2008 through September 28, 2008, with respect to the drafting of the letters of intent and negotiation and drafting of the Contract, which the parties signed on September 25, 2008.

156.    If this dispute had been venued in a United States District Court, then the Federal Rules of Evidence would have limited Mr. McLeod's testimony to those matters that are based upon his "personal knowledge," *See* F.R.E. 602, or lay opinions based upon matters that he personally saw, heard, touched, or sensed, *See* F.R.E. 701.  Indeed, under Federal Rule of

35

A314

Evidence 701, a lay witness may only give an opinion that if it is rationally based on what the witness has personally observed, helpful to clearly understanding the witnesses testimony, and not based upon scientific, technical, or specialized knowledge that would otherwise constitute expert testimony or opinion under Federal Rule of Evidence 702. *See* F.R.E. Rule 701; F.R.E. Rule 702; *United States v. Garcia*, 413 F.3d 201, 211-215 (2nd Cir. 2005). (A copy of the cited authorities is submitted herewith in Appendix D.)

157. Moreover, under Antiguan Law, testimony is limited to facts within the personal knowledge of the witness and a party may not offer opinion testimony without the prior permission of the Tribunal. (Eastern Caribbean SC Civ. Pro.(2000) Rules, Rule 32.6(1)) (Appendix D)

158. If Mr. McLeod had limited his testimony to what he observed, heard, read, stated or personally did or did not do between the Spring of 2008 and September 2008 concerning the Project, then Leeward would not be objecting to Mr. McLeod's witness statement. The problem is that Mr. McLeod goes well beyond mere factual testimony as to his involvement with the Project.

159. Beginning with ¶23 of Mr. McLeod's witness statement, Mr. McLeod repeatedly gives opinions based upon his experiences in the construction industry, rather than what he observed or did on the project. For example, although Mr. McLeod was not involved with the review or processing Leeward's monthly requisitions after the parties signed the contract documents on September 25, 2008, he gives an opinion as to the "monthly true-up of additions and deductions to the contract sum" in lieu of the use of change orders as required under the contract, and opines that adhering to the change order requirements in the very contract that he drafted is "often impractical, and thus it is not uncommon for parties to disregard such

formalities in favor of more informal means for communicating and effectuating changes." Similarly, at the end of ¶24 and in ¶29, he gives an opinion as to the effectiveness of the "monthly true-up" to adjust the contract price as opposed to the use of the contractually required change orders.

160.    In ¶25 of his witness statement, Mr. McLeod gives several opinions and draws conclusions based upon his review of the "draft final account" that Leeward submitted in October, 2009, more than a year after Mr. McLeod left the project, as well as his review of Mr. Dickinson's witness statement and the allegations in the AUA's Answering Statement, as opposed to Mr. McLeod's personal knowledge of the facts. Again, in ¶28 of his statement, he gives an opinion and draws conclusions based upon his review of Leeward's "draft final account" even though he had nothing whatsoever to do with the preparation or approval of that document or any of Leeward's monthly requisitions subsequent to the signing of the contract.

161.    Lastly, the fact that the AUA bought Mr. McLeod's testimony at a cost of $220.00/hr is further evidence that Mr. McLeod testified as an expert witness, rather than a fact witness.  Although Leeward concedes that a party may compensate a fact witness for actual expenses and reasonable compensation for loss of time (i.e. the witness' lost wages), the AUA has apparently compensated Mr. McLeod for his expenses and time at the rate that Mr. McLeod's employer charges its customers for Mr. McLeod's knowledge and expertise. (McLeod's witness statement, ¶14; McLeod Testimony, March 3, 2012)

### SUMMARY

162.    Upon the evidence submitted at the evidentiary hearing, Leeward respectfully requests that the Tribunal award it damages in this matter as follows:

| Original Contract Sum | EC $27,436,824.00 | US $10,162,599.61 |
| Deleted Work | EC $ 3,667,711.00 | US $ 1,358,520.15 |
| Overhead and Profit (18%) on Deleted Work | EC $    559,481.40 | US $    207,231.91 |
| Revised Contract Sum | EC $24,328,594.40 | US $ 9,011,311.37 |
| Extra Work Under Contract | EC $ 1,604,066.62 | US $    594,146.28 |
| Additional Preliminaries/General Conditions | EC $ 1,985,711.68 | US $    735,507.61 |
| Total | EC $27,918,372.70 | US $10,340,965.25 |
| Payments Received | EC $22,930,176.49 | US $ 8,493,337.37 |
| TOTAL: | EC $ 4,988,196.21 | US $ 1,847,627.88 |
| **Additional Monies Due** | | |
| Interest on balance due for 2 years, 9 months at 10%/yr through May 31, 2012. | EC $ 1,371,753.94 | US $    508,097.66 |
| ABST Error | EC $    83,000.00 | US $    30,743.20 |
| Interest on Late Payments | EC $    63,739.12 | US $    23,608.97 |
| SUBTOTAL: | EC $ 6,506,689.27 | US $ 2,410,077.71 |
| Monies due on Additional Works Contracts | EC $    201,757.43 | US $    74,730.95 |
| TOTAL: | EC $ 6,708,446.70 | US $ 2,484,808.66 |

163.   If the Tribunal determines that Leeward is entitled to damages as specified in Paragraph 131, *supra*, then Leeward respectfully requests that the Tribunal award it damages in this matter as follows:

| Original Contract Sum | EC $27,436,824.00 | US $10,162,599.61 |
| Deleted Work | EC $ 3,667,711.00 | US $ 1,358,520.15 |
| Overhead and Profit (18%) on Deleted Work | EC $    559,481.40 | US $    207,231.91 |
| Revised Contract Sum | EC $24,328,594.40 | US $ 9,011,311.37 |
| Extra Work Under Contract | EC $ 1,604,066.62 | US $    594,146.28 |
| Additional Preliminaries/General Conditions | EC $    955,554.08 | US $    353,937.23 |
| Total | EC $26,888,215.10 | US $ 9,959,394.87 |
| Payments Received | EC $22,930,176.49 | US $ 8,493,337.37 |
| TOTAL: | EC $ 3,958,038.61 | US $ 1,466,057.50 |
| **Additional Monies Due** | | |
| Interest on balance due for 2 years, 9 months at 10%/yr. through May 31, 2012. | EC $ 1,088,460.66 | US $    403,165.83 |
| ABST Error | EC $    83,000.00 | US $    30,743.20 |
| Interest on Late Payments | EC $    63,739.12 | US $    23,608.97 |
| SUBTOTAL: | EC $ 5,193,238.39 | US $ 1,923,575.50 |
| Monies due on Additional Works Contracts | EC $    201,757.43 | US $    74,730.95 |
| TOTAL: | EC $ 5,394,995.82 | US $ 1,998,306.45 |

164.   If the Tribunal determines that Leeward is entitled to damages as specified in Paragraph 133, *supra*, then Leeward respectfully requests that the Tribunal award it damages in this matter as follows:

| | | |
|---|---|---|
| Original Contract Sum | EC $27,436,824.00 | US $10,162,599.61 |
| Omitted and Deleted Work | EC $ 5,272,328.00 | US $ 1,952,870.29 |
| Overhead and Profit (18%) on Omitted and Deleted Work | EC $    804,253.50 | US $    297,895.50 |
| Revised Contract Sum | EC $22,968,749.50 | US $ 8,507,624.82 |
| Extra Work Under Contract | EC $ 1,604,066.62 | US $    594,146.28 |
| Additional Preliminaries/General Conditions | EC $    955,554.08 | US $    353,937.23 |
| Total | EC $25,528,370.20 | US $ 9,455,708.33 |
| Payments Received | EC $22,930,176.49 | US $ 8,493,337.37 |
| TOTAL: | EC $ 2,598,193.71 | US $    962,370.95 |
| **Additional Monies Due** | | |
| Interest on balance due for 2 years, 9 months at 10%/yr. through May 31, 2012. | EC $    714,503.23 | US $    264,652.00 |
| ABST Error | EC $    83,000.00 | US $    30,743.20 |
| Interest on Late Payments | EC $    63,739.12 | US $    23,608.97 |
| SUBTOTAL: | EC $ 3,459,436.06 | US $ 1,281,375.12 |
| Monies due on Additional Works Contracts | EC $    201,757.43 | US $    74,730.95 |
| TOTAL: | EC $ 3,661,193.49 | US $ 1,356,106.07 |

Dated:  April 20, 2012

**LEWIS & GREER, P.C.**
510 Haight Avenue, Suite 202
Poughkeepsie, New York 12603
*Counsel for Claimant,*
*Leeward Construction Company, Ltd.*

By:   J. Scott Greer, Esq.

39

# EXHIBIT F

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES

| | |
|---|---|
| LEEWARD CONSTRUCTION COMPANY, Ltd. <br><br> Claimant, <br><br> v. <br><br> AMERICAN UNIVERSITY OF ANTIGUA COLLEGE OF MEDICINE C/O GCLR, LLC, <br><br> Respondent. | Case No. 50 110 T 00075 11 <br><br><br> **RESPONDENT'S REBUTTAL OF CLAIMANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The Respondent, American University of Antigua ("AUA"), hereby submits the following Rebuttal Submission ("Rebuttal") to the proposed Findings of Fact and Conclusions of Law submitted by Claimant Leeward Construction Co., Ltd. ("Leeward") on April 20, 2012 ("Leeward's Post-Trial Brief" or "LC Br. ").

## PRELIMINARY STATEMENT

1.     Leeward commenced this arbitration in February 2011 by submitting a laundry list of complaints and demanding EC $13,161,136.88 from AUA. Leeward did not specify the factual basis for its claims, content to rely upon its general allegations and the argument that all that was required at that early stage of the proceedings was a short statement of its claim. Even when ordered by the Tribunal to provide a more definite statement -- resulting in halving its original demand -- Leeward still avoided connecting its claims and alleged damages to the evidence.

2.     Leeward no longer has that luxury. As Claimant, Leeward bears the burden to prove each of its claims through the evidence presented to the Tribunal. It is therefore incumbent upon Leeward in its Post-Trial Brief to demonstrate that it carried this burden by

1

Case 13-1708, Document 93, 02/20/2015, 1442825, Page46 of 147

detailing the factual evidence to prove each specific claim asserted, and then connecting each claim to the damages Leeward allegedly suffered at the hands of AUA.

3.　　Leeward's Post-Trial Brief starts with the same laundry list contained in its original demand (*see* LC Br., ¶ 12), but rather than connecting record evidence (*i.e.*, specific exhibits or trial testimony) to the claims asserted and damages alleged, Leeward submits a collection of sweeping (and usually erroneous) factual allegations and legal conclusions disconnected from the actual evidence presented to the Tribunal.  Leeward barely cites to the record evidence and makes no specific reference to the live testimony taken at the hearing, even though it obtained a copy of the hearing transcript.[1]  Despite the difficulties presented by Leeward's failure to cite record evidence, AUA has identified a substantial number of Leeward's proposed findings of fact that are inconsistent with the actual evidence presented by the parties at the hearing.

4.　　By failing to cite record evidence -- *i.e.*, witness statements, oral testimony, and trial exhibits -- to support nearly all of its factual contentions, Leeward evades accountability for their accuracy.  Neither AUA nor the Tribunal can check or challenge an evidentiary citation when none is provided.  And the reason no citation is provided is that, in most instances, no credible evidence exists to support the proposed contention.

5.　　Leeward's Post-Trial Brief is not only disconnected from the evidence, but also from its own arbitration demand.  Specifically, through the March 2012 evidentiary hearing, Leeward sought to be paid in full for work it did not perform, namely the Omitted Work and the Flooring Work, asserting that it was entitled to the entire Contract Sum listed in the Contract Documents unless adjusted by change order.  This was the primary issue litigated at the hearing.

---

[1] Although Leeward refused to share the costs of preparing a stenographic record of the hearing, on March 21, 2012, Leeward advised that it was ordering a copy of the transcript from AUA's Court Reporter.

Six weeks after the hearing, Leeward has now submitted brand new claims to recover the overhead and profits it would have earned on the Omitted Work and the Flooring Work had that work been performed, even though no evidence was presented on these new claims.

6.     The above examples only scratch the surface of the fundamental flaws with Leeward's Post-Trial Brief, but reflect Leeward's practice throughout this arbitration to play fast and loose with the evidence and to use its own inaccuracy as a weapon.

7.     Leeward's evasion of detail in its Post-Trial Brief once again requires AUA to undertake the significant time and expense first to deconstruct Leeward's sweeping assertions, and then, in painstaking factual detail, to demonstrate why Leeward is not entitled to any of the money it now seeks to recover.

8.     As demonstrated in AUA's proposed Findings of Fact and Conclusions of Law ("AUA's Post-Trial Brief" or "AUA Br.") and below, the sharp knife of factual precision slices through Leeward's gauzy submission, demonstrating that Leeward has failed to satisfy its burden of proof, and that its arbitration demand should be rejected in its entirety.

I.     **THE EVIDENCE PRESENTED AT THE HEARING REFUTES LEEWARD'S POST-TRIAL SUBMISSION**

9.     As demonstrated below, the pervasive misstatements in Leeward's proposed Findings of Fact misconstrue the evidentiary record.

A.     <u>Leeward's Flawed Findings of Fact</u>

10.     The primary problem with Leeward's Post-Trial Brief is that it contains statements that are flatly contradicted by record evidence. A clear example is Leeward's continued assertion that AUA failed to pay a total of EC $181,847.52 for costs incurred by Leeward in connection with certain "extra work." LC Br., ¶¶ 80, 104 and 128. The evidence presented at the hearing confirmed that Leeward was paid $162,372.12 of this amount, with the

3

EC $19,475.40 balance attributable to Leeward's Whitsuntide Holiday claim. *See* AUA's Findings of Fact ("FOF"), ¶¶ 74-75. Leeward made no attempt to rebut AUA's evidence of payment, yet continues to press its claim that it was not paid this money.

11.     Similarly, in Paragraph 129 of its Post-Trial Brief, Leeward contends that "throughout the Project the AUA routinely forced Leeward to accept reductions in its preliminaries costs, including arbitrary reductions in the preliminaries rates." Leeward then claims it was damaged as a result. This statement has two major flaws.

12.     First, the evidence is undisputed that Leeward was not damaged by any rate reductions. Despite Leeward's having spent the good portion of one day of the hearing trying to establish that AUA wrongfully reduced contractually agreed upon preliminary rates in one of the monthly payment applications, AUA established that this dispute was resolved the very next month, and that Leeward was paid all monies at the contractually-agreed upon rates. Transcript (Antony), 4:685:15-690:16 and 5:821:6-825:10. Leeward's counsel conceded as much. Transcript (Antony), 4:696:18-698:5 and 4:700:1-5 ("Yes they got caught and they stopped doing it. But they did and they did get caught ... and I don't think there's much more to it").

13.     Second, Leeward's claim for additional preliminaries is limited to the preliminaries it claims it should have been paid for the time spent on the Project after May 14, 2009 (the date when it was supposed to achieve Substantial Completion). *See* LC ¶¶ 112-113. It is not seeking any damages for any reductions allegedly forced upon it by AUA.

14.     Leeward also misrepresents the terms of the Contract Documents in its Post-Trial Brief. For example, Leeward states that "Article 5.1.3 of the Contract requires the AUA to pay Leeward's monthly payment applications by the twenty-second day of each month for applications submitted by the seventh day of the month." LC Br., ¶ 59. Leeward omits the

4

**A323**

clause specifically added by the parties to this provision that requires the Owner to agree with the amount of the payment application before the clock begins to run on AUA's time to pay each invoice. This omission is material, as it directly impacts the due date of each payment application, and in turn, Leeward's interest claim on alleged late payments. The omission is also particularly glaring given that during contract negotiations Leeward repeatedly objected, but ultimately relented, to altering Section 5.1.3 to require Leeward to agree with AUA on the payment application before submitting it to the Architect. *See* LC 80 at LC003008.

15.     Leeward's claim for interest highlights another problem with Leeward's Post-Trial Brief -- Leeward's reliance on facts that are not supported by record evidence. In calculating its claim for interest on AUA's alleged late payments, Leeward submits a chart containing the dates AUA allegedly paid each payment application. No evidence was presented at trial to establish the payment dates. While Leeward attempted to submit the chart contained in its Post-Trial Brief as a trial exhibit (LC 245), that proposed exhibit was stricken from the record after AUA objected to its admission, and not admitted in evidence. *See* Post-Hearing Motion on Exhibits, ¶ 1(r).

16.     Finally, Leeward's Post-Trial Brief gets verifiable details wrong. For example, Leeward claims that the Contract Time was extended until May 10, 2009, when the evidence confirms it was extended until May 14, 2009. *See* AUA Ex. 67.

**B.     Leeward's Flawed Alternate Damages Calculations**

17.     Equally flawed are the various charts contained within Leeward's Post-Trial Brief setting forth Leeward's alternative damages theories. *See* LC Br., ¶¶ 162-164.

18.     Leeward's Post-Trial Brief carries forward the same top-down approach to calculating its alleged damages that Leeward employed in its Amended Demand for Arbitration and in Paragraph 51 of Andy Green's Witness Statement. Specifically, Leeward starts with the

5

original Contract Sum, adds to that all extra work allegedly performed, deducts some (but not all) of the work it did not perform, and subtracts from that total the amount it claims was paid by AUA.

19.     Leeward's top-down analysis ignores the individual components of its claim. Among other things, this results in double-counting. For example, the evidence at the hearing conclusively established that Leeward drew down the $1,000,000 Cash Allowance account entirely and was paid an additional $1,262,166.51 in contingent costs, resulting in a total payment of EC $2,262,166.51 in contingent costs. *See* FOF, ¶¶ 38-39, 76. Leeward accounted for all of these costs in the monthly payment applications it submitted as either Change Orders (*i.e.*, paid overtime) or Preliminaries (*i.e.*, additional craneage and scaffolding). FOF, ¶¶ 70-76.

20.     Leeward's top-down analysis starts with the initial EC $27,436,824 Contract Sum, which sum includes the EC $1 million Cash Allowance account. Leeward then adds to the Contact Sum the entire EC $2,262,166.51 in extra costs charged to AUA. However, because Leeward does not then deduct the EC $1 million in extra costs embedded within the Contract Sum, Leeward's damages calculation is double-counting the EC $1 million Cash Allowance. This fundamental error exists in each iteration of Leeward's damages charts. *See* LC Br., ¶¶ 130-133, 162-164.

21.     A second flaw is Leeward's treatment of the ABST error. During its opening, AUA explained its discovery of the mutual mistake that resulted in the parties crediting Leeward with having received EC $83,059.62 more than it actually had been paid. This error is embedded within Leeward's top-down analysis as one of the components of Leeward's claim for general damages because it is part of the difference between the total amount Leeward claims it should have been paid and the amount it was actually paid. *E.g.*, LC Br., ¶ 130. However, in each

6

iteration of its damages summary chart (LC Br., ¶¶ 162-164), Leeward seeks to recover the ABST error a second time by adding it as a separate line item.

22.    A third flaw with Leeward's damages charts is that each is infected with the damages sought on Leeward's new claims for overhead and profits, which are both procedurally barred and contrary to the record evidence, as demonstrated below.

## II.    LEEWARD FAILED TO SATISFY ITS BURDEN OF PROOF ON EACH ASPECT OF ITS EC $6,701,390.33 CLAIM.

23.    At the hearing, the Tribunal requested that the post-trial submissions not only address the primary issue presented at the hearing -- *i.e.*, whether Leeward was entitled to get paid for work it did not perform -- but also thoroughly explain the basis for the balance of the monies sought by Leeward.  Transcript, 3:515:21-516:21.

24.    As an initial matter, Leeward's Post-Trial Brief does not proffer any evidence adduced at the hearing to demonstrate that Leeward timely asserted each of its claims in accordance with the Contract Documents.  As set forth in AUA's Conclusions of Law ("COL") at ¶¶ 1-28, Leeward either did not initiate each of its Claims timely (*i.e.*, within the 21 day period set forth in the Contract Documents) or did not commence arbitration within a reasonable amount of time.  Having failed to satisfy these contractual preconditions to commencing this arbitration, Leeward's claims must be denied.

25.    Even if Leeward had complied with the contractual preconditions to commencing arbitration, however, its claims still must be denied.  AUA showed a chart during its opening that broke down Leeward's claim into 11 component parts.  That chart provided as follows:

| | LEEWARD'S CLAIMS | EC $6,701,390.33 |
|---|---|---|
| 1. | Omitted Work | EC $1,604,617.00 |
| 2. | Deleted Work Delta | EC $1,718,955.68 |
| 3. | Modified Work Delta | (EC $ 14,294.10) |
| 4. | Additional Preliminaries | EC $955,554.08 |
| 5. | Change Order Delta | EC $190,210.19 |
| 6. | Claims Delta (Whitsuntide) | EC $19,475.40 |
| 7. | Cash Allowance Double Count | EC $1,000,000.00 |
| 8. | Overhead & Profits | EC $350,775.96 |
| 9. | Separate Contracts | EC $202,943.00 |
| 10. | Retainage | EC $590,083.00 |
| 11 | ABST Error | EC $83,059.56 |

AUA's Post-Trial Brief demonstrated that Leeward failed to satisfy its burden of proof on each aspect of its claim. We review of each component of Leeward's EC $6,701,390.33 claim below to show that Leeward's Post-Trial Brief does not change that analysis.

### A.   Omitted Work (EC $1,604,617.00)

26.     As detailed in AUA's Post-Trial Brief, the evidence presented at the hearing conclusively established that Leeward was not entitled to be paid for work it did not perform, namely the Omitted Work and the Flooring Work. The evidence further confirmed that the absence of change orders issued in the manner provided in Section 7 of the General Conditions did not warrant awarding Leeward a windfall. This is so because witnesses proffered by both parties and contemporaneous documents confirmed that in lieu of such change orders, the parties tracked adjustments to the Contract Sum through the monthly requisition process. The absence

8

A327

of any claim to the contrary by Leeward during or immediately after the completion of the Project further confirms that Leeward understood it was not entitled to be paid for the work it did not perform. *See* FOF, ¶¶ 16-69, 77-97.

27.     Faced with this mountain of evidence against it, Leeward decided to raise a new claim for the first time in its Post-Trial Brief. Specifically, Leeward contends that if it is not entitled to be paid for work it did not perform, it should at least be awarded the overhead and profit it would have earned on that work pursuant to Section 7.3.7 of the General Conditions. Leeward attempts to sneak this new claim into one paragraph of its proposed Findings of Fact (LC Br. , ¶ 84) and one paragraph of its proposed Conclusions of Law (LC Br., ¶ 133), despite the fact that Leeward did not previously assert such a claim and no evidence was presented in support of it at the hearing. As detailed below, Leeward's claim for Overhead and Profits was, at all times, expressly limited to the Painting Work and the Doors and Windows Work. Similarly, at all times, Leeward only sought to be paid in full for the Omitted Work.

28.     Leeward's new claim for Overhead and Profits on Omitted Work is barred by the terms of the Contract. Pursuant to Section 4.3.2 of the General Conditions, "Claims" must be initiated promptly, *i.e.*, "within 21 days from the claimant knowing he's got a claim to claim for." Transcript (Winwood), 2:239:3-11. Leeward understood that if a Claim was not asserted promptly, it would be waived. Transcript (Winwood), 2:242:3-243:4.

29.     The Contract Documents further provide that any Claims asserted by Leeward must be formally served by written notice to the Architect and AUA in the manner proscribed in the Contract Documents. AUA Ex. 1 at AUA 000051 (General Conditions, § 13.3.1).

30.     While Leeward did assert a Claim to recover Overhead and Profits on the Painting Work and Doors and Windows Work that AUA deleted from the Contract, that Claim was

**A328**

expressly limited to these two areas of the Project; nothing more. *See* LC 213. Leeward did not then, and has not since, asserted a Claim to recover its Overhead and Profits on the Omitted Work (*i.e.*, the work removed from Leeward's scope of work due to design changes and/or site conditions).

31.    When Leeward submitted its Draft Final Account in October 2009 and sought 97.5% of the Contract Sum, it sought neither to paid in full for the Omitted Work nor to be paid 18% as and for its Overhead and Profits on the Omitted Work. Leeward knew then that AUA was not paying Leeward any compensation for the Omitted Work (including Overhead and Profits). *See* AUA Ex. 21 at AUA 002905 to AUA 002933. At best, Leeward had 21 days from its submission of the Draft Final Account thereafter to initiate a Claim to recover its Overhead and Profits on the Omitted Work. Leeward did not make such a Claim, and has not submitted any evidence to the contrary. Because Leeward failed to assert a Claim for Overhead and Profits on the Omitted Work within 21 days of its accrual, as required by Section 4.3.2 of the General Conditions, Leeward has waived the right to do so. *See* Transcript (Winwood), 2:242:3-243:4 ("Q: It is important to remind people to assert their claims within 21 days, because if not, Leeward might waive that claim. A. Absolutely.").

32.    The Contract Documents bar Leeward from asserting a new claim for Overhead and Profits on the Omitted Work at this late juncture for a separate reason. Section 4.6.5 of the General Conditions provides that the "party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded." AUA Ex. 1 at AUA 000037.

33.    Leeward filed this arbitration on February 3, 2011 seeking EC $13,161,136.88. Leeward's arbitration claim was vague and confusing, and the itemized list of its claims seemed

10

**A329**

to bear no resemblance to what Leeward claimed to remain at issue in Mr. Green's October 26, 2009 letter (AUA Ex. 33).

34.     On September 8, 2011, the Tribunal conducted a Preliminary Hearing.  Prior to the Preliminary Hearing, AUA requested that Leeward be required to submit a more detailed and definite statement of its claims and damages because the EC $13,161,136.88 sought by Leeward in arbitration was so inconsistent with the EC $1,071,944.88 claimed by Leeward in October 2009, and the EC $13,161,136.88 demand was neither documented nor cogently explained in Leeward's arbitration demand.  Leeward opposed this request, but the Tribunal granted AUA's request and required Leeward to submit a more particularized claim by October 14, 2011.

35.     Leeward submitted its Amended Demand on October 14, 2011.  Forced to explain the basis for its various claims, Leeward abandoned a number of them, reducing its demand from EC $13,161,136.88 to EC $6,800,572.28 as detailed in its "Revised Statement of Claim" attached to its Amended Demand.

36.     Neither the Amended Demand nor the Revised Statement of Claim attached thereto asserted a Claim for Overhead and Profits on the Omitted Work.  Rather, Leeward's Claim for Overhead and Profits was limited to the "the items of work that the AUA removed from Leeward's contract and awarded other contractors."  Amended Demand, ¶ 24.  Leeward then specifically referred to its May 12, 2009 Claim (LC 213) and the Deleted Work Summary attached to its Amended Demand as encompassing the scope of this Claim, both of which were limited to the Painting Work and the Doors and Windows Work.  *Id.*

37.     The parties then proceeded to litigate the Claims asserted in Leeward's Amended Demand for Arbitration, culminating in a five-day evidentiary hearing.  At the evidentiary hearing, Leeward submitted as an exhibit another copy of its claim summary, including the very

11

same Deleted Work Summary that it attached to its May 12, 2009 Claim and its October 14, 2011 Amended Demand. *See* LC 244. Indeed, at no time during the hearing did Leeward seek Overhead and Profits on Omitted Work and neither party submitted any evidence in support of or in defense of such a Claim. Rather, Leeward only sought to be paid the entire EC $1,604,617 in the Omitted Work that it did not perform. Were Leeward permitted to add this new claim now, AUA would be deprived of the opportunity to submit evidence in response, as it did not have a reason to do so at the hearing.

38.     Because Leeward did not include its new claim for Overhead and Profits for Omitted Work in its Demand for Arbitration or its Amended Demand for Arbitration, Section 4.6.5 precludes Leeward from doing so now.

39.     Leeward's claim for Overhead and Profits on Omitted Work is also barred under the Construction Industry Arbitration Rules of the American Arbitration Association ("CIAR") that govern this arbitration. See AUA Ex. 1 at AUA 000036 (General Conditions, § 4.6.2). Specifically, once the arbitrators are appointed, the Rules do not permit a party to submit a "new or different claim" without the arbitrator's consent. CIAR, R-6(b). Given that Leeward expressly and repeatedly limited its Overhead and Profits Claim to the Painting Work and Doors and Windows Work, there can be no dispute that Leeward's claim for Overhead and Profits on the Omitted Work, asserted for the first time in Leeward's Post-Trial Brief, is a new claim.

40.     As set forth in Leeward's Post-Trial Brief, this Tribunal was appointed "on or about June 9, 2011." LC Br., ¶ 9. Leeward never sought the Tribunal's consent to assert this new claim.

41.     Not only is Leeward's new claim for Overhead and Profits on Omitted Work barred on procedural grounds, but -- even though it was not properly presented so as to provide

12

A331

AUA with a full and fair opportunity to defend against it -- it is still refuted by the record evidence. The evidence presented at the hearing conclusively established that the parties never understood Section 7.3.7 of the General Conditions to have the meaning Leeward now urges, namely that Leeward would be entitled to recover the overhead and profits on all work that it did not perform, including work removed due to changes in design or site conditions (like the chain link fence).

42.     First, in his contemporaneous summary of the Contract Documents, Robert Winwood confirmed that Leeward was to be paid for work "as built" in accordance with the "final measure." LC 84 at LC003034. Mr. Winwood's summary did not indicate that Leeward would be entitled to overhead and profits on the difference between the original BOQ and the "final measure" if the project "as built" required less work than the original design contemplated.

43.     Second, whatever effect Section 7.3.7 might have when not combined with non-AIA forms or language, the evidence presented at the hearing confirmed that the parties combined the AIA form documents, which are primarily used in American construction projects, with a Bill of Quantities, which are primarily used in the United Kingdom and not typically used with AIA contracts. McLeod Statement, ¶ 21; Transcript (McLeod), 1:137:9-11 and 1:193:17-194:5.

44.     Both Peter McLeod and Neil Dickinson testified that the parties used the agreed-upon unit rates in the Bill of Quantities to adjust the Contract Sum upwards or downwards to account for changes in the scope of the work. Transcript (McLeod), 1:194:11-195:19; Transcript (Dickinson), 1:99:22-100:2. As Mr. McLeod explained, the BOQ was akin to a "shopping list," where the parties agreed upon the price to be paid for each specific item of work the parties contemplated being performed, and this "shopping list" gave the parties "a very fair way of

determining what you do and don't pay for" when there is a change in the scope of the work. Transcript (McLeod), 1:193:12-16 and 1:194:7-195:5. Neither testified that Leeward was entitled to overhead and profits on the work that was not performed due to changes in design or site conditions.[2]

45.     Third, at no time before Leeward submitted its Post-Trial Brief did Leeward claim it was entitled to Overhead and Profits on the EC $1,604,617 in Omitted Work. Leeward did not make any such assertion in any of its monthly payment applications, in its Draft Final Account, or in the October 26, 2009 letter. *See* AUA Ex. 21; Transcript (Dickinson), 1:101:12-18; AUA Ex. 33. Leeward did not even make such a claim when it submitted its December 17, 2010 claim for EC $13,161,136. AUA Ex. 72.

46.     By way of comparison, exactly 21 days after AUA advised Leeward it was taking away the Painting Work and Doors and Windows Work altogether, Leeward served a written Claim for overhead and profits under Section 7.3.7 detailing the precise amount sought on those specific items of deleted work. LC 213.

47.     Given that Andy Green testified that he wanted Leeward to receive "as much as it is legally entitled to be paid ... as soon as it is legally entitled to be paid" (Transcript (Green), 3:370:6-16), it is inconceivable that Leeward would have withheld seeking its Overhead and Profits on the Omitted Work had it ever believed that it was entitled to them under the Contract Documents.

48.     In sum, Leeward has failed to satisfy its burden of proof on its claim to be paid for work it did not perform, and cannot, at this late juncture, salvage 18% of this amount under the

---

[2] Leeward seeks to preclude portions of Mr. McLeod's trial testimony to the extent he offers expert, as opposed to fact, testimony. LC Br., ¶¶ 154-161. Specifically, Leeward seeks to bar Paragraphs 23, 24, 25, 28 and 29 of Mr. McLeod's Witness Statement. *Id.* AUA has cited only factual testimony by Mr. McLeod and is not relying upon any of the challenged testimony in its Post-Trial submissions. Therefore, AUA does not need to, and will not, address Leeward's arguments regarding those portions Leeward claims to be improper expert testimony.

theory that it is entitled at least to be paid its overhead and profits. Leeward is not entitled to any portion of the EC $1,604,617 in Omitted Work.

**B.     Deleted Work Delta (EC $1,718,985.68)**

49.     The Deleted Work Delta consists almost exclusively of the Flooring Work removed from the Contract by AUA. At the hearing, and at all times prior to the hearing, Leeward contended that it was entitled to be paid in full for the Flooring Work in the same manner that it claimed it was entitled to be paid in full for the Omitted Work.

50.     While Leeward agreed that the Contract Sum had been reduced by the Painting Work and Doors and Windows Work deleted from Leeward's scope of work (*see* Amended Demand, ¶ 23; Green Statement, ¶ 51), it refused to treat the Flooring Work in the same manner.

51.     In its Post-Trial Brief, Leeward for the first time admits that the Contract Sum should be reduced to account for the Flooring Work deleted from Leeward's scope of work (LC Br., ¶¶ 86 and 123), but also contends, for the first time, that it was entitled to 18% as and for its overhead and profits on the deleted Flooring Work. *See* LC Br., ¶¶ 127 and 130 (including the Flooring Work in its calculation of Overhead and Profits).

52.     As was the case, however, with Leeward's attempt to recover Overhead and Profits on the Omitted Work, its new claim for Overhead and Profits on the Flooring Work is asserted far too late, in violation of the Contract Documents (Sections 4.3.1, 4.3.2 and 4.6.5 of the General Conditions) and R-6(b) of the CIAR.

53.     Among other things, Leeward did not comply with the 21-day notice of claim provision in the Contract Documents. Leeward's Post-Trial Brief concedes that AUA removed the Flooring Work on April 21, 2009, at the same time it took away the Painting Work and Doors and Windows Work. LC Br., ¶ 36. Yet, when Leeward asserted its Claim for Overhead and Profits on May 12, 2009, the Claim was expressly limited to the Painting Work and Doors and

15

**A334**

Windows Work. LC 213. Leeward did not seek Overhead and Profits on the Flooring Work then or at any time thereafter. Given that Leeward did not previously seek to recover its overhead and profits on the Flooring Work, it cannot do so now.

54.     Leeward's new claim for overhead and profits on the Flooring Work also fails on substantive grounds. Specifically, Leeward entered into a new contract with AUA to perform the Flooring Work in July 2009. LC 229. Leeward was paid in full for that work and earned overhead and profit on the actual work it performed pursuant to this separate contract. Antony Statement, ¶ 128 and 138-139; Nagesh Statement, ¶¶ 45-47. Leeward submitted no evidence at the hearing to the contrary.

55.     In sum, given that Leeward now concedes that the Contract Sum should be reduced by at least EC $3,667,711 to account for all of the work deleted from the contract (*i.e.*, the Painting Work, the Doors and Windows Work and the Flooring Work) (LC Br., at ¶ 86), and given that Leeward's attempt to seek its Overhead and Profits on the Flooring Work is both procedurally barred and substantively wrong, Leeward is not entitled to recover any portion of the EC $1,718,955.68 Deleted Work Delta.

### C.     Modified Work Delta (- EC $14,294.10)

56.     Leeward does not address the Modified Work Delta in its Post-Trial Brief. The evidence submitted at the hearing, however, conclusively established that Leeward was only to be paid for the work it performed "as built" and in accordance with the "final measure." *See* FOF, ¶¶ 23-34. When Leeward submitted its Draft Final Account, it only sought to be paid for the Measured Works "as built." *See generally*, AUA Ex. 21. Leeward is not entitled to any damages as a result of the fact that the "as built" measurements differed from the quantities listed in the initial Bill of Quantities.

16

**A335**

**D.    Additional Preliminaries (EC $955,554.08)**

57.    In its Post Trial Brief, Leeward contends that it was entitled to be paid EC

$1,985,711.68 over and above the EC $3,906,146 in Preliminaries embedded within the original

Contract Sum as and for its delay damages. LC Br., ¶ 113. According to Leeward, this amount

compensates it for the Preliminaries incurred operating the construction site for an additional 19

weeks beyond the Contract Time. *Id.* Leeward's claim is not supported by the record evidence.

58.    First, Leeward's Post-Trial Brief is unclear as to whether it is seeking to recover

EC $1,985,711.68 or EC $955,554.08 in Additional Preliminaries. The evidence presented at the

hearing conclusively established that Leeward was paid a total of EC $4,936,303.60 in

Preliminaries, which is EC $1,030,157.60 more than the amount provided for in the original

Contract Sum. AUA Ex. 22 at AUA 002855; Antony Statement, ¶ 54. Accordingly, Leeward's

claim is for EC $955,554.08, the precise amount identified by Leeward in Andy Green's October

26, 2009 letter. AUA Ex. 33. *See* Transcript (Green), 3:415:14-419:24.

59.    Second, in order to establish its right to Additional Preliminaries, Leeward must

prove that delays allegedly caused by AUA impacted the critical path and required Leeward to

spend more time to complete its Work. *See* Transcript (Winwood), 2:281:15-17. As set forth in

AUA's Post-Trial Brief, Leeward must "present a drawing by drawing, beam by beam, column

by column, gutter by gutter factual analysis to show how a particular event had the effect of

delaying other identified work." AUA's COL ¶ 54 (citing *Walton Constr.* at [33]; *Kane Constr.*

at [675]).

60.    Leeward's Claim for Additional Preliminaries, as stated in its May 11, 2009

Claim, was limited to its contention that Leeward was deprived access to an EC $500,000 Non-

Productive Overtime account in the Contract Documents that was added to reduce the Contract

Time from 68 to 52 weeks. LC 211. *See* Dickinson Statement, ¶ 18. The evidence presented at

17

**A336**

trial conclusively established that this set aside did not exist, as AUA refused to include it in the Contract Documents despite Leeward's request during contract negotiations. FOF, ¶ 111.[3]

61.     Leeward did not submit any specific evidence at the hearing that the denial of overtime applications impacted the critical path. In the absence of such evidence, the delay claim actually asserted by Leeward must be denied.

62.     Third, Leeward's Post-Trial Brief essentially abandons its "non-Productive Overtime" claim in favor of a series of proposed factual findings regarding other alleged delay issues, none of which cite to record evidence. LC Br., ¶¶ 106-111. Among other things, Leeward contends that its performance of the Contract work was delayed by unanticipated weather conditions, design changes, delays in issuing design drawings, delays in endorsing customs documents, delays in paying mobilisation fees, and delays in purchasing materials for the doors and windows, *id.*, much of which was supported by Leeward's trial exhibits, LC 175-LC 192 (Winwood Statement, ¶ 22).

63.     The evidence submitted at trial, and in particular the admissions made by Robert Winwood during his cross-examination, established that Leeward did not submit any Claims for an extension of the Contract Time or increase in the Contract Sum on account of any of these alleged delays in accordance with Section 4.3 of the General Conditions. FOF, ¶¶ 113-116; Transcript (Winwood), 2:272:12-273:25 (LC 175-192 "are merely examples from the correspondence file that indicate design alterations or lack of information causing delay and disruption. They're not formal claims. They're not claims submitted as such."); and 2:275-23-281:22 (confirming LC 175 to 192 are not claims with a capital "C").

---

[3]  While Leeward argued that the $1,000,000 Cash Allowance account was to be used exclusively for Overtime (Dickinson Statement, ¶ 30), Leeward's Post-Trial Brief admits that other charges, such as scaffolding and craneage, were to be drawn against this account as well. LC Br., ¶ 50.

64.     Moreover, Leeward's Post-Trial Brief ignores the evidence submitted by AUA in response to each of the above delay claims (*see* Antony Statement ¶¶ 75 to 119 and Nagesh Statement, ¶¶ 24 to 44), as well as the evidence AUA presented that Leeward was to blame for any delay (FOF ¶¶ 117-119), content to rely on its conclusory contentions without record citations.  Leeward fell far short of establishing that AUA was responsible for any delay.

65.     In any event, Leeward failed to demonstrate how any of these alleged delays impacted the critical path, and if so, to what extent.  *See* COL, ¶¶ 50-60.  The absence of such evidence is fatal to Leeward's claim for delay.

**E.     Change Order Delta (EC $190,210.19)**

66.     Leeward's Post-Trial Brief contends that it performed $1,604.066.62 in "extra work."  LC Br. ¶ 79.  This amount is the sum of the extra "Change Order" Leeward claims it performed (EC $1,422,219.10) and the "Claims" Leeward contends it was entitled to recover (EC $181,847.52).  According to Leeward, it was not paid any of the $181,847.52 in Claims, consisting of "hurricane safety measures; works carried out to shut down and secure the site on October 23-24, 2008; customs storage charges; election day close down costs; Labour Day close down costs; Whit Monday close down costs; and other adverse weather costs."  LC Br., ¶¶ 80, 104 and 128.  Leeward's contention is contradicted by the evidence submitted at the hearing.

67.     First, AUA and Leeward agreed that Leeward was only entitled to EC $1,232,008.91 for "Change Orders," and not the EC $1,422,219.10 Leeward now seeks to recover.  *See* AUA Ex. 21 at AUA 002896 and AUA 002945; FOF, ¶ 75.  Leeward did not submit any evidence at the hearing that it was entitled to the EC $190,210.19 difference (the "Change Order Delta").  Having failed to do so, Leeward is not entitled to recover any portion of the Change Order Delta.

19

**A338**

68.     Second, Leeward's contention that is was not paid $181,847.52 for the "Claims" is in direct conflict with the record evidence. *See* FOF, ¶¶ 74-75. The Draft Final Account confirms that AUA paid Leeward $162,372.12 in Claims, which specifically covered the monies sought for "Hurricane Omar Site Preparation" (Item No. 17.02), "Site Shutdown" (Item No. 18.02), "Custom Storage Charges" (Item No. 47), "Election Close Down Costs" (Item No. 48), "Labour Day Close Down Costs" (Item No. 54) and "Adverse Weather" (Item No. 58). *See* AUA Ex. 21 at AUA 002896 and AUA 002935 to AUA 002945; AUA Ex. 22. The EC $19,725 difference is Leeward's Whitsuntide Holiday claim (discussed below). While Leeward still continues to contend -- but without any proof -- that it was not paid these amounts, the only one of these "Claims" identified in Andy Green's October 26, 2009 letter, sent one week after Leeward submitted the final iteration of the Draft Final Account, was the Whitsuntide Holiday claim. *See* AUA Ex. 33.

**F.     Claims Delta (Whitsuntide) (EC $19,475.40)**

69.     The evidence at trial conclusively established that AUA paid Leeward for all Claims with the exception of the Whitsuntide Holiday. Leeward's Post-Trial Brief does not separately address this Claim, other than to include it within the "Claims" AUA allegedly did not pay. Nevertheless, because Leeward failed to satisfy its burden of proof on its delay claim, not only is Leeward not entitled to charge AUA for Additional Preliminaries after May 14, 2009, so too is Leeward precluded from recovering additional costs for the June 1, 2009 Whitsuntide Holiday because it occurred after May 14, 2009.

**G.     Cash Allowance Double Count (EC $1,000,000)**

70.     One of the components of the Contract Sum is the $1,000,000 Cash Allowance account for approved changes, overtime, scaffolding, craneage and other contingent costs. AUA Ex. 1 at AUA 000113 (Specifications, Section 12000, Part 1.3A); LC Br., ¶ 50.

71.    Leeward's itemization of Preliminaries and Changes Orders included all contingent expenses that were to be drawn against the EC $1 million Cash Allowance. Antony Statement, ¶ 51. The approved extra costs totaled EC $2,262,166.51, *i.e.*, EC $1,262,166.51 more than the Cash Allowance contained within the original Contract Sum. *Id.*

72.    As stated above, in calculating its claim for damages, Leeward employs a top-down method that starts with the original Contact Sum of EC $27,436,824, and, among other things, adds to that number all the "extra work" performed and "additional preliminaries" expended.

73.    Leeward's damages calculation, therefore, includes the EC $1,000,000 Cash Allowance twice: once, as part of the Contract Sum, and a second time when Leeward adds all EC $2,262,166.51 in "extra work" to the Contract Sum. Leeward is not entitled to recover this money twice.

74.    Because Leeward did not produce any evidence at the hearing to demonstrate it was not double-counting the EC $1,000,000 Cash Allowance in its damages calculation, each iteration of Leeward's claim for damages must be reduced by EC $1,000,000.

**H.    Overhead and Profits on Painting Work and Doors and Windows Work (EC $350,775.96)**

75.    Leeward relies upon Section 7.3.7 of the General Conditions in support of its claims that it is entitled to recover its Overhead and Profits on the Painting Work and the Doors and Windows Work.

76.    Leeward's Post-Trial Brief does not address any of the defenses raised by AUA at the hearing with respect to this Claim, including the evidence that Leeward entered into a separate contract for the Doors and Windows Work, or that the removal of the Painting Work

21

**A340**

avoided Leeward's being assessed more in liquidated damages than it seeks in overhead and profits.

77.    For the reasons set forth in AUA's Post-Trial Brief, Leeward is not entitled to any award for Overhead and Profits on the Painting Work and the Doors and Windows Work.

### I.    Separate Contracts (EC $202,943)

78.    Leeward's claim to recover monies under the Separate Contracts raises two fundamental issues:  (i) whether the claims are subject to arbitration; and (ii) if so, whether Leeward is owed any money.

79.    With respect to the first issue, Leeward's Post-Trial Brief contends that all of the work performed under the Separate Contracts "arose out of and relates to the Contract work on the Project" because "the additional works were initially part of the original contract … that the AUA subsequently removed from that contract and gave back to Leeward under separate contracts." LC Br., ¶¶ 134 and 135.  Leeward does not cite to any record evidence to support this statement, nor does any such evidence exist for all but two of the Separate Contracts ("Doors and Windows" and "Tiling").

80.    In any event, whether the Separate Contracts involved work that was within the original scope of the Contract or not, the record is simply devoid of any evidence that AUA agreed to arbitrate payment disputes under the Separate Contracts.  For this reason alone, Leeward's Claims under the Separate Contracts are subject to dismissal.

81.    Moreover, even if Claims asserted under the Separate Contracts were subject to arbitration, as set forth in AUA's Post-Trial Brief, Leeward submitted no evidence at the hearing that it timely asserted a Claim for payment.  FOF ¶ 139 and COL, ¶¶ 72-76.

82.     Finally, Leeward's contention that it is still owed EC $201,757.43 under the

Separate Contracts (LC Br., ¶ 91) is contrary to the record evidence.[4]  First, the amount claimed

is wrong.  In the aggregate, the difference between the estimated amount Leeward would earn

under each contract and the amount it was paid was only EC $60,844.88.  Nagesh Statement, ¶

47; AUA Exs. 41-54; LC 228-239.  For example, Leeward claims that it was paid EC

$448,054.30 on its contract with AUA for tile work.  LC Br., ¶ 91.  However, its own document

advanced at the hearing, LC 229 at LC 003844, shows that it was paid EC $557,435.77 (by

check in the amount EC $68,332.01 made subsequent to EC $489,109.76 in payments), exactly

as AUA states (on the basis of the same document). *See* AUA Ex. 42; Nagesh Statement, ¶ 47.

Similarly, Leeward continues to assert that its Concrete Band Work contract was for EC $74,491

(LC Br., ¶ 91) when its evidence actually shows that the contract was only for $36,463.13. *See*

LC 234 at LC003889.

83.     Second, the record evidence at the hearing reflected that Leeward was to be paid

based on the work actually performed, and that Leeward was in fact paid all that it was owed

under the Separate Contracts.  Nagesh Statement, ¶ 47.  Leeward did not produce any evidence

to the contrary, including a contemporaneous demand for final payment.

84.     Thus, even if Leeward's claims under the Separate Contracts were properly before

this Tribunal, Leeward is not entitled to recover any damages.

**J.     Retainage (EC $590,083)**

85.     Leeward contends that AUA admitted it owes Leeward EC $590,083 in retainage.

LC Br., ¶ 26.  Leeward does not cite any record evidence to support this statement, nor does any

exist because Leeward misstates AUA's position with respect to the retainage.

---

[4] This amount is slightly less than the amount (EC $202,943) that Leeward claimed it was owed at the hearing. *See* Green Statement, ¶ 51.

86.     In its Opening Statement, AUA explained that it still held EC $590,083 in retainage, but that Leeward was not yet entitled to recover that money because it had not complied with its obligation to submit an affidavit due under Section 9.10.2 of the General Conditions.  Transcript (Opening), 1:70:18-71:25.  *See* COL, ¶¶ 81-83.

87.     Leeward failed to produce any evidence at the hearing that is submitted the requisite affidavit, and thus, until it does so, AUA has no obligation to turn over any of the retainage to Leeward.

### K.     ABST Error (EC $83,059.62)

88.     Leeward also contends that AUA admitted it owes Leeward EC $83,000 "due to an error in the calculation of Antigua and Barbuda Sales Tax ("ABST") on the Contract payments." LC Br., ¶ 27.  Once again, Leeward misstates the record.

89.     In its Opening Statement, AUA volunteered that the painstaking process of determining the components of Leeward's EC $6,701,390.33 claim revealed a mutual mistake in the payment applications.  Transcript (Opening), 1:72:4-73:2.  The payment applications indicated that Leeward was paid EC $83,059.62 more than it actually had been.  The arithmetic error appeared to be attributable to the parties having credited Leeward as receiving roughly $83,000 of ABST as compensation.

90.     Leeward was unaware of the mutual error, as indicated by the fact that it never sought to recover this amount until AUA pointed it out at the hearing, and the error can and should be corrected outside of the context of this arbitration because the ABST error has never been the subject of a Claim or arbitration demand.  *See* COL, ¶¶ 78-80.

*     *     *

91.     In sum, Leeward is not entitled to recover any portion of its claim for $6,701,390.33.

24

A343

## III. LEEWARD'S CLAIM FOR INTEREST IS FACTUALLY AND LEGALLY FLAWED

92.     Leeward seeks an award of interest, at a rate of 10%, for all monies it claims it should have been paid, running from October 23, 2009 (15 days after it first submitted its Draft Final Account). LC Br., ¶¶ 143-145. Further, Leeward seeks an award of interest, also at a rate of 10%, for each payment application that AUA allegedly paid late. *Id.* As set forth below, Leeward is not entitled to any interest, and even if it were, the rate would be at the judgment rate of 5%, considered to be the "legal rate" of interest in Antigua.

### A.   Interest on the Allegedly Unpaid Claims

93.     The Contract Documents call for interest if, and only if, "payments are due and unpaid." Section 7.2 of the Contract and Section 13.6.1 of the General Conditions both provide: "payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such a rate the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time [in Antigua]." AUA Ex. 1 at AUA 000052.

94.     Because AUA does not owe Leeward any money, Leeward is not entitled to an award of interest. Even if Leeward were to prevail on some portion of its claim, however, any interest awarded should be far less than Leeward contends it is entitled to receive.

95.     First, Leeward applies the wrong rate of interest. The Contract Documents call for interest at the "legal rate" prevailing in Antigua. Leeward erroneously contends that Antigua does not have a "legal rate" of interest, and seeks to recover interest at the commercial lending rate, which Leeward claims to be about 10%. LC Br., ¶ 143. In Antigua, a country governed by the Eastern Caribbean Supreme Court ("ECSC"), the "legal rate" is considered to be the judgment rate. *Benoit Leriche v. Francis Maurice*, [2008] UKPC 8, [2], [17] (Privy Council

2008, on Appeal from ECSC Ct. of App.). The judgment rate in Antigua is 5%. See Laws of Antigua and Barbuda, Ch. 227 § 7 (Interest on Judgments).

96.      In *Benoit Leriche*, an ECSC construction case in Saint Lucia, the lower Court awarded interest on the judgment at the 6% judgment rate. The appellate court granted pre-judgment interest as well, and applied the "legal rate," which it held to be the judgment rate. This case reflects that when the parties agreed to apply the "legal rate" of interest in Antigua, they were agreeing to interest at the judgment rate of 5%. Leeward, the party seeking an award of interest, has not submitted any factual evidence to the contrary.

97.      Rather, based on the incorrect premise that Antiguan law does not contain a "legal rate" of interest, Leeward contends that the Tribunal should substitute the commercial lending rate, which fluctuated around 10% during the time period at issue. LC Br., ¶¶ 141-143. Leeward relies upon a footnote in *Roxanne Frederich as Administratrix of Steve Fraser v. Richard Lam*, Antigua and Barbuda Suit No. ANUHCV 2008/0322 at [45] n.33, which suggests *in dictum* that the commercial lending rate may be the appropriate measure of pre-judgment interest where the parties have not designated a rate.

98.      That case does not apply because, here, the parties agreed that interest would be at the "legal rate," not the commercial lending rate. Had the parties wished to use the commercial lending rate, they could -- and would – have done so expressly, either by "agree[ing] in writing" or using that phrase in lieu of "legal rate" in Section 7.2 of the Contract and Section 13.6.1 of the General Conditions.

99.      Therefore, to the extent Leeward is entitled to any interest on the claims asserted in the arbitration, it should be calculated at the rate of 5%, not 10%.

26

A345

100.    Leeward's claim for interest is also flawed because it starts the clock on interest far too early by contending that it should be awarded interest "on the unpaid contract balance ... running from no later than October 23, 2009 ... until the date of payment." LC Br., ¶ 145.

101.    The only monies Leeward claimed to have been due in October 2009 are the three Claims detailed in Andy Green's October 26, 2009 Letter -- Additional Preliminaries, Overhead and Profits on the Painting Work and Doors and Windows Work, and the Whitsuntide Holiday claim -- totaling EC $1,072,093.88.  AUA Ex. 33; Transcript (Green), 3:436:10-441:22.

102.    Were the Tribunal to determine that Leeward is entitled to an award on any of these three claims, under Antiguan law it has wide discretion in determining not only the rate to apply, but whether and when to apply it. *E.g., Benoit Leriche*, at [17] (the Court found it may be appropriate to refuse to award pre-judgment interest in a construction case if "there is some reason to the contrary in the circumstances of the case."); *Quorum A/S v. Schramm (No. 2)*, [2002] 2 Lloyd's Rep. 72 at [11] (Queen's Bench Div. Comm. Ct. 2001) (where the claimant unreasonably delays in bringing his action, a tribunal may reduce the time period during which interest accrues, in accord with such delay).

103.    Here, Leeward did not commence arbitration on these three claims "as soon as possible," as it threatened it would in late 2009. *See* AUA Ex. 65.  Rather, Leeward chose to wait an additional 14 months before finally commencing arbitration on February 3, 2011.  Even then, Leeward's demand for arbitration was so vague and confusing -- in part because it inexplicably increased its claim from EC $1.072 million to EC $13.161 million -- that AUA was unable to decipher what claims Leeward sought relief upon in arbitration.  In reality, it was not until October 14, 2011, when Leeward submitted its Amended Demand for Arbitration upon

order to do so by the Tribunal, that AUA was aware Leeward was seeking payment for, among other things, the three items in Andy Green's October 26, 2009 letter.

104.    At a minimum, interest should not begin to run on any award of Additional Preliminaries, Overhead and Profits on Painting Work and Doors and Window Work or the Whitsuntide Holiday claim until February 3, 2011, given Leeward's unreasonable delay in commencing arbitration.[5] *See Quorum A/S* at [11] (the discretion to limit interest in a case of unreasonable delay may be exercised "to encourage plaintiffs to prosecute their claims with diligence, and also because such conduct may lull a defendants into a false sense of security, leading him to think the claim will not be pursued against him ... .")(citations omitted). However, because Leeward's February 3, 2011 demand was too vague to decipher, AUA submits that any interest on these claims should not begin to run until Leeward adequately defined its claims in its October 14, 2011 Amended Demand for Arbitration.

105.    As for the balance of Leeward's EC $6,701,390.33 claim, no basis exists to commence running interest as of October 23, 2009, as Leeward contends, because Leeward did not demand payment for any of the monies until December 17, 2010, at the earliest, and AUA was unable to decipher these claims until Leeward submitted its Amended Demand for Arbitration on October 14, 2011.

106.    Interest on these remaining claims (except retainage and the ABST error) should not being to run until October 14, 2011, because both the December 17, 2010 claim and the February 3, 2011 Arbitration Demand were so lacking in detail that AUA had no way to determine what Leeward claimed it was owed.  Indeed, AUA was not in a position to attempt to

---

[5] Leeward's unreasonable delay in commencing arbitration is grounds to dismiss the arbitration altogether, pursuant to Section 4.6.3 of the General Conditions. COL, ¶¶ 20-28. But if the Tribunal declines to do so, at a minimum, AUA should not have to incur interest during this period of delay.

28

A347

decode the balance of Leeward's claim until Leeward submitted its Amended Demand for Arbitration on October 14, 2011.

107.   As for retainage, Leeward is not entitled to any interest because AUA does not currently owe Leeward this money because Leeward still has failed to comply with the contractual prerequisites set forth in Section 9.10.2 of the General Conditions. COL, ¶¶ 81-83.

108.   As for the ABST error, no interest can be awarded on this small amount because Leeward never demanded payment. AUA identified the error, a product of a mutual mistake, and volunteered to reimburse Leeward this money. COL, ¶¶ 78-80.

109.   Finally, Leeward's claim for interest includes interest on the two new claims it has asserted for the first time in its Post-Trial Brief. Needless to say, Leeward is not entitled to any interest on these claims, let alone interest dating back to October 2009, as Leeward seeks to recover.

### B.   <u>Interest On Late Payments</u>

110.   Leeward also seeks interest for each day AUA allegedly delayed in making payments due under certain payment applications. LC Br., ¶ 144. Leeward bases its claim on Section 5.1.3 of the Contract. LC Br., ¶¶ 59-60, 139 and 144. According to Leeward, that provision requires AUA to pay Leeward's payment applications by the 22nd day of the month if they are submitted by the 7th day of the month. LC Br., ¶ 139. Leeward's Post-Trial Brief includes a chart purporting to show when Leeward submitted each payment application, when payment was due, and when payment was made. LC Br., ¶ 144. Leeward's interest calculations are incorrect, are based upon facts not in evidence, and conflict with record evidence.

111.   First, in the chart purporting to demonstrate Leeward's entitlement to late payment interest, Leeward asserts dates on which AUA allegedly made its payments. *See* LC Br., ¶ 144. Yet, no evidence was submitted regarding payment dates. While Leeward sought to

29

**A348**

introduce a compilation similar to the chart reproduced at Paragraph 96 of Leeward's Post-Trial Brief, that proposed exhibit (LC 245) was stricken and not admitted in evidence. *See* Joint Motion on Exhibits, ¶ 1(r). **For this reason alone, Leeward has failed to satisfy its burden of proof on its claim for interest on late payments.**

112.    Second, the same chart states incorrect "Due Dates" for these payments, rooted in the fact that Leeward set these due dates by measuring 15 days after the date Leeward first submitted each application for payment, or by setting the 22nd of the month as the due date for applications submitted before the 7th of the month. *Id.* In so doing, Leeward misapplies Section 5.1.3 of the Contract, which deviates from the AIA form provision by requiring that AUA agree to the amount of each payment application before the time begins to run on AUA's time to make payment. *See* AUA Ex. 1 at AUA 000007. *See also*, Rebuttal, ¶ 14, *supra*. It was only after AUA agreed to the payment amount that the Architect certified each application for payment. Nagesh Statement, ¶ 20. **By failing to properly apply Section 5.1.3 of the Contract, Leeward's interest claim is fundamentally flawed. Below are a few examples.**

113.    With respect to Application No. 13, Leeward seeks 31 days of interest totaling EC $6,579.75, claiming that the due date for payment was November 22, 2008 because Leeward initially submitted its payment application on November 5, 2008. *See* LC 13 at LC000804. However, the record evidence reflects that the Architect did not receive Application No. 13 until December 5, 2008 (*id.*), and the Architect did not certify it for payment until December 16, 2008. *Id.* at LC000805. Thus, the payment which AUA allegedly rendered on December 23, seven days later, was timely.

114.    Similarly, with respect to Application No. 18, Leeward seeks 4 days of interest totaling EC $1,434.96, claiming that the due date for this payment was May 22, 2009 because

Leeward initially submitted the claim on May 2, 2009. *See* LC Ex. 18 at LC001793. However, the record evidence reflects that the Architect did not receive Application No. 18 until May 5, 2009, and did not certify it for payment until May 11, 2009. *Id.* at LC001795. Thus, the payment which AUA allegedly rendered on May 26, 15 days later, was timely.

115.    Leeward commits the same error with respect to the Draft Final Account. Leeward claims that payment was rendered 5 days late, entitling it to $143.65 in interest, based on the fact that it first submitted its Draft Final Account on October 9, 2009. However, as the evidence submitted at the hearing demonstrated, Leeward resubmitted its Draft Final Account on October 19, 2009, after Leeward, AUA and the Architect made mutual revisions. *See* AUA Ex. 21; FOF, ¶¶ 77-91. Leeward claims it was paid on October 27, 2009, 8 days later. Leeward was therefore paid timely on the Draft Final Account, as well.

116.    The flaws inherent in Leeward's interest claim are exemplified in its claim for interest with respect to Application Nos. 25 and 26. Leeward all but admits that no factual basis exists for its interest claims as to these payments because the entries on Leeward's chart fail to identify what amount Leeward sought for payment and when. *See* LC Br., ¶ 144.

117.    Finally, Leeward is not entitled to interest on Mobilisation payments. Leeward seeks a total of EC $39,234.95 for two Mobilisation payments it claims were due to be paid on October 1, 2008, but were not paid until November 6, 2008 and December 22, 2008, respectively. *See* LC Br., ¶ 144.

118.    The dispute over whether AUA failed to pay Mobilisation when due was the reason why Leeward shut down the construction site in October 2008. *See* Antony Statement, ¶¶ 133-137. After agreeing to return to the job site, in November 2008 Leeward submitted a claim to recover, among other things, the costs of the shutdown and a release of the outstanding

31

A350

Mobilisation, including interest.  Leeward then sent a "Demand for Arbitration" on December 15, 2008, which included its claim to recover Mobilisation, with interest.  AUA Ex. 66.  As Leeward admits, AUA paid Leeward the remaining Mobilisation on December 22, 2009.  Thereafter, on January 13, 2009, the parties settled the disputes raised in Leeward's December 15, 2009 letter.  AUA Ex. 67.  Among other things, AUA compensated Leeward for the late Mobilisation payments as part of the settlement by agreeing to extend the time in which it would recover the advance by three months.  *See* AUA Ex. 67 at AUA 003269.  Having settled the dispute over Mobilisation in January 2009, Leeward cannot now, three years later, seek to recover interest on alleged late payments.

## IV.   AUA, NOT LEEWARD, IS ENTITLED TO RECOVER ITS COSTS

119.   The parties agree that Construction Industry Arbitration Rule R-45 permits the Tribunal to award costs in its discretion.  Without providing any concrete guidance on how the Tribunal should exercise this discretion, Leeward contends that it should be awarded 100% of its costs and fees.  LC Br., ¶ 150.  At the same time, Leeward's Post-Trial Brief is silent as to AUA's Counterclaim for fees.  As demonstrated in AUA's Post-Trial Brief, and below, this case presents the paradigm for fee-shifting, which is designed to deter Claimants, like Leeward here, from asserting and then continuing to press spurious claims in the face of irrefutable evidence that they lack merit.

120.   While Leeward cited no authority regarding the breadth or scope of the Tribunal's discretion, such guidance is widely available, and it demonstrates that AUA, not Leeward, is entitled to an award of costs.

121.   Included in the scope of the Tribunal's discretion in determining entitlement to costs is its ability to consider:

32

a.  Which party was more successful in asserting or defending against the claims at hand. Redfern at §9.93; *Rochamel Constr.Ltd. v. National Ins. Corp.*, Civ. App. No. 10 of 2003 at [8] (Ct. App. 2003); Eastern Caribbean Supreme Court Civil Procedure Rules (2000) ("ECSC Rules"), R. 64.6(1).

b.  The degree of success relative to the amount claimed. Murray L. Smith, *Costs in International Commercial Arbitration*, in American Arbitration Association Handbook on International Arbitration Practice at 313, 318 (2010).

c.  "Whether it was reasonable for a party to pursue a particular allegation or raise a particular issue[,] and whether the claimant gave reasonable notice of intention to pursue a claim." *Rochamel* at [8]; ECSC Rules, R. 64.6(6).

d.  That claimant's "claims were misconceived from the outset," that claimant "initiated the arbitral proceedings without any examination of the jurisdictional basis of its claims," and/or that claimant's "pleadings were lackadaisical and failed entirely to address the questions [at issue]." *Telenor Mobil Communications A.S. v. Republic of Hungary*, ICSID Case No. Arb/04/15, at ¶¶ 104, 107 (September 13, 2006) (cited in José Rosell, Arbitration Costs as Relief and/or Damages, Journal of International Arbitration 28(2): 115, 120 (2011)).

e.  Whether costs for only certain parts of the proceedings should be awarded. ECSC Rules, R. 64.6(3) and R. 65.5(4)(b).

122.   The point of this discretion is to discourage parties "from bringing proceedings or making allegations which are spurious, in the sense that they are unsupported by the evidence." *See Rochamel* at [10].

123.   Leeward's strategy since the inception of this arbitration has been to seek as much in damages as possible, regardless of whether the evidence supported its claims. Leeward's claims were not vetted before they were asserted, as shown by Leeward's ever-changing claims. Leeward reduced its arbitration demand from EC $13.136 million to EC $6.8 million when forced to provide a more specific statement of its Claim. Leeward reduced the claim further when it submitted its Witness Statements just before the hearing. And now, six weeks after the evidentiary hearing, Leeward decided to add two new claims not previously asserted because the

33

ones it did assert lacked merit, requiring AUA to spend more time and money to demonstrate

why Leeward's new claims are procedurally barred and substantively flawed.

124.    Leeward's conduct goes beyond a lack of the high level of due diligence called

for in international arbitration. It reflects a strategy to provide as little detail as possible about its

claims, affording it the opportunity to constantly shift gears as AUA demonstrated the flaws in

Leeward's contentions. This lack of specificity caused AUA to spend much more in defense

costs than it otherwise should have. For example, Leeward's Amended Demand for Arbitration,

while more detailed than the prior demand, by and large failed to assert the basis for Leeward's

claim. As a result, AUA had to methodically deconstruct Leeward's Amended Demand, at great

expense, to first understand, based on the limited information then provided, what Leeward was

claiming, and then respond to it. In fact, Leeward has never been willing or able to accurately

and clearly demonstrate how its multitude of claims add to EC $6.7 million, leaving it for AUA

to take on the task itself.

125.    Defending an international arbitration should not require a respondent to hit a

constantly moving target. Ultimately, this arbitration revealed that Leeward's claims are

spurious at best, and in some instances plainly frivolous. For this reason, it is AUA, not

Leeward, that should recover 100% of its fees and expenses. Leeward failed to initiate any

Claim in accordance with the Contract Documents for the vast majority of the EC $6,701,390.33

sought in this arbitration. Indeed, most of the claims now asserted were raised for the first time

14 months after Leeward completed the Project and submitted its Draft Final Account for 97.5%

of the Contract Sum. When Leeward commenced arbitration on February 3, 2011, it took what

was an EC $1.072 million dispute and increased it by a factor of thirteen, without any

34

A353

explanation or justification. AUA unnecessarily has had to incur enormous expenses defending Leeward's inflated claims.

126.    For example, AUA conclusively established that Leeward wrongfully claimed that AUA had not paid it for some $181,847.52 in Claims. Despite this evidence, Leeward continued to pursue its frivolous claim, and continues doing so to this day, perhaps hoping that if it keeps making the claim, the Tribunal will make a mistake and issue an award to which Leeward clearly is not entitled. Of course, AUA has had to continue to spend the time and money proving, time and time again, why Leeward's claim is without merit.

127.    In stark contrast with Leeward, AUA recognized that it had not carried its burden of proof on its alternative claim for actual delay damages at trial, and properly dropped it before post-hearing submissions were due. Leeward argues that AUA's withdrawal of this claim justifies awarding Leeward 100% of its fees and expenses. LC Br., ¶ 151. AUA's withdrawal of its alternative claim actually proves the opposite. The contrast between AUA's candid evaluation, and hence withdrawal, of its alternative damages claim and Leeward's attitude of "Damn the torpedoes, full speed ahead!" to the evidence -- as well as to the Tribunal and AUA -- encapsulates why this Tribunal should award AUA its fees and expenses.

128.    In sum, fee-shifting is designed to deter claimants from asserting inflated and baseless claims that require those responding to them unnecessarily to incur significant legal expense. That is precisely what Leeward did here, and precisely why this Tribunal should exercise its discretion and award AUA the lion's share of its legal fees and expenses.[6]

---

[6] Leeward suggests as an alternative to exercising discretion that it turn to Eastern Caribbean Supreme Court (ECSC) Civil Procedure Rule 65.65 (Appendix B) as a basis for making its award. Doing so would undercut the discretionary approach called for by the CIAR that govern this arbitration, and deprive AUA of obtaining an appropriate award of fees. While certain portions of the ECSC rules contain principles that assist in defining the scope of the discretion vested by the Rules, as noted above, the portion relied on by Leeward does not. Leeward asks the Tribunal to adopt a local court practice that would improperly dictate (and, in fact, nullify) the Tribunal's exercise of discretion by swapping discretion with a formula. *See* Redfern at §9.100 (stating that national court rules

35

A354

## CONCLUSION

129.    In sum, and for the reasons set forth below and in AUA's Post-Trial Brief, the

Tribunal should dismiss Leeward's Claims in their entirety, award AUA US $117,000 in

Liquidated Damages to be paid from Leeward's retainage, together with attorney's fees.

Dated:  May 4, 2012

> SILLS CUMMIS & GROSS P.C.
> 30 Rockefeller Plaza
> New York, New York 10112
> (212) 643-7000
> *Attorneys for Respondent*
>
> By: _____
>     Mark S. Olinsky
>     Jonathan S. Jemison

---

are not "compelling guidelines for the way in which a Tribunal should exercise its discretion," but that substantive law may assist in defining the scope of Tribunal discretion).  Accordingly, the Tribunal should reject Leeward's invitation to award "prescribed" costs in accord with Appendix B of the ECSC Civil Procedure Rules.

# S I L L S   C U M M I S   &   G R O S S

A PROFESSIONAL CORPORATION

The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102-5400
Tel: 973-643-7000
Fax: 973-643-6500

30 Rockefeller Plaza
New York, NY 10112
Tel: 212-643-7000
Fax: 212-643-6500

Mark S. Olinsky
Member of the Firm
Direct Dial:  (973) 643-5402
E-mail: molinsky@sillscummis.com

650 College Road East
Princeton, NJ 08540
Tel: 609-227-4600
Fax: 609-227-4646

July 10, 2012

**Via Email**

Rekha Rangachari, Esq.
International Case Manager
International Centre for Dispute Resolution,
A Division of the American Arbitration Association
1633 Broadway, 10th Floor
New York, New York 10019

Re:   *Leeward Construction Company Limited v. American University of*
*Antigua – College of Medicine, Case No. 50 110 T 00075 11*

Dear Ms. Rangachari:

This firm represents Respondent American University of Antigua ("AUA") in the above-referenced matter.  We write, pursuant to R-48 of the Construction Industry Arbitration Rules for the American Arbitration Association ("CIAR"), to request a modification of the Final Award dated June 22, 2012 to correct certain "technical and computational errors," as detailed below.

During the September 8, 2012 Initial Hearing, the Tribunal ruled that the Award in this Arbitration would be a "Reasoned Award as provided for in Rules L-6 and R-[44(a)] of the AAA."  According to Redfern, giving reasons in an arbitral award requires more than a statement that "the arbitral tribunal accepted the evidence of one party and rejected the evidence of the other … ."  *Redfern and Hunter on International Arbitration* (5th ed.), § 9.125 (excerpt attached).  AUA has conducted a diligent review of the Final Award and, bearing in mind what is typically required of a "Reasoned Award," has identified four specific errors in the Final Award issued to the Claimant Leeward Construction Co., Ltd. ("Leeward") that call for modification.

SILLS CUMMIS & GROSS
A PROFESSIONAL CORPORATION
Ms. Rangachari
July 10, 2012
Page 2

1.  **Interest on the Payments Due and Unpaid (EC $44,617.37).**

This portion of the Final Award contains a computational error. As set forth in Section VI.(A-3) and VI.(A-4), the Tribunal found that AUA failed to timely pay certain payment requisitions and awarded Leeward interest on late payments at a rate of 7% per annum. The Tribunal also found, however, that Leeward was not entitled to an award of interest with respect to the allegedly late mobilization payments because "the disputes regarding mobilization were resolved with a payment by AUA in December 22, 2009 and a settlement was reached by the parties in January 13, 2009." *See* Final Award, Section VI.(B-33). In Paragraph 144 of Leeward's April 20, 2012 Proposed Findings of Fact and Conclusion of Law, Leeward claimed it was entitled to interest in the amount of EC $63,739.12 for all late payments. Leeward's claim included interest on mobilization (EC $39,234.95)[1] and was calculated at a rate of 10% per annum. The Final Award does not detail the calculation of the interest award, but the amount awarded, EC $44,617.37, is exactly 70% of the EC $63,739.12 claimed by Leeward. Thus, the Tribunal reduced the interest rate by 30% (from 10% to 7%) but erroneously included interest on mobilization when calculating this portion of the Final Award. The correct amount of interest is EC $17,152.92 as follows:

$$
\begin{array}{rl}
& \text{EC \$63,739.12 (Amount sought by Leeward)} \\
- & \underline{\text{EC \$39,234.95 (interest sought on Mobilization)}} \\
= & \text{EC \$24,504.17} \\
* & \underline{\hspace{2cm} 70\%} \\
= & \text{EC \$17,152.92}
\end{array}
$$

Accordingly, the Final Award should be modified by reducing the amount due for interest from EC $44,617.37 to EC $17,152,92.

2.  **Damages (EC $232,670.13).**

This portion of the Final Award contains both a technical and computational error. The Tribunal awarded damages of EC $232,670.13 under the "bad faith doctrine" "after careful consideration regarding the works that were deleted from the Contract and then assigned to Leeward under Separate Contracts." Final Award, Section VI.(A-19). However, Leeward only sought to recover its Overhead and Profits on the deleted work (which the Tribunal awarded in part), and never asked to be awarded additional damages "under the bad faith doctrine" or any other theory. As a result, neither party briefed the "bad faith doctrine" in post-hearing submissions. The Tribunal's assessment of damages, while precise in amount to the penny, does not provide the factual basis for the award or an explanation as to how it was calculated,

---

[1]  Leeward sought two interest payments with respect to Mobilization -- EC $9,588.95 and EC $29,646, which total EC $39,234.95. *See* Leeward's Proposed Findings of Fact and Conclusions of Law, ¶ 144.

SILLS CUMMIS & GROSS
A PROFESSIONAL CORPORATION

Ms. Rangachari
July 10, 2012
Page 3

depriving AUA of the ability to determine whether there is a computational error. Moreover, absent a "Reasoned Award," AUA cannot assess what rights it may have to challenge this aspect of the Award.

Accordingly, AUA requests that the Final Award be modified so as to include the reasoning for assessing these damages and an explanation of how the Tribunal calculated the amount of damages.

### 3.    Overhead and Profit for work deleted, omitted or modified (EC $802,399.25).

This portion of the Final Award contains both a technical and computational error. As set forth in Section VI.(A-7) of the Final Award, the Tribunal determined that Leeward was entitled to its Overhead and Profit for "work omitted, deleted or modified" pursuant to Section 7.3.7 of the General Conditions of the Contract for Construction, less EC $185,425.07 "for the overhead and profit for the Doors & Window and Flooring works that were deleted from the Contract's original scope of work and then given to Leeward under a Separate Contract." While the Tribunal did not provide its mathematical calculations, the logic of the Award indicates that the Tribunal intended to award 18% of the difference between the Measured Works portion of the Contract Sum set forth in the initial Bill of Quantities (EC $22,530,678) and the Measured Works actually paid to Leeward for the work it actually performed (EC $17,727,635.37), less a credit of EC $185,425.07. The difference between the Measured Works as originally designed and as built is EC $5,258,042.63. *See* AUA's Findings of Fact and Conclusions of Law, ¶ 67. The overhead and profit (at 18%) on this net decrease in the Contract Sum is EC $946,447.67. After applying the EC $185,425.07 credit, Leeward's award should have been EC $761,022.60, not EC $802,399.25.

Leaving aside this computational error, the Final Award is technically flawed because it adjudicated a claim that was not submitted to the Tribunal by Leeward prior to the hearing held on March 5-9, 2012. Leeward only sought to be awarded Overhead and Profits on the Painting Work and the Doors and Windows Work and sought an award of EC $350,777.96 in overhead and profits for that work. Leeward sought to be paid in full for the balance of the work it did not perform, as confirmed in Paragraph 23 of its Amended Demand for Arbitration. CIAR R-6 prohibits submitting new or different claims after the arbitrator is appointed absent the arbitrators' consent. Leeward submitted its new claim for overhead and profits on the net change in Measured Works in its April 20, 2012 Post-Hearing submission without obtaining consent from the Tribunal to do so, in violation of CIAR R-6. By adjudicating a claim that was submitted after the hearing, and in violation of CIAR R-6, the Tribunal deprived AUA of an opportunity to proffer a defense, exceeded its powers, and issued an award that deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or containing decisions on matters beyond the scope of the submission to arbitration.

A358

SILLS CUMMIS & GROSS
A PROFESSIONAL CORPORATION

Ms. Rangachari
July 10, 2012
Page 4

Accordingly, AUA requests both correction of the computational error detailed above and a reasoned explanation of why Leeward was entitled to receive an award on a claim for which it did not obtain consent to raise and AUA did not have an opportunity to offer evidence and defend.

4.   **Change Order Work (EC $190,210.19).**

This portion of the Final Award contains a technical error. In awarding Leeward EC $190,201.19 in Change Order Work, the Tribunal stated "[f]rom the evidence presented at trial, the Panel finds that Leeward is entitled to the additional EC $190,210.19." Final Award, Section VI.(B-16). No other reasons are given. As discussed above, the Final Award was required to be a reasoned decision and merely citing the "evidence presented at trial" is not sufficient. *See Redfern and Hunter on International Arbitration* (5th ed.), § 9.125. Given the absence of a "Reasoned Award," AUA does not know how the Tribunal reached its ruling and is, therefore, unable to assess what rights it may have to challenge this aspect of the Award. Substantively, awarding Leeward EC $190,210.19 in additional Change Order Work is squarely at odds with the undisputed facts submitted at the hearing. Leeward initially sought payment for the additional Change Order Work when it submitted its Draft Final Account for approval. After Leeward and the Architect reviewed the Draft Final Account to confirm that it accurately reflected the work Leeward actually performed, Leeward agreed that its claim for Change Order Work was in error. Leeward submitted a revised Draft Final Account that corrected this error, which AUA paid in full. The difference between the total amount of Change Order Work Leeward claimed it was entitled to recover at the hearing (EC $1,422,219.10) and the amount it agreed it was entitled to be paid when it submitted the corrected Draft Final Account (EC $1,232,008.91), is the EC $190,210.19 that the Tribunal awarded Leeward without providing its reasoning. *See* AUA's Findings of Fact and Conclusions of Law, ¶ 75 and AUA's Rebuttal Submission, ¶¶ 66-67.

Accordingly, AUA requests a modification of the Final Award so that it either: (i) provides a Reasoned Award in the portion granting Leeward EC $190,210.91 in Change Order Work; or (ii) if no reasoning can be provided, removes this portion of the Final Award.

SILLS CUMMIS & GROSS
A PROFESSIONAL CORPORATION

Ms. Rangachari
July 10, 2012
Page 5

\*       \*       \*

Therefore, AUA moves for modification on the four matters set forth above.

Respectfully,

Mark S. Olinsky

cc:   J. Scott Greer, Esq. (*via E-Mail*)

A360

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
LEEWARD CONSTRUCTION COMPANY, LTD.

|  |  |
|---|---|
| Petitioner, | Case No. 1:12-CV-06280-LAK/GWG (ECF CASE) |
| -against- | Honorable Lewis A. Kaplan United States District Judge |
| AMERICAN UNIVERSITY OF ANTIGUA -- COLLEGE OF MEDICINE AND MANIPAL EDUCATION AMERICAS, LLC f/k/a GCLR, LLC | **DECLARATION OF** **VERONICA A. MCMILLAN** |
| Respondents. | |

------------------------------------------------------------------x

**VERONICA A. MCMILLAN**, being duly sworn, deposes and says:

1.     I am a member of the law firm of Lewis & Greer, P.C., counsel for the Petitioner, Leeward Construction Company, Ltd. (hereinafter "Petitioner"), and am fully familiar with all the facts and circumstances set forth herein.

2.     I submit this declaration in further support of Petitioner's Notice of Petition, Petition and Memorandum of Law in support of Petitioner's motion to confirm arbitration award filed August 16, 2012.  This declaration is also submitted in opposition to Respondents' cross-motion to dismiss pursuant to the *Forum Non Conveniens* Doctrine and Fed. R. Civ. P. 12(b)(6) or in the alternative, to vacate or modify the arbitration award.

<u>The Parties</u>

3.     Leeward is a corporation duly organized and existing under the laws of the Commonwealth of Antigua and Barbuda, with office and principal place of business at All Saints Road, St. John's, Antigua.

A361

4.     The Respondents contend that the AUA is also a corporation organized and existing under the laws of Antigua and Barbuda.  However, they have offered no verifying documentation.

5.     The AUA is owned and operated by Manipal Education Americas, LLC f/k/a GCLR, LLC. ("Manipal")  Manipal is a limited liability company organized and existing under the laws of the State of New York, with office and principal place of business at 1 Battery Park Plaza, 33rd Floor, New York, New York. (Annexed hereto as Exhibit C is a copy of Manipal's corporate information as maintained by the New York State Secretary of State.)

6.     The AUA and Manipal have an exceptionally close relationship.  The first page of the AUA's contract with Leeward indicated its address as c/o Greater Caribbean Learning Center, New York, New York 10005. (Exhibit A to the Petition)  The AUA's website also demonstrates an extensive connection between the two entities.  Screen shots from the AUA's website indicate that the AUA's Admissions, Bursar, and Financial Aid offices as well as its contact information are all based in New York.  The employees have email addresses that all end in "auamed.org" which is the AUA's internet address.  Further, online applications can be submitted through the website and are paid in US dollars. (A copy of the website printouts is annexed hereto as Exhibit A.)

7.     During the arbitration hearings, Manipal (formerly known as GCLR, LLC) disbursed funds on AUA's behalf for fees from its bank accounts in New York. (A copy of the check Lewis & Greer, P.C. received from GCLR, LLC as reimbursement for the AUA's half of the cost of the hearing rooms in Puerto Rico is annexed hereto as Exhibit B.)

8.     GCLR, LLC's Chief Financial Officer, Prabhu Marudheri entered a witness statement and testified via Skype from New York on behalf of the AUA.  In his witness

statement, Mr. Marudheri acknowledged that GCLR, LLC owns AUA. (A copy of Mr. Marudheri's witness statement is annexed hereto as Exhibit D.)

## The Arbitration Proceeding

9.      On September 25, 2008, Leeward, as contractor, and the AUA, as owner, executed a contract for the construction of a medical school in St. Johns, Antigua (the "Contract"). Section 4.6 of the General Conditions to the Contract contained an arbitration agreement that reads as follows:

> § 4.6 ARBITRATION
>
> § 4.6.1  Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration.
>
> § 4.6.2  Claims shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect.  The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect.  Location of any Arbitration will be Antigua.

(A copy the Contract containing the arbitration agreement is annexed to the Petition as Exhibit A.)

10.      On February 3, 2011, Leeward commenced an arbitration proceeding with the American Arbitration Association International Center for Dispute Resolution ("AAA") to arbitrate claims arising out of or related to the Contract.  Pursuant to the Construction Industry Rules of American Arbitration Association, the AAA appointed a panel of three arbitrators to hear and determine the claims (the "Tribunal").

11.    On or about October 14, 2011, Leeward served and filed an Amended Demand for Arbitration requesting an award for breach of contract in the amount of US $2,518,931.97/EC $6,800,572.28; interest on late payments as provided in the Contract from the date the payments were due until the date the payments were made at the legal rate of interest in Antigua as determined by the Arbitrators; and legal fees and expenses, including the cost and expense of arbitration, as determined by the Arbitrators in accordance with the laws of Antigua. (A copy of Leeward's Amended Demand for Arbitration is annexed to the Declaration of Leonard Sclafani, dated September 25, 2012 as Exhibit C.)

12.    Leeward's breach of contract claim alleged that the AUA repeatedly breached the contract by failing to issue change orders/change directives for additional contract work; failing to pay for additional work that the AUA authorized and directed Leeward to perform; failing to pay Leeward's payment applications in accordance with the terms of the Contract; failing to certify the Project as substantially complete; failing to issue a final certificate of payment; failing to make final payment to Leeward in accordance with the terms of the Contract; failing to pay the mobilization fee as provided in the Contract; failing to authorize overtime as provided in the Contract; failing to coordinate the work of other contractors as required in the Contract; and failing to properly administer the Contract as provided in the Contract documents. (Sclafani Declaration, Exhibit C)

13.    On or about November 30, 2011, the AUA filed a reply to the Amended Demand that included counterclaims for liquidated delay damages in the amount of US $117,000.00 and in the alternative, actual delay damages in the amount of US $371,955.31/EC $1,004,199.00. (The AUA withdrew its counterclaim for actual delay damages on April 11, 2012.)

14.     On December 11, 2011, the Tribunal held a hearing during which the parties stipulated to conduct the evidentiary hearings in San Juan, Puerto Rico, notwithstanding the venue provision in the arbitration agreement requiring that the arbitration take place in Antigua. The arbitration hearings were heard at the Courtyard Marriott in Isla Verde, Puerto Rico from March 5, 2012 through March 9, 2012.

15.     Following the close of the hearings, the parties submitted lengthy post-hearing findings of fact and conclusions of law. (A copy of the parties' Proposed Findings of Fact and Conclusions of Law as well as the Respondent's Rebuttal Proposed Findings of Fact and Conclusions of Law submissions are annexed to the Sclafani Declaration as Exhibits D, E, and F; A copy of the Petitioner's Reply Proposed Findings of Fact and Conclusions of Law is annexed hereto as Exhibit E.)   The Arbitrators declared the hearings closed and the case submitted for resolution on May 22, 2012.

16.     By Final Award certified June 22, 2012 and modified August 8, 2012, the Arbitrators directed the AUA in a to pay damages to Leeward in the amount of $976,421.37, plus interest at the rate of seven percent (7%) per annum as provided in the Award. (A copy of the Final Arbitration Award certified on June 22, 2012, is annexed to the Petition as Exhibit B; a copy of the Resolution dated August 9, 2012 modifying the Final Award is annexed to the Petition as Exhibit C; and a copy of the August 8, 2012 modified Final Award as modified on August 8, 2012 is annexed to the Petition as Exhibit D)

17.     On July 10, 2012, the AUA moved the Tribunal to modify the arbitration award claiming that the award contained "technical and computational errors." (A copy of the AUA's motion to modify the arbitration award before the Tribunal is annexed to the Sclafani Declaration as Exhibit G.)   As here, the AUA in its motion to modify claimed that the award

contained errors in that the Tribunal improperly 1) awarded Leeward too much money in interest on payments due under the Contract; 2) failed to provide a reasoned award; and 3) exceeded its authority in awarding damages for bad faith and lost profit and overhead because Respondents claimed Leeward never demanded these damages during the arbitration. (Sclafani Declaration, Exhibit G)

18.     On July 19, 2012, Leeward filed its opposition to the motion to modify contesting each of the grounds the AUA claimed the award was subject to modification. (A copy of Leeward's July 19, 2012 opposition to the AUA's motion to modify is annexed to the McMillan Declaration as Exhibit F.) Leeward argued that the award did not contain computational errors as the Respondents claim in this regard was based on conjecture and not upon mathematical errors appearing on the face of the award.   Second, the Tribunal had in fact, provided a reasoned award as it issued an award that was "something short of findings of fact and conclusions of law but more than a simple result." *Sarofim v. Trust Co. of the West*, 440 F.3d 213, 215, n.1 (5th Cir. 2006)   Finally, the Tribunal did not exceed its authority in awarding Leeward damages for bad faith and lost profits and overhead as the general issue of breach of contract was before the Tribunal and therefore, the Tribunal was authorized to consider every breach of contract supported by the evidence even if the fact, law or legal tenet may not have been specifically argued by the parties. (Exhibit F)

19.     On August 8, 2012, the Tribunal issued a modified award correcting some minor clerical errors but maintaining the damages awards as initially provided in the June 22, 2012 award. (Exhibits B and D to the Petition)

20.     On August 16, 2012, the Petitioner filed its Petition herein.   On September 25, 2012, the Respondents filed their cross-motion to dismiss on the basis of, *inter alia*, Fed. R.

Civ. P. 12(b)(6) for Petitioner's alleged failure to state a claim against Manipal.  Pursuant to Fed. R. Civ. P. 15(a), the Petitioner is within the allowed time to amend the Petition as of right. While the Petitioner's allegations in the Petition were sufficient to constitute a cause of action against Manipal as AUA's owner, agent and/or alter ego, for enforcement of the arbitration award, the Petitioner has out of an abundance of caution, filed an Amended Petition amending its allegations against Manipal. (Amended Petition is annexed hereto as Exhibit G.)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:          October 16, 2012

_____
Veronica A. McMillan, Esq.

# Exhibit E

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES
-------------------------------------------------------------------x
LEEWARD CONSTRUCTION COMPANY, LTD.,

Claimant,

**CLAIMANT'S REPLY
PROPOSED FINDINGS
OF FACTS AND
CONCLUSIONS OF LAW**

-against-

AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE C/O GCLR, LLC,

Case No. 50 110 T 00075 11

Respondent.
-------------------------------------------------------------------x

Claimant, Leeward Construction Company, Ltd. ("Claimant" or "Leeward") submits this Reply Proposed Findings of Facts and Conclusions and Law in accordance with the Tribunal's Resolution, dated March 2, 2012, and directive at the conclusion of the evidentiary hearing held on March 5 - 9, 2012.

**INTRODUCTION**

1.      The purpose of this "Reply" is not to address each and every statement in the Proposed Findings of Fact and Conclusions of Law submitted by the Respondent, American University of Antigua -- College of Medicine ("Respondent" and/or "AUA").[1] The Tribunal has reviewed the Witness Statements and exhibits, heard the live testimony of the witnesses, and observed the demeanor of the witnesses at the hearing. We trust the Tribunal's ability in reading the post-hearing submissions to separate fact from fiction and half-truths, and to give appropriate weight to the evidence.

2.      Just because Leeward does not address a particular statement in the RFOF or

---

[1] The Respondent's Proposed Findings of Fact and Conclusions of Law, dated April 20, 2012, are cited herein as follows: Respondent's Findings of Fact -- "RFOF"; Respondent's Conclusions of Law -- "RCOL." Leeward's Proposed Findings of Fact and Conclusion of Law, dated April 20, 2012, are cited herein as follows: Leeward's Findings of Fact -- "LFOF"; Leeward's Conclusions of Law -- "LCOL."

RCOL, does not mean that Leeward concedes the alleged fact or legal argument. Rather, the respective positions of the parties are evident from the witness statements, testimony, and exhibits and Leeward's intent is not to retry the case in the post-hearing submissions.

3.    Leeward objects to the AUA's submission of excerpts from the "unofficial" stenographic transcript of the evidentiary hearing with its Proposed Findings of Fact and Conclusions of Law. The Tribunal has already ruled by Resolution, dated March 13, 2012, that the Tribunal's notes are the official record of the evidentiary hearing. By cutting and pasting parts of the stenographic transcript into its post-hearing submission, the AUA has effectively circumvented the Tribunal's ruling by making parts of the unofficial transcript an official part of the record of this proceeding in the event the AUA appeals the Tribunal's decision through the judicial system. If Leeward submits parts of the transcript in response to the AUA's submissions, then the "unofficial" stenographic record effectively becomes the "official" record of the evidentiary hearing -- which is exactly what the AUA requested and the Tribunal denied by resolution, dated March 13, 2012. If Leeward does not submit excerpts from the "unofficial" stenographic transcript, then the self-serving and out-of-context excerpts that the AUA has submitted will stand un-rebutted to the disadvantage of Leeward should the AUA continue to litigate this dispute in the court system. In the interest of fundamental fairness and equity, Leeward respectfully requests that the Tribunal strike the unofficial stenographic transcript from the AUA's post-hearing submissions so that the "unofficial" stenographic transcript does not become an official part of the record.

2

A370

## REPLY FINDINGS OF FACT

a.     **Overhead and Profit on Changes of the Scope of Work**

4.      In RFOF ¶ 14, the AUA selectively emphasizes Contract §4.3 in concluding that the negotiated unit prices, inclusive of overhead and profit, are used to determine additions or deductions to the stipulated contract sum as a result of changes to the scope of work. The AUA ignores the last sentence of the quoted provision of Contract §4.3, which states that the use of unit prices in determining additions and deductions are "subject to the provisions of Article 7 of the General Conditions of the Contract." (LC 1, p. LC000007)

5.      Article 7.3.7 of the General Conditions reads in relevant part that the "amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a net decrease in the contract sum shall be *actual net cost* as confirmed by the Architect. [emphasis added]." (LC1, p. LC000040)  According to the Official AIA Commentaries to the General Conditions (AIA A201-1997), the phrase "actual net costs" means that "[w]here a change results in a credit [to the Owner], the amount of the credit is determined by the cost that would have incurred in executing the change by the Contractor *without decreasing the Contractor's overhead and profit* [emphasis added]." (Official AIA Commentary, p. 58-59) (A copy of the relevant portions of the Official AIA Commentaries are submitted herewith as Appendix E.)[2]

6.      Contract §4.3, read in harmony with the General Conditions Article 7.3.7, provides that the unit rates and other prices in the Project Manual, excluding that part of the unit rate or price that constitutes the contractor's overhead and profit, shall be used to determine the value of changes to the scope of work that result in a decrease in the stipulated contract sum.

---

[2] Appendix A-D are submitted as part of Leeward's Proposed Findings of Facts and Conclusions of Law, dated April 20, 2012.

3

7.     The agreed overhead and profit on Leeward's work is 18% (LC 1, p. LC000072) and therefore, the AUA's credit on the changes to the scope of the contract work that resulted in a decrease in the stipulated contract sum is the unit rate or other price in the Project Manual for the items of work at issue, less 18% overhead and profit.

8.     While the AUA contends that Leeward never sought payment for overhead and profit on the deleted works (RFOF ¶ 57), its statement is patently false.  In a letter to the Architect, dated May 12, 2009, Leeward requested payment for overhead and profit on the doors, windows, and painting work removed from the Contract (LC 213, p. LC003732).  The AUA admits Leeward made this claim (RFOF ¶ 124).  Moreover, overhead and profit on deleted or omitted work is something the parties should have addressed in negotiating and processing change orders, except that the AUA and its Architect failed and refused to issue change orders as required by the contract documents.

**b.     The Stipulated Contract Sum is Subject to Additions and Deductions by Change Order**

9.     The AUA repeatedly cites to provisions in the Contract that state that the stipulated contract sum is "subject to additions and deductions," but in doing so, the AUA repeatedly deemphasizes the operative language "as provided in the Contract Documents." (*See e.g.,* RFOF ¶ 16, 18, and 19)  In RFOF ¶ 16, for example, the AUA selectively quotes Contract §4.1, stating that the contract sum payable to Leeward is "subject to additions and deductions," when in fact, §4.1 provides that the contract sum is "subject to additions and deductions as provided in the Contract Documents." (LC 1, p. LC000006)  After selectively and deceptively quoting Contract §4.1, the AUA then has the audacity to state "Leeward agrees" with the AUA's mischaracterization of the Contract and even mis-cites the Dickinson Witness Statement ¶ 21 in support of its position.  In fact, Mr. Dickinson states in paragraph 21 of his witness statement that

4

the fixed contract sum is "subject to additions and deduction by **change order** [emphasis added]."

10.     Similarly, the AUA misquotes Robert Winwood's summary of the contract terms (LC 84, p. LC003034) in claiming that Mr. Winwood "acknowledged that the total payment for the Measured Works was to be 'as built' and in accordance with the 'final measure'." (RFOF ¶ 23, 68)   What Mr. Winwood actually stated in his summary of the contract terms is that a "change order will be required when the final measure differs from the Contract BOQ." (LC 1, p. LC003034)

11.     Leeward repeatedly requested Nagesh, as the Project Architect, to issue change orders as provided in the contract documents with respect to additions, deletions, and modifications to the contract work, but Nagesh, on his own or at the direction of the AUA's representative, Lt. Colonel Antony ignored Leeward's request and refused to issue even a single change order notwithstanding literally dozens of changes to the scope of the contract work. (Dickinson Witness Statement, ¶ 47-48; Green Witness Statement, ¶ 33-34; Winwood Witness Statement, ¶ 17)

c.     **The AUA Unilaterally Changed the Contractually Agreed Method for Documenting Additions and Deductions to the Stipulated Sum Contract**

12.     The AUA contends that the "*parties* did not use formal change orders in the manner set forth in the Article 7 of the General Conditions to document 'additions and deductions' to the contract sum [emphasis added]." (RFOF   ¶ 40)   The AUA has misstated throughout its post-hearing submission that the parties mutually agreed to dispense with the formal change order process for documenting changes to the scope of work and the contract sum in favor of the informal "true-up" process that the AUA describes in its witness statements and post-hearing submission. (RFOF ¶ 16-34, 40-48; 64-65, 68-69, 91; RCOC ¶ 18-19, 29-44)

5

13.     The undisputed fact is that the AUA did not use formal or informal change orders in the manner set forth in Article 7 of the General Conditions. The AUA submitted no evidence whatsoever establishing that this informal "true-up" process was a mutually agreed upon modification to the Contract in accordance with the requirements set forth in General Conditions §1.1.1 (LC 1, p. LC000025) or that Leeward knowingly, intentionally, and unequivocally waived the use of change orders in favor of the true-up process notwithstanding the "no waiver clause" in General Conditions §13.4.2 (LC1, p. 000051). (*See* ¶ 41-45, herein)

14.     Both Lt. Colonel Antony and Nagesh acknowledged during the hearing that they had no prior experience with AIA contract documents, such as the Contract (AIA A101-1997) and the General Conditions (AIA A201-1997). (Lt. Col. Antony Testimony, March 7, 2012; Nagesh Testimony, March 9, 2012) The concept of change orders seemed completely foreign to them. (Dickinson Witness Statement, ¶ 47-48; Green Witness Statement, ¶ 33; Winwood Witness Statement, ¶ 17) Nagesh and Lt. Colonel Antony ignored Leeward's repeated requests for change orders and they decided on their own, without Leeward's consent, to use the so called "true-up" process instead of contractually mandated change orders. Even Peter McLeod, who assisted the parties in negotiating the Contract, acknowledged that the Contract requires the AUA/Architect to issue change orders for changes to the contract work. (McLeod Testimony, March 5, 2012)

15.     The AUA selectively quotes from Dickinson Witness Statement ¶ 47 as evidence that Leeward agreed to the "true-up" process. (RFOF ¶ 41) Read in its entirety, Dickinson Witness Statement ¶ 47 unequivocally demonstrates that the decision to use the informal "true-up" process instead of change orders was a decision that Lt. Colonel Antony and/or Nagesh made and forced upon Leeward. Leeward did not agree to modify or waive the contract terms

6

A374

with respect to change orders. Rather, if it wanted to get paid for the contract work, it had no choice but to submit to the so-called "true-up" process in accordance with the "Golden Rule."[3]

16.     The AUA states in RFOF ¶ 45 that in reviewing the monthly requisitions, Nagesh would first reach agreement with Leeward and then review the revised payment requisition again with Lt. Colonel Antony to obtain the AUA's consent to the revised payment application. What really happened is that after Nagesh and Leeward came to terms on the payment requisitions, Lt. Colonel Antony would make additional changes to the payment requisitions without Leeward's consent and without even discussing the changes with Leeward, and then Nagesh would rubber-stamp Lt. Colonel Antony's changes, rather than exercise his contractual obligation to objectively review and certify the monthly requisitions. (LC 1, p. LC000032-34) Leeward was at the mercy of Lt. Colonel Antony in terms of what it would be paid on a monthly basis. (Dickinson Witness Statement, ¶ 56-58; LC 73)

17.     In making changes to Leeward's monthly payment requisitions, Lt. Colonel Antony ignored the unit prices in the Contract and changed the quantities that Leeward and Nagesh had agreed upon even though Lt. Colonel Antony acknowledged during cross-examination that he has no training or experience as a quantities surveyor. (Lt. Col. Antony Testimony, March 8, 2012)

18.     The same is true with regard to the October, 2009 Draft Final Account. (AUA 30) Throughout the RFOF, the AUA alleges that Leeward agreed to the October 2009 Draft Final Account as paid (AUA 22) and that it represents the AUA's final payment on the Project. (RFOF ¶ 94-97, 129-133) Leeward complained about the AUA's last payment following its receipt. (AUA 33) Leeward did not, as the AUA contends, limit its claim to those items listed in

---

[3] According to the Golden Rule, "he who has the gold, makes the rules." In this case, the AUA had the gold and it made the rules. If Leeward wanted to get paid, then it had no choice but to acquiesce to this so-called "true-up" process given the AUA's failure and refusal to issue change orders.

its October 26, 2009 correspondence. (AUA 33)  In fact, in its July 7, 2010 correspondence to

the AUA, Leeward indicated that its final application for payment would be submitted in due

course. (Green Witness Statement, ¶ 49-50; LC 200)

   19. Citing Robert Windwood's cross-examination testimony at the hearing, the

Respondent states at RFOF ¶ 106, that "Leeward understood that if a Claim was not asserted

properly, it *would* be waived [emphasis added]."  According to the AUA's excerpts from the

unofficial stenographic transcript of the hearing, Mr. Winwood testified as follows:

> Page 242
>
> | | |
> |---|---|
> | 14 | Q. And it was important that you -- the |
> | 15 | people administering the contract abide by the |
> | 16 | 21-day time period. Correct? |
> | 17 | A. Absolutely. It's written in the contract. |
> | 18 | Q. And if they didn't abide by it, Leeward |
> | 19 | *might* waive their claim. Correct? |
> | 20 | A. Either party *might*. As you say, it |
> | 21 | applies to the contractors and the owner. |
> | 22 | Q. Well, if we could turn back to 4.3.7.1, |
> | 23 | that's referring to a contractor claim. Correct? |
> | 24 | A. Yes. |
> | 25 | Q. Okay. So my question is, it was important |
>
> Page 243
>
> | | |
> |---|---|
> | 1 | to remind people to assert their claims within 21 |
> | 2 | days, because if not, Leeward *might* waive that |
> | 3 | claim. |

(Winwood Transcript 242:14-243:4 [emphasis added])  The AUA has changed Mr. Winwood's

testimony from the mere possibility that a claim *might* be waived to an absolute certainty that the

claim *would* be waived.  Regardless, as explained in ¶ 29, herein, what constitutes a proper

notice of claim is a question of law for the Tribunal to decide, not a question of fact for a witness

to opine.

**d.      The AUA Has Not Demonstrated That Leeward Delayed The Project**

20.      In RFOF ¶ 117, the Respondent incorrectly states that "Leeward also failed to rebut at trial the evidence provided by AUA that Leeward was responsible for such delay." The only testimony the AUA has presented with respect to delays allegedly attributable to Leeward is in Lt. Colonel Antony's witness statement ¶ 90-91, where he claims that the "supporting columns Leeward had constructed for the concrete slab were defective and had to be dismantled and rebuilt." (Lt. Col. Antony Witness Statement ¶ 90)  The AUA failed to present any evidence whatsoever identifying the nature and location of the alleged defect and whether the defect was a result of design errors, construction errors, weather, earthquake, or other factors attributable to the AUA, the Project Architect, the structural engineer, Nagesh, Lt. Colonel Antony, Leeward, or anyone else.   The AUA failed to submit any evidence establishing that the alleged, but unidentified defects delayed Leeward in the performance of its contract work. The AUA failed to proffer any evidence establishing the length of the alleged delay resulting from the defect or whether the alleged defect had any impact upon Leeward's schedule.   Indeed, the Tribunal cannot determine from Lt. Colonel Antony's Witness Statement whether the delay, if any, resulting from the alleged defect lasted a minute, an hour, a day, a week, or a month, or whether the alleged defect had any impact upon Leeward's schedule at all.

21.      The only documentary evidence that the AUA cites in support of its claim that the alleged defect in the supporting columns delayed Leeward's performance of the contract work is "LC 31," which is an email, dated July 21, 2008, from Lt. Colonel Antony concerning the Project meeting held on July 19, 2008. This email is as benign and uninformative as Lt. Colonel Antony's Witness Statement in that it contains only a vague reference to the "concrete strength at the column that had failed," without even using the word "defect" or blaming Leeward or anyone

9

else for the alleged failure. (LC 31, p. LC 002819, ¶ 6)  What Lt. Colonel Antony's email does

show, however, is that as early as July 19, 2008, Leeward expressed concern about the lack of

design information and details for "doors, windows, finishing items, MEP, etc.," and that Lt.

Colonel Antony responded that "all outstanding items will be resolved during the progress of the

project..." (LC 31, p. LC002819, ¶ 5; *see also* LC 31, p. LC002820, ¶ e)  As Nagesh testified

during cross-examination, the AUA did not even start shopping for windows and doors until

October 2008, and did not place the order for the windows and doors until "January, February, or

March 2009," and the windows and doors were not delivered to the Project until July, 2009,

approximately two months after the substantial completion date set forth in the Contract.

(Nagesh Testimony, March 9, 2012; *see also* Dickinson Witness Statement, ¶ 81-86; LC 139-

174)  The evidence also establishes that the flooring that Lt. Colonel Antony and the AUA

ordered did not arrive at the Project until July, 2009, and that the AUA was still designing the

MEP works in June, 2009, all of which occurred after the May 15, 2009,  the substantial

completion date in the Contract, as extended by the AUA.  (Dickinson Witness Statement, ¶ 73-

74, 87-90; Winwood Witness Statement, ¶ 19)

22.    In RFOF ¶ 118, the AUA continues to claim that Leeward was responsible for

delays on the Project because it was not working at an adequate pace.  In support of this claim,

the AUA offers the non-sensical contention that Leeward should have been producing at least EC

$3,000,000.00 per month in work between November, 2008 and April, 2009.  Its only support for

this contention is Lt. Colonel Antony's Witness Statement, ¶ 89.  However, the AUA's claim

makes no sense in light of its own statement that the total value of all work Leeward performed

under the Contract throughout the Project was less than EC $18,000,000.00.  (AUA 23)

Moreover, the Project's records are replete with examples of what slowed Leeward's pace on the

Project: The AUA's ineffective and incompetent administration of the Contract.

e.    **The AUA's Opening Statement and Off-Color Comments are Not Evidence**

23.    In RFOF ¶ 140-144, the AUA references the "detailed chart breaking down the components of Leeward's claim" that AUA's lawyer presented to the Tribunal during his opening statement and asserts that "Leeward did not dispute this breakdown at trial." Opening statements are not evidence and do not prove anything. Leeward had absolutely no obligation during the hearing or in its post-hearing submissions to respond to counsel's opening statement because AUA's counsel was not a witness and his opening statement has no probative value whatsoever.

24.    The AUA states in its conclusions of law that at the time Leeward submitted the Draft Final Account in October 2009, "Leeward did not seek to be paid for the work it did not perform, nor did Leeward assert that it was entitled to such payment on the theory that AUA failed to comply with the formalities of Article 7. It was not until December 2010, (fourteen months later *and after engaging counsel*) that Leeward belatedly sought to be paid for work it did not perform and to enforce the contractual formalities through change orders." (RCOL ¶ 41 [emphasis added])  The obvious implication is that Leeward revised its claim upward on the advice of counsel. The AUA's counsel made similar comments in his opening statement and at other times during the hearing, and quite frankly, Leeward and its counsel were as offended then as they are now by these unwarranted, irrelevant and inflammatory remarks. As the AUA's counsel ought to know, Leeward cannot respond to this accusation without violating the attorney-client privilege. If AUA's counsel had made the comment in his opening statement before a jury in a United Stated District Court, there is a good chance that the Court would have declared a mistrial and sanctioned counsel for misconduct.

11

25.     The bottom line is that Leeward has never demanded payment for work it did not perform; rather, Leeward has requested payment of the stipulated contract sum "subject to additions and deductions as provided in the Contract documents." (LC 1, p. LC000006) Change orders, as provided in Article 7 of the General Conditions, Section 1200, Part I, Section 1.7 of the Specifications, and other provisions in the Contract Documents (LC 1, p. LC000039 - LC000040, LC000113-LC000118), are the only agreed upon method in the Contract for increasing or decreasing the stipulated contract sum, and since the AUA and its Project Architect knowingly and intentionally failed and refused to issue change orders, Leeward has every right to the payment of the stipulated contract sum.   Moreover, Leeward is not required to forfeit upward adjustments to the contract price as a result of extra work that Leeward performed at the AUA's request simply because the AUA and the Project Architect refused to issue change orders as required under the Contract.   Nor should Leeward be required to accept downward adjustments in the contract price as a result of modifications and deletions to the contract work without a formal change order that properly credits Leeward for overhead and profit on deleted works as required under Article 7.3.7 of the General Conditions, given the undisputed fact that the AUA is the party that breached the Contract by failing to issue change orders.   Indeed, to do so would effectively punish Leeward for the AUA's errors and omissions.[4]

**f.      Leeward Accounted for All Deleted Work in its Damage Calculation**

26.     At RFOF ¶ 60, the AUA complains that Leeward failed to completely reduce the

---

[4] An argument could be made that as a result of the AUA's failure and refusal to issue formal change orders in accordance with the Contract documents, the stipulated Contract Sum should not be adjusted upward or downward from the original fixed price in the amount of US $10,162,599.61/EC $27,436,824.00.  If the Tribunal accepts this argument, then Leeward is entitled to the unadjusted Contract price, less payments received, including interest on the balance due, as follows:

$$\begin{array}{ll}
\text{US } \$10{,}162{,}599.61/\,\text{EC } \$27{,}436{,}824.00 & \text{(original contract sum, LFOF ¶ 41)} \\
-\ \underline{\text{US } \$ \ 8{,}493{,}337.37/\,\text{EC } \$22{,}930{,}176.49} & \text{(contract payments, LFOF ¶ 60, 62)} \\
\text{US } \$ \ 1{,}669{,}262.24/\,\text{EC } \$ \ 4{,}506{,}647.51 & \\
+\ \underline{\text{US } \$ \quad 431{,}226.09/\,\text{EC } \$ \ 1{,}164{,}217.30} & \text{(Interest @ 10\%/yr. from October 23, 2009} \\
=\ \text{US } \$ \ 2{,}100{,}488.33/\,\text{EC } \$ \ 5{,}670{,}864.81 & \text{through May 31, 2012)}
\end{array}$$

contract sum by all deleted work by omitting the flooring work. The Tribunal should note that Leeward addressed this oversight in its post-hearing submissions at LFOF ¶ 130, 131, and 133. Leeward has included deductions for all deleted work, including flooring work. AUA 26 is a compilation of deleted work on the Project. The total from that exhibit, US $1,358,520.15/EC $3,667,711.00, is the amount deducted for deleted work in each of Leeward's general damages calculations.

### g. Leeward's Claim For The Balance Due And Owing on The Additional Works Contracts is Not a New Claim

27.     At RFOF ¶ 139, the AUA claims that Leeward did not "reveal" that it was seeking payment for the balance due and owing on the additional works contracts until it filed its Witness Statements in this matter. However, Paragraph "23" of Leeward's Amended Demand for Arbitration contained a summary of Leeward's claim. The seventh line of the summary referred to "Additional Work (Revised Statement of Claim and BS 258-282)" and set forth the amount due and owing. Paragraph "27" of the Amended Demand for Arbitration also defined the phrase "Additional Work" as follows:

> "Additional Work" refers to work that was included in the original contract, that the AUA removed from the Contract then awarded the work back to Leeward in a separate contract. A summary of the Contract work that the AUA removed from the Contract and then awarded back to Leeward in a separate contract is set forth at Revised Statement of Claim, annexed hereto, and at BS 258-282.

In addition, annexed to the Amended Demand for Arbitration was a document entitled "Revised Statement of Claim." The fourth page of that document laid out Leeward's claim for "Additional Work" and specifically references the contracts for additional work set forth at BS 258-282 of that document. The dollar amount of that part of the claim correlated with the amount as set

forth in Paragraph "23" of the Amended Demand for Arbitration. Thus, Leeward has made clear that its claim included the unpaid balance on the additional works contracts since the beginning of this proceeding.

### REPLY CONCLUSIONS OF LAW

**a.    Leeward Complied With The Notice of Claim Provisions in The Contract And Timely Commenced This Arbitration**

28.    In RCOL ¶ 1-28, the AUA argues that Leeward's claims herein are barred because it did not comply with the notice of claim provision in the Contract and it failed to timely commence this arbitration. The AUA is wrong on both counts. Leeward has satisfied the requirements of the notice of claim provision and this proceeding was timely commenced.

**i.    Leeward Complied With The Contract's Notice of Claim Provision**

29.    RCOL ¶ 8-19 are devoted to the AUA's argument that Leeward did not comply with the Contract's notice of claim provision. Initially, we note that the interpretation of the Contract is a question of law, which the Contract specifies must be decided under Antigua law. (LC1, p. LC000051) Conversely, whether the notice of claim provision, as interpreted under Antiguan law, was properly followed is a question of fact, to be decided by the Tribunal. While the Tribunal must interpret this provision in accordance with Antigua law, the AUA has curiously neglected to cite Antiguan law in support of its argument. Moreover, Mr. Winwood's testimony in this matter was solely factual in nature. He was not an expert witness and his testimony, however misconstrued by the AUA, is not dispositive. (*See* ¶ 19 herein)

30.    Instead, the AUA relies on *Kingsley Arms v. Sano Rubin*, 16 A.D.3d 813, 814 (N.Y. App. Div. 2005). However, in addition to being New York law and not binding on the Tribunal, the AUA's description of the holding in *Kingsley* is extremely misleading. In *Kingsley*, the court held that the failure to comply with the notice provision was a waiver of

14

A382

claim because the Plaintiff, a subcontractor suing for breach of contract, could not produce any evidence, that the general contractor had been provided written notice of the subcontractor's claims. The only evidence of a timely claim was the subcontractor's self-serving assertion that it had "orally" notified the general contractor of its claims.    So too in *American Nat'l Elec. Corp. v. Poythress Comm. Contractors Inc.*, 604 S.E.2d 315, 317 (N.C. Ct. App. 2004), a North Carolina case on which the AUA relies. In *American Nat'l Elec. Corp.*, the contractor provided oral notice of a claim and then followed it up with written notice months later. *See Id.* In the case at hand, Leeward provided the AUA with written notices as claims arose during the Project. *See* LC 201-222. Therefore, this case is clearly distinguishable.

      31.     In relying on inapplicable precedent to argue that a "formal notice" is required under the Contract (RCOL ¶ 13), the AUA ignores the Official AIA Commentaries to the General Conditions (AIA A201-1997), which make clear that a notice of claim under General Conditions §4.3.2 *need not* contain all the information pertaining to the claim. *See* Official AIA Commentary, page 38 (Appendix E). The purpose is simply to put the other side on notice. In so doing, the AUA ignores the 22 exhibits Leeward admitted into evidence all of which constitute notices of claim because they gave the AUA notice of a variety of issues encountered on the Project contemporaneously with the occurrence of those events. (Green Witness Statement, ¶ 46; LC 201-222) This includes Leeward's claim for additional Preliminaries. As the AUA admits, Leeward had been sending it emails since January 2009 regarding its need for additional Preliminaries. (RCOL ¶ 15) Thus, Leeward put the AUA on notice of its claim for additional Preliminaries contemporaneously with the occurrence giving rise to the claim.

      32.     LC 206 is an example of the AUA's knowledge of problems on the Project. LC 206 is a chain of emails in which Leeward notified the AUA about issues impacting the Project's

15

A383

progress such as concrete supply issues, customs problems, and delivery of necessary materials like windows and doors. These items were not within Leeward's control, but adversely affected its work on the Project. (LC 206)  Even after LC 206 was written, Leeward continued to notify the AUA of the same issues (LC 211) as the Project continued and the AUA failed to resolve the issues.

33.    The AUA also argues that Leeward's October 26, 2009 correspondence was its only notice of claim and as such, it is limited by what was contained in that correspondence. (RCOL ¶11)   However, Official AIA Commentaries to the General Conditions indicate otherwise. *See* Official AIA Commentary, page 38 (Appendix E).  Under the Contract, the October 26, 2009 communication served as a notice of the fact that Leeward had claims arising from the payment of the Draft Final Account, regardless of whether they were specifically identified or not. In addition, during the pendency of the 21 day time period after the payment of the Draft Final Account, Leeward and the AUA exchanged multiple emails where Leeward notified the AUA and the Architect's representative of other claims that it had, including those arising as a result of the AUA's payment of the Draft Final Account. (AUA 64, 65, 66)

34.    The timing of Leeward's December 2010 claim does not alter the fact that the AUA was already on notice of the issues on the Project by virtues of Leeward's timely notices of claim. Leeward's December 2010 claim document amplified previous, timely notices. Nothing in the Contract prohibits an amplification of notice, even after the time limit for the notice has passed.

**ii.    The Arbitration Was Timely Commenced**

35.    In RCOL ¶ 20-28, the AUA argues that Leeward failed to commence this arbitration within a "reasonable" period of time. Section 4.6.3 of the General Conditions states:

> [a] demand for arbitration shall be made within the time limits
> specified in Subparagraphs 4.4.6 and 4.6.1 as applicable, and in
> other cases within a reasonable time after the Claim has arisen, and
> **in no event shall it be made after the date when institution of
> legal or equitable proceedings based on such Claim would be
> barred by the applicable statute of limitations** as determined
> pursuant to Paragraph 13.7.

(LC 1, p. LC 000036, emphasis added). Neither the Contract nor the Commentaries define the

term "reasonable." However, according to the Contract's terms, the demand for arbitration could

not have been made after the expiration of the applicable statute of limitations. According to the

Antigua and Barbuda Limitation Act 1997, §§7 and 33, the statute of limitations is six years. (A

copy of The Antigua and Barbuda Limitation Act 1997 is submitted herewith as Appendix F.)

Thus, Leeward's demand for arbitration is timely under the terms of the Contract since it was

made within six years of the AUA's breach.

36.     In contrast, the AUA claims that a "reasonable" period of time to commence this

arbitration was six months. *See* RCOL ¶ 22. As support for its argument, the AUA selectively

and disingenuously quotes the Contract language regarding the demand for arbitration to

conveniently omit the language setting the end limit for the demand to be filed at the expiration

of the applicable statute of limitations. *See* RCOL ¶ 21. When the clause is read as a whole, the

AUA's argument holds no merit as the applicable statute of limitations for breach of contract

under Antigua law is six years. *See* Antigua and Barbuda Limitation Act 1997, §§7, 33

(Appendix F).

37.     The AUA's conclusion that a "reasonable" time to commence the arbitration

would be six months is inconceivable when, without the arbitration clause, Leeward would have

had six years to commence a litigation for the same claim. Moreover, were Leeward to follow

the procedure the AUA advocates as proper, Leeward would have had to commence multiple

17

A385

arbitrations throughout the course of the Contract. This would have been extremely burdensome and would have affected the critical path of the work. It was more prudent and, indeed, proper under the Contract, to wait to commence arbitration until Leeward had completed the Project and could adjudicate all of its timely claims against the AUA within a single arbitration. The AUA was not prejudiced in any way by the timing of Leeward's commencement of arbitration. Indeed, the AUA was aided by the fact that all timely claims were adjudicated under a single arbitration. As a result, the timing of Leeward's commencement of arbitration was certainly reasonable.

38.     In addition, the AUA's citations in support of its contention that six months is the "reasonable" time limit to commence arbitration (RCOL ¶ 22) should not be considered by the Tribunal for two reasons. First, the cases are not binding precedent within this Arbitration. The Contract provides that Antigua law governs the interpretation of the Contract, including the arbitration provision. LC1, p. LC000051. None of the cases the AUA cites are based on Antigua law.

39.     Second and most importantly, the cases the AUA cites are easily distinguished from the present case. In *Bickerstaff v. Frazier*, 232 So.2d 190, 191 (Fla. Dist. Ct. App. 1st 1970), a breach of contract lawsuit was filed by the complaining party prior to filing a demand for arbitration. As a result of the five (5) month delay created by filing of the lawsuit, the court found the demand for arbitration to be untimely.

40.     In *Lyons v. Krathen*, 368 So.2d 906, 908 (Fla. Dist. Ct. App. 3d 1979), the claim at issue was submitted to the architect, who made a decision on the claim, and the subject demand for arbitration was filed four (4) months **after** the architect's decision. In *Riggi v. Wade Lupe Constr. Co.*, 176 A.D.2d 1177 (App. Div. 1991), the court specifically found the owner's

18

A386

argument that the demand for arbitration was untimely to be "meritless" due to the fact that "the architect's decision [did] not state '(1) that the decision is final but subject to appeal, and (2) that any demand for arbitration must be made within thirty days after the date on which the party making the demand receives the written decision.'" Riggi, *supra*, at 1179.  In the instant matter, Nagesh, the Project Architect, never made a decision on many of Leeward's claims.  Where Nagesh arguably made a decision, the decision did not state, as required by the Contract that (1) the decision was final and subject to appeal, and (2) a demand for arbitration must be made within 30 days. (*See* LC1, p. LC 000036)  Therefore, Leeward was certainly reasonable to commence its arbitration when it did.

**b.  Leeward Never Waived its Contractual Right to Change Orders to Affect Additions and Deductions to the Contract Price**

41.    The AUA argues at RCOL ¶ 29-44 that the parties waived the use of change orders as provided in the Contract and opted instead to use monthly requisitions to document additions and deductions to the contract sum.  The AUA's argument conflicts with the plain and unequivocal language in the Contract.  General Condition §13.4.2 reads as follows:

> No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

(LC 1, p. LC000051)  Similarly, General Conditions §1.1.1 provides that the Contract may not be modified except by (a) written amendment to the Contract signed by both parties, (b) a Change Order, (c) a Construction Change Directive or (d) a written order for a minor change in the Work issued by the Architect.  (LC 1, p. LC000025)  Thus, under the terms of the Contract, Leeward could not have waived or modified its contractual right to receive change orders for additions, modifications, or deletions to the Contract work -- particularly when the change results

19

**A387**

in an addition or deductions to the stipulated Contract price -- unless the waiver is specifically agreed to in writing (General Conditions §13.4.2) or the modification is in a written amendment to the Contract that is signed by both parties (General Conditions §1.1.1).

42.    With two exceptions, none of the authorities that the AUA cites in support of its waiver argument address the effects of the no waiver/no modification clause in the Contract. The two exceptions are the AUA's citation to the treatises Wilken and Villiers: The Law of Waiver, Variation and Estoppel 2d ("Wilken"), §19.13 and Chitty on Contracts ("Chitty"), §22-045. (The relevant portion of Chitty and Willken are set forth in the Proposed Findings of Fact and Conclusions of Law at Tabs 26 and 27 respectively.) Specifically, Wilken, §19.13 states that "[i]n considering waiver... care must be taken as it is common for standard form construction contracts to contain express provisions as to when and in what circumstances a party will be taken to have waived its rights." Chitty, §22-040 is even more to the point:

> **Contracting out of waiver.** It would appear that there is no
> general principle of law that parties to a contract cannot restrict the
> operation of the doctrine of waiver by the terms of their contract.

The AUA does not address the impact of the no modification/no waiver clauses in the Contract or their effect upon the AUA's waiver argument. The obvious reason for the AUA's omission is that the no modification/no waiver provisions in the Contract do not support the AUA's theory of the case.

43.    In many of the cases that the AUA cites in support of its waiver argument, the Court found that the owner of the project waived the right to insist upon a change order as a prerequisite for the payment of extra work, because the owner was responsible, under the contract, for issuing change orders for the extra work that the owner requested and accepted. *See, e.g., Moore Constr. Co. Inc. v. Clarsksville Dep't of Elec.*, 707 S.W.2d 1 (Tenn. Ct. App.

1985); *Circle Y Constr. Inc. v. WRH Realty Serv.*, 721 F. Supp. 1272 (N.D. Ga. 2010). In other words, having failed to issue a change order for extra work that it requested and accepted, the owner cannot deny payment for the extra work because of its failure to issue a change order. If these cases are at all relevant, then it is because they show that the AUA waived the right to withhold payment for extra work because of its own failure to issue change orders. The cases do not support the AUA's waiver argument with respect to Leeward.

44.       Under the cases and treatises that the Respondent cites, a person can only waive contractual right by words or conduct that are knowing, intentional, and unequivocal. *See generally, Moore Constr. Co. Inc., supra; Bremer Handelsgesellschaft v. C. Mackprang Jr.,* 1 Lloyd's Rep 221 (Court of Appeal 1979); *Circle Y Constr. Inc., supra.*,; Wilken, §3.15. Here, the overwhelming evidence shows that Leeward repeatedly demanded change orders as provided in the Contract, but the AUA and its Architect repeatedly ignored Leeward's requests. (Dickinson Witness Statement, ¶ 47-48; Green Witness Statement, ¶ 33-34; Winwood Witness Statement, ¶ 17)  Leeward's clear intent was not to waive the right to change orders, but to enforce the right to change orders.

45.       Most importantly, the AUA failed to raise a defense of waiver in its Answering Statement and Counterclaim to the Amended Demand for Arbitration, dated November 30, 2011, and we respectfully submit that the AUA should not be allowed to raise a waiver defense for the very first time after the evidentiary hearing.

**c.   Leeward is Entitled to Its Unpaid Change Orders and Unpaid Claims and Has Not Double-Counted**

46.       In RCOL ¶45-47, AUA argues that Leeward is not entitled to recover the amount of its unpaid change orders because the amounts were not listed in its October 26, 2009 correspondence. Further, in RCOL ¶61-62 the AUA claims that Leeward is not entitled to

21

recover for its unpaid claims, including the Whitsuntide Holiday because the AUA paid and/or denied in the Draft Final Account. As Leeward has already extensively explained in ¶ 18 and 33 herein as well as in its Proposed Findings of Fact and Conclusions of Law, Leeward's claims are not limited to the items contained in its October 26, 2009 correspondence or by how the AUA chose to fashion the last payment paid on the Project. Throughout this proceeding, Leeward has continuously disputed the method by which the AUA calculated its last payment on the Project. Regardless of how the AUA chooses to characterize it, Leeward has not been paid for these items. As such, Leeward is entitled to recover for its unpaid change orders and unpaid claims as asserted herein, including the Whitsuntide Holiday.

47.     In RCOL ¶ 48-49, AUA claims that Leeward has somehow double-counted in its claim for damages.   Without explanation for its conclusion, AUA claims that the EC $1,000,000.00 contingency in the Contract was drawn down in full and Leeward "was actually paid an additional EC $1,262,166.51 for these contingent costs." (RCOL ¶ 48)  The AUA offers no support for this conclusion. (RCOL ¶ 76)  Leeward has not double-counted in its damages calculation and is entitled to all that it has requested.

**d.     Leeward is Entitled to Additional Preliminaries as a Result of Project Delays**

48.     The AUA contends in RCOL ¶ 50-61 that Leeward is not entitled to additional Preliminaries for the nineteen week period of running from the May 15, 2009 substantial completion date in the Contract, as extended by the AUA, through the completion of the Project on or about September 18, 2009, because Leeward did not offer expert testimony at trial to establish "drawing by drawing, beam by beam, column by column, gutter by gutter" how a specific event delayed a particular item of work.  (RCOL ¶ 54)  The case authorities that the AUA cites in support of its position are easily distinguished from the present controversy in that

22

A390

none of the cases involved an arbitration where the tribunal consisted of professional engineers and lawyers who are experts in the field and fully familiar with claims for extension of time. Indeed, one of the reasons that parties to a construction contract agree to arbitrate disputes through the American Arbitration Association ("AAA") pursuant to its Construction Industry Rules is because of the AAA's ability to assign arbitrators who have extensive knowledge and experience as arbitrators and as practicing professionals in the construction industry with respect to construction related issues and disputes such as claims for extension of time. Parties to an arbitration should not be compelled to spend a hundred thousand dollars or more on expert witnesses to explain to the arbitrators what they already know and understand and are capable of analyzing on their own. This is particularly true in the present case where Leeward's claim for additional Preliminaries as a result of project delays is relatively small. Indeed, under Rule 702 of the Federal Rules of Evidence, expert testimony is neither required not admissible where the trior of fact is capable of comprehending the evidence and drawing the correct conclusions. *See Pfeifer v. Lewis County*, 308 F.Supp.2d 88, 95-96 (N.D.N.Y. 2004) (Appendix G); F.R.E. Rule 702 (text of Rule 702 is quoted in *Pfeifer*, 308 F.Supp.2d at 96)

49.    In addition, the case authorities that the AUA cites involve claims that were significantly larger and more complicated than the claims at issue in the present case. *See, e.g., McAlpine Humberoak Ltd. V. McDermott Int'l Inc.*, 58 Build LR 1 (Eng. Ct. of App. 1992) (Plaintiff made delay claim with respect to construction of an offshore oil rig for $5,740,688.98/£3,548,848, and alleged that the revision of more than 60 drawings, the failure of defendants to promptly answer over 45 technical queries, and the issuance of over 83 changes orders caused their delay. The trial lasted 92 days and over 37,000 pages of documents were entered into evidence.). Leeward respectfully submits that expert testimony is not required to

23

establish its claim for additional Preliminaries when the AUA, as the owner of the Project failed to provide the design details, information, and specifications that the contractor required to substantially complete the Project on time until several weeks and months after the Substantial Completion date. (Dickinson Witness Statement, ¶ 66-77; Winwood Witness Statement, ¶ 23-26)

e.   **The AUA is Not Entitled to Liquidated Damages**

50.   The AUA claims liquidated damages in the amount US $117,000.00. (RCOL ¶ 63-67)   The AUA is not entitled to liquidated damages because the credible evidence overwhelmingly establishes that the AUA was responsible for the project delays.

51.   In addition, the AUA failed to establish at the hearing or even allege compliance with the notice of claim provisions in Article 4.3.2 of the Contract, which apply equally to the AUA. (LC1, p. 000034)

52.   The AUA also failed to meet its own standards for establishing delay claims (RCOL ¶ 50-62)   by the use of expert testimony to link cause and effect on a drawing by drawing, beam by beam, column by column and gutter by gutter basis.

f.   **Leeward is Entitled to Retainage**

53.   The AUA contends that Leeward is not yet entitled to the Contract retainage in the amount of US $218,566.74/EC $590,083.00 because Leeward has yet to comply with General Conditions §9.10.2. (RCOL ¶ 981-83) The AUA is wrong for two reasons.

54.   First, the obligations under General Conditions §9.10.2 do not even come into play until the Architect certifies the project as substantially complete and issues a certificate of substantial completion as required under General Conditions §9.8.4. (LC 1, p. LC000044) As of this date, the AUA's Architect has yet to issue a Certificate of Substantial Completion

24

A392

notwithstanding Leeward's repeated demands.  (Dickinson Witness Statement, ¶ 63-64; Green Witness Statement, ¶ 40, 50)

56. Second, the AUA presented no evidence establishing that it has ever requested Leeward to submit documents identified in General Conditions §9.10.2 or that they are even applicable to this particular Project.  For example, Antigua does not appear to have a lien law that would encumber the AUA's property in the event Leeward failed to pay a indebtedness connected with the work; nothing in the Contract requires Leeward to maintain insurance after final payment; and there was no surety with respect to Leeward's work.  If the AUA had concerns about the applicability of General Conditions §9.10.2, then Lt. Colonel Antony or Nagesh could have simply sent Leeward an email or walked the short distance across the Project site to Leeward's office and discuss the close out documentation.  They did not because the AUA had no intent of paying Leeward the Contract retainage.

g. **Leeward is Entitled to Overhead and Profit for the Doors and Windows, Painting and Flooring Work deleted from the Contract**

56. In RCOL ¶ 68-71 of the RCOL, the AUA argues that Leeward is not entitled to overhead and profit on the painting work or the doors and windows works deleted from the Contract.  Despite the AUA's contention that the deleted flooring work should be included in Leeward's calculation (RFDF ¶ 60), it has not addressed the flooring work in its argument concerning Leeward's entitlement to overhead and profit for deleted work.  Leeward regards this omission as the AUA's admission that Leeward is entitled to overhead and profit on the deleted flooring work pursuant to Section 7.3.7 of the General Conditions.

57. The AUA claims that Leeward is not entitled to overhead and profit on the doors and windows work deleted from the scope of its work because these items were provisional sums.  However, Section 7.3.7 of the General Conditions provides that Leeward will be

25

A393

compensated for its overhead and profit on items deleted from the scope of work. (LC 1, p. LC 000040) The doors and window items deleted from the BOQ were for labor to be provided for the installation of the doors and windows. The items were added into the fixed price sum for the Contract. Consequently, if they are deducted from the fixed price sum of the Contract, Leeward should be awarded overhead and profit on the items.

58.     The fact that Leeward installed the doors and windows under a separate additional works contract does not alter this conclusion. By the time the installation of the doors and windows was deleted from Leeward's scope of work (April 21, 2009), it had already expended considerable resources on the Project. Thus, it was entitled to its overhead and profit. Moreover, Leeward had to competitively bid the additional works contract for the installation of the doors and windows with no guarantee of being awarded the work. (Dickinson Testimony, March 5, 2012) And, as Lt. Col. Antony acknowledged during cross-examination, he has no idea whether Leeward's bid included overheard and profit at the 18% rate in the Contract or at a significantly lower rate to stay competitive. (Lt. Col. Antony Testimony, March 7, 2012)

59.     The AUA also claims that "equity militates against awarding Leeward overhead and profit for the Painting Work" because the AUA did Leeward a favor by deleting the work from Leeward's scope of work thereby allowing Leeward to reach substantial completion sooner. As Leeward has demonstrated throughout this matter, the delays on the Project were the result of several factors none of which were Leeward's responsibility, including but not limited to the AUA's representatives complete inability to administer the Contract and coordinate the work of various trades on the Project. The AUA was not doing Leeward a favor by deleting the painting work, it was trying to save money on Preliminaries. (Dickinson Witness Statement, ¶ 78-79; Winwood Witness Statement, ¶ 28-29) In addition to being a contractual requirement, equity

26

A394

militates that Leeward be awarded overhead and profit on all deleted work and omitted work on the Project.

**h.     The Additional Works Contracts are Subject to Arbitration**

60.     Throughout the course of the Project, Leeward was awarded additional works contracts for work that was deleted from the Contract's scope as well as additional work required for the Project.   These additional works contracts arose out of and related to the Contract. (Dickinson Witness Statement, ¶ 78-90; LC 228-241)

61.     Section 4.6.1 of the General Conditions to the Contract provides that that parties agree to submit to arbitration "[a]ny Claim arising out of or related to the Contract..." (LC 1, p. LC 000036)  The additional works contracts arise out of and related to the Contract in that the additional works were initially part of the Contract, including design documents, specifications, and project schedule, that the AUA subsequently removed from the Contract and given back to Leeward under separate contracts.

62.     In addition, Section 6.1.1 of the General Conditions to the Contract provides that "[t]he Owner reserves the right ... to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these [General Conditions]..." (LC 1, p. LC 000038)  While the additional works contracts may not have contained separate arbitration provisions, they are included within Sections 4.6.1 and 6.1.1 of the General Conditions to the Contract and as such, are subject to arbitration herein.

63.     Should the Tribunal decide that the additional works contracts are not subject to arbitration, the claim for the amount due and owing on those contracts is easily removable from Leeward's total claim.  As the Tribunal will note at LCOL ¶ 162-164, Leeward has separated the

amount due on the additional works contracts from the other damages demanded herein. The Tribunal can easily strike this amount should it decide that the balance due and owing on the additional works contracts is not subject to arbitration herein.

i.  **If Leeward Prevails in this Arbitration, then it is Entitled Under the Contract to Interest on Payments Due and Unpaid Pursuant to the Contract Documents from the Date Payment is Due at the Prevailing Legal Rate in Antigua**

68.     In RCOL ¶ 89, n. 9, the AUA complains that Leeward failed to offer any factual evidence at trial as to the amount of interest due and/or the applicable legal rate and that Leeward did not raise the applicable interest rate as an issue until the pre-hearing conference on March 1, 2012. The AUA demands a continuation of the evidentiary hearing and even more litigation to determine the legal rate of interest in Antigua in the event the Tribunal rules in favor of Leeward.

69.     Although Leeward was prepared to offer documentary evidence as to the prevailing legal rate of interest in Antigua during the relevant time periods, the parties agreed to address this issue in their respective post hearing submissions. A factual hearing is not required to establish the prevailing legal rate in Antigua because the information is widely and publicly available on the Internet to anyone who bothers to look. We respectfully request the Tribunal to take the equivalent of "judicial notice" of the legal rate of interest in accordance with Antiguan law, as set forth in the LCOL ¶ 137-145 and Appendix B.

70.     Contrary to the AUA's assertion, Leeward did not wait until the prehearing conference to raise the issue of the appropriate rate of interest on payments due and owing under the contract. "Claim Two" in Leeward's Amended Demand for Arbitration is dedicated to the recovery of interest on the unpaid contract balance at the "legal rate" in Antigua from the date that the payment is due to the date the payment is made as provided in the Contract. Leeward had no obligation to share its research with the AUA as to what constitutes the "legal rate."

28

A396

Dated:  May 4, 2012

LEWIS & GREER, P.C.
510 Haight Avenue, Suite 202
Poughkeepsie, New York  12603
*Counsel for Claimant,*
*Leeward Construction Company, Ltd.*

By: _____
J. Scott Greer, Esq.
Veronica A. McMillan, Esq.

29

# Exhibit F

*Lewis & Greer, P.C.*

*Attorneys at Law*

LOU LEWIS
J. SCOTT GREER
VERONICA A. McMILLAN*

JOAN QUINN**
PAUL E. DENBAUM
ALANA R. BARTLEY*

*Also Admitted in New Jersey
**Also Admitted in Massachusetts

510 HAIGHT AVENUE
POUGHKEEPSIE, NEW YORK 12603

(845) 454-1200

FAX (845) 454-3315

WWW.LEWISGREER.COM

MAILING ADDRESS

P.O. BOX 2990
POUGHKEEPSIE, NY 12603

July 19, 2012

**VIA ELECTRONIC MAIL**
Rekha Rangachari, Esq.
International Case Manager
International Centre for Dispute Resolution®
A Division of the American Arbitration Association
1633 Broadway, 10th Floor
New York, NY 10019

Re:     Leeward Construction Company Limited v. American University of Antigua -
College of Medicine
**Case No. 50 110 T 00075 11**
Our File No.: 966-04

Dear Ms. Rangachari:

This office represents Leeward Construction Company Limited in the above referenced. We write in response to the Respondent American University of Antigua's July 10, 2012 motion to modify the Final Award, dated June 22, 2012, to "correct certain 'technical and computational errors.'"

The AUA's motion is improper under the Construction Industry Arbitration Rules for the American Arbitration Association ("CIAR"). CIAR R-48(a) provides that a party "may [only] request that the arbitrator correct any clerical, typographical, technical or computational errors in the award," and that the Tribunal "is not empowered to re-determine the merits of any claim already decided." Under CIAR R-48(a), "technical errors" are in the nature of misspellings or failure to sign the award. *See, e.g., Chicago Regional Council of Carpenters v. Kattan & Kattan General Constractors, Inc.*, 2006 WL 314517 (N.D. Ill. 2006); *Local No. 20 Sheet Metal Workers' Intern. Ass'n. v. Culver Roofing, Inc.*, 2006 WL 229041 (N.D. Ind. 2006)[1] Computation errors are mathematical errors "appear[ing] on the face of the award." *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 194 (4th Cir. 1998) The AUA alleges errors in its motion to modify that go far beyond the limited scope of CIAR R-48 and should not be considered by the Tribunal as a basis for modification.

---

[1] Each of the cited cases are submitted herewith in the order that they appear in this letter.

Rekha Rangachari, Esq.
July 19, 2012
Page 2 of 4

Should the Tribunal decide that the AUA seeks a modification of the award within the meaning of CIAR R-48(a), then Leeward responds as follows:

1.    **The Award is a Reasoned Award:** The AUA contends that the Tribunal did not provide a reasoned award. The AUA bases its claim on *Redfern and Hunter on International Arbitration* (5th ed.). Although the AAA ICDR has administered this arbitration, the AUA is well aware that the arbitration is not governed by the International Arbitration Rules. Rather, the parties agreed in Section 4.6.2 of the General Conditions to the Contract to arbitrate in accordance with "the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect." *See* AUA Exhibit 1, AUA 000016. The AUA's citation to a treatise on international arbitration to define a reasoned award in an arbitration governed by the AAA Construction Industry Arbitration Rules is irrelevant, improper and violates the terms of the arbitration agreement between the parties.

United States Courts have held that where there is no agreement between the parties as to what the award shall contain (as in the present case) the contents of a reasoned award is within the discretion of the arbitrators and the award will be deemed a reasoned award if it is "something short of findings of fact and conclusions of law but more than a simple result." *Sarofim v. Trust Co. of the West*, 440 F.3d 213, 215 n.1 (5th Cir. 2006); *see also*, *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469 (5th Cir. 2012) (court found that arbitrators had rendered a sufficiently "reasoned award" when the arbitration award thoroughly described contentions asserted by the parties and then summarily concluded that the evidence presented either supported or did not support each contention.) The Tribunal has more than complied with the minimum requirements for a reasoned award.

2.    **Computational Errors:** In sections 1, 2, and 3 of its motion, the AUA claims that the award contains computational errors. The AUA's claims are based upon conjecture and not upon mathematical errors appearing on the face of the award. *See Apex Plumbing Supply, Inc.*, 142 F.3d at 194 (court denied modification of award because alleged miscalculation was not evident from the face of the award). Quite frankly, after reading and re-reading the AUA's motion to modify we still cannot determine the basis of the alleged computational errors. The fact that the AUA needs five pages to explain the alleged computation errors that are not obvious on the face of the award demonstrates that the AUA's application goes far beyond the scope of CIAR R-48 and is an attempt to substantively rewrite the award to obtain a more favorable result for the AUA.

CIAR R-45(a) and (d)(i) provide, the Tribunal may "grant any remedy or relief" they deem "just and equitable and within the scope of the agreement of the parties...," including "interest at such rate and from such date as the arbitrator may deem appropriate..." The AUA has not demonstrated that the Tribunal's award was inappropriate or that it does not reflect exactly what the Tribunal intended to award. Rather, the Tribunal has made an award with

Rekha Rangachari, Esq.
July 19, 2012
Page 3 of 4

which the AUA disagrees. The AUA's disagreement, however, is not a basis for modification under CIAR R-48.

Moreover, the Tribunal is not required to provide "an explanation of how the Tribunal calculated the amount of the damages." The Tribunal has met its obligations for a reasoned award by stating the issue, finding for Leeward (or the AUA) on the issue, and stating the damages associated therewith. *See Rain CII Carbon, LLC*, 674 F.3d at 474 (court sustained eight page award as "reasoned" where the "arbitrator laid out the facts, described the contentions of the parties, and decided which of the two proposal should prevail"). The AUA is not entitled to anything more.

3.     **Technical Errors:** In sections 2, 3 and 4 of its motion, the AUA claims that the award contains technical errors because the Tribunal exceeded its authority in awarding Leeward damages for AUA's "bad faith," overhead and profit on work deleted, omitted or modified and for unpaid change order work. The AUA is incorrect. First, the AUA's argument is not an attempt to modify the award to correct a "technical error" as the term is used in CIAR R-48, but rather, an attempt to vacate part of the award to obtain a more favorable result for the AUA. What the AUA is really requesting the Tribunal to do is to re-determine the merits of a claim in violation of CIAR R-48(a).

Second, Federal courts enforcing arbitration awards under the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards and the Federal Arbitration Act have held that an arbitrator does not exceed his/her authority where he/she decides an issue submitted for arbitration even when the award is made on the basis of a fact, law or legal tenet that may not have been specifically argued. An arbitration panel exceeds its authority when it reaches conclusions on issues that the parties never submitted to arbitration at least in general. *See, e.g., Rosati v. Bekhor*, 167 F.Supp.2d 1340, 1345 (M.D. Fla. 2001) (court upheld award in favor of the claimant based upon Florida securities law statute even though claimant raised the issue of securities fraud, in general, without a specific reference to the Florida statute); *Vandenavond v. 12 Technologies, Inc.*, 2008 WL 5336300 (N.D. Texas 2008) (court upheld arbitration award for breach of employment contract even though the award was based upon the breach of a contract provision that neither party specifically addressed during arbitration).

Here, the general issue before the Tribunal was whether the AUA breached the contract and therefore, the Tribunal was authorized to consider every breach of contract supported by the evidence, including whether the AUA breached the contract by acting in bad faith[2] and whether Leeward was entitled to damages for that bad faith, as well as overhead and profit for work deleted, omitted or modified and unpaid through change orders, regardless of whether the parties raised "bad faith" as a specific basis for the breach.

---

[2] Every contract carries with it a duty that the parties exercise good faith. *See Restatement (Second) of Contracts*, §205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.")

Rekha Rangachari, Esq.
July 19, 2012
Page 4 of 4

 

      We suspect that the AUA will submit a reply in response to their letter if only to have the last word.  We respectfully request the Tribunal to reject any further submissions in which the AUA attempts to explain what it was unable to explain in its initial motion papers.  Enough is enough.  The AUA should not be permitted to elongate what is supposed to be a process for the efficient and relatively inexpensive resolution of disputes.

      We respectfully request that the Tribunal deny the AUA's motion for modification of the award in its entirety.

                  Very truly yours,

                  LEWIS & GREER, P.C.

                  J. Scott Greer

JSG/mlb
cc:    Mark Olinsky, Esq. (via electronic mail)
       Jonathan Jemison, Esq. (via electronic mail)
       Andy Green (via electronic mail)
       Eric Linde (via electronic mail)

Case 1:12-cv-06280-LAK   Document 27   Filed 03/28/13   Page 1 of 1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___7/28/13___

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
LEEWARD CONSTRUCTION COMPANY,

               Petitioner,

       -against-

AMERICAN UNIVERSITY OF ANTIGUA -
COLLEGE OF MEDICINE, and MANIPAL
EDUCATION AMERICAS, LLC f/n/a GCLR, LLC.,

               Respondents.

-----------------------------------------------------------X

**12 CIVIL** 6280 (LAK)

## JUDGMENT

Petitioner Leeward Construction Company ("Leeward") having sought to confirm an

international arbitration award against Respondents American University of Antigua ("AUA") and

Manipal Education Americas ("Manipal"), and the matter having been brought before the Honorable

Lewis A. Kaplan, United States District Judge, and the Court, on March 26, 2013, having issued its

Memorandum Opinion granting Leeward's amended petition to confirm the arbitration, but only as

against AUA, granting Manipal's cross motion to dismiss as to itself without prejudice to Leeward's

filing a separate plenary action against it, and denying AUA's cross motion to dismiss, modify, or

vacate, it is,

     **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Memorandum Opinion dated March 26, 2013, Leeward's amended petition to confirm the

arbitration is granted, but only as against AUA; Manipal's cross motion to dismiss as to itself is

granted without prejudice to Leeward's filing a separate plenary action against it; and AUA's cross

motion to dismiss, modify, or vacate is denied; accordingly, the case is closed.

**Dated:**  New York, New York
       March 28, 2013

                      **RUBY J. KRAJICK**

                         Clerk of Court

     **BY:**

                         **Deputy Clerk**

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

A403

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
LEEWARD CONSTRUCTION COMPANY, LTD.,

                                        Petitioner,

                 -against-

AMERICAN UNIVERSITY OF ANTIGUA-
COLLEGE OF MEDICINE and MANIPAL
EDUCATION AMERICAS, LLC f/k/a GCLR, LLC,

                                        Respondents,
-----------------------------------------------------------------x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: _5/23/13_ |

**AMENDED JUDGMENT**

12 CIVIL 6280 (LAK)

# 13, 1085

        Petitioner Leeward Construction Company, Ltd. ("Leeward") having sought to confirm an

international arbitration award against Respondents American University of Antigua ("AUA") and

Manipal Education Americas, LLC ("Manipal"), and the matter having been brought before the

Honorable Lewis A. Kaplan, United States District Judge, and the Court, on March 26, 2013,

having issued its Memorandum Opinion granting Leeward's amended petition to confirm the

arbitration, but only as against AUA, granting Manipal's cross motion to dismiss as to itself

without prejudice to Leeward's filing a separate plenary action against it, and denying AUA's

cross motion to dismiss, modify, or vacate, it is

        **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's

Memorandum Opinion dated March 26, 2013, Leeward's amended petition to confirm the

arbitration is GRANTED, but only as against AUA, and Leeward is awarded a judgment against

the AUA as follows:

    a)      the sum of $16,524.95[1] with 7% interest thereon from the 31st day of October 2009 through April 23, 2013, totaling $20,549.80;

    b)      the sum of $86,174.12 with 7% interest thereon from the 22nd day of June 2012 thought April 23, 2013, totaling $91,214.72;

    c)      the sum of $297,184.91 with 7% interest thereon from the 31st day of October 2009 through April 23, 2013, totaling $369,567.75;

    d)      the sum of $176,954.46 with 7% interest thereon from the 31st day of October 2009 through April 23, 2013, totaling $220,053.78;

    e)      the sum of $70,448.22 with 7% interest thereon from the 31st day of October 2009 through April 23, 2013, totaling $87,606.70;

    f)      and the sum of $218,549.26 with 7% interest thereon from the 12th day of August 2012 through April 23, 2013, totaling $229,195.30; and

    g)      the total of the above referenced being $1,018,188.05;

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Opinion, dated March 26, 2013, the AUA is awarded a judgment against Leeward in the sum of $58,500.00 with 7% interest thereon from the 22nd day of June, 2012, totaling $107,383.56 and deducting this amount from Leeward's judgment yields a judgment to Leeward in the amount of $910,804.49 and it is further

**ORDERED, ADJUDGED AND DECREED:** That Leeward is hereby awarded a judgment in the amount of $910,804.49 plus interest at a rate of 7% per annum until the judgment is paid.

---

[1] All dollar amounts in the Judgment have been converted from East Caribbean Dollars, as they were issued in the original arbitration award, at the current conversion rate of $1 U.S. Dollar to $2.700 East Caribbean Dollars.

Case 1:12-cv-06280-LAK   Document 34   Filed 05/23/13   Page 3 of 3

Case 1:12-cv-06280-LAK   Document 31-16   Filed 04/25/13   Page 3 of 3

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Opinion dated March 26, 2013, Manipal's cross motion to dismiss as to itself is GRANTED without prejudice to Leeward's filing a separate plenary action against it; and it is further

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Opinion dated March 26, 2013, AUA's cross motion to dismiss, modify, or vacate is DENIED; and accordingly, the case is closed.

Dated:   ~~April~~ May 23 ___, 2013
         New York, New York

                                          Enter,

                                          _Ruby J. Krajick_
                                          CLERK

                                          By  _____
                                              Dep. Clerk

**THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____**

3

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _6/11/13_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
LEEWARD CONSTRUCTION COMPANY, LTD.,

                                        Petitioner,                    **CORRECTED**
                                                                       **AMENDED JUDGMENT**
              -against-                                                 12 CIVIL 6280 (LAK)

AMERICAN UNIVERSITY OF ANTIGUA-
COLLEGE OF MEDICINE and MANIPAL                                         #15,(o.55
EDUCATION AMERICAS, LLC f/k/a GCLR, LLC,

                                        Respondents,
------------------------------------------------------------------x

        Petitioner Leeward Construction Company, Ltd. ("Leeward") having sought to confirm

an international arbitration award against Respondents American University of Antigua (AUA")

and Manipal Education Americas, LLC ("Manipal"), and the matter having been brought before

the Honorable Lewis A. Kaplan, United States District Judge, and the Court, on March 26, 2013,

having issued its Memorandum Opinion granting Leeward's amended petition to confirm the

arbitration, but only as against AUA, granting Manipal's cross motion to dismiss as to itself

without prejudice to Leeward's filing a separate plenary action against it, and denying AUA's

cross motion to dismiss, modify, or vacate, it is

        **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's

Memorandum Opinion dated March 26, 2013, Leeward's amended petition to confirm the

arbitration is GRANTED, but only as against AUA, and Leeward is awarded a judgment against

the AUA as follows:

a)      the sum of $16,524.95[1] with 7% interest thereon from the 31st day of October 2009 through June 11, 2013, totaling $20,763.14;

b)      the sum of $86,174.12 with 7% interest thereon from the 22nd day of June 2012 thought June 11, 2013, totaling $92,105.77;

c)      the sum of $297,184.91 with 7% interest thereon from the 31st day of October 2009 through June 11, 2013, totaling $373,404.58;

d)      the sum of $176,954.46 with 7% interest thereon from the 31st day of October 2009 through June 11, 2013, totaling $222,338.36;

e)      the sum of $70,448.22 with 7% interest thereon from the 31st day of October 2009 through June 11, 2013, totaling $88,516.23;

f)      and the sum of $218,549.26 with 7% interest thereon from the 12th day of August 2012 through June 11, 2013, totaling $231,425.45; and

g)      the total of the above referenced being $1,028,553.54;

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Opinion, dated March 26, 2013, the AUA is awarded a judgment against Leeward in the sum of $58,500.00 with 7% interest thereon from the 22nd day of June, 2012, totaling $62,526.76 and deducting this amount from Leeward's judgment yields a judgment to Leeward in the amount of $966,026.79 and it is further

**ORDERED, ADJUDGED AND DECREED:** That Leeward is hereby awarded a judgment in the amount of $966,026.79 plus interest at a rate of 7% per annum until the judgment is paid.

---

[1] All dollar amounts in the Judgment have been converted from East Caribbean Dollars, as they were issued in the original arbitration award, at the current conversion rate of $1 U.S. Dollar to $2.700 East Caribbean Dollars.

2

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Opinion dated March 26, 2013, Manipal's cross motion to dismiss as to itself is GRANTED without prejudice to Leeward's filing a separate plenary action against it; and it is further

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Opinion dated March 26, 2013, AUA's cross motion to dismiss, modify, or vacate is DENIED; and accordingly, the case is closed.

Dated:   June ___, 2013
         New York, New York

Enter,

_____

**THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON** _____

3

**A409**

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

LEEWARD CONSTRUCTION COMPANY, LTD.,

                                    Petitioner,

            -against-

AMERICAN UNIVERSITY OF ANTIGUA- COLLEGE
OF MEDICINE AND MANIPAL EDUCATION
AMERICAS, LLC f/k/a GCLR, LLC,

                                    Respondents.

------------------------------------------------------------X

Civil Action No. 12-CIV-6280

ECF CASE

STIPULATION AND
CONSENT ORDER

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned attorneys for the parties, that:

1.      Pursuant to Fed. R. Civ. Pr. 62 and the *supersedeas* bond attached hereto as Exhibit A, enforcement of the Judgment (as amended) entered in this action be and hereby is stayed pending a dismissal with prejudice of the appeal before the Second Circuit Court of Appeals under Docket No. 13-1708, or any other final disposition of that appeal.

2.      The June 27, 2013 Order to Show Cause For a Stay of Judgment Enforcement Proceedings filed by Respondent American University of Antigua – College and Medicine ("AUA") be and hereby is withdrawn without prejudice.

Dated:       New York, New York
             July 30, 2013

LEWIS & GREER, P.C.                          SILLS CUMMIS & GROSS, P.C.

By: _____               By: _____
    J. Scott Greer, Esq.                         Jonathan S. Jemison, Esq.

Attorneys for Petitioner                     Attorneys for Respondents
Leeward Construction Company, Ltd.           American University of Antigua -- College of
510 Haight Avenue, Suite 202                 Medicine
Poughkeepsie, New York 12603                 Thirty Rockefeller Plaza
Tel: (845) 454-1200                          New York, NY 10112
Fax: (845) 454-3315                          Tel: (212) 643-7000
                                             Fax: (212) 643-6500


SO ORDERED:

_____
Hon. Lewis A. Kaplan, U.S.D.J.

8/14/13

Exhibit A

Bond Number 3349772

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF
NEW YORK

------------------------------------------------------------------

LEEWARD CONSTRUCTION COMPANY, LTD.,                    Civil Action No. 12-CIV-6280
                                    Petitioner,                    ECF CASE

                    -against-

AMERICAN UNIVERSITY OF ANTIGUA- COLLEGE
OF MEDICINE AND MANIPAL EDUCATION AMERICAS, LLC
f/k/a GCLR, LLC

                                    Respondents

------------------------------------------------------------------

WHEREAS, in the above entitled Court, a Judgment confirming the arbitration award entered in this action on the March 28, 2013,against Respondent, American University of Antigua-College of Medicine ("AUA") and in favor of Leeward Construction Company, Ltd.,.

And the said Respondent, feeling aggrieved thereby, intends to appeal therefrom to the United States Court of Appeals for the Second Circuit.

NOW, THEREFORE, the SureTec Insurance Company having an office and principal place of business for the State of New York, c/o Arthur B. Levine Company, Inc., located at 60 East 42nd Street, Room 965, New York, NY 10165 does hereby undertake in the sum of One Million Seventy Three and 00/100th ($1,073,000.00)DOLLARS, that if the above-named Respondent shall satisfy judgment herein in full, if for any reason the appeal is dismissed or if the judgment is affirmed, and shall satisfy in full such modification of the judgment and such cost as the Appellate Court may adjudge and award, then this obligation shall be void, otherwise the same shall be and remain in full force and virtue.

DATE  August 6,2013

                                    SureTec Insurance Company

                                    By: _____
                                    Margaret McLaughlin ,      Attorney – In   Fact

<u>SURETY ACKNOWLEDGMENT</u>:

STATE OF   <u>NEW YORK</u>

COUNTY OF <u>NEW YORK</u>

On this 6th day of  August, 2013  before me personally came <u>Margaret McLaughlin</u>
to me known, who, being by me duly sworn, did depose and say that she is an Attorney-in-Fact
of <u> SureTec Insurance Company </u> the corporation described in and which the within instrument;
that she knows the corporate seal of said corporation; that the seal affixed to the within
instrument is such corporate seal, and that she signed the said instrument and affixed the said
seal as Attorney-in-Fact by authority of the Board of Directors of said corporation and by
authority of this office under the Standing Resolutions thereof.

My Commission Expires_____   _____                     _____
                                                                Notary Public

ANITA HUNTER
Notary Public, State of New York
NO. 01HU4828371
Qualified in Richmond County
Commission Expires April 30, 20__

POA #: 3210004

# SureTec Insurance Company
## LIMITED POWER OF ATTORNEY

*Know All Men by These Presents,* That SURETEC INSURANCE COMPANY (the "Company"), a corporation duly organized and existing under the laws of the State of Texas, and having its principal office in Houston, Harris County, Texas, does by these presents make, constitute and appoint

Anita Hunter, Carol Levine, Sybil Levine, Margaret McLaughlin, Maria Sponza

its true and lawful Attorney-in-fact, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver any and all bonds, recognizances, undertakings or other instruments or contracts of suretyship to include waivers to the conditions of contracts and consents of surety for:

### Three Million and 00/100 Dollars ($3,000,000.00)

and to bind the Company thereby as fully and to the same extent as if such bond were signed by the President, sealed with the corporate seal of the Company and duly attested by its Secretary, hereby ratifying and confirming all that the said Attorney-in-Fact may do in the premises. Said appointment shall continue in force until _____ 8/30/2015 _____ and is made under and by authority of the following resolutions of the Board of Directors of the SureTec Insurance Company:

*Be it Resolved,* that the President, any Vice-President, any Assistant Vice-President, any Secretary or any Assistant Secretary shall be and is hereby vested with full power and authority to appoint any one or more suitable persons as Attorney(s)-in-Fact to represent and act for and on behalf of the Company subject to the following provisions:

*Attorney-in-Fact* may be given full power and authority for and in the name of and of behalf of the Company, to execute, acknowledge and deliver, any and all bonds, recognizances, contracts, agreements or indemnity and other conditional or obligatory undertakings and any and all notices and documents canceling or terminating the Company's liability thereunder, and any such instruments so executed by any such Attorney-in-Fact shall be binding upon the Company as if signed by the President and sealed and effected by the Corporate Secretary.

*Be it Resolved,* that the signature of any authorized officer and seal of the Company heretofore or hereafter affixed to any power of attorney or any certificate relating thereto by facsimile, and any power of attorney or certificate bearing facsimile signature or facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached. *(Adopted at a meeting held on 20th of April, 1999.)*

*In Witness Whereof,* SURETEC INSURANCE COMPANY has caused these presents to be signed by its President, and its corporate seal to be hereto affixed this 21st day of March, A.D. 2013.

SURETEC INSURANCE COMPANY

By: _____
John Knox Jr., President

State of Texas    ss:
County of Harris

On this 21st day of March, A.D. 2013 before me personally came John Knox Jr., to me known, who, being by me duly sworn, did depose and say, that he resides in Houston, Texas, that he is President of SURETEC INSURANCE COMPANY, the company described in and which executed the above instrument; that he knows the seal of said Company; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said Company; and that he signed his name thereto by like order.

JACQUELYN MALDONADO
Notary Public
State of Texas
My Comm. Exp. 5/18/2017

_____
Jacquelyn Maldonado, Notary Public
My commission expires May 18, 2017

I, M. Brent Beaty, Assistant Secretary of SURETEC INSURANCE COMPANY, do hereby certify that the above and foregoing is a true and correct copy of a Power of Attorney, executed by said Company, which is still in full force and effect; and furthermore, the resolutions of the Board of Directors, set out in the Power of Attorney are in full force and effect.

Given under my hand and the seal of said Company at Houston, Texas this 6th day of August 2013 A.D.

_____
M. Brent Beaty, Assistant Secretary

Any instrument issued in excess of the penalty stated above is totally void and without any validity.
For verification of the authority of this power you may call (713) 812-0800 any business day between 8:00 am and 5:00 pm CST.

### SURETEC INSURANCE COMPANY
1330 Post Oak Blvd., Suite 1100
Houston, Texas   77056
(713) 812-0800

## Financial Information:

| As of: | Dec. 31, 2010 | Dec. 31, 2011 | Dec. 31,2012 |
|---|---|---|---|
| Total Assets | $115,996,536 | $122,816,131 | $150,313,814 |
| Total Liabilities | $48,595,961 | $56,368,950 | $78,014,698 |
| Asset to Liability Ratio | 2.3 | 2.1 | 1.9 |
| Capital | $5,000,000 | $5,000,000 | $5,000,000 |
| Net Surplus | $62,400,576 | $61,447,182 | $67,299,115 |
| Net Life Ins | N/A | N/A | N/A |

## Premiums:

| As of: | Dec. 31, 2010 | Dec. 31, 201 | Dec. 31, 2012 |
|---|---|---|---|
| Life and Annuities | N/A | N/A | N/A |
| Accident and Health | $0 | $0 | $0 |
| Property and Casualty | $22,482,231 | $18,257,067 | $18,692,583 |
| Total Texas Premium | $22,482,231 | $18,257,067 | $18,692,583 |
| National Premium | $46,273,274 | $50,023,232 | $51,843,573 |

CERTIFICATE OF SOLVENCY UNDER SECTION 1111 OF THE NEW YORK INSURANCE LAW

STATE OF NEW YORK

DEPARTMENT OF FINANCIAL SERVICES

It is hereby certified that

SURETEC INSURANCE COMPANY

Of Houston, Texas

a corporation organized under the laws of the State of Texas and duly authorized to transact the business of insurance in this State, is qualified to become surety or guarantor on all bonds, undertakings, recognizances, guaranties and other obligations required or permitted by law, and that the said corporation is possessed of a capital and surplus including gross paid-in and contributed surplus and unassigned funds (surplus) aggregating the sum of $69,333,286 (Capital $5,000,000) as is shown by its sworn financial statement for the Third Quarter of September 30, 2012, on file in this Department, prior to audit.

The said corporation cannot lawfully expose itself to loss on any one risk or hazard to an amount exceeding 10% of its surplus to policyholders, unless it shall be protected in excess of that amount in the manner provided in Section 4118 of the Insurance Law of this State.



In Witness Whereof, I have hereunto set my hand and affixed the official seal of this Department at the City of Albany, this 20th day of November, 2012

Benjamin M. Lawsky
Superintendent

By Jacqueline Cataffamo

Jacqueline Cataffamo
Special Deputy Superintendent

www.dfs.ny.gov

N.Y.S.D. Case #
12-cv-6280(LAK)

## UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 20th day of August, two thousand and thirteen,

Leeward Construction Company, Ltd.,

     Petitioner - Appellee,

     v.

American University of Antigua - College of Medicine,

     Respondent - Appellant,

Manipal Education Americas, LLC, FKA GCLR, LLC,

     Respondent.

**ORDER**
Docket No. 13-1708

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 20, 2013

The parties in the above-referenced case have filed a stipulation withdrawing this appeal pursuant to Local Rule 42.1.

The stipulation is hereby "So Ordered".

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

CERTIFIED COPY ISSUED ON 08/20/2013

**A418**

N.Y.S.D. Case #
12-cv-6280(LAK)

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 30ᵗʰ day of July, two thousand and fourteen,

Leeward Construction Company, Ltd.,

      Petitioner - Appellee,

      v.

American University of Antigua - College of Medicine,

      Respondent - Appellant,

Manipal Education Americas, LLC, FKA GCLR, LLC,

      Respondent.

**ORDER**
Docket No. 13-1708

> **USDC SDNY**
> **DOCUMENT**
> **ELECTRONICALLY FILED**
> **DOC #:** _____
> **DATE FILED:** July 30, 2014

The parties in the above-referenced case have filed a stipulation withdrawing this appeal pursuant to Local Rule 42.1.

The stipulation is hereby "So Ordered".

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

Catherine O'Hagan Wolfe

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

Catherine O'Hagan Wolfe

CERTIFIED COPY ISSUED ON 07/30/2014

**A419**

Case 1:12-cv-06280-LAK   Document 51   Filed 12/03/14   Page 1 of 1

| N.Y.S.D. Case # |
| 12-cv-6280(LAK) |

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 3rd day of December, two thousand and fourteen,

Leeward Construction Company, Ltd.,

      Petitioner - Appellee,

      v.

American University of Antigua - College of Medicine,

      Respondent - Appellant,

Manipal Education Americas, LLC, FKA GCLR, LLC,

      Respondent.

**ORDER**
Docket No. 13-1708

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** December 3, 2014

The parties in the above-referenced case have filed a stipulation withdrawing this appeal pursuant to Local Rule 42.1.

The stipulation is hereby "So Ordered".

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

CERTIFIED COPY ISSUED ON 12/03/2014

A420

# UNITED STATES COURT OF APPEALS
## FOR THE
### SECOND CIRCUIT

$\boxed{\text{1:12-cv-06280-LAK}}$

---

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 2nd day of February, two thousand and fifteen,

---

Leeward Construction Company, Ltd.,

　　　Petitioner - Appellee,

　　　v.

American University of Antigua - College of Medicine,

　　　Respondent - Appellant,

Manipal Education Americas, LLC, FKA GCLR, LLC,

　　　Respondent.

**ORDER**
Docket No. 13-1708

$\boxed{\begin{array}{l} \text{USDC SDNY} \\ \text{DOCUMENT} \\ \text{ELECTRONICALLY FILED} \\ \text{DOC \#: _____} \\ \text{DATE FILED: \underline{~Feb. 2, 2015~}} \end{array}}$

---

This appeal was withdrawn subject to reinstatement upon terms agreed to by the parties.

Counsel for the appellant has submitted a timely notice of reinstatement.

IT IS HEREBY ORDERED that the appeal is reinstated.

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

*Catherine O'Hagan Wolfe*

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

*Catherine O'Hagan Wolfe*

CERTIFIED COPY ISSUED ON 02/02/2015

**A421**

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the Joint Appendix Volumes I and II on behalf of Respondent-Appellant American University of Antigua-College of Medicine with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the Appellate CM/ECF system on February 13, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

SILLS CUMMIS & GROSS P.C.

By: _____
James M. Hirschhorn
101 Park Avenue, 29th Floor
New York, New York 10178
(212) 643-7000
jhirschhorn@sillscummis.com

*Attorneys for Respondent-Appellant American University of Antigua-College of Medicine*

Dated: February 13, 2015