# 13-1708-cv

## United States Court of Appeals
### *for the*
## Second Circuit

~•~

LEEWARD CONSTRUCTION COMPANY, LTD.,

*Petitioner-Appellee,*

-v.-

AMERICAN UNIVERSITY OF ANTIGUE-COLLEGE OF MEDICINE,

*Respondent-Appellant,*

MANIPAL EDUCATION AMERICAS, LLC, FKA GCLR, LLC,

*Respondent.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND ADDENDUM OF PETITIONER-APPELLEE
## LEEWARD CONSTRUCTION COMPANY, LTD.

VERONICA A. MCMILLAN
LEWIS & GREER, P.C.
*Attorneys for Petitioner-Appellee*
510 Haight Avenue, Suite 202
Poughkeepsie, New York 12603
(845) 454-1200

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Petitioner-Appellee Leeward Construction Company, Ltd. certifies that it is a private non-governmental party without any corporate parent, affiliate and/or subsidiary, publicly held or otherwise. No publicly held corporation owns 10% or more of Leeward Construction Company, Ltd.'s stock.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT..................................................................1

STATEMENT OF THE CASE.................................................................3

    I.     The Parties.................................................................3

    II.    The Arbitration Proceeding.................................................4

    III.   The Confirmation Proceeding.............................................7

SUMMARY OF ARGUMENT.................................................................9

ARGUMENT..........................................................................................11

    I.     THE STANDARD OF REVIEW.......................................11

    II.    THE ARBITRATORS DID NOT COMMIT MISCONDUCT BY AWARDING DAMAGES FOR "BAD FAITH".....................14

    III.   THE ARBITRATORS PROVIDED A REASONED AWARD......................................................................19

CONCLUSION........................................................................................23

CERTIFICATE OF COMPLIANCE WITH FED.R.APP.P. 32 (A).....................24

CERTIFICATE OF SERVICE.................................................................25

ADDENDUM..........................................................................................26

# TABLE OF AUTHORITIES

**CASES**
**PAGE(S)**

*Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188 (4th Cir. 1988)....... 21

*Carmody Bldg. Corp. v. Richter & Ratner Contracting Corp.*,
    2013 U.S. Dist. LEXIS 117262 (S.D.N.Y. 2013) .............................. 21

*Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836
    (11th Cir. 2011) ............................................................. 2, 20

*Florasynth, Inc. v. Pickholz*, 750 F.2d 171 (2d Cir. 1984). ................................... 11

*Fulbrook Capital Management, LLC v. Batson*, 2015 U.S. Dist. LEXIS
    8204 (S.D.N.Y. 2015)................................................... 20, 21

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*,
    729 F.3d 99 (2d Cir. 2013) ......................................... 11, 14

*Leeward Constr. Co. v. Am. Univ. of Antigua*, 2013 U.S. Dist. LEXIS
    43350 (SDNY 2013)........................................... 1, 3, 16, 21

*Nash v. Paragon Finance, plc* [2001] 1 WLR 685 ................................. 17

*Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469
    (5th Cir. 2012) ....................................................... 10, 20, 21

*Rich v. Spartis*, 516 F.3d 75 (2d Cir. 2008) ..................................... 12, 15

*Rosati v. Bekhor*, 167 F.Supp.2d 1340 (M.D. Fla. 2001) ...................... 15

*Sarofim v. Trust Co. of the West*, 440 F.3d 213 (5th Cir. 2006). ...................... 2, 20

*Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444 (2d Cir. 2011).................. 13

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329
    (2d Cir. 2010). ...................................................... 11, 14

*Telenor Mobile Commc'ns. AS v. Storm, LLC*, 584 F.3d 396 (2d Cir. 2009)......... 15

*Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16 (2d Cir. 1997)..... 11, 12, 13, 14, 15

*Telenor Mobile Commc'ns. AS v. Storm, LLC*, 584 F.3d 396
   (2d Cir. 2009) ............................................................... 12, 15

*Tully Constr. Co. v. Canam Steel Corp.*, 2015 U.S. Dist. LEXIS 25690
   (S.D.N.Y. 2015)................................................................ 20

*Vandenavond v. 12 Technologies, Inc.*, 2008 WL 5336300 (N.D. Texas 2008).... 15

*Washington Land Development, LLC v. Lloyds TSB Bank, PLC*,
   2014 U.S. Dist. LEXIS 98121 (W.D. Wash. 2014) ........................... 19

*Yam Seng Pte Ltd. v. International Trade Corp. Ltd.* [2013] EWHC 111 (QB).... 17

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*,
   126 F.3d 15 (2d Cir. 1997) ........................................... 11, 12

*Zieler v. Deitsch*, 500 F.3d 157 (2d Cir. 2007) ....................................... 12

**STATUTES**
**PAGE(S)**

9 U.S.C. § 10(a)(3)........................................................ 1, 9, 13, 14, 16, 19

9 U.S.C. §10(a)(4)................................................................ 2, 19, 22

9 U.S.C. §203 ...........................................................................3

9 U.S.C. §207 ................................................................... 12

10 U.S.C. §10 (a)(4)................................................................ 13, 14

iv

28 U.S.C. §1332(a)(2) ................................................................3

Fed. R. Civ. P. 12(b)(6) ......................................................... 3, 7

Federal Arbitration Act, 9 U.S.C. §1, *et seq.* ..................................... 3, 11

**OTHER AUTHORITIES**
**PAGE(S)**

The Convention on the Recognition and Enforcement of Foreign
      Arbitral Awards ..................................................... 3, 12, 13

## **PRELIMINARY STATEMENT**

This proceeding arises out of a contract between the Petitioner- Appellee Leeward Construction Company, Ltd. ("Appellee" or "Leeward") and Respondent-Appellant American University of Antigua -- College of Medicine ("Appellant" or "AUA") for the construction of a medical school in St. Johns, Antigua. Pursuant to the terms of the parties' contract (A 35), Leeward initiated arbitration proceedings against the AUA in February, 2011, which resulted in an Award, in favor of Leeward, on June 22, 2012 (the "Award") (A 87). The Award was modified on August 8, 2012 to correct minor clerical errors (A 126). The United States District Court for the Southern District of New York confirmed the Award in a Memorandum Opinion entered on March 26, 2013 which is reported *Leeward Constr. Co. Ltd. v. American University of Antigua – College of Medicine*, 2013 U.S. Dist. LEXIS 43550 (S.D.N.Y. 2013) (the "Decision"). On June 11, 2013, the District Court's Clerk entered an Amended Corrected Judgment in Leeward's favor (A 407).

The AUA has appealed to this Court from the Decision arguing the Award should be modified in two respects. First, the AUA claims that the Arbitrators awarded Leeward damages under a theory of recovery not before them and contrary to English common law upon which Antiguan law is based, in violation of 9 U.S.C. §10(a)(3). The AUA is incorrect in this regard. The Arbitrators did not

1

commit misconduct in awarding Leeward damages as a result of, *inter alia*, the AUA's bad faith because the Arbitrators were authorized to consider every breach of contract supported by the evidence even if the fact, law or legal tenet may not have been specifically argued by the parties. The Appellant has offered no proof that Antiguan law does not imply a covenant of good faith and fair dealing. Further, implied covenants of good faith are authorized by English common law.

Second, the AUA argues that the Arbitrators failed to render a "reasoned award" in violation of 9 U.S.C. §10(a)(4) "as the Agreement required, with respect to the amount of several items of damages." Appellant Brief, p. 1. Again, the AUA is incorrect. The parties' agreement did not require a reasoned award. *See, e.g., Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 840, n.6 (11th Cir. 2011). Further, the Arbitrators did provide a reasoned award as the Federal courts have defined that term. *See, e.g., Sarofim v. Trust Co. of the West*, 440 F.3d 213, 215, n. 1 (5th Cir. 2006).

The AUA fails to raise a justifiable basis for modifying and/or vacating any part of the Award. The AUA's appeal herein should be denied, the Decision affirmed and the Amended Corrected Judgment as entered, enforced.

## **STATEMENT OF THE CASE**

The instant appeal arises from Leeward's petition to confirm the Award, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §203 (the "Convention") and 28 U.S.C. §1332(a)(2), filed in the United States District Court for the Southern District of New York on August 16, 2012 (A 27). On September 25, 2012, AUA cross-moved to dismiss the petition pursuant to the *Forum Non Conveniens* Doctrine and Fed. R. Civ. P. 12(b)(6) or in the alternative, to vacate or modify the Award pursuant to the Federal Arbitration Act, 9 U.S.C. §1, *et seq*. ("FAA") (A 170). On March 26, 2013, the District Court entered a Memorandum Opinion which, *inter alia*, granted Leeward's petition (A 13). The opinion is reported at *Leeward Constr. Co. Ltd. v. American University of Antigua – College of Medicine*, 2013 U.S. Dist. LEXIS 43550 (S.D.N.Y. 2013). On June 11, 2013, the District Court's Clerk entered an Amended Corrected Judgment in Leeward's favor (A 407).

### I.    **The Parties**

Leeward is a corporation duly organized and existing under the laws of the Commonwealth of Antigua and Barbuda, with office and principal place of business at All Saints Road, St. Johns, Antigua. Upon information and belief, AUA is a corporation organized and existing under the laws of Antigua, with an office and principal place of business at Coolidge, Antigua. The AUA is owned

3

and operated by Respondent Manipal Education Americas, LLC, f/k/a GCLR, LLC, a limited liability company organized and existing under the laws of the State of New York, with office and principal place of business at 1 Battery Park Plaza, 33rd Floor, New York, New York (A 361).

## II.    The Arbitration Proceeding

On September 25, 2008, Leeward, as contractor, and the AUA, as owner, executed a contract for the construction of a medical school in St. Johns, Antigua (the "Contract") (A 35).  Section 4.6 of the General Conditions to the Contract contained an arbitration agreement that reads as follows:

> § 4.6 ARBITRATION
>
> § 4.6.1    Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration.
>
> § 4.6.2    Claims shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect.  The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect.  Location of any Arbitration will be Antigua.

(A 67).

On February 3, 2011, Leeward commenced an arbitration proceeding with the American Arbitration Association International Center for Dispute Resolution ("AAA") to arbitrate claims arising out of or related to the Contract. Pursuant to the Construction Industry Rules of American Arbitration Association, the AAA appointed a panel of three arbitrators to hear and determine the claims (the "Arbitrators").

On or about October 14, 2011, Leeward served and filed an Amended Demand for Arbitration requesting an award for breach of contract in the amount of US $2,518,931.97/EC $6,800,572.28; interest on late payments as provided in the Contract from the date the payments were due until the date the payments were made at the legal rate of interest in Antigua as determined by the Arbitrators; and legal fees and expenses, including the cost and expense of arbitration, as determined by the Arbitrators in accordance with the laws of Antigua (A 192).

Leeward's breach of contract claim alleged that the AUA repeatedly breached the contract by failing to issue change orders/change directives for additional contract work; failing to pay for additional work that the AUA authorized and directed Leeward to perform; failing to pay Leeward's payment applications in accordance with the terms of the Contract; failing to certify the Project as substantially complete; failing to issue a final certificate of payment; failing to make final payment to Leeward in accordance with the terms of the Contract; failing to

pay the mobilization fee as provided in the Contract; failing to authorize overtime as provided in the Contract; failing to coordinate the work of other contractors as required in the Contract; and failing to properly administer the Contract as provided in the Contract documents (A 192).

On or about November 30, 2011, the AUA filed a reply to the Amended Demand that included counterclaims for liquidated delay damages in the amount of US $117,000.00 and in the alternative, actual delay damages in the amount of US $371,955.31/EC $1,004,199.00. (The AUA withdrew its counterclaim for actual delay damages on April 11, 2012.)

On December 11, 2011, the Arbitrators held a hearing during which the parties stipulated to conduct the evidentiary hearings in San Juan, Puerto Rico, notwithstanding the venue provision in the arbitration agreement requiring that the arbitration take place in Antigua. The arbitration hearings were heard in Isla Verde, Puerto Rico from March 5, 2012 through March 9, 2012. The parties submitted lengthy post-hearing findings of fact and conclusions of law (A 217, 279, 319, 368). The Arbitrators declared the hearings closed and the case submitted for resolution on May 22, 2012.

In the Award certified June 22, 2012 and modified August 8, 2012, the Arbitrators directed the AUA to pay damages to Leeward in the amount of $976,421.37, plus interest at the rate of seven percent (7%) per annum as provided

in the Award (A 126). The unanimous Award, thirty-four (34) pages in length detailed the procedural background of the matter; uncontested facts; witnesses; interlocutory matters; controversies submitted to the panel for resolution; and the damages awarded (A 127-160). In Section VI of the Award (controversies submitted for resolution), the Arbitrators recited twenty-six (26) controversies Leeward submitted for resolution and thirty-eight (38) controversies AUA submitted for resolution together with their decision for each and every one (A 132-157). The arbitrators awarded seven (7) different categories of damages, including EC $157,950.00 in liquidated damages to AUA (A 157-158).

On July 10, 2012, the AUA moved the Arbitrators to modify the arbitration award claiming that the award contained "technical and computational errors" (A 356). On July 19, 2012, Leeward filed its opposition to the motion to modify (A 398). On August 8, 2012, the Arbitrators issued a modified award correcting some minor clerical errors, but maintaining the damages awards as initially provided in the June 22, 2012 award (A 121, 126).

### III.    The Confirmation Proceeding

On August 16, 2012, Leeward filed a petition to confirm the Award (A 27). On September 25, 2012, the AUA cross-moved to dismiss the petition pursuant to the *Forum Non Conveniens* Doctrine and Fed. R. Civ. P. 12(b)(6) or in the alternative, to vacate or modify the Award pursuant to the FAA (A 170). The

7

District Court confirmed the Award in the Decision entered on March 26, 2013 (A 13). On June 11, 2013, the District Court's Clerk entered an Amended Corrected Judgment in Leeward's favor (A 407).

On April 29, 2013, AUA filed a Notice of Appeal (A 12). Beginning on August 20, 2013, the parties entered into a series of stipulations pursuant to LAR 41.2 dismissing this appeal without prejudice with leave for AUA to reinstate the appeal by a date certain (A 418-420). AUA reinstated its appeal on February 2, 2015. On August 9, 2013, AUA filed a *supersedeas* bond in the amount of $1,073,000 securing the Amended Corrected Judgment during the pendency of its appeal. On August 16, 2013, the District Court entered a Stipulation and Consent Order staying the enforcement of the Amended Corrected Judgment pending the outcome of AUA's appeal (A 410).

# SUMMARY OF ARGUMENT

The Appellant has failed to articulate any reason under either the Convention or the FAA for modifying or vacating any portion of the Award. Accordingly, the Court should deny AUA's appeal herein, affirm the Decision and enforce the Amended Corrected Judgment as entered.

In its appeal, the AUA argues that the Award should be modified to vacate those portions awarding Leeward damages for the AUA's bad faith as well as for lost profits and overhead and change order work. With regard to the bad faith damages, the AUA claims that the Arbitrators committed misconduct in making this award because the ground was not raised in the arbitration. Further, the AUA claims that bad faith damages are not permitted under English common law upon which Antiguan law is based. The AUA is incorrect on both counts. First, as the District Court has already recognized, the issue of the AUA's bad faith in deleting work from the Contract and then re-awarding it to Leeward under separate contracts after a competitive bidding process was extensively litigated in the underlying proceeding. Thus, the AUA cannot now feign surprise. Further, a breach of an implied covenant of good faith and fair dealing in a commercial contract is in fact, recognized by English common law. Thus, the Arbitrators did not commit misconduct under the terms of 9 U.S.C. §10(a)(3).

9

The AUA also argues that the Award should be modified to vacate the awards for bad faith, lost profits and overhead, and change order work because the Arbitrators failed to provide a reasoned award with regard to these categories of damages. Contrary to the AUA's claim, the Arbitrators more than met their obligations for a reasoned award by rendering a decision, over thirty (30) pages in length in which they stated the issues, made finding for one party or another and stated the damages associated therewith. *See Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 474 (5th Cir. 2012) The AUA's claims otherwise are based on speculation and conjecture. The AUA was not entitled to anything more than the Award as the Arbitrators rendered it.

## ARGUMENT

### I.   THE STANDARD OF REVIEW

On appeal from a confirmation proceeding, this Court reviews questions of law *de novo*. *See T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010).   However, the Court's review is still limited in the same manner the District Court's was during the confirmation proceeding.   The confirmation of an arbitration award is a summary proceeding that merely converts a final arbitration award into an enforceable judgment of the Court.   *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) (citing *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)).   As this Court has held:

> The role of a district court in reviewing an arbitration award is "narrowly limited" and "arbitration panel determinations are generally accorded great deference under the [Federal Arbitration Act.]"   This deference promotes the "twin goals of arbitration, namely settling disputes efficiently and avoiding long and expensive litigation."   Consequently, the burden of proof necessary to avoid confirmation of an arbitration award is very high, and a district court will enforce the award as long as "there is a barely colorable justification for the outcome reached."

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 103-104 (2d Cir. 2013) (quoting *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16,

19 (2d Cir. 1997); *Telenor Mobile Commc'ns. AS v. Storm, LLC*, 584 F.3d 396, 405 (2d Cir. 2009); *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008))

Under the Convention arbitrations between citizens of signatory states must be confirmed except when a court finds one of the seven defenses for vacating the award under Article V(1) of the Convention exists. *See* 9 U.S.C. §207; *Zieler v. Deitsch*, 500 F.3d 157, 164 (2d Cir. 2007); *Yusuf*, 126 F.3d at 19.[1] The Convention governed the confirmation and enforcement of the Award herein given the parties' citizenship (Antigua); the situs of the project (Antigua); and the terms of the Contract.

When an international arbitration governed by the Convention takes place within the United States, the court may also vacate the arbitration award upon any of the grounds set forth in Section 10 of the FAA for vacating a domestic arbitration. *See Zieler*, 500 F.3d at 164 (citing *Yusuf*, 126 F.3d at 21-23); 9 U.S.C. §10. Here, recognizing that there is no basis to modify or vacate the Award under

---

[1] Under Article V of the Convention, the grounds for vacating an arbitration award are: (a) incapacity of a party to the Arbitration Agreement; (b) failure to provide proper notice of the appointment of the arbitrator or of the arbitration proceeding; (c) the award exceeds the scope of the arbitration agreement; (d) the composition of the arbitral authority or procedure was not in accordance with the arbitration agreement; or (e) "the award has not yet become binding on the parties, or has been satisfied or suspended by a competent authority of the country in which, or under the law of which, that award was made."

the Convention, the Appellant relies on 9 U.S.C. §10(a)(3) to claim that the Arbitrators engaged in misconduct. 9 U.S.C. §10(a)(3) provides:

> ...where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced...

9 U.S.C. §10(a)(3). However, to warrant modification under 9 U.S.C. §10(a)(3), this Court has held that the misconduct must amount to a denial of fundamental fairness. *See Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) ("Courts have interpreted Section 10(a)(3) to mean that except where fundamental fairness is violated, arbitration determinations will not be opened up to evidentiary review."); *see also, Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444 (2d Cir. 2011).

Additionally, the AUA seeks to modify the Award to vacate certain categories of damages pursuant to 10 U.S.C. §10(a)(4) claiming that the Arbitrators did not act within the boundaries of the arbitration proceeding by allegedly failing to provide a reasoned award. 9 U.S.C. §10(a)(4) provides:

> ...where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and

13

> definite award upon the subject matter submitted was not
> made.

9 U.S.C. §10(a)(4). As with 9 U.S.C. §10(a)(3), this Court has "consistently accorded the narrowest of readings to the FAA's authorization to vacate awards" under this provision. *T.Co Metals, LLC*, 592 F.3d at 342.

## II. THE ARBITRATORS DID NOT COMMIT MISCONDUCT BY AWARDING DAMAGES FOR "BAD FAITH"

In its appeal herein, AUA claims that the Award is subject to modification to vacate that portion in which the Arbitrators awarded Leeward damages on the basis of the bad faith doctrine because in making the award, the Arbitrators engaged in misconduct pursuant to 9 U.S.C. §10(a)(3). Specifically, the AUA claims that the award came as a complete surprise thereby depriving it of the opportunity to defend against the claim and is contrary to Antiguan law. *See* Appellant's Brief, pp. 13-16.

Federal courts enforcing arbitration awards have held that an arbitrator does not exceed his authority where he decides an issue submitted for arbitration even when the award is made on the basis of a fact, law or legal tenet that may not have been specifically argued as long as there is a "barely colorable justification for the outcome reached". *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 103-104 (2d Cir. 2013) (quoting *Tempo Shain Corp. v. Bertek*,

14

*Inc.*, 120 F.3d 16, 19 (2d Cir. 1997); *Telenor Mobile Commc'ns. AS v. Storm, LLC*, 584 F.3d 396, 405 (2d Cir. 2009); *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008)). An arbitration panel only exceeds its authority when it reaches conclusions on issues that the parties never submitted to arbitration at least in general. *See, e.g.*, *Rosati v. Bekhor*, 167 F.Supp.2d 1340, 1345 (M.D. Fla. 2001) (applying the FAA, court upheld award in favor of the claimant based upon Florida securities law statute even though claimant raised the issue of securities fraud, in general, without a specific reference to the Florida statute); *Vandenavond v. 12 Technologies, Inc.*, 2008 WL 5336300 (N.D. Texas 2008) (applying FAA, court upheld arbitration award for breach of employment contract even though the award was based upon the breach of a contract provision that neither party specifically addressed during arbitration).

Here, the general issue before the Arbitrators was whether the AUA breached the Contract. The Arbitrators were therefore authorized to consider every breach of contract theory supported by the evidence, including whether the AUA breached the contract by acting in bad faith[2] and whether Leeward was entitled to damages for that bad faith, as well as overhead and profit for work deleted, omitted or modified and unpaid through change orders.

---

[2] Every contract carries with it a duty that the parties exercise good faith. *See Restatement (Second) of Contracts*, §205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.")

In confirming the Arbitrators' decision to award Leeward damages under the bad faith doctrine, the District Court recognized that the AUA's behavior in deleting work from the Contract and then awarding it back to Leeward under separate contracts was "questionable and leaves much to be desired" and that Leeward had argued for the result if through the use of slightly different terms. *See Leeward Construction Co., Ltd.*, 2013 U.S. Dist. LEXIS 43550 at \*15. The District Court correctly observed:

> While Leeward had framed its claim as one for overhead and profit and did not use the term bad faith, it essentially argued that AUA's action with regard to this work breached the implied covenant of good faith and fair dealing. That is, it argued that it was entitled to the benefit of the bargins it had negotiated for such work in the original contract and that AUA had deprived it of this benefit when it deleted the work from the contract and then put the work up for separate bidding.

> In awarding damages under what they called the "bad faith doctrine," the arbitrators apparently accepted Leeward's contentions that AUA had evaded the spirit of the bargain. The award of damages can be construed as restoring to Leeward the benefit of the original contract as to this work.

*Id.* at \*15-16. Leeward clearly demonstrated its claim in the underlying arbitration; it was of no surprise to the AUA and AUA had ample opportunity to defend against the claim. In fact, the District Court points out that the AUA

16

appears to ignore and does not even attempt "to engage with the issue with which the arbitrators were clearly concerned: AUA's actions in deleting work from the original contract and then putting that work up for competitive bidding." *Id.* at *16.

The AUA also claims that the award of bad faith damages was improper because it is contrary to Antiguan law. Essentially, AUA claims that English common law, upon which Antiguan law is based, does not recognize the implied covenant of good faith and fair dealing in commercial contracts. The AUA is incorrect. First, the AUA presents no proof that Antiguan law does not recognize an implied covenant of good faith and fair dealing. Second, while English courts may not call it "the implied covenant of good faith and fair dealing," the fact remains, that English common law, like American jurisprudence, does recognize an implied covenant of reasonability and fair dealing to give effect to the reasonable expectations of the parties to a commercial contract. *See Nash v. Paragon Finance, plc* [2001] 1 WLR 685, ¶42[3] (In context of consumer credit mortgage action court concluded: "there was an implied term of both agreements that the Claimant would not set rates of interest unconscionably high … Such an implied term is necessary in order to give effect to the reasonable expectations of the parties.") Indeed, in *Yam Seng Pte Ltd. v. International Trade Corp. Ltd.*

---

[3] For the Court's convenience, a copy of *Nash v. Paragon Finance, plc* [2001] 1 WLR 685 is annexed hereto as part of the Appellee's addendum to this brief.

17

[2013] EWHC 111 (QB)[4], a dispute concerning a commercial distribution contract, the High Court of Justice in the Queen's Bench Division held that implied covenants of this nature have a long history in English common law:

> Understood in the way I have described, there is in my view nothing novel or foreign to English law in recognising an implied duty of good faith in the performance of contracts. It is consonant with the theme identified by Lord Steyn as running through our law of contract that reasonable expectations must be protected: see First Energy (UK) Ltd v Hungarian International Bank Ltd [1993] 2 Lloyd's Rep 194, 196; and (1997) 113 LQR 433. Moreover such a concept is, I believe, already reflected in several lines of authority that are well established. One example is the body of cases already mentioned in which duties of cooperation in the performance of the contract have been implied. Another consists of the authorities which show that a power conferred by a contract on one party to make decisions which affect them both must be exercised honestly and in good faith for the purpose for which it was conferred, and must not be exercised arbitrarily, capriciously or unreasonably (in the sense of irrationally): see e.g. Abu Dhabi National Tanker Co v. Product Star Shipping Ltd (The "Product Star") [1993] 1 Lloyd's Rep 397, 404; Socimer International Bank Ltd v Standard Bank London Ltd [2008] 1 Lloyd's Rep 558, 575-7. A further example concerns the situation where the consent of one party is needed to an action of the other and a term is implied that such consent is not to be withheld unreasonably (in a similar sense): see e.g. Gan v Tai Ping (Nos 2 & 3) [2001] Lloyd's Rep IR 667; Eastleigh BC v Town Quay Developments Ltd [2010] 2 P&CR 2. Yet another example, I would suggest, is the line of authorities

---

[4] For the Court's convenience, a copy of *Yam Seng Pte Ltd. v. International Trade Corp. Ltd.* [2013] EWHC 111 (QB) is annexed hereto as a part of the Appellee's addendum to this brief.

> of which the <u>Interfoto</u> case is one which hold that an
> onerous or unusual contract term on which a party seeks to
> rely must be fairly brought to the notice of the other party if
> it is to be enforced.

*Id.* at ¶145; *see also, Washington Land Development, LLC v. Lloyds TSB Bank,*

*PLC*, 2014 U.S. Dist. LEXIS 98121 (W.D. Wash. 2014). Thus, the Award is not

contrary to Antiguan law or English common law.

In sum, the Arbitrators did not engage in misconduct and as such, 9 U.S.C.

§10(a)(3) does not provide a basis for the Award to be modified or vacated. The

Arbitrators' award to Leeward of bad faith damages should be enforced.

## III. THE ARBITRATORS PROVIDED A REASONED AWARD DESPITE NOT BEING REQUIRED TO DO SO

The AUA also claims that the Award should be modified to vacate certain

categories of damages awarded because pursuant to 9 U.S.C. §10(a)(4). The AUA

argues that the arbitrators exceeded their powers by failing to provide a reasoned

award on the amount of damages awarded for bad faith, lost profits and overhead

on omitted work, and change order work under the Contract. *See* Appellant Brief,

pp. 17-20. The AUA's contention is without merit and should not be countenanced

by this Court.

First, contrary to the AUA's statement in its brief, the Contract's arbitration

agreement did not call for a reasoned award (A 35, 67). Rather, the Arbitrators

19

provided in the September 4, 2011 preliminary hearing order that the award would be a reasoned one (A 189).   Under these circumstances, at least one circuit court has questioned whether the Arbitrators were actually bound to render a reasoned award at all. *See Cat Charter, LLC*, 646 F.3d at 840, n.6 ("Given the deference we accord arbitrators in determining arbitral procedures, we are not entirely convinced that the parties' agreement bound the Panel to deliver a reasoned award. Nevertheless, we will …assume that the parties validly altered the procedures to require a reasoned award…")

Second, the September 4, 2011 preliminary hearing order did not specify what the reasoned award would include (A 189).   Federal courts have held that where there is no agreement between the parties as to what the award shall contain (as in the present case), the contents of a reasoned award is within the discretion of the arbitrators and the award will be deemed a reasoned award if it is "something short of findings of fact and conclusions of law but more than a simple result." *Sarofim*, 440 F.3d at 215, n. 1; *see also*, *Rain CII Carbon, LLC*, 674 F.3d 469 (applying FAA, court found that arbitrators had rendered a sufficiently "reasoned award" when the arbitration award thoroughly described contentions asserted by the parties and then summarily concluded that the evidence presented either supported or did not support each contention).   This Court has not yet addressed the issue of what constitutes a reasoned award but several district courts in the

20

Second Circuit have subscribed to the Fifth Circuit's definition enunciated in *Sarofim* and *Rain CII Carbon, LLC*. *See, e.g., Tully Constr. Co. v. Canam Steel Corp.*, 2015 U.S. Dist. LEXIS 25690 (S.D.N.Y. 2015); *Fulbrook Capital Management, LLC v. Batson*, 2015 U.S. Dist. LEXIS 8204 (S.D.N.Y. 2015); *Carmody Bldg. Corp. v. Richter & Ratner Contracting Corp.*, 2013 U.S. Dist. LEXIS 117262 (S.D.N.Y. 2013)

Under this standard, the Award was extensively reasoned. The District Court correctly found that the Award, over thirty (30) pages in length, provided "considerable detail regarding the panel's findings and conclusions as to the various components of the overall award …[and that] the arbitrators were [not] obliged to show how every single proposition they adopted could be derived from first principles. " *Leeward Construction Co., Ltd.*, 2013 U.S. Dist. LEXIS 43550 at *10.

Further, the AUA's claims that the damage categories were not adequately explained, and that one category of damage could be duplicative of another is based on conjecture and not fact. *See Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 194 (4th Cir. 1988) (apply FAA, court denied modification of award because alleged miscalculation was not evident from the face of the award) The Arbitrators were not required to provide an explanation of how damages were calculated. The Arbitrators met their obligations for a reasoned award by stating

the issue, finding for Leeward (or the AUA) on the issue, and stating the damages associated therewith. *See Rain CII Carbon, LLC*, 674 F.3d at 474 (court sustained eight page award as "reasoned" where the "arbitrator laid out the facts, described the contentions of the parties, and decided which of the two parties should prevail"). The AUA is not entitled to anything more.

The Arbitrators in rendering the Award did not violate 9 U.S.C. §10(a)(4). Accordingly, the AUA's appeal should be denied, the Decision affirmed and the Award enforced in toto.

## CONCLUSION

For the foregoing reasons, the decision of the District Court should be affirmed and the Amended Corrected Judgment, as entered, enforced.

Dated:      March 16, 2015

<div style="margin-left:50%">

Respectfully submitted,

**LEWIS & GREER, P.C.**
510 Haight Avenue, Suite 202
Poughkeepsie, New York 12603
(845) 454-1200

By: _____
      Attorney for Appellee

</div>

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5807 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-Point font.

Dated:         March 16, 2015

                              **LEWIS & GREER, P.C.**

                              By: _____
                                    Veronica A. McMillan, Esq.
                                    510 Haight Avenue, Suite 202
                                    Poughkeepsie, New York 12603
                                    (845) 454-1200
                                    vamcmillan@lewisgreer.com

                              *Attorney for Petitioner-Appellee*
                              *Leeward Construction Company, Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the Brief of Petitioner-Appellee Leeward Construction Company, Ltd. with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the Appellate CM/ECF system on March 16, 2015.

I hereby certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Appellate CM/ECF system.

I hereby certify that six (6) copies of the Brief of Petitioner-Appellee Leeward Construction Company, Ltd. have been forwarded to the Clerk of the Court for the United States Court of Appeals for the Second Circuit via Federal Express for filing pursuant to Local Rule 31.1.

Dated:        March 16, 2015

LEWIS & GREER, P.C.

By:_____
        Veronica A. McMillan, Esq.
        510 Haight Avenue, Suite 202
        Poughkeepsie, New York 12603
        (845) 454-1200
        vamcmillan@lewisgreer.com

*Attorney for Petitioner-Appellee*
*Leeward Construction Company, Ltd.*

# ADDENDUM

Yam Seng PTE Ltd. v. International
Trade Corp. Ltd.,
[2013] EWHC 111 (QB)



# England and Wales High Court (Queen's Bench Division) Decisions

[New search] [Printable RTF version] [Help]

**Neutral Citation Number: [2013] EWHC 111 (QB)**

Case No: HQ11X00722

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION

Royal Courts of Justice
Strand, London, WC2A 2LL

01/02/2013

B e f o r e :

**MR JUSTICE LEGGATT**

---

Between:

**Yam Seng Pte Limited**
**(A company registered in Singapore)**　　　**Claimant**

**- and -**

**International Trade Corporation Limited**　　　**Defendant**

---

**Adrian Salter (instructed by Benson Mazure LLP) for the Claimant**
**David Eaton Turner (instructed by Edwin Coe LLP) for the Defendant**
**Hearing dates: 31 October, 21-23, 26-27 November 2012**

---

**HTML VERSION OF JUDGMENT**

---

Crown Copyright ©

**Mr Justice Leggatt :**

## A. INTRODUCTION

1. On 12 May 2009 the parties to this action entered into a written contract entitled "Manchester United Distribution Agreement". Under this Agreement the Defendant ("ITC") granted the Claimant ("Yam Seng") the exclusive rights to distribute certain fragrances bearing the brand name "Manchester United" in specified territories in the Middle East, Asia, Africa and Australasia. The rights were for the most part limited to duty free sales but also included "domestic" sales in Hong Kong, Macau and two provinces of mainland China. The contract period initially ran from 12 May 2009 until 30 April 2010 but was later extended until 31 December 2011.

2. To begin with, the business relationship between the parties was a warm one, despite some strain caused by delays in supplying products. In 2010, however, the relationship soured and in July 2010 it ended acrimoniously with Yam Seng informing ITC that it was terminating the contract as ITC was in breach.

3. In this action Yam Seng claims damages for alleged breaches of the Agreement which are said to have consisted in late shipment of orders, failing or refusing to supply all the specified products, undercutting prices agreed with Yam Seng and providing false information. Yam Seng also claims damages on the alternative ground that it was induced to enter into the Agreement by misrepresentation.

4. Both claims are strenuously denied by ITC. As regards the claim for breach of contract, ITC denies that it committed any breach, or any breach which caused loss, and in any event denies that it committed any breach which was repudiatory and justified Yam Seng in terminating the Agreement. As regards the claim for misrepresentation, ITC denies that any misrepresentation was made or, if made, was relied upon by Yam Seng. ITC also disputes the quantum of damages claimed.

### The Parties

5. Although the contract in this case was made between two companies, the business relationship was essentially one between two individuals.

6. The Claimant, Yam Seng, is a company incorporated in Singapore which is controlled by Mr Sunil Tuli. Mr Tuli was born in India but now lives in Singapore. He is employed by King Power Group (Hong Kong) as managing director of its Duty Free Travel Retail Division; but he also carries on business ventures through his own company, Yam Seng. Mr Tuli has extensive experience of duty free sales, particularly in the Asia Pacific region, having been in this business for some 28 years.

7. The Defendant, ITC, is an English company controlled by Mr Roy Presswell. Mr Presswell is also a very experienced businessman, who has been selling fragrances for some 40 years. Since 1990 he has carried on business through ITC.

### The Evidence

8. Mr Tuli and Mr Presswell were the only two witnesses of fact who gave evidence at the trial. There are many matters on which they disagreed. Fortunately their business dealings are well documented. In particular, there are many contemporaneous emails. I approach the evidence on the

basis that, as in almost every case where there is a contemporaneous documentary record, the documents provide the best evidence of what happened. Human memory is notoriously unreliable, and the strong interests and emotions to which disputes resolved through litigation give rise are powerful distorting factors, however honest and well-intentioned the witness. Indeed, the more patently honest and convincing the witness, the greater can often be the risk of placing reliance on their testimony.

9.  That was not a risk presented by the evidence of Mr Presswell. It is clear from the correspondence that when his business relationship with Mr Tuli broke down, he felt angry and outraged at what he regarded as unwarranted attacks on his integrity. Those feelings were equally apparent when he gave evidence. Mr Presswell was completely unwilling to contemplate that in relation to the matters complained of he might have been in any way at fault. In seeking to justify his conduct, Mr Presswell made numerous claims about what he said or must have said on various occasions to Mr Tuli which were inconsistent with the documentary evidence. I have no doubt that Mr Presswell believed those claims, many of them made for the first time during cross-examination. I am unable, however, to attach any credence to his testimony.

10. Mr Tuli was a far more moderate and reasonable witness who was prepared to make sensible concessions in cross-examination.

11. In relation to the email correspondence, Mr Presswell pointed out that he does not use a computer or mobile phone and does not have direct access to emails, but relies on a secretary to print out messages received and type emails for him. He suggested that this explains why he sometimes did not respond promptly or at length to Mr Tuli's emails.

12. I bear in mind that Mr Presswell was not as avid in his use of email as Mr Tuli, but it is clear from the documentary record that Mr Presswell received Mr Tuli's emails and, when it suited him, replied to emails promptly. I do not consider that Mr Presswell would have inadvertently left unanswered significant email messages.

## B. THE FACTUAL HISTORY

13. Before considering the allegations of breach of contract and misrepresentation, I will first describe the history of the parties' business relationship. In doing so, I will record my findings on material points of fact that are in dispute.

### The Start of the Relationship

14. The first communication between the parties was an email sent by Mr Presswell to Mr Tuli on 23 January 2009. In that email Mr Presswell said that he had been introduced by a mutual friend and that his company, ITC:

> "has recently signed an exclusive three year worldwide licence agreement with Nike/Manchester United to manufacture and sell Manchester United fragrances."

Mr Presswell went on to say that he intended to visit Hong Kong and would like to meet Mr Tuli to discuss a potential deal.

15. The statement that ITC had "recently signed" a licence agreement to manufacture and sell Manchester United fragrances was untrue. Documents disclosed by ITC on the morning of the second day on which Mr Presswell gave evidence put that fact beyond doubt. That disclosure showed that the only document which ITC had signed as at 23 January 2009 was a 2-page "Licence

3/16/2015

**Case 13-1708, Document 105, 03/16/2015, 1461636, Page37 of 103**
Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

Deal Summary". There were two versions of this document, the first dated 24 October 2008 and the second dated 24 November 2008. Both documents started with the words (underlined in the original):

"The following details shall not constitute a legally binding contract, nor create any pre-contractual liabilities on either party. They are simply a summary of what has been discussed previously in relation to the proposed licence and are strictly subject to contract."

Both documents also ended with a statement that, by signing the deal summary, "you agree that this reflects what has been previously discussed as forming the basis on which we will proceed with negotiations."

16. I am sure that Mr Presswell knew perfectly well when he contacted Mr Tuli on 23 January 2009 that he had not signed a licence agreement and that his proposed deal with Manchester United Merchandising Limited was at that stage subject to contract. From my impression of Mr Presswell, however, I do not think that it would have struck him that he was making a false statement, as he undoubtedly was. Mr Presswell's attitude, both in his dealings with Mr Tuli and in giving evidence, was characterised by a striking ability to treat wishful thinking as fact.

17. Under cross-examination Mr Presswell would not admit that his statement that he had signed a licence agreement was untrue. He sought to justify the statement on the basis that the licence agreement for Manchester United fragrances which he did ultimately sign at the beginning of May 2009 specified the licence period as having begun on 1 January 2009. The fact that Mr Presswell was able to convince himself that this somehow made true the statement in his email to Mr Tuli is symptomatic of the attitude I have described.

18. The meeting proposed by Mr Presswell duly took place in Hong Kong on 26 February 2009. Mr Tuli and Mr Presswell gave very different accounts of what was said by Mr Presswell at this meeting about the availability of the products under discussion. According to Mr Tuli, Mr Presswell said that he already had stock of two products: Eau de Toilette ("EDT") 100ml and Deodorant Body Spray 150ml in red packaging. Other products were already in production including hair gel and body gel (referred to as "toiletries") and gift sets. Mr Tuli also claimed that Mr Presswell told him that ITC had a licence from Manchester United for the full product range. Mr Presswell's evidence, by contrast, was that he made it clear that there was no product on the market at that time and that the initial launch would be limited to EDT 100ml, packaged in red to match the Manchester United red home shirt. Subsequently he planned to launch EDT 100ml in black packaging in August 2009 to match Manchester United's new black kit for away matches. Thereafter he hoped to develop deodorant, toiletries and gift sets. Mr Presswell also claimed that he told Mr Tuli that he did not yet have a formal agreement with Manchester United for the toiletry products.

19. Following the meeting in Hong Kong, Mr Presswell sent a letter to Mr Tuli dated 2 March 2009 in which he referred to their discussion and set out the following timetable:

"The initial launch will be two sku's [stock keeping units] in red packaging.

○ Eau de Toilette Spray 100ml

○ Deodorant Body Spray 150ml

Thereafter, in August 2009, I will launch two sku's in black packaging, to coincide

3/16/2015

Case 13-1708, Document 105, 03/16/2015, 1461636, Page38 of 103
Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

with the launch of the new Manchester United black away kit.

- Eau de Toilette Spray 100ml

- Deodorant Body Spray 150ml

Thereafter, in October 2009, I will launch 2 gift sets, red packaging and black packaging for Christmas 2009, New Year – 1 January 2010, Chinese New Year 2010, Valentine's Day 2010.

Contents:

- Eau de Toilette Spray 50ml

- Shower Gel (tube) 150ml"

20. In my view, this letter is the best evidence of what was said at the meeting on 26 February 2009 with regard to the availability of products. I am not convinced that Mr Presswell said that he already had stock of EDT 100ml and Deodorant Body Spray 150ml; but I am sure that he gave the impression to Mr Tuli that those products were about to be launched. The timetable discussed for when other products would be available must have been as set out in the letter dated 2 March 2009. Although the letter referred to shower gel only as part of the gift sets, it was clearly contemplated that the toiletries would be available by the time the gift sets were launched in October 2009. I am sure that Mr Presswell did not disclose to Mr Tuli that ITC at that stage had no licence agreement (nor even any deal proposal) which covered toiletry products. I have no doubt that Mr Presswell gave the impression that the licence agreement which he had claimed in his email of 23 January 2009 already to have signed covered all the products ITC was offering to supply.

21. Mr Tuli was very interested in a distributorship deal and negotiations continued in email correspondence. On 6 April 2009 Mr Tuli sent an email to Mr Presswell containing what Mr Tuli described as a "business plan", setting out the proposed structure for an agreement. Mr Tuli had previously indicated (on 24 March) that he would be getting back to Mr Presswell on "the initial order quantities, as well as the planned purchases for the first twelve months". In his email of 6 April 2009, however, Mr Tuli said that getting a clear idea of the potential for the Manchester United fragrance was proving to be a rather difficult exercise. He suggested that "we place an initial order for 10,000 bottles, and get a few listings in key locations, and then decide on the figures, planned purchases and budgets a few weeks later."

22. Mr Tuli's email proposed that the agreement should include, as well as duty free sales, the right to sell the products in the domestic markets of Hong Kong and Macau and some other parts of China. Before a cosmetic product can be imported into China, it must be registered with the Chinese government authorities. Later on 6 April 2009, Mr Presswell sent an email to Mr Tuli in which he confirmed that four Manchester United products (the Eau de Toilette and Deodorant Body Spray, each in red and black) "will be registered in China within the next four months" and that thereafter:

"we will register and launch Manchester United Hair Gel, which has massive potential in China and the Asia Pacific/Middle East regions."

23. Mr Presswell acknowledged in evidence that, when he sent this email, he had made no enquiries and knew nothing about the process of registration in China and had no basis other than optimism for stating that four products would be registered in China within the next four months. He later learned that the registration process was much more laborious and bureaucratic than he had

3/16/2015

Case 13-1708, Document 105, 03/16/2015, 1461636, Page39 of 103
Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

imagined. His evidence in court was that registration of a new product in China can be expected to take at least twelve months and can take much longer.

24. In a letter dated 9 April 2009, Mr Presswell responded to various points in Mr Tuli's "business plan". Amongst other things, this letter stated that ITC would launch a 50ml Eau de Toilette Spray, aimed at sales to airlines, "circa August 2009". The letter also attached a pro forma invoice for an initial order of EDT 100ml, implying that stock of this product was available to order.

25. Mr Tuli prepared a draft agreement, which he sent to Mr Presswell by email on 20 April 2009. A plan was made to sign the agreement on 12 May 2009 in Mr Tuli's office in Singapore. Mr Presswell sent back an amended draft on 6 May which Mr Tuli approved. The signing took place as planned on 12 May 2009.

**The Agreement**

26. The Distribution Agreement is a short document, which was evidently prepared by the parties themselves without the assistance of lawyers. It consists of eight clauses, as follows:

> (1) Clause A is headed "Grant of Rights" and states that ITC grants Yam Seng "the exclusive rights for the Contract Period to distribute, market and sell in the Territory" products consisting of fragrances, deodorants, hair and body wash and hair styling gel.

> (2) Clause B defines the "Territory" as the list of countries set out in Schedule 1. Schedule 1 lists 42 territories under the heading "Duty Free and Travel Retail" and also four territories under the heading "Domestic" – namely, Hong Kong, Macau, Chongqing (China) and Xian (China).

> (3) Clause C defines the "Contract Period" as a period commencing 12 May 2009 and expiring on 30 April 2010 – with provision for the contract to be extended to 31 December 2011 subject to Yam Seng achieving "mutually agreed targets".

> (4) Clause D provides for payment by letter of credit.

> (5) Clause E is headed "Price Structure" and specifies the duty free retail price and Yam Seng buying price for six Manchester United products: EDT 100ml; EDT 50ml; Deodorant Body Spray 150ml; Hair and Body Wash 200ml; Hair Styling Gel 200ml; and a Gift Set comprising EDT 50ml and Hair and Body Wash 150ml.

> (6) Clause F provides that ITC will supply Yam Seng with "testers and posters" free of charge to demonstrate the fragrances, and that other marketing expenses will be borne by Yam Seng.

> (7) Clause G (headed "Distribution") states:

>> "[Yam Seng] will place an initial order after the signing of this agreement, and depending on the sales results of the first two months, will then forecast the sales/purchases from ITC for the next ten months.

>> ITC will ensure that all orders placed by [Yam Seng] will be shipped promptly. ..."

> (8) Clause H provides that the contract is to be governed by English law and that the

3/16/2015    Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

parties irrevocably submit to the exclusive jurisdiction of the courts of England and Wales.

27. It was clearly implicit in the grant of rights to distribute the products referred to in the Agreement that ITC had the rights to grant. In the case of the Eau de Toilette and the deodorant, that was so by the time the Agreement was signed, as a licence agreement between Manchester United Merchandising Limited and ITC covering those products had been concluded a few days earlier on 5 May 2009. However, in the case of the toiletries (i.e. the hair and body wash and the hair gel) ITC still did not at that stage possess the rights which it purported to grant. It was only on 21 May 2009 that Mr Presswell received a deal summary for a proposed licence for these products. A licence agreement was subsequently entered into between Manchester United Merchandising Limited and ITC on 21 August 2009 which granted ITC the non-exclusive rights to distribute hair and body wash and hair gel with effect from 1 July 2009.

28. I am sure that Mr Tuli would not have signed the Agreement if he had known that ITC did not yet have some of the rights which it was purporting to grant. I am equally sure that Mr Presswell did not explain the true position to Mr Tuli. He would have seen no need to do so when in his own mind he believed (perhaps with justification) that a licence to sell toiletry products would assuredly be granted.

**The First Order**

29. After the Agreement had been signed, discussions took place by email regarding Yam Seng's first order. The order was placed on 22 May 2009 and was for 10,000 units of 100ml EDT. In acknowledging the order, ITC stated that the shipment date from the UK would be approximately 30 June 2009. In the event the goods were shipped under a bill of lading dated 24 July 2009. No complaint was made at the time, however, about the delay in shipping this order.

**The Second Order**

30. Yam Seng followed up its initial order with a request sent to ITC by email on 5 June 2009 for a pro forma invoice so that Yam Seng could place a second order for the following items: 7,000 units of 100ml EDT, 1,000 units of 50ml EDT and 1,000 units of the deodorant 150ml. Mr Presswell replied on 8 June 2009 attaching a pro forma invoice, but only for the 7,000 units of 100ml EDT. With regard to the 50ml EDT and deodorant, he said: "Let's discuss on 24 June." This was a reference to a planned meeting on that date in London.

31. Mr Tuli and Mr Presswell duly met on 24 June 2009 at a hotel near Heathrow Airport. One of the matters they discussed was when the 50ml EDT and deodorant would be available. According to an email sent a few days later by Mr Tuli on 29 June 2009, Mr Presswell said at the meeting that these two products would be available to Yam Seng by "early August". Later emails from Mr Tuli suggest that what Mr Presswell in fact indicated was that the products would be available for delivery to Yam Seng in early September, which would mean shipping them in August. Mr Tuli was keen to place an order which included 50ml EDT and the deodorant, as he was getting interest in these products from potential customers, including Dubai Duty Free (the biggest duty free outlet in the world and a key customer for Yam Seng). As part of its marketing, Yam Seng had also been giving potential customers a free gondola stand in Manchester United get-up to display the fragrances. These gondolas were produced at Yam Seng's cost (of about US$800 per unit) and Mr Tuli was concerned that the gondolas could not be used to present an attractive display if they were only stocked with one item.

32. On 13 July 2009 Mr Tuli sent an email to Mr Presswell proposing that, instead of the 7,000 units of 100ml EDT which ITC had offered to supply, the second order should include 1,000 units of the 50 ml EDT and 1,000 units of the deodorant, along with 6,112 units of the 100ml EDT – which would in total come to the same price.

33. Having received no reply to this email, Mr Tuli explained the situation in a further email to Mr Presswell sent on 16 July 2009:

> "Please refer to my email below and one last week on the same subject, i.e. our second order, and the inclusion of the 50s and the deos in that.
>
> Could you please give me a response to them as I am having a problem giving answers to my potential customers. Duty Free operators are now in the process of placing orders, and need to know what we can give them and when.
>
> Based on the samples and the product shots you gave me, we have presented the whole range. It is very difficult to convince people to have only the 100ml on a gondola in a shop in the airport, and unless they have at least the 50 and the deo, they will delay orders.
>
> In other words we will be sitting on the stocks of the first order, till we can mix it with the other skus.
>
> In London you had said they would be available in early September to us. I have written to you saying this would mean placing our order in mid July, and your shipping it out in mid August, and verbally you have confirmed this.
>
> Before I make further commitments to my customers, I would however request for an official confirmation of this, as besides the financial exposure I have on this, I also run the risk of losing my credibility with so many people, due to not being able to deliver after going around making presentations etc on the brand, advertising it in the press etc.
>
> I am sorry to keep asking you for a reply on this, but we do need to know to be able to plan ahead, to make sure we make a success of this business."

34. Shortly after this email was sent, Mr Tuli attended two football matches as Mr Presswell's guest which were part of a Manchester United tour of the Far East. The matches were at Kuala Lumpur on 18 July and Seoul on 26 July 2009. When he met Mr Presswell at these matches, and in emails sent afterwards, Mr Tuli emphasised Yam Seng's urgent need to know when the 50ml EDT and the deodorant would be supplied. It appears from emails sent by Mr Tuli to Mr Presswell on 26 July and 30 July 2009 that Yam Seng had told Dubai Duty Free, optimistically, that these products would be available by mid August, in time for a launch at the airport on 1 September 2009.

35. It is apparent from the email correspondence that Mr Tuli spoke to Mr Presswell on the telephone on 4 August 2009 to discuss Yam Seng's order, and that Mr Presswell said that ITC would be able to get the 50ml EDT and deodorant to Yam Seng by the end of September. As a result of this conversation, Yam Seng placed a revised order dated 6 August 2009 for 5,000 units of 100ml EDT, 2,300 units of 50ml EDT and 2,000 units of deodorant. Yam Seng also fixed a launch date of 1 October 2009 for Dubai, Doha and Bahrain.

36. There were, however, a series of delays in shipping this order.

3/16/2015

Case 13-1708, Document 105, 03/16/2015, 1461636, Page42 of 103
Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

37. In an email dated 6 August 2009 Mr Presswell asked Mr Tuli to bear with him until the following Monday, 10 August – "at which time I will hopefully be able to confirm [a] definitive shipment date from the UK." However, Mr Presswell did not notify a shipment date on 10 August and, despite various chasing emails, he had still not done so over a month later when he met Mr Tuli in London on 14 September 2009. At this meeting the parties signed a revised version of the Distribution Agreement which amended the Contract Period specified in Clause C. The continuation of the contract after 30 April 2010 until 31 December 2011 had been subject to Yam Seng "achieving mutually agreed targets." Mr Presswell accepted that because of the delay and uncertainty over deliveries it had not been possible for Yam Seng to commit to targets for the first year of operation of the Agreement. He accordingly agreed to delete this condition. The revised Agreement provided that the Contract Period would expire on 31 December 2011 and that the contract was subject to renewal by mutual agreement after this date.

38. At the meeting Mr Presswell also explained that there had been delays in getting component parts, in particular the bottles and caps needed for the 50ml EDT, and that delivery by the end of September was now not going to be possible. Mr Presswell proposed, and Mr Tuli agreed, that they should start "with a clean sheet". He said he would let Mr Tuli know definite delivery dates later that week.

39. However, this promise too was not kept. In an email dated 30 September 2009, Mr Tuli wrote:

> "Please urgently advise delivery dates for the 50ml and the Deodorant. You had advised me in London on the 14th that you would let me know definite dates by 16th (the following Wednesday).
>
> Please do let me know the situation as we are having to slow down our efforts to get more business due to our not being able to supply. As you know the 100mls that we have are mostly booked, but we cannot ship them as customers want other products as well…"

40. It appears that a few days after this email was sent Mr Tuli spoke on the telephone to Mr Presswell who assured him that supplies of the 50ml EDT and the deodorant would be with Yam Seng by the end of October. On this basis Mr Tuli arranged a new launch date of 7 November 2009 with Dubai Duty Free. Mr Tuli emphasised the importance of meeting this date in an email sent to Mr Presswell on 12 October 2009.

41. Mr Tuli met Mr Presswell again at a trade fair in Cannes in the week beginning 18 October 2009. It was agreed that the 5,000 units of 100ml EDT included in the second order would be supplied to Yam Seng from stock left over from a promotion which ITC had organised in Singapore in collaboration with Singapore Telecom. ITC also agreed to supply another 5,000 units from the Singapore stock on open account (rather than requiring payment by letter of credit). Mr Tuli confirmed this agreement in an email dated 26 October 2009. In the same email he asked Mr Presswell to air freight a quantity of the 50ml EDT and the deodorant to Dubai and Doha in view of the proximity of the 7 November launch date. In another email sent later that day Mr Tuli asked if he could call Mr Presswell to discuss the position as the Dubai launch was being prepared and press organised etc. Mr Tuli stressed that "it will be absolutely necessary to make it this time or there will be negative publicity, something we cannot afford."

42. Mr Tuli was unable to contact Mr Presswell by phone and got no reply to his emails until 29 October 2009, when Mr Presswell finally contacted Mr Tuli to say that delivery of the order had been further delayed "due to circumstances beyond my control being the late delivery of certain

components and packaging." As a result, the launch was postponed again, this time until 22 November 2009. Arrangements were discussed for sending supplies of the 50ml EDT and deodorant directly to Dubai by air. The goods finally arrived on the night of 19 November 2009, but because the next day was a public holiday Yam Seng did not manage to get them to the duty free outlets in time for the proposed launch, which was missed. The launch finally took place in the first week of December 2009.

43. It was Mr Tuli's evidence, which I accept, that the repeated postponement of the launch in Dubai damaged his credibility with an important customer, although because of his good relationship with Dubai Duty Free he still managed to keep their custom.

**Other Products**

44. From the start of the contract period Yam Seng had been marketing to its customers the full range of products covered by the Distribution Agreement. Mr Presswell was well aware of this having, for example, been shown by Mr Tuli at their meeting in London on 24 June 2009 a marketing presentation which Yam Seng was using entitled "Welcome to the Theatre of Dreams". According to the original timetable set out by Mr Presswell before the Distribution Agreement was signed, the black "away kit" versions of the EDT and deodorant were to be launched in August 2009 and the toiletries (i.e. the hair and body wash, the hair gel and the gift set) in October 2009. However, this did not happen. Against this background, Mr Tuli asked Mr Presswell in an email dated 2 December 2009 to advise "when the other products, i.e. the hair gel, body wash and the gift set will be available, and also when will the Black range be available."

45. Mr Presswell did not reply to this email, but it is apparent from a later email that the matter was discussed when Mr Tuli visited ITC's offices in England later that month. On that occasion, and at a subsequent meeting in Singapore, Mr Presswell said that these products would be available by the end of March 2010.

46. On 2 February 2010 Yam Seng placed a further order for the existing products (i.e. the 100ml and 50ml EDT and deodorant in red) followed by an order dated 3 February 2010 for an initial quantity of the 100ml EDT in black. On 8 February 2010 Mr Tuli's son asked when these orders would be shipped and also for an indication of when the other products would be available. There was no response until 17 February 2010, when Mr Presswell telephoned Mr Tuli. In this call he informed Mr Tuli that ITC would not, after all, be launching the toiletry products.

47. Mr Tuli recorded his disappointment at this news in an email dated 18 February 2010. He wrote:

> "I was disappointed to hear yesterday that the body wash and hair gel will not be available, and we should not accept the orders and forget about these products. As you know, since you started sending us product information, pictures, pricing, catalogues etc from June last year, these items have been included in every presentation we have made.
>
> …
>
> Going forward, Roy, I think we need to understand the availability of products, and the schedules, before we go out to customers and start the selling process. As you know we had a lot of problems last year with supplies to Dubai, as deliveries kept getting delayed, and we lost a lot of goodwill. We have also invested a lot in the brand, and it will be a shame if the brand loses its reputation due to us not being able

3/16/2015

Case 13-1708, Document 105, 03/16/2015, 1461636, Page44 of 103
Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

to keep our commitments on deliveries etc. Customers, as you very well know, lose
interest very quickly, if the support of the brand is not behind them."

48. Mr Presswell explained in evidence that the reason for his decision not to produce the toiletries
was that the tube supplier insisted on a minimum order quantity (MOQ) of 25,000 for any
particular product or design, and that it had become clear that Yam Seng would not be able to place
an order of this size. In his oral evidence (although not in his witness statement) Mr Presswell
claimed that he told Mr Tuli that any supplies of the toiletries would be subject to MOQs, although
he said he could not recall whether this had been mentioned before the Distribution Agreement was
signed.

49. I am sure that Mr Presswell did not say anything about MOQs before the Agreement was signed,
not least because he only discovered himself that there would be such a requirement when he
reached the stage in the product development of having discussions with component manufacturers
in September or October 2009. I think it likely that at that stage Mr Presswell nevertheless hoped,
optimistically, that there would be enough demand for the products, from Yam Seng and other
customers, to make it economic for ITC to order the minimum quantity. Mr Presswell was still no
doubt living in hope that this would be so, and failing to face reality, when he told Mr Tuli in
December 2009 that the products would be available at the end of the following March. It was only
in February 2010 that Mr Presswell, to quote his witness statement, "examined the situation in
detail" and "came to the conclusion that there was simply no practical reason in proceeding with
launching [the toiletry products]." He may well have told Mr Tuli at that time that the reason for
his decision was that the components were subject to MOQs and that the demand was insufficient
to make it economic for ITC to manufacture the toiletries. I am sure, however, that it had never
previously been suggested to Mr Tuli that there was any constraint of this kind on the availability
of the toiletry products.

**Further Orders**

50. The orders which Yam Seng had placed on 2 and 3 February, and another order placed on 18
February 2010 for the 50ml EDT and Deodorant Spray in black, were shipped on 23 March 2010.
It took a number of chasing emails before the shipment date was confirmed, but Mr Tuli accepted
in evidence that the delay in shipping these orders was not significant. The final orders placed by
Yam Seng before the contract was terminated were placed on 7 and 9 April 2010. These orders
were shipped on 20 April 2010. Mr Tuli agreed that this shipment was prompt.

**China Registration**

51. On 22 April 2010 Mr Tuli sent an email to Mr Presswell informing him that Yam Seng was now
ready to launch the Manchester United fragrance in China and asking to know the status of the
registration of the products in China. There was no reply to this email.

52. The registration of the products in China had been discussed the previous July at the football match
in Kuala Lumpur to which Mr Presswell had taken Mr Tuli on 18 July 2009. On that occasion Mr
Tuli was introduced to someone called Dro Tan who was to be ITC's distributor in China.
According to Mr Tuli, he was told that Dro Tan would be applying for the registration of the
Manchester United products with the Chinese authorities to enable them to be sold in China. It was
also Mr Tuli's evidence that he telephoned Mr Presswell a few days later to ask about the
registration and was told that Dro Tan had already applied. There is no contemporaneous reference
in any of Mr Tuli's emails to these conversations and Mr Presswell said that the football match at
which Mr Tuli was introduced to Dro Tan was a purely social occasion at which there was no

Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

detailed business discussion. However, it was also Mr Presswell's evidence that, as a result of an email received from Dro Tan on 31 July 2009, he (Mr Presswell) thought at that stage that everything was moving smoothly towards achieving registration. In these circumstances I think it likely that Mr Presswell did tell Mr Tuli a few days after introducing him to Dro Tan that the registration process in China was underway. That said, there is insufficient evidence for me to conclude that Mr Presswell specifically stated that an application for registration had been submitted or made any statement to Mr Tuli at that time which he did not believe to be true.

53. I further think it likely that the progress of the registration was subsequently raised by Mr Tuli from time to time in discussion, although it was not a matter of such priority as to be the subject of any emails. The first reference to the subject in an email was on 28 January 2010 when Mr Presswell stated that ITC was "in the process of registering" the EDT 100ml and 50ml which "should be registered by end April 2010." It was no doubt this statement which prompted Mr Tuli's enquiry on 22 April 2010 about the status of the registration.

54. It appears (from an email dated 2 June 2010) that Mr Tuli spoke to Mr Presswell about the China registration on the telephone in early May and on that occasion was told that an application for registration had been made only about two weeks earlier. That surprised Mr Tuli as he had previously been given the impression that the registration process was almost complete. In fact, an application had still not even then been made. On 15 April 2010 Mr Presswell had been told in an email from a company assisting with the arrangements for registration that "we are now ready to go pending receipt of the samples". However, there is no evidence that samples were ever sent.

55. In response to a request for further information made in these proceedings ITC admitted that, although it "began the process leading up to an application for registration in China", ITC "did not make a formal application" before the Agreement was terminated.

**Breakdown of the Relationship**

56. On 10 May 2010 Mr Tuli and Mr Presswell met at the Fairmont Hotel in Singapore. Mr Presswell described this meeting in his evidence as "something of a turning point in our relationship because Mr Tuli's whole attitude and approach to me was noticeably different from then on." He said that at this meeting Mr Tuli for the first time was cold and brisk. I have no doubt that Mr Presswell's perception was correct and that Mr Tuli's frostiness reflected pent-up frustration. It is clear from Mr Tuli's later email dated 2 June 2010 that the two issues which had vexed him most of all were the discovery that he had been misled about the status of the China registration and the announcement earlier in the year that the toiletry products would not after all be made available (together with the fact that Mr Tuli's email of 18 February 2010 complaining about this decision had been ignored by Mr Presswell).

57. Mr Tuli's anger finally boiled over in a telephone conversation with Mr Presswell on 21 May 2010. The trigger was a request by Mr Tuli for payment of an invoice for certain testers which Yam Seng had supplied to customers. This was a cost which ITC had agreed to bear under Clause F of the Distribution Agreement. Mr Presswell's response to the request for payment was to say: "I am not the Bank of England". This angered Mr Tuli and the conversation became very heated. Mr Tuli followed up the conversation with an email on 25 May 2010 in which he referred to Mr Presswell's remark and said: "I certainly hope that the Bank of England does not back away from written agreements and commitments made!"

58. In a further email dated 2 June 2010, Mr Tuli set out a list of issues which he said he had wanted to discuss, the first two of which were the China registration and the decision not to produce the

toiletries. Mr Tuli nevertheless ended this email on a more conciliatory note and Mr Presswell replied suggesting that the issues should be discussed at a meeting which they were due to have in Hong Kong on 1 July 2010.

59. By the time the meeting in Hong Kong took place, a further issue had arisen concerning the price at which the Manchester United fragrance was being sold in Singapore. It was this issue which, from Mr Tuli's point of view, proved to be the final straw.

**Singapore Pricing – The Final Straw**

60. It was common ground between Mr Tuli and Mr Presswell that there is an industry assumption that retail prices in domestic markets will be higher than the corresponding duty free retail prices at airports or on board aeroplanes. For Singapore, Yam Seng had been granted the distribution rights for duty free sales but not for the domestic market. For the Singapore domestic market, ITC had appointed another distributor called Kay Ess. Mr Tuli was accordingly concerned that the retail prices of the Manchester United products in the Singapore domestic market should not be lower than the duty free retail prices which Yam Seng had agreed with the airport operator, Nuance Watson, and with airlines operating out of Singapore.

61. ITC had launched the Manchester United fragrance in Singapore through a special promotion run by Singapore Telecom in which the 100ml EDT had been offered for sale online at a price of 59 Singapore dollars (S$59). This was lower than the intended duty free retail price, and Yam Seng therefore waited for the Singapore Telecom promotion to end before commencing duty free sales in Singapore. The retail price Yam Seng agreed with Nuance Watson and with the airlines was US$44 (equivalent to around S$62).

62. After the Singapore Telecom promotion had ended, ITC began to sell the 100ml EDT to Kay Ess to distribute in the Singapore domestic market. In emails sent on 20 and 26 January 2010, Mr Tuli asked Mr Presswell to confirm that the retail price for the 100ml EDT in the Singapore domestic market would not be less than the duty free price of US$44. Mr Presswell replied on 26 January 2010 saying that he had informed Kay Ess that they must increase the Singapore domestic retail price to S$65 being the equivalent of US$46.40.

63. At the time when he sent this email, Mr Presswell had not yet actually informed Kay Ess that they must increase the retail price to S$65. But he did so three days later, in an email sent on 29 January 2010. The response that he received from Kay Ess, on that day, was that the products had already gone on sale at a price of S$59 which had been agreed with ITC, and that Kay Ess could not go back to their customers and inform them that the retail price had increased within a matter of days.

64. Mr Presswell did not pass on this reply to Mr Tuli, who was therefore left with the impression that ITC had taken action to ensure that the domestic retail price in Singapore would be S$65. In evidence, Mr Presswell sought to justify his conduct on the basis that there was, in fact, no reason for him to get back to Mr Tuli urgently because Nuance Watson, the duty free operator at Singapore Airport, did not place its first order with Yam Seng until 15 May 2010. This information, however, is something that Mr Presswell only learnt as a result of the disclosure of documents in the present action: at the time he did not know when Nuance Watson would be placing any order. The justification given by Mr Presswell was therefore a spurious one.

65. On 2 June 2010 Mr Tuli said in an email to Mr Presswell:

"As we have now launched Singapore Airport Duty Free and the 4 airlines out of

3/16/2015

Case 13-1708, Document 105, 03/16/2015, 1461636, Page47 of 103
Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

Singapore, and also Malaysia Duty Free, it becomes very important for the prices in the domestic markets of Malaysia and Singapore to be at least the duty free price plus the duty or tax. I am therefore looking forward to receiving the confirmation of these prices which I am sure you have finalised along with your agreement of distributorship."

This issue was also mentioned in Mr Tuli's longer email sent the same day (referred to at paragraph 56 above) listing issues that he wanted to discuss with Mr Presswell.

66. Mr Tuli was not prepared to leave this issue for discussion at the planned meeting in Hong Kong on 1 July 2010, and sent a further email on 3 June 2010 pressing for confirmation of the domestic price for Singapore. Mr Presswell replied the same day stating that the EDT 100ml (red) "is being retailed in Singapore at S$59 each."

67. In an email sent on 4 June 2010 Mr Tuli reminded Mr Presswell of what he had said in his email of 26 January 2010, when he had reported having informed Kay Ess that they must increase the Singapore domestic retail price to S$65. Mr Tuli pointed out that a domestic price of S$59 rather than S$65 meant that Yam Seng had violated its agreement with Nuance Watson and the airlines, all of whom had launched the fragrance on 1 June 2010. In a further email sent on 8 June 2010, Mr Tuli reiterated that he had "gone ahead with these accounts in good faith, and on the basis of your written confirmations on the prices."

68. Mr Presswell responded on 9 June 2010 saying that he had "today" sent an email to Kay Ess informing them that they must immediately increase the Singapore domestic retail price for the Manchester United EDT 100ml to S$65 each. He said that he expected to receive their confirmation the next day that they would follow his request and that he would keep Mr Tuli further informed.

69. Mr Presswell did send such an instruction to Kay Ess on 9 June 2010. However, the response that he received the next day from Kay Ess was that, while they could advise the department stores to increase the price, it would usually take one or two months before a price change would be implemented. Mr Presswell did not pass this reply on straight away to Mr Tuli. Instead he simply told Mr Tuli in an email dated 11 June 2010 that he had received confirmation from Kay Ess that they had already advised the department stores to increase the price to S$65. Mr Presswell omitted to mention that he had been told this would take one or two months to implement.

70. The pricing issue was raised at the meeting on 1 July 2010 in Hong Kong when, in Mr Presswell's words, "Mr Tuli absolutely berated me" about the retail price in Singapore. Mr Presswell assured Mr Tuli that he had requested Kay Ess to increase the price immediately from the previously agreed S$59 to S$65. Mr Tuli accepted his explanation.

71. A few days later, however, Mr Tuli visited a store in Singapore and found the 100ml EDT on sale at a price of S$53.10 – in other words, significantly lower even than the price of S$59 which had supposedly now been increased to S$65. Mr Tuli took a picture on his mobile phone showing the price and emailed it to Mr Presswell on 5 July 2010, saying:

"From our point of view, the image of the brand, and the pricing as compared to Duty Free, this is a disaster, as the duty free operator is being undercut by the domestic distributor by over 20%!!!!"

72. Mr Presswell immediately contacted Kay Ess by email. They replied the next day reminding Mr

Presswell that they had said the price increase could only take effect after one or two months as the retail stores needed time to activate the change in their system. Kay Ess also explained that the price which Mr Tuli had found was especially low as the store in question (SASA) was a discount store and had been running a sale promotion. Mr Presswell sent this email exchange, together with his earlier email exchange with Kay Ess on 9 and 10 June 2010, to Mr Tuli on 6 July 2010 for his information.

73. On 7 July 2010 ITC's agent in Singapore, Shunil Lal, sent an email to Mr Presswell in which he pointed out that stores in Singapore were following ITC's "instructed price strategy" of S$59 at retail. Mr Tuli was copied into this email. The conclusion which Mr Tuli drew was that Mr Presswell must have lied to him when informing him in January that the domestic price was being increased to S$65. The belief that Mr Presswell had lied to him on this commercially important issue was a breaking point in the relationship.

**Termination of the Agreement**

74. On 8 July 2010 Mr Tuli sent two emails to Mr Presswell. In the first of these Mr Tuli referred to the email from Shunil Lal about the retail price in Singapore and said:

> "If what Shunil is saying is correct, then apparently you had agreed to the price of S$59 with Kay Ess last year. In this case, I am led to believe that your email of January this year, where you had confirmed the price of $65 to me, was deliberately misinforming me, and I was not told the truth."

Mr Tuli ended by saying that he felt he now had no other choice but to seek legal advice on how to proceed.

75. In his second email sent on 8 July 2010, Mr Tuli referred to another matter which had been raised at the meeting in Hong Kong. On that occasion Mr Presswell had mentioned his plans for distribution of the Manchester United products in China and had asked Mr Tuli if Yam Seng would agree to "give back" the rights to distribute the toiletry products in Hong Kong and Macau. Mr Presswell had repeated this request in an email sent to Mr Tuli on 2 July 2010. He said that this would be beneficial for him as it would enable ITC to work with the same distributor for the toiletry products in Hong Kong and Macau as they planned to use for the rest of China.

76. In his second email sent on 8 July 2010, Mr Tuli reminded Mr Presswell that Yam Seng had made considerable efforts to promote the toiletry products only to be told (in February) that ITC would not be able to supply the products. He commented that to have the distribution rights for Hong Kong and Macau taken away now, without Yam Seng even been given chance to sell the products, "does not seem fair". Mr Tuli also pointed out that Yam Seng had, in turn, entered into an exclusive agreement for these territories with SASA.

77. Mr Presswell did not reply to the email about the Singapore pricing but he did reply later the same day to the email about "giving back" the distribution rights in Hong Kong and Macau. Mr Presswell wrote:

> "If you want to be very precise about our original discussions regarding exclusivity for. Hong Kong/Macau, then you were supposed to supply a business plan with quantities for me to agree before actually granting you the exclusivity. This you did not do and therefore I am quite within my rights to inform you that you no longer have any distribution rights for Manchester United products in Hong Kong/Macau other than

Manchester United Eau de Toilette."

Mr Presswell's email ended:

"Sunil, it seems to me that we may have reached the end of the road with regard to our business relationship. The final call is yours!"

78. After this, the tone of the email correspondence deteriorated further. Mr Tuli accused Mr Presswell of not being a man of his word. Mr Presswell took offence at the aspersion that he was a liar and demanded a retraction. Mr Tuli pressed for a response to his email sent on 8 July 2010 regarding the Singapore pricing, but did not get one. On 29 July 2010 Mr Presswell demanded to know whether Yam Seng intended to pay an invoice for US$38,705 which had become due for payment that day. In response, Mr Tuli made a proposal that:

"1. We terminate the business with you with immediate effect.

2. You take back whatever stock we have.

3. You compensate us for the expenses and losses incurred in our doing this business, as we are terminating the agreement with you as you are in breach."

79. At 10:33 on 29 July 2010 Mr Presswell replied. He said:

"My absolute gut instinct has proven to be correct and if you think you can manipulate your way out of the Distribution Agreement then you are totally mistaken."

Mr Presswell went on to threaten legal proceedings unless payment of ITC's invoice was received before 13 August 2010.

80. At 11:04 on 29 July 2010 Mr Tuli replied to say that he was terminating the agreement "as you are in breach" and would now take legal action.

81. There was further correspondence during August 2010, at first between Mr Tuli and Mr Presswell and then between their solicitors. The point was fairly made by Counsel for Yam Seng in cross-examining Mr Presswell that, although Mr Tuli and his solicitors on several occasions set out their allegations of breach of contract by ITC, no attempt was made Mr Presswell or his solicitors in any correspondence to answer the allegations. The first time that any substantive response was provided by ITC was in its Defence in these proceedings.

82. These proceedings were commenced by Yam Seng on 28 February 2011.

## C. THE CONTRACTUAL CLAIM

### The Alleged Breaches

83. It is Yam Seng's case that ITC committed breaches and demonstrated an intention to commit further breaches of the Agreement which justified Yam Seng in terminating the contract when it did. In summary, the breaches of contract alleged by Yam Seng are that ITC:

(1) failed to ensure that orders placed by Yam Seng were shipped promptly;

(2) failed to make products available when promised or, in the case of the toiletries, at

3/16/2015

Case 13-1708, Document 105, 03/16/2015, 1461636, Page50 of 103
Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

all;

(3) undercut the duty free prices agreed with Yam Seng by offering the same products for sale at a lower price in the domestic market of the same territory; and

(4) provided false information on which ITC knew that Yam Seng was likely to rely in marketing the products.

**The Issues**

84. I will consider these allegations in turn. In relation to each of them, three issues arise: (1) what, if any, relevant obligation did ITC have under the Agreement; (2) was ITC in breach of that obligation; and (3) if so, did the breach justify the termination of the Agreement?

85. The third of these issues has two aspects which depend on well established legal principles.

86. In the first place, whether an actual or threatened breach of contract is sufficiently serious to justify the other party in treating the contract as at an end depends (in the absence of any other expressed intention) on whether the breach is characterised as repudiatory. A number of expressions have been used to describe what amounts to a repudiatory breach. Two tests commonly applied are whether the breach is such as to "go to the root of the contract" or to deprive the innocent party of "substantially the whole benefit which it was the intention of the parties as expressed in the contract that he should obtain" from the obligations then remaining unperformed": see Chitty on Contracts (31st ed), Vol 1, paras 24-018 and 24-041.

87. Second, a breach which has this repudiatory character does not automatically terminate the contract but gives the injured party a choice whether or not to treat the contract as at an end. If the injured party, with knowledge of the breach, instead elects to treat the contract as continuing, he will be taken to have "affirmed" the contract and cannot afterwards terminate it on account of that breach.

**Failure to Ship Promptly**

88. In all, seven purchase orders were placed by Yam Seng which were delivered in four shipments. The dates of these orders and the relevant shipment dates were as follows:

| Order Date | Shipment Date |
| --- | --- |
| 22/05/09 | 24/07/09 |
| 06/08/09 | 18/11/09 |
| 02/02/10 | 23/03/10 |
| 03/02/10 | 23/03/10 |
| 18/02/10 | 23/03/10 |
| 09/04/10 | 20/04/10 |
| 07/04/10 | 20/04/10 |

It is Yam Seng's pleaded case that ITC failed to ensure that the orders placed by Yam Seng were

3/16/2015

Case 13-1708, Document 105, 03/16/2015, 1461636, Page51 of 103
Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

shipped "promptly", as required by Clause G of the Agreement.

89. ITC contended that the obligation to ship "promptly" meant promptly following manufacture of the goods; or alternatively that what counted as prompt depended on whether Yam Seng had previously provided a forecast of its future purchases, as it was required to do by the first paragraph of Clause G. Counsel for ITC, Mr Eaton Turner, argued that ITC could not be expected to have stock immediately available to ship if Yam Seng had failed to forecast its requirements, and that a shipment time which could not have been described as prompt if a forecast had previously been given might nevertheless comply with ITC's obligation where no forecast had been given.

90. I do not accept that ITC's obligation to ship "promptly" was affected by whether Yam Seng had fulfilled its obligation to provide a forecast of the purchases which it expected to make during the ten months following the first two months of sales. It is clear from the wording of Clause G that Yam Seng's obligation to provide a forecast and ITC's obligation to ensure that all orders will be shipped promptly are independent of each other. Nor on the plain wording of the Agreement did the latter obligation depend in any way on the time required to manufacture products. Yam Seng did not know what arrangements ITC had made with its own suppliers, what stock levels ITC would maintain nor what the time involved in manufacture would be – all of which were matters outside Yam Seng's control. Indeed the obvious purpose of the obligation on ITC to ensure that all orders were shipped promptly was to make it clear that such matters were the sole responsibility of ITC. Thus it was ITC's responsibility to ensure that it had enough stock available at any given time to fulfil its shipment obligation.

91. I accept, however, that what counts as "prompt" must allow for the need to book container space on a ship sailing to the relevant destination and arrange transportation to the port. There was no evidence specifically directed to the process of shipping goods from England to Singapore. However, from the time which the later orders took to ship and my sense of the parties' expectations, I consider that an order could fairly be described as shipped "promptly" if the bill of lading was issued within around two or three weeks after the order had been placed.

92. On this basis the first order placed by Yam Seng (on 22 May 2009) was not shipped promptly, as the goods were not shipped until two months later (on 24 July 2009). However, Mr Tuli did not complain of the delay either at the time or in his witness statement, and he accepted in evidence that it did not cause him problems. Mr Tuli further accepted that although there was a delay in making the third shipment (on 24 March 2010), the delay was not significant and that the fourth shipment (on 20 April 2010) was made promptly. I accordingly consider that there was no breach of contract in relation to the last shipment and that any breach in failing to make the first and third shipments promptly was not material.

93. The position was very different in the case of the second shipment. In that case there was a serious delay, exacerbated by the fact that Mr Presswell made several promises of shipment and delivery dates which were not kept. Furthermore, as reflected in the correspondence at the time, the delay caused significant embarrassment to Mr Tuli and damaged his credibility with an important customer, Dubai Duty Free, which had to be asked to postpone the launch of the new fragrance several times.

94. Nevertheless, in the context of a distribution agreement with a contract period of two and a half years and which covered many territories, it cannot in my view be said that the breach of contract in shipping this order late was such as to deprive Yam Seng of substantially the whole benefit which it was intended that Yam Seng should obtain from the contract. In any event, Yam Seng did

not seek to terminate the contract on account of this breach but chose to go on with the contract despite the breach and with knowledge of it. Having thus affirmed the contract, Yam Seng could not subsequently rely on the breach as a reason to terminate the contract in July 2010.

**Obligation to Make Products Available**

95. The Agreement did not expressly state when products would be available to order. Yam Seng's case is that it was implicit in ITC's obligation to ensure that all orders would be shipped promptly that all the products described in the Agreement would be available to order from the start of the contract period. Hence ITC was in breach of the Agreement because:

> (1) for the first six months of the Agreement only one product was available (EDT 100ml); and
>
> (2) three of the six products (hair and body wash, hair gel and the gift sets) were never made available.

96. ITC's pleaded case is that it had no obligation to make the products referred to in the Agreement available for distribution: the Agreement simply provided a framework within which sales could take place of such products as ITC in fact made available and Yam Seng chose to order. Understandably, Mr Eaton Turner drew back in his oral submissions from the unattractive implication of this argument that ITC, having entered into the Agreement in the knowledge that Yam Seng would be incurring significant expenditure in marketing and promoting the products, could then have chosen to make none of the products available for Yam Seng to order. Mr Eaton Turner submitted that the contractual obligation to make products available was defined by the letter from ITC dated 2 March 2009 which specified dates when the various products would be launched.

97. If the Agreement were to be read in isolation, I would construe it as containing an implied undertaking that all the products described in the Agreement were available for order. I would derive that implication, not from the shipment obligation in Clause G, but from the grant of rights in Clause A. It would ordinarily be implicit in the grant of a right for the contract period to "distribute, market and sell" a particular product that the product was and would throughout the period be available to distribute. However, the Agreement was, as I have found, made against the background of a clear understanding that most of the products would not be available to order immediately and that they would be launched on dates which had been set out in ITC's letter of 2 March 2009 (and in the case of the EDT 50ml, in its letter of 9 April 2009). In these circumstances to interpret the Agreement as obliging ITC to make all the products available for order immediately would, it seems to me, be as unreasonable as the opposite contention that ITC had no obligation to make products available. Neither contention reflects the reality of what the parties reasonably understood and expected the position to be.

98. In my view, the legal analysis which best gives effect to what a reasonable person would have understood the parties to have intended is to interpret the letters of 2 March and 9 April 2009 as containing collateral warranties. The language of those letters is categorical. They do not state that it is ITC's current intention to launch the products on the specified dates but that ITC "will" do so. ITC knew that Yam Seng would be relying in marketing the products and soliciting orders from customers on the time scales specified. In those circumstances I consider that the objective intention was that the commitments as to dates given in the letters would have contractual effect.

99. On that basis the absence of any provision in the Agreement dealing with the matter is explicable.

3/16/2015

Case 13-1708, Document 105, 03/16/2015, 1461636, Page53 of 103
Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

The Agreement did not stipulate when the products would be launched, but that had been set out elsewhere.

**Breaches of the Obligation**

100. On this analysis, ITC was in breach of its obligation to make products available in the following respects:

(1) The deodorant body spray was not available at the outset or until November 2009;

(2) The EDT 50ml was not made available in around August 2009 but only in November 2009;

(3) The EDT and deodorant were not made available in black in around August 2009 but only in February 2010; and

(4) The toiletries and gift sets were not made available in October 2009 and ITC indicated in February 2010 that they would never be produced at all.

101. The delays in producing the deodorant and EDT 50ml led to the delay in shipping the second order. For the reasons given above, however, the late supply of these products, although disruptive for Yam Seng and damaging to its relationship with Dubai Duty Free, was not in my view a repudiatory breach of the Agreement. In any event, Yam Seng did not seek to terminate the Agreement on account of these delays and therefore lost any right to do so.

102. Little mention was made either at the time or in evidence of the delay in producing the black versions of the EDT and deodorant, and I infer that this did not cause any significant prejudice.

**Failure to Produce the Toiletries**

103. As for the hair gel and hair and body wash, ITC's case was that these products were peripheral and of little relevance. In his first witness statement Mr Presswell expressed the view that the toiletries would account for, at the very most, 2% of total duty free sales. In his second witness statement Mr Presswell suggested that this was, if anything, an over-estimate. He exhibited print-outs from the websites of various duty free operators showing that none of them sells or promotes any hair gel or body wash products.

104. Mr Tuli agreed that the EDT was always going to be the main driver of duty free sales and the main source of profits. His own profit estimate made at the time of entering into the Agreement, to which I will refer later, confirms this. He made the point, however, that he had included the toiletries in all his presentations to customers before eventually being told that they were not going to be produced. Mr Tuli also pointed out that Mr Presswell had led him to believe that the hair gel had massive potential in the domestic market in China.

105. The evidence established that the toiletry products were of far less commercial importance than the EDT. I do not accept, however, that they were as irrelevant as Mr Presswell sought to suggest. Indeed, if Mr Presswell's evidence were accurate one may wonder why they were included in the Distribution Agreement in the first place. Furthermore, the very fact that Yam Seng featured the toiletries in all its marketing presentations indicates that they were thought to have some significant value. I take their main value to have been to enhance the overall attractiveness and profile of the Manchester United fragrance brand by enabling Yam Seng to offer a full range of products, even though it was not expected that the toiletries would themselves account for more

than a small proportion of total sales and profits.

106. There is a further aspect to Mr Presswell's announcement in February 2010 that ITC would not after all be producing the toiletries which, in my view, is of greater significance. ITC had led Yam Seng to believe that the toiletries were under production and on the faith of this Yam Seng had presented the hair gel and body wash products to its customers and solicited orders for them. For Yam Seng then to have to inform its customers that the toiletries were not going to be available after all was damaging to its credibility. Even more important, it was very damaging to ITC's credibility.

107. Even so, serious as this breach was, I have concluded that it was not so serious as to justify termination of the Agreement. In any event Yam Seng with knowledge of the breach chose to carry on with the contract, placing further orders in April 2010. Having affirmed the Agreement in this way, Yam Seng could not afterwards terminate it on account of this breach.

**Request to "Give Back" Distribution Rights**

108. It might have been expected that after being told that ITC was not going to produce the toiletries Mr Tuli would have heard no more about them. As described earlier, however, when they met in Hong Kong on 1 July 2010 Mr Presswell asked Mr Tuli if Yam Seng would agree to "give back" the rights to distribute the toiletry products in Hong Kong and Macau as it would be beneficial for ITC to distribute the toiletry products in those territories using another distributor.

109. One of the potential benefits advertised by Mr Presswell when the Agreement was being negotiated had been that the Manchester United hair gel had "massive potential" in China. After Yam Seng had been marketing the hair gel and other toiletry products for several months, Mr Tuli had then been told that they would not after all be produced. He had also had his expectations disappointed over registration in China. Those were two of the issues which Mr Tuli had raised for discussion at the Hong Kong meeting. Against that background, for Mr Presswell to ask at the meeting if Yam Seng would "give back" the rights to distribute the toiletry products in two of its Chinese territories so that ITC could distribute those products there using another distributor was undiplomatic, to put it no higher.

110. When Mr Tuli did not agree to "give back" these distribution rights, Mr Presswell's response (in an email sent on 8 July 2010) was to claim that the grant of exclusivity for Hong Kong and Macau had been conditional on Yam Seng supplying a business plan with quantities for him to agree. That was not true. Although Clause G of the Agreement had required Yam Seng, based on the sales results for the first two months, to provide a forecast of sales and purchases from ITC for the next ten months, the grant of rights in Clause A was not made conditional on the provision of such a forecast. The only relevant condition in the Agreement when signed was that its continuation after 30 April 2010 until 31 December 2011 was subject to Yam Seng achieving "mutually agreed targets". Moreover, that condition was later removed when the Agreement was revised in September 2009 in recognition, as I have found, of the fact that the delays and uncertainty over deliveries had made it impracticable for Yam Seng to commit to such targets.

111. Mr Presswell accepted in cross-examination that he had been mistaken in claiming that Yam Seng was supposed to supply a business plan before being granted exclusivity. He said that he had written this in his email based on his recollection without checking the actual terms of the Agreement. The real controversy, however, surrounded the further statement in Mr Presswell's email that therefore:

"I am quite within my rights to inform you that you no longer have any distribution rights for Manchester United products in Hong Kong/Macau other than Manchester United Eau de Toilette."

112. Mr Salter on behalf of Yam Seng submitted that this statement amounted to a purported withdrawal of the right to distribute any product other than the EDT in Hong Kong and Macau. Mr Eaton Turner disputed this and argued that the words "I am quite within my rights to inform you" signified that Mr Presswell was not actually purporting to withdraw the distribution rights but was merely suggesting (albeit incorrectly) that ITC would be entitled to do so if it chose. At the very least, Mr Eaton Turner submitted, the statement was equivocal and therefore did not amount to a clear refusal to perform the Agreement.

113. In my view a reasonable person in the position of Mr Tuli would have understood Mr Presswell's email as a clear refusal to perform the Agreement. I agree with Mr Eaton Turner that the email was equivocal as to whether Mr Presswell was actually purporting to withdraw Yam Seng's distribution rights there and then – though it is to be noted that Mr Presswell did not say that he "would be" within his rights to inform Mr Tuli that Yam Seng no longer had such rights but (categorically) that he was within his rights to do so. The essential point, however, which Mr Presswell was making was that he did not accept that Yam Seng had any right to prevent him from appointing another distributor for the toiletry products in Hong Kong and Macau and, by clear implication, that he intended to do so whether Yam Seng gave its consent or not. Mr Presswell's further statement that "it seems to me that we may have reached the end of the road with regard to our business relationship. The final call is yours!" reinforced the message that Mr Presswell had no intention of backing down on the point and that, having refused to supply the toiletries to Yam Seng in flagrant breach of the Agreement, ITC now intended to supply them to someone else, in further plain breach of the Agreement, whether Yam Seng liked it or not.

114. In short, Mr Presswell's email was not confined to asserting his (erroneous) view as to the effect of the contract. It was not only provocative but conveyed a clear threat to breach the contract on a manifestly spurious ground. Coming as it did against the background of ITC's earlier breaches of contract and in particular the refusal to supply the toiletry products to Yam Seng after promising that they would be available by the end of March 2010, I consider that this communication put Mr Tuli in a position where he simply could no longer reasonably place any reliance on ITC to adhere to the terms of the Agreement.

115. I conclude that the email sent by Mr Presswell on 8 July 2010 amounted to a repudiation and that Yam Seng was entitled in response to this communication to terminate the contract.

**Alleged Threat to Withdraw Distribution Rights in China**

116. Yam Seng advanced an argument that an email from Mr Presswell to Mr Tuli dated 11 June 2010 contained a denial of Yam Seng's rights to act as the domestic distributor for the Manchester United products in the two Chinese cities of Chongqing and Xian which amounted to a repudiation of the Agreement. In that email Mr Presswell stated that:

"… I may appoint Jahwa Shanghai as the China domestic distributor for Manchester United personal care fragrance products excluding Chongqing and Xian providing that your business plan for these two cities justifies ITC granting you exclusivity."

Mr Salter submitted that under the Agreement ITC had already granted Yam Seng the exclusive distribution rights for Chongqing and Xian without making this conditional on the provision of a

business plan and that by this statement ITC evinced an intention not to honour the Agreement.

117. As in the case of the grant of exclusive rights for Hong Kong and Macau, Mr Presswell was wrong to suggest that the grant of exclusivity for Chongqing and Xian was, or could be made, conditional on the provision of a business plan. I do not consider, however, that the statement in this email can reasonably be understood as demonstrating any firm intention to act in breach of the Agreement, let alone the clear and absolute refusal to perform the contract in some essential respect which would be required to establish a repudiation. The appointment of the China domestic distributor was raised only as a possibility ("I may appoint") and in circumstances where no distribution in China could in any event take place unless and until the products had been registered. Even then, the email indicated that any such appointment would, *prima facie*, exclude the two cities named in the Agreement with Yam Seng, although that intention was unjustifiably qualified. Nor were the domestic distribution rights for these two Chinese cities of such importance in the overall scheme of the Agreement that a denial of exclusivity in relation to them could in itself be said to deprive Yam Seng of substantially the whole benefit which it was intended that Yam Seng should obtain from the contract.

118. I think it notable too that Mr Tuli did not respond to this statement in any email and made no reference to it in the correspondence leading up to and immediately following his decision to terminate the Agreement. The reason for that, I infer, is that he rightly at the time did not attach the significance to the statement in Mr Presswell's 11 June 2010 email which Yam Seng has since sought to give it.

**An Implied Duty of Good Faith?**

119. As pleaded in the Particulars of Claim, it is Yam Seng's case that there was an implied term of the Agreement that the parties would deal with each other in good faith.

120. The subject of whether English law does or should recognise a general duty to perform contracts in good faith is one on which a large body of academic literature exists. However, I not am aware of any decision of an English court, and none was cited to me, in which the question has been considered in any depth.

121. The general view among commentators appears to be that in English contract law there is no legal principle of good faith of general application: see Chitty on Contract Law (31st Ed), Vol 1, para 1-039. In this regard the following observations of Bingham LJ (as he then was) in <u>Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd</u> [1989] 1 QB 433 at 439 are often quoted:

> "In many civil law systems, and perhaps in most legal systems outside the common law world, the law of obligations recognises and enforces an overriding principle that in making and carrying out contracts parties should act in good faith. This does not simply mean that they should not deceive each other, a principle which any legal system must recognise; its effect is perhaps most aptly conveyed by such metaphorical colloquialisms as 'playing fair', 'coming clean' or 'putting one's cards face upwards on the table.' It is in essence a principle of fair open dealing... English law has, characteristically, committed itself to no such overriding principle but has developed piecemeal solutions in response to demonstrated problems of unfairness."

122. Another case sometimes cited for the proposition that English contract law does not recognise a duty of good faith is <u>Walford v Miles</u> [1992] 2 AC 128, where the House of Lords considered that a duty to negotiate in good faith is "inherently repugnant to the adversarial position of the parties

3/16/2015

Case 13-1708, Document 105, 03/16/2015, 1461636, Page57 of 103
Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

when involved in negotiations" and "unworkable in practice" (per Lord Ackner at p.138). That case was concerned, however, with the position of negotiating parties and not with the duties of parties who have entered into a contract and thereby undertaken obligations to each other.

123. Three main reasons have been given for what Professor McKendrick has called the "traditional English hostility" towards a doctrine of good faith: see McKendrick, Contract Law (9th Ed) pp.221-2. The first is the one referred to by Bingham LJ in the passage quoted above: that the preferred method of English law is to proceed incrementally by fashioning particular solutions in response to particular problems rather than by enforcing broad overarching principles. A second reason is that English law is said to embody an ethos of individualism, whereby the parties are free to pursue their own self-interest not only in negotiating but also in performing contracts provided they do not act in breach of a term of the contract. The third main reason given is a fear that recognising a general requirement of good faith in the performance of contracts would create too much uncertainty. There is concern that the content of the obligation would be vague and subjective and that its adoption would undermine the goal of contractual certainty to which English law has always attached great weight.

124. In refusing, however, if indeed it does refuse, to recognise any such general obligation of good faith, this jurisdiction would appear to be swimming against the tide. As noted by Bingham LJ in the <u>Interfoto</u> case, a general principle of good faith (derived from Roman law) is recognised by most civil law systems – including those of Germany, France and Italy. From that source references to good faith have already entered into English law via EU legislation. For example, the Unfair Terms in Consumer Contracts Regulations 1999, which give effect to a European directive, contain a requirement of good faith. Several other examples of legislation implementing EU directives which use this concept are mentioned in Chitty on Contract Law (31st Ed), Vol 1 at para 1-043. Attempts to harmonise the contract law of EU member states, such as the Principles of European Contract Law proposed by the Lando Commission and the European Commission's proposed Regulation for a Common European Sales Law on which consultation is currently taking place, also embody a general duty to act in accordance with good faith and fair dealing. There can be little doubt that the penetration of this principle into English law and the pressures towards a more unified European law of contract in which the principle plays a significant role will continue to increase.

125. It would be a mistake, moreover, to suppose that willingness to recognise a doctrine of good faith in the performance of contracts reflects a divide between civil law and common law systems or between continental paternalism and Anglo-Saxon individualism. Any such notion is gainsaid by that fact that such a doctrine has long been recognised in the United States. The New York Court of Appeals said in 1918: "Every contract implies good faith and fair dealing between the parties to it": <u>Wigand v Bachmann-Bechtel Brewing Co</u>, 222 NY 272 at 277. The Uniform Commercial Code, first promulgated in 1951 and which has been adopted by many States, provides in section 1-203 that "every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." Similarly, the Restatement (Second) of Contracts states in section 205 that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement."

126. In recent years the concept has been gaining ground in other common law jurisdictions. Canadian courts have proceeded cautiously in recognising duties of good faith in the performance of commercial contracts but have, at least in some situations, been willing to imply such duties with a view to securing the performance and enforcement of the contract or, as it is sometimes put, to ensure that parties do not act in a way that eviscerates or defeats the objectives of the agreement that they have entered into: see e.g. <u>Transamerica Life Inc v ING Canada Inc</u> (2003) 68 OR (3d)

457, 468.

127. In Australia the existence of a contractual duty of good faith is now well established, although the limits and precise juridical basis of the doctrine remain unsettled. The springboard for this development has been the decision of the New South Wales Court of Appeal in <u>Renard Constructions (ME) Pty v Minister for Public Works</u> (1992) 44 NSWLR 349, where Priestley JA said (at 95) that:

> "... people generally, including judges and other lawyers, from all strands of the community, have grown used to the courts applying standards of fairness to contract which are wholly consistent with the existence in all contracts of a duty upon the parties of good faith and fair dealing in its performance. In my view this is in these days the expected standard, and anything less is contrary to prevailing community expectations."

128. Although the High Court has not yet considered the question (and declined to do so in <u>Royal Botanic Gardens and Domain Trust v Sydney City Council</u> (2002) 186 ALR 289) there has been clear recognition of the duty of good faith in a substantial body of Australian case law, including further significant decisions of the New South Wales Court of Appeal in <u>Alcatel Australia Ltd v Scarcella</u> (1998) 44 NSWLR 349, <u>Burger King Corp v Hungry Jack's Pty Ltd</u> [2001] NWSCA 187 and <u>Vodafone Pacific Ltd v Mobile Innovations Ltd</u> [2004] NSWCA 15.

129. In New Zealand a doctrine of good faith is not yet established law but it has its advocates: see in particular the dissenting judgment of Thomas J in <u>Bobux Marketing Ltd v Raynor Marketing Ltd</u> [2002] 1 NZLR 506 at 517.

130. Closer to home, there is strong authority for the view that Scottish law recognises a broad principle of good faith and fair dealing: see the decision of the House of Lords in <u>Smith v Bank of Scotland</u>, 1997 SC (HL) 111 esp. at p.121 (per Lord Clyde).

131. Under English law a duty of good faith is implied by law as an incident of certain categories of contract, for example contracts of employment and contracts between partners or others whose relationship is characterised as a fiduciary one. I doubt that English law has reached the stage, however, where it is ready to recognise a requirement of good faith as a duty implied by law, even as a default rule, into all commercial contracts. Nevertheless, there seems to me to be no difficulty, following the established methodology of English law for the implication of terms in fact, in implying such a duty in any ordinary commercial contract based on the presumed intention of the parties.

132. Traditionally, the two principal criteria used to identify terms implied in fact are that the term is so obvious that it goes without saying and that the term is necessary to give business efficacy to the contract. More recently, in <u>Attorney General for Belize v Belize Telecom Ltd</u> [2009] 1 WLR 1988 at 1993-5, the process of implication has been analysed as an exercise in the construction of the contract as a whole. In giving the judgment of the Privy Council in that case, Lord Hoffmann characterised the traditional criteria, not as a series of independent tests, but rather as different ways of approaching what is ultimately always a question of construction: what would the contract, read as a whole against the relevant background, reasonably be understood to mean?

133. The modern case law on the construction of contracts has emphasised that contracts, like all human communications, are made against a background of unstated shared understandings which inform their meaning. The breadth of the relevant background and the fact that it has no conceptual limits

have also been stressed, particularly in the famous speech of Lord Hoffmann in <u>Investors Compensation Scheme Ltd v West Bromwich Building Society</u> [1998] 1 WLR 896 at pp.912-3, as further explained in <u>BCCI v Ali</u> [2002] 1 AC 251 at p.269.

134. Importantly for present purposes, the relevant background against which contracts are made includes not only matters of fact known to the parties but also shared values and norms of behaviour. Some of these are norms that command general social acceptance; others may be specific to a particular trade or commercial activity; others may be more specific still, arising from features of the particular contractual relationship. Many such norms are naturally taken for granted by the parties when making any contract without being spelt out in the document recording their agreement.

135. A paradigm example of a general norm which underlies almost all contractual relationships is an expectation of honesty. That expectation is essential to commerce, which depends critically on trust. Yet it is seldom, if ever, made the subject of an express contractual obligation. Indeed if a party in negotiating the terms of a contract were to seek to include a provision which expressly required the other party to act honestly, the very fact of doing so might well damage the parties' relationship by the lack of trust which this would signify.

136. The fact that commerce takes place against a background expectation of honesty has been recognised by the House of Lords in <u>HIH Casualty v Chase Manhattan Bank</u> [2003] 2 Lloyd's Rep 61. In that case a contract of insurance contained a clause which stated that the insured should have "no liability of any nature to the insurers for any information provided". A question arose as to whether these words meant that the insured had no liability even for deceit where the insured's agent had dishonestly provided information known to be false. The House of Lords affirmed the decision of the courts below that, even though the clause read literally would cover liability for deceit, it was not reasonably to be understood as having that meaning. As Lord Bingham put it at [15]:

> "Parties entering into a commercial contract ... will assume the honesty and good faith of the other; absent such an assumption they would not deal."

To similar effect Lord Hoffmann observed at [68] that parties "contract with one another in the expectation of honest dealing", and that:

> "... in the absence of words which expressly refer to dishonesty, it goes without saying that underlying the contractual arrangements of the parties there will be a common assumption that the persons involved will behave honestly."

137. As a matter of construction, it is hard to envisage any contract which would not reasonably be understood as requiring honesty in its performance. The same conclusion is reached if the traditional tests for the implication of a term are used. In particular the requirement that parties will behave honestly is so obvious that it goes without saying. Such a requirement is also necessary to give business efficacy to commercial transactions.

138. In addition to honesty, there are other standards of commercial dealing which are so generally accepted that the contracting parties would reasonably be understood to take them as read without explicitly stating them in their contractual document. A key aspect of good faith, as I see it, is the observance of such standards. Put the other way round, not all bad faith conduct would necessarily be described as dishonest. Other epithets which might be used to describe such conduct include "improper", "commercially unacceptable" or "unconscionable".

139. Another aspect of good faith which overlaps with the first is what may be described as fidelity to the parties' bargain. The central idea here is that contracts can never be complete in the sense of expressly providing for every event that may happen. To apply a contract to circumstances not specifically provided for, the language must accordingly be given a reasonable construction which promotes the values and purposes expressed or implicit in the contract. That principle is well established in the modern English case law on the interpretation of contracts: see e.g. Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900; Lloyds TSB Foundation for Scotland v Lloyds Banking Group Plc [2013] UKSC 3 at [23], [45] and [54]. It also underlies and explains, for example, the body of cases in which terms requiring cooperation in the performance of the contract have been implied: see Mackay v Dick (1881) 6 App Cas 251, 263; and the cases referred to in Chitty on Contracts (31st Ed), Vol 1 at paras 13-012 – 13-014.

140. The two aspects of good faith which I have identified are consistent with the way in which express contractual duties of good faith have been interpreted in several recent cases: see Berkeley Community Villages Ltd v Pullen [2007] EWHC 1330 (Ch) at [95]-[97]; CPC Group Ltd v Qatari Diar Real Estate Investment Co [2010] EWHC 1535 (Ch) at [246].

141. What good faith requires is sensitive to context. That includes the core value of honesty. In any situation it is dishonest to deceive another person by making a statement of fact intending that other person to rely on it while knowing the statement to be untrue. Frequently, however, the requirements of honesty go further. For example, if A gives information to B knowing that B is likely to rely on the information and A believes the information to be true at the time it is given but afterwards discovers that the information was, or has since become, false, it may be dishonest for A to keep silent and not to disclose the true position to B. Another example of conduct falling short of a lie which may, depending on the context, be dishonest is deliberately avoiding giving an answer, or giving an answer which is evasive, in response to a request for information.

142. In some contractual contexts the relevant background expectations may extend further to an expectation that the parties will share information relevant to the performance of the contract such that a deliberate omission to disclose such information may amount to bad faith. English law has traditionally drawn a sharp distinction between certain relationships – such as partnership, trusteeship and other fiduciary relationships – on the one hand, in which the parties owe onerous obligations of disclosure to each other, and other contractual relationships in which no duty of disclosure is supposed to operate. Arguably at least, that dichotomy is too simplistic. While it seems unlikely that any duty to disclose information in performance of the contract would be implied where the contract involves a simple exchange, many contracts do not fit this model and involve a longer term relationship between the parties which they make a substantial commitment. Such "relational" contracts, as they are sometimes called, may require a high degree of communication, cooperation and predictable performance based on mutual trust and confidence and involve expectations of loyalty which are not legislated for in the express terms of the contract but are implicit in the parties' understanding and necessary to give business efficacy to the arrangements. Examples of such relational contracts might include some joint venture agreements, franchise agreements and long term distributorship agreements.

143. The Agreement in this case was a distributorship agreement which required the parties to communicate effectively and cooperate with each other in its performance. In particular, ITC needed to plan production and take account of the expected future demand from Yam Seng for Manchester United products. For its part Yam Seng, which was incurring expense in marketing the products and was trying to obtain orders, was arguably entitled to expect that it would be kept informed of ITC's best estimates of when products would be available to sell and would be told of any material change in this information without having to ask. Yam Seng's case was not advanced

3/16/2015

Case 13-1708, Document 105, 03/16/2015, 1461636, Page61 of 103
Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

in this way, however, and it is therefore unnecessary for me to decide whether the requirements of good faith in this case extended to any such positive obligations of disclosure.

144. Although its requirements are sensitive to context, the test of good faith is objective in the sense that it depends not on either party's perception of whether particular conduct is improper but on whether in the particular context the conduct would be regarded as commercially unacceptable by reasonable and honest people. The standard is thus similar to that described by Lord Nicholls in a different context in his seminal speech in <u>Royal Brunei Airlines v Tan [1995] 2 AC 378</u> at pp.389-390. This follows from the fact that the content of the duty of good faith is established by a process of construction which in English law is based on an objective principle. The court is concerned not with the subjective intentions of the parties but with their presumed intention, which is ascertained by attributing to them the purposes and values which reasonable people in their situation would have had.

145. Understood in the way I have described, there is in my view nothing novel or foreign to English law in recognising an implied duty of good faith in the performance of contracts. It is consonant with the theme identified by Lord Steyn as running through our law of contract that reasonable expectations must be protected: see <u>First Energy (UK) Ltd v Hungarian International Bank Ltd</u> [1993] 2 Lloyd's Rep 194, 196; and (1997) 113 LQR 433. Moreover such a concept is, I believe, already reflected in several lines of authority that are well established. One example is the body of cases already mentioned in which duties of cooperation in the performance of the contract have been implied. Another consists of the authorities which show that a power conferred by a contract on one party to make decisions which affect them both must be exercised honestly and in good faith for the purpose for which it was conferred, and must not be exercised arbitrarily, capriciously or unreasonably (in the sense of irrationally): see e.g. <u>Abu Dhabi National Tanker Co v. Product Star Shipping Ltd (The "Product Star")</u> [1993] 1 Lloyd's Rep 397, 404; <u>Socimer International Bank Ltd v Standard Bank London Ltd</u> [2008] 1 Lloyd's Rep 558, 575-7. A further example concerns the situation where the consent of one party is needed to an action of the other and a term is implied that such consent is not to be withheld unreasonably (in a similar sense): see e.g. <u>Gan v Tai Ping (Nos 2 & 3) [2001] Lloyd's Rep IR 667</u>; <u>Eastleigh BC v Town Quay Developments Ltd</u> [2010] 2 P&CR 2. Yet another example, I would suggest, is the line of authorities of which the <u>Interfoto</u> case is one which hold that an onerous or unusual contract term on which a party seeks to rely must be fairly brought to the notice of the other party if it is to be enforced.

146. There are some further observations that I would make about the reasons I mentioned earlier for the reluctance of English law to recognise an implied duty on contracting parties to deal with each other in good faith.

147. First, because the content of the duty is heavily dependent on context and is established through a process of construction of the contract, its recognition is entirely consistent with the case by case approach favoured by the common law. There is therefore no need for common lawyers to abandon their characteristic methods and adopt those of civil law systems in order to accommodate the principle.

148. Second, as the basis of the duty of good faith is the presumed intention of the parties and meaning of their contract, its recognition is not an illegitimate restriction on the freedom of the parties to pursue their own interests. The essence of contracting is that the parties bind themselves in order to co-operate to their mutual benefit. The obligations which they undertake include those which are implicit in their agreement as well as those which they have made explicit.

149. Third, a further consequence of the fact that the duty is based on the parties' presumed intention is

3/16/2015

Case 13-1708, Document 105, 03/16/2015, 1461636, Page62 of 103
Yam Seng PTE Ltd v International Trade Corporation Ltd [2013] EWHC 111 (QB) (01 February 2013)

that it is open to the parties to modify the scope of the duty by the express terms of their contract and, in principle at least, to exclude it altogether. I say "in principle at least" because in practice it is hardly conceivable that contracting parties would attempt expressly to exclude the core requirement to act honestly.

150. Fourth, I see no objection, and some advantage, in describing the duty as one of good faith "and fair dealing". I see no objection, as the duty does not involve the court in imposing its view of what is substantively fair on the parties. What constitutes fair dealing is defined by the contract and by those standards of conduct to which, objectively, the parties must reasonably have assumed compliance without the need to state them. The advantage of including reference to fair dealing is that it draws attention to the fact that the standard is objective and distinguishes the relevant concept of good faith from other senses in which the expression "good faith" is used.

151. Fifth, in so far as English law may be less willing than some other legal systems to interpret the duty of good faith as requiring openness of the kind described by Bingham LJ in the <u>Interfoto</u> case as "playing fair'" "coming clean" or "putting one's cards face upwards on the table", this should be seen as a difference of opinion, which may reflect different cultural norms, about what constitutes good faith and fair dealing in some contractual contexts rather than a refusal to recognise that good faith and fair dealing are required.

152. Sixth, the fear that recognising a duty of good faith would generate excessive uncertainty is unjustified. There is nothing unduly vague or unworkable about the concept. Its application involves no more uncertainty than is inherent in the process of contractual interpretation.

153. In the light of these points, I respectfully suggest that the traditional English hostility towards a doctrine of good faith in the performance of contracts, to the extent that it still persists, is misplaced.

154. I have emphasised in this discussion the extent to which the content of the duty to perform a contract in good faith is dependent on context. It was Mr Salter's submission that the relevant content of the duty in this case was captured by two more specific terms which Yam Seng contends are to be implied into the Agreement. I therefore turn to consider these.

**A Duty Not to Give False Information?**

155. The first more specific term said by Yam Seng to be implied in the Agreement is a term that "insofar as [ITC] instructed or encouraged [Yam Seng] to incur marketing expenses it would not do so for products which it was unable or unwilling to supply, nor offer false information on which [Yam Seng] was likely to rely to its detriment."

156. As I see it, the essential difficulty with this formulation is that it does not distinguish between encouraging expenditure in the expectation that products would be supplied, or providing false information, dishonestly and doing so innocently. In my view, such a distinction is critical. To take the first limb of the alleged implied term, in so far as ITC led Yam Seng to expect that products were going be supplied believing that it would be able to supply them and intending to do so, there would be no lack of good faith on the part of ITC. The position would be different if ITC wilfully led Yam Seng to expect that products would be supplied in circumstances where ITC did not in fact intend to supply them or knew that it would be unable to do so. Conduct of the latter kind would be clearly contrary to standards of commercial dealing which the parties would reasonably have taken for granted; but I can see no basis for implying any more onerous obligation. The same distinction needs to be drawn in relation to the second limb of the alleged implied term. I can see

Case 13-1708  Document 105  03/16/2015  1461636  Page 63 of 103

no justification for implying an unqualified obligation not to provide false information – equivalent to a warranty that any information given by ITC on which Yam Seng was likely to rely would be true. By contrast, it was clearly implied that ITC would not <u>knowingly</u> provide false information on which Yam Seng was likely to rely. Such conduct would plainly infringe the core expectation of honesty discussed earlier.

**A Duty Not to Undercut Duty Free Prices?**

157. The second more specific term which Yam Seng contends was implied in the Agreement is a term that "[ITC] would not prejudice [Yam Seng]'s sales by offering the same products for sale within the same territories at a lower price than [Yam Seng] was permitted to offer."

158. As pointed out by Mr Eaton Turner, this alleged term as formulated does not accord with the facts, as ITC did not itself make any direct sales in any territory. In particular, in Singapore – which was the focus of Yam Seng's complaint – ITC sold the Manchester United 100ml EDT to a distributor, Kay Ess, which in turn sold the product to retailers for sale to consumers. There is no evidence of the price at which ITC sold the product to Kay Ess. In any case, the price about which Yam Seng complained was not the price paid or charged by Kay Ess but was the retail price in stores. ITC could not directly dictate the retail price. What ITC could do is agree with its distributor, Kay Ess, a recommended retail price for the Singapore domestic market and ask Kay Ess to seek to ensure so far as it could that retailers offered the product for sale at that price.

159. The highest that the putative implied term could therefore be put is as an obligation not to approve a retail price for any product for any domestic market which was lower than the duty free retail price for the product agreed with Yam Seng.

160. In ordinary circumstances I would see no justification for implying such a term. The reasonable commercial expectation would be that ITC was free to sell its products to others on such terms as it chose unless it had expressly agreed otherwise with Yam Seng. Three particular contextual features of this case, however, lead me to conclude that there was in fact such an implied term of the Agreement.

161. The first is that the Agreement is a skeletal document which does not attempt to specify the parties' obligations in any detail. In relation to such a document it is easier than in the case of a detailed and professionally drafted contract to suppose that a part of the bargain has not been expressly stated.

162. Second, I think it significant that the Agreement (at Clause E) specified the "duty free retail price" for each product. Yam Seng was thus constrained by the Agreement from selling or authorising the sale of any product in duty free outlets at any lower price than the specified duty free retail price. It would be surprising in these circumstances if the parties had intended that ITC should be free to authorise the sale of a product in the domestic market of any territory at a lower price than Yam Seng was permitted by its contract with ITC to sell the same product in duty free.

163. The third and in my view decisive contextual feature is that, as was common ground, the background to the Agreement included an industry assumption that retail prices in domestic markets will be higher than the corresponding duty free retail prices at airports or on board aeroplanes. The parties would reasonably have understood and expected that their obligations would reflect this assumption without needing to spell this out.

164. In my view these matters, taken together, lead to the necessary implication that ITC would not

Case 13-1708  Document 105  03/16/2015  1461636  Page64 of 103

authorise the sale of any product in the domestic market of any territory covered by the Agreement at a lower retail price than the duty free retail price for the product which had been specified in the Agreement with Yam Seng.

**Was there a Breach by ITC?**

165. The next question is therefore whether there was a breach by ITC of either of the particular terms which I have held was implied in the Agreement: namely, the implied duty of honesty in the provision of information and the implied duty not to approve a domestic retail price for a product which undercut the duty free retail price.

166. It is convenient to take the latter first. I find that Yam Seng has not established that ITC was in breach of this implied term.

167. The retail price agreed by ITC with Kay Ess for sales of the 100ml EDT in the Singapore domestic market was S$59, equivalent to just over US$42. The duty free retail price for the 100ml EDT specified in the Agreement was US$42. Therefore, ITC did not agree a lower price for the domestic market than the retail price agreed with Yam Seng for duty free sales.

168. The problem seems to have arisen because the duty free retail price which Yam Seng communicated to Nuance Watson, the duty free operator at Changi Airport in Singapore, and to the airlines, was US$44. There is no evidence, however, that before setting this price Mr Tuli obtained Mr Presswell's agreement to vary the duty free retail price for the 100ml EDT specified in the Agreement.

169. Where I consider that Yam Seng has legitimate cause for complaint in relation to domestic pricing in Singapore is that Mr Presswell misled Mr Tuli about what ITC had done. For the reasons indicated, Yam Seng was not entitled to insist that ITC instruct Kay Ess to set the Singapore domestic retail price for the 100ml EDT above US$44. However, Mr Presswell agreed to do so and in his email to Mr Tuli dated 26 January 2010 said that he had informed Kay Ess that they must increase the Singapore domestic retail price to S$65 being the equivalent of US$46.40. I have found that at the time when he sent this email Mr Presswell had not yet sent such an instruction to Kay Ess, and that when he did so on 29 January 2010 he was told in reply that the product had already gone on sale at a price of S$59 and that Kay Ess was not willing to go back to its customers and inform them that the retail price had increased within a matter of days. Mr Presswell nevertheless left the matter there and did not inform Mr Tuli that the domestic retail price had not, after all, been increased. Instead he left Mr Tuli with the understanding, for which he was responsible and on which he knew that Yam Seng would be relying, that the domestic retail price was being increased when he knew that this information was false.

170. Mr Presswell showed no sign either in the emails exchanged when the facts came to light in July 2010 or in his evidence in court that he saw anything dishonest about his conduct. When Mr Tuli accused him in their correspondence of having lied about the Singapore domestic price, Mr Presswell took great offence and (in an email dated 9 July 2010) demanded "by return email your retraction and sincere apology". Despite numerous requests, however, Mr Presswell never gave any answer in correspondence to the accusation that he had knowingly misled Mr Tuli. He simply ignored the requests for an explanation.

171. There can, however, be no doubt that objectively, whether Mr Presswell recognised it or not, his conduct in leaving Mr Tuli with the belief that the domestic retail price had been increased to S$65 when Mr Presswell knew that to be untrue was dishonest. Furthermore, the nature of the

dishonesty, on a matter of commercial importance in Yam Seng's dealings with its customers, was in my view such as to strike at the heart of the trust which is vital to any long term commercial relationship, particularly one which is dependent as this relationship was on the mutual trust of two individuals. I do not think that a businessman in Mr Tuli's position could reasonably be expected to continue to do business with ITC after Mr Presswell's dishonest behaviour regarding the Singapore pricing had come to light – all the more so given Mr Presswell's refusal to explain his conduct. I therefore have no hesitation in holding that this was a repudiatory breach of contract.

172. There was a further matter about which Mr Presswell appears to have misled Mr Tuli, although it is not one of which Mr Tuli was aware at the time of his decision to terminate the Agreement. This concerned the steps taken to register the products in China. I have found that both before the Agreement was made and afterwards Mr Presswell gave information to Mr Tuli about the time frame within which registration would take place which was wholly unrealistic. That in itself did not amount to breach of the duty of honesty in the provision of information which I have held was implied. However, when, as I have found that he did, Mr Presswell told Mr Tuli in early May 2010 that an application for registration had been made some two weeks earlier, it is hard to suppose that he did not appreciate that this information was false and that, as ITC has admitted in these proceedings, an application had still not in fact been made. Yam Seng did not allege, however, that the information given in early May 2010 was a further instance of bad faith, and in these circumstances it is not right that I should make any finding to that effect.

**Conclusion on Lawfulness of Termination**

173. In summary, I have found that ITC was in repudiatory breach of the Agreement in two respects:

> (1) In signifying its intention to use another distributor for the toiletry products in Hong and Macau, in breach of the exclusivity granted to Yam Seng, having previously refused, in breach of its contractual obligation, to supply the toiletries to Yam Seng; and
>
> (2) In giving Yam Seng information about the Singapore domestic retail price on which Mr Presswell knew that Yam Seng was likely to rely and which he knew to be false.

174. Either of these breaches on its own would in my view have justified the termination of the Agreement on 29 July 2010; in combination they certainly did so.

**Measure of Damages for Breach of Contract**

175. Yam Seng claims damages for breach of contract on two alternative measures. Its primary claim is for loss of profits which Yam Seng would allegedly have made if ITC had performed its obligations under the Distribution Agreement for the whole of the contract period. Alternatively, Yam Seng claims as wasted expenditure the loss which it sustained as a result of entering into the contract.

176. I will consider the figures in more detail later, but in broad terms Yam Seng appears to have made a loss in its trading under the Distribution Agreement because such gross profits as it has received from sales of the fragrance have failed to defray its marketing and promotion costs.

**Claim for Loss of Profits**

177. Yam Seng claims that, if it had not been for ITC's breaches and the consequent premature

termination of the Distribution Agreement, Yam Seng would have made a net profit from the Agreement which Yam Seng quantifies at S$789,516 (equivalent to around £370,000).

178. This figure is based on an estimate which Mr Tuli says he made at the time of entering into the Agreement of the profits which Yam Seng could expect to make from selling the 100ml EDT. There is no document evidencing the calculation, but it was Mr Tuli's evidence that he made what he called the "conservative assumption" that Yam Seng could sell 1,500 units per month in each of China, the Middle East and the Asia Pacific region and another 1,000 units per month to airlines. This would produce total monthly sales of 5,500 units. Mr Tuli estimated that his gross profit per unit would be US$6.80 and assumed selling expenses (to include marketing) of 50% of the gross profit, yielding a net margin of US$3.40. Sales of 5,500 units at a net margin of US$3.40 would generate a net profit of US$18,700 per month which at the time was equivalent to about S$26,180. Mr Tuli says he rounded this down to S$25,000 as "a safe estimate". Over the whole contract period from 12 May 2009 to 31 December 2011, a profit of S$25,000 per month would have resulted in a total profit of S$789,516.

179. The fundamental problem with this calculation is that it takes no account of what actually happened in performing the Agreement. Sales of the 100ml EDT fell far below Mr Tuli's expectations. According to an analysis made by ITC's expert accountant, only some 15,000 units of the product were sold during a period of about a year. That equates to average monthly sales of around 1,250 units, which is less than a quarter of the rate forecast by Mr Tuli. Of course it is Yam Seng's case, which I have found to be justified in most respects, that ITC committed breaches of the Agreement. However, no attempt has been made to estimate what impact on sales any of those breaches actually had.

180. Moreover, one of Mr Tuli's complaints which he made at the time of termination of the Agreement and maintained in evidence was that the product was not as good as he had been led to believe. For example, in an email to Mr Presswell dated 2 August 2010, Mr Tuli said this:

> "We also feel that you are now in a bit of a panic situation with regards to the brand, as you have realised that you have made a sub standard product, which is losing its listing due to the poor performance. We have many times told you that quality, packaging etc is of poor quality, and you have always ignored this. You have 20,000 pieces lying in Dubai at the warehouse, and the same number in Singapore for over a year that you cannot sell ..."

The reference to stock lying in Dubai and Singapore was to stock left over from the promotion organised by ITC with Singapore Telecom which was the first launch of the Manchester United fragrance. Mr Tuli's understanding was that this promotion failed dismally and only a few bottles were sold.

181. There was also evidence that sales of the fragrance by airlines were disappointing. In an email dated 8 February 2010 Mr Tuli reported to Mr Presswell that sales on board Cathay Pacific and Dragonair were a bit slow, but he had persuaded them keep listing the fragrance for another quarter. Sales did not improve, however, despite a special promotion and on 10 May 2010 Cathay Pacific informed Yam Seng that the Manchester United fragrance would be de-listed "due to unsatisfactory sales performance." In his email to Mr Presswell dated 2 June 2010 setting out issues that he wanted to discuss, Mr Tuli identified slow sales as one such issue, giving Korean Airlines as an example, and said:

> "... while we are trying to promote the brand we are getting de-listed from places as

well, and this is a matter of concern which should be addressed."

182. All this tends to suggest that the sales performance would probably have been much poorer than Mr Tuli had forecast even if ITC had complied in full with the Agreement.

183. In considering the general attractiveness and likely profitability of the product, I think it also relevant to note that ITC appears to have had no success in selling the Manchester United fragrance in other territories and in domestic markets, and that since the termination of the Agreement the product line has been discontinued altogether.

184. In these circumstances it seems to me impossible to treat Mr Tuli's estimate of profits, made at the time of entering into the Agreement and before there was any actual experience of trying to sell the product, as a reasonable estimate of what financial results would have been achieved if ITC had performed all its obligations under the Distribution Agreement. The likelihood is that sales would have fallen short of Mr Tuli's original expectations even if there had been no breach of contract by ITC. Neither party, however, has put forward any other estimate of what the outcome would have been in those circumstances.

185. I conclude that Yam Seng has failed to prove what profit it would have made or indeed that it would have made a profit at all if ITC had fully performed its obligations under the Agreement.

**Claim for Wasted Expenditure**

186. ITC's alternative claim is for its net expenditure incurred as a result of entering into the Agreement. The basis on which wasted expenditure can be recovered as damages for breach of contract was considered by Teare J in Omak Maritime Ltd v Mamola Challenger Shipping Co [2011] 1 Lloyd's Rep 47. In his masterly judgment Teare J has shown that awarding compensation for wasted expenditure is not an exception to the fundamental principle stated by Baron Parke in Robinson v Harman (1848) 1 Ex 850 at 855 that the aim of an award of damages for breach of contract is to put the injured party, so far as money can do it, in the same position as if the contract had been performed, but is a method of giving effect to that fundamental principle. That conclusion must logically follow once it is recognised, as it was by the Court of Appeal in C & P Haulage v Middleton [1983] 1 WLR 1461, that the court will not on a claim for reimbursement of losses incurred in reliance on the contract knowingly put the claimant in a better position than if the contract had been performed.

187. The advantage of claiming damages on the 'reliance' basis is not that the claimant can recover expenditure which would have been wasted even if the contract had been performed but that, where such a claim is made, the burden of proof lies on the defendant to show that the expenditure would not have been recouped and would have been wasted in any event: see CCC Films (London) Ltd v Impact Quadrant Films [1985] QB 16. In this regard the English courts have adopted the approach stated by Learned Hand CJ in L Albert & Son v Armstrong Rubber Co 178 F 2d 182 (1949):

> "We cannot agree that the promisor's default in performance should under this guise make him the insurer of the promisee's venture; yet it does not follow that the breach should not throw upon him the duty of showing that the value of the performance would in fact have been less than the promisee's outlay. It is often very hard to learn what the value of the performance would have been; and it is a common expedient, and a just one, in such situations to put the peril of the answer upon that party who by his wrong has made the issue relevant to the rights of the other."

188.  The "common expedient" referred to by Chief Judge Learned Hand reflects a general theme which
runs through the law of damages. On the one hand, the general rule that the burden lies on the
claimant to prove its case applies to proof of loss just as it does to the other elements of the
claimant's cause of action. But on the other hand, the attempt to estimate what benefit the claimant
has lost as a result of the defendant's breach of contract or other wrong can sometimes involve
considerable uncertainty; and courts will do the best they can not to allow difficulty of estimation
to deprive the claimant of a remedy, particularly where that difficulty is itself the result of the
defendant's wrongdoing. As Vaughan Williams LJ said in <u>Chaplin v Hicks</u> [1911] 2 KB 786 at
792: "the fact that damages cannot be assessed with certainty does not relieve the wrong-doer of
the necessity of paying damages for his breach of contract." Accordingly the court will attempt so
far as it reasonably can to assess the claimant's loss even where precise calculation is impossible.
The court is aided in this task by what may be called the principle of reasonable assumptions –
namely, that it is fair to resolve uncertainties about what would have happened but for the
defendant's wrongdoing by making reasonable assumptions which err if anything on the side of
generosity to the claimant where it is the defendant's wrongdoing which has created those
uncertainties.

189.  A classic statement of this principle in the context of a claim for breach of contract is to be found
in the case of <u>Wilson v Northampton and Banbury Junction Railway Co</u> (1873-74) LR 9 Ch App
279. In that case a railway company was in breach of a contract to build a station in a particular
location. The contract contained no further description of the station nor of what use the railway
company was to make of it. The plaintiff sought an order for specific performance of the contract
on the ground that the loss caused by the breach was too uncertain to be quantified so that damages
would not be an adequate remedy. The Court of Appeal in Chancery rejected that argument,
considering that an inquiry into damages met the justice of the case. Lord Selborne LC said at 285-
6 that in the assessment damages:

> "... the Plaintiff will be entitled to the benefit of such presumptions as, according to the
> rules of law, are made in Courts both of Law and Equity against persons who are
> wrong-doers in the sense of refusing to perform, and not performing, their agreements.
> We know it to be an established maxim, that in assessing damages every reasonable
> presumption may be made as to the benefit which the other parties might have
> obtained by the bonâ fide performance of the agreement. On the same principle, no
> doubt, in the celebrated case of the diamond which had disappeared from its setting
> and was not forthcoming, a great Judge directed the jury to presume that the cavity
> had contained the most valuable stone which could possibly have been put there. I do
> not say that that analogy is to be followed here to the letter; the principle is to be
> reasonably applied according to the circumstances of each case. ... It appears to me,
> therefore, that substantial justice may in that way be done between the parties."

190.  It seems to me that the (rebuttable) presumption that the claimant would have recouped
expenditure incurred in reliance on the defendant's performance of the contract is an illustration of
this approach. Parties in normal circumstances contract and incur expenditure in pursuance of their
contract in the expectation of making a profit. Where money has been spent in that expectation but
the defendant's breach of contract has prevented that expectation from being put to the test, it is fair
to assume that the claimant would at least have recouped its expenditure had the contract been
performed unless and to the extent that the defendant can prove otherwise.

191.  Applying this approach to the present case, ITC has not attempted to discharge the burden of
showing what financial return Yam Seng would have made if ITC had not been in breach of
contract. It is reasonable to suppose that if ITC had made all the Manchester United products

available in accordance with the timetable promised and had shipped all orders promptly, Yam Seng would have made more sales than it in fact did. What the proceeds of such sales would have been and whether they would have been sufficient to defray Yam Seng's expenditure including its expenditure on marketing and promoting the fragrance is impossible for me to determine. ITC has not put forward any estimate of what loss, if any, Yam Seng would have suffered in those circumstances and I am unable to make such an assessment.

192. I therefore conclude that Yam Seng is entitled to recover as damages for ITC's breach of contract its net expenditure incurred in performing the Agreement.

## D. **THE MISREPRESENTATION CLAIM**

193. As an alternative to its claim for damages for breach of contract, Yam Seng claims damages on the basis that it was induced to enter into the Agreement by misrepresentation.

### **The Facts**

194. I have found that, in his very first communication to Mr Tuli, Mr Presswell falsely represented that ITC had "recently signed" a licence agreement to manufacture and sell Manchester United fragrances and that during the subsequent negotiations leading to the conclusion of the Agreement on 12 May 2009 Mr Presswell continued (expressly or impliedly) to represent that ITC had the legal right to manufacture and sell the products which it was offering to supply to Yam Seng and to grant Yam Seng the exclusive right to distribute. In fact, ITC did not acquire any such rights until 5 May 2009, and when the Agreement with Yam Seng was signed ITC still had no such rights in relation to the toiletries – for which it acquired a (non-exclusive) licence only on 21 August 2009.

195. The likely reason why Mr Presswell falsely represented that ITC already had rights which in truth it had not yet acquired was that he wanted to get the maximum benefit from the three year licences which he was negotiating and expected to conclude with Manchester United Merchandising Limited, and therefore wanted to start selling the products as early as possible. If Mr Presswell had waited until he had in fact signed a licence agreement before starting to negotiate a distribution agreement valuable time would have been lost.

196. Mr Tuli's evidence was that he would not have proceeded with negotiations for a distribution agreement if he had known that ITC did not yet have the right to manufacture and sell the Manchester United fragrances. That seems to me to make obvious sense. I also infer that if Mr Presswell had said nothing about his licence position Mr Tuli would have asked. Any businessman of ordinary prudence who was offered a distributorship deal for a branded product would naturally want to know what rights in the brand the person offering the deal had, and would be unlikely to think it worth entering into any detailed discussions unless and until assured that that person had secured the legal right to manufacture and sell the product. I am sure that this was Mr Presswell's perception also, which is why he falsely represented that ITC had already signed a licence agreement.

197. Mr Tuli also gave evidence that he would not have gone ahead with the Agreement if he had not believed that ITC was able to supply the entire range of products, including the toiletries. While I have no doubt that the inclusion of the toiletries added to the overall attractiveness of the product line, I think it likely – given their relative unimportance commercially, as discussed earlier – that Mr Tuli would have been willing to enter into a distribution agreement without them. That said, I am sure that the Agreement would not have been signed in the terms that it was on the date that it was if Mr Presswell had not led Mr Tuli to believe that ITC had the legal rights which it purported

Case 13-1708   Document 105   03/16/2015   1461636   Page70 of 103

to grant in respect of the toiletries.

198. I conclude that, if Mr Presswell had not made the representations which I have found were made regarding ITC's rights to manufacture and sell the Manchester United products, the Agreement dated 12 May 2009 would not have been made.

**Section 2(1) of the Misrepresentation Act**

199. Yam Seng has not pleaded a case of deceit, being content to rely on section 2(1) of the Misrepresentation Act 1967. This provides:

> "2.— **Damages for misrepresentation.**
>
> (1) Where a person has entered into a contract after a misrepresentation has been made to him by another party thereto and as a result thereof he has suffered loss, then, if the person making the misrepresentation would be liable to damages in respect thereof had the misrepresentation been made fraudulently, that person shall be so liable notwithstanding that the misrepresentation was not made fraudulently, unless he proves that he had reasonable ground to believe and did believe up to the time the contract was made that the facts represented were true."

200. To establish a right to recover damages under this statutory provision, it is thus necessary for a claimant to show:

> (1) that it has entered into a contract with the defendant;
>
> (2) that it did so after a representation of fact had been made to it by the defendant (and in reliance on that representation);
>
> (3) that the representation was false; and
>
> (4) that as a result of entering into the contract with the defendant, the claimant has suffered loss.

201. Provided these matters are established and the defendant would be liable to pay damages if the misrepresentation had been made fraudulently, then the burden is on the defendant in order to avoid liability under section 2(1) to prove that it had reasonable ground to believe, and did believe, up to the time the contract was made that the facts represented were true.

202. In the present case I have found that Yam Seng has established the first three of the above requirements. I am also satisfied that Mr Presswell did not believe, let alone have any reasonable ground to believe, when he represented that ITC had recently signed a licence agreement to manufacture and sell Manchester United fragrances that the fact represented was true. Nor did he believe, let alone have any reasonable ground to believe, at the time when the Agreement was made that ITC had yet signed a licence (nor even agreed a deal subject to contract) which included the toiletries.

203. It only remains therefore to consider the question of loss.

**Measure of Damages for Misrepresentation**

204. In Royscot Trust v Rogerson [1991] 2 QB 297 the Court of Appeal held that the wording of section

Case 13-1708  Document 105  03/16/2015  1461636  Page71 of 103

2(1) of the Misrepresentation Act requires damages awarded under that provision to be calculated in the same way as if the representation been made fraudulently. In a case of fraudulent misrepresentation the claimant is entitled to recover compensation for all loss directly flowing from (i.e. caused by) the transaction induced by the representation, whether or not the loss was reasonably foreseeable and including any consequential losses: see <u>Doyle v Olby</u> [1969] 2 QB 158; <u>Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd</u> [1997] AC 254. The Court of Appeal in <u>Royscot Trust</u> therefore applied this measure of damages to a claim under section 2(1).

205. Applying this measure, Yam Seng claims as damages the costs which it incurred in marketing and distributing the products which were the subject of the Agreement less the income received from sales of those products. This is the same sum which Yam Seng claims as damages for breach of contract if such damages are calculated on the basis of wasted expenditure.

206. The decision in <u>Royscot Trust</u> has been much criticised. As has been pointed out by academic writers, the policy considerations which justify a broad measure of damages where fraud has been demonstrated do not apply, or in nothing like the same degree, in cases of mere negligence. Nor does the language of section 2(1) seem to me to compel such a conclusion. It is possible to construe the words "and as a result thereof has suffered loss" as requiring the claimant to show that he has suffered loss as a reasonably foreseeable result of a misrepresentation having been made to him, and to treat the following words as imposing an <u>additional</u> requirement (that the defendant would be liable to damages had the misrepresentation been made fraudulently) which must also be satisfied. Unless and until <u>Royscot Trust</u> is over-ruled, however, it represents the law; and I must therefore apply it.

207. Yam Seng cannot claim to have suffered any loss by reason of the representation that ITC had already acquired a licence being false. ITC did acquire the legal right to manufacture and sell all the products which were the subject of the Agreement and the fact that ITC did not have any such legal right when the negotiations began and still did not have a licence for the toiletries for the first few months of the contract period did not cause Yam Seng any prejudice. In a case of negligent misrepresentation at common law, ITC could in these circumstances rely as a defence on the principle which limits damages to the loss attributable to the representation being untrue: see <u>South Australia Asset Management Corp v York Montague Ltd</u> [1997] AC 191. That limitation does not apply, however, where the misrepresentation is fraudulent: see <u>Smith New Court</u>, *supra*, overruling <u>Downs v Chappell</u> [1997] 1 WLR 426 on this point. On the authority of <u>Royscot Trust</u>, therefore, the limitation also does not apply where damages are awarded under section 2(1).

208. The argument made by Mr Eaton Turner on behalf of ITC was that the misrepresentations made in this case did not cause loss because Yam Seng would still have lost money if it had not entered into the Agreement. The only effect of the misrepresentations, Mr Eaton Turner submitted, was to accelerate the making of the contract. If Mr Presswell had waited before approaching Mr Tuli until he had signed a licence agreement with Manchester United Merchandising Limited, the likelihood is that a distribution agreement would still have been concluded with Yam Seng in similar terms to the agreement actually made; the only difference would have been that the contract period would have commenced a few months later. In that event, Mr Eaton Turner submitted, there is no reason to think that the sales and profits would have been materially different from the results actually achieved. Thus, the likelihood is that Yam Seng would still have suffered a loss similar to that which it in fact suffered.

**Relevance of Alternative Transactions**

Case 13-1708 Document 105 03/16/2015 1461636 Page72 of 103

209. This argument raises a question of principle: in assessing damages for fraudulent misrepresentation or under section 2(1), is it relevant to consider what, if any, other transaction the claimant would have entered into if the misrepresentation had not been made? One approach would be to say that it is not. It might be said that where the claimant has been induced to enter into a contract by misrepresentation the object of an award of damages is simply to restore the claimant to the position before the contract was made: there is no warrant for going further and examining what the claimant would or would not have done if it had not made the contract and then bringing into account in assessing damages the financial consequences of such hypothetical alternative transactions. This approach finds support in a dictum of Hobhouse LJ in <u>Downs v Chappell</u> [1997] 1 WLR 426 at 441:

> "In general, it is irrelevant to inquire what the representee would have done if some different representation had been made to him or what other transactions he might have entered into if he had not entered into the transaction in question. Such matters are irrelevant speculations."

210. This statement was cited and applied by May J in <u>Slough Estates plc v Welwyn Hatfield District Council</u> [1996] 2 PLR 50. In that case the plaintiffs were induced by fraudulent misrepresentations to invest in a property development. During the period of the investment property values fell. The plaintiffs recovered damages calculated as the difference between all their costs incurred in relation to the development and all their receipts plus the value of the property at the time of assessment. Applying the dictum of Hobhouse LJ in <u>Downs v Chappell</u> quoted above, May J considered that it was irrelevant to inquire whether if they had not entered into the transaction the plaintiffs would have invested in another development and incurred a loss as a result of the fall in property values. Commenting on the defendant's objection that the damages awarded amounted to a windfall, he said (at 124):

> "If, as I conceive, the policy of the law is to transfer the whole foreseeable risk of a transaction induced by fraud to the fraudulent defendant, and if, as I conceive, the court does not speculate what, if any, different transaction the plaintiff might have done if the fraudulent representation had not been made, damages on this basis are not to be regarded as a windfall, but the proper application of the policy of the law."

211. Another case where the court refused to speculate about what the claimant would have done if the representation had not been made is <u>Naughton v O'Callaghan</u> [1990] 3 All ER 191. In that case the plaintiffs were induced to buy a thoroughbred yearling colt by a misrepresentation as to the colt's pedigree. As part of their damages the plaintiffs claimed costs incurred in training and keeping the colt before the misrepresentation was discovered. The defendant argued that the expenditure would have been incurred anyway as the plaintiffs would, if they had not bought this particular yearling, have bought another one at the same sale. The plaintiffs accepted this but said that had they bought a different horse it might have paid for its keep and reaped for them rich rewards. Waller J said:

> "I have concluded that the plaintiffs are entitled to ask the court to look simply at the contract they made in reliance on the representation which induced them to enter into that bargain. They are entitled to say that there must be no speculation one way or the other about what would have happened if they had not purchased this horse and if no misrepresentation had been made to them."

212. Nevertheless, there is a line of cases in which courts have inquired and taken account in assessing damages of what other transaction the claimant would have entered into if no misrepresentation had been made.

Case 13-1708  Document 105  03/16/2015  1461636  Page73 of 103

213. In <u>East v Maurer</u> [1991] 1 WLR 461 the plaintiffs bought a hairdressing salon from the defendant in reliance on a fraudulent misrepresentation that the defendant did not intend to carry on operating another salon which he also owned in the same area. The business lost money as customers deserted it for the defendant's other salon. The Court of Appeal held that the plaintiffs were entitled to recover as damages not only the trading losses they sustained in running the salon and the capital loss suffered on its eventual resale, but also the profits which they could reasonably have expected to make if they had instead bought another similar hairdressing business in a different part of the town.

214. In <u>Clef Acquitaine SARL v Laporte Materials (Barrow) Ltd</u> [2001] QB 488, the Court of Appeal went a step further. In that case the plaintiffs entered into two distributorship agreements with the defendant which were in fact profitable. However, the judge found that, but for the defendant's deceit during the negotiations, the agreements would have contained more favourable terms as to price and the profits made by the plaintiffs would consequently have been greater. The Court of Appeal held that the plaintiffs were entitled to recover as damages the additional profits which they would have made in those circumstances.

215. In <u>4 Eng Ltd v Harper</u> [2009] Ch 91 damages were awarded on a loss of a chance basis for the lost opportunity of entering into another, more profitable transaction. The claimant was induced by fraudulent misrepresentations to buy a company from the defendant which turned out to be worthless. David Richards J found that there was another company which the claimant would have sought to buy if it had not bought the company in question and that there was a good chance, which he assessed at 80 per cent, that the owners of that company would have been agreed to sell it to the claimant. On this basis he awarded as damages 80% of the income and capital gain which the claimant would have received from such an investment, assessed at the date of trial.

216. In all these cases the hypothetical alternative transaction which the claimant would otherwise have entered into was one which would have been profitable. Should account also be taken of a transaction which would probably have resulted in a loss? Chitty on Contracts (31st Edn) at para 6-064 suggests not, citing an observation of Lord Steyn in <u>Smith New Court</u> at 283 that:

> "... it is not necessary for the judge to embark on a hypothetical reconstruction of what the parties would have agreed had the deceit not occurred."

Similarly, Clerk & Lindsell on Torts (20th Edn) at para 18-45 states that:

> "where a defendant deceives the claimant into entering a business transaction, the claimant is entitled to recover the loss he suffers as a result, without reference to the fact that he might otherwise have invested his money in some other unprofitable way and lost it anyway."

The editors add in a footnote, however, that such an attitude is difficult to defend and that:

> "if the claimant can increase his recovery by showing he would have invested his money profitably, by parity of reasoning the defendant ought to be able to reduce his exposure by showing that, but for his deceit, the claimant would have lost it in any case."

217. In my view such an attitude would be not merely difficult but impossible to defend. In circumstances where it is established that the claimant can recover a profit that would have been obtained from entering into some other transaction, it must in principle be equally relevant to take

account of any loss. Nor in my view does the case law justify any different conclusion. In particular:

(1) The dictum of Hobhouse LJ in <u>Downs v Chappell</u> quoted above begins with the words "in general". It cannot therefore have been intended to state a rule of law – all the more so since it immediately follows a reference to <u>East v Maurer</u> where the plaintiffs were awarded profits which they would have been made if they had entered into a different transaction.

(2) The observation of Lord Steyn in <u>Smith New Court</u> quoted in Chitty is taken out of context. The hypothetical reconstruction which Lord Steyn was disapproving was a reconstruction of the kind suggested separately by Hobhouse LJ in <u>Downs v Chappell</u> of what the claimant would have done if the representation had been true; Lord Steyn's observation should not be interpreted as a statement that it is never relevant to consider what alternative transaction would have been entered into if the representation had not been made – not least since Lord Steyn (at 282) specifically approved <u>East v Maurer</u> as showing that "an award based on the hypothetical profitable business in which the plaintiff would have engaged but for deceit is permissible: it is classic consequential loss."

(3) The statements of Hobhouse LJ in <u>Downs v Chappell</u> and of Lord Steyn in <u>Smith New Court</u> were both considered by the Court of Appeal in <u>Clef Aquitaine</u> and explained by Simon Brown LJ in the way I have indicated above.

(4) There is no difference in principle between an alternative transaction which would have been more profitable and one which would have been less profitable than the actual transaction such that it can be relevant to take account of the former but not the latter.

(5) The evidential burden will be on the defendant, however, to show that if the misrepresentation had not been made the claimant would have incurred a loss. In seeking to discharge this burden, the defendant (unlike the claimant) does not have the benefit of the principle that if the financial outcome of the alternative transaction is uncertain the court will make reasonable assumptions in its favour (for example by allowing damages to be calculated on a loss of a chance basis) to assist in the proof of loss.

(6) Unless the defendant can demonstrate with a reasonable degree of certainty, therefore, both the fact that the claimant would probably have suffered a loss from entering into an alternative transaction and the amount of that loss, the damages will not be reduced on that account. In this respect there is a disparity, but a principled one, between hypothetical transactions which would have made the claimant worse off and those which would have made the claimant better off.

(7) <u>Slough Estates</u> and <u>Naughton v O'Callaghan</u> are both consistent with this analysis. In those cases there was evidence which justified a very general inference that the claimant would quite likely have suffered some loss if it had not entered into the contract in question (by investing in another property development or buying another horse). But there was no way of estimating with any certainty or precision what loss, if any, the claimant would have incurred from any such transaction. As it was the defendant rather than the claimant who wished to rely on such a loss, that difficulty

was insuperable and meant that there was no quantifiable loss which could be taken into account.

**Conclusions on Right to Damages for Misrepresentation**

218.　I therefore consider that in this case it would in principle be open to ITC to show that, if the misrepresentations regarding ITC's legal right to manufacture and sell the Manchester United products had not been made and the Agreement had not been concluded, Yam Seng would nevertheless have entered into a similar contract at a later date and lost money. However, in order to reduce the damages recoverable by Yam Seng on this basis, it would be necessary for ITC to quantify a sum of money which the court can conclude with reasonable confidence that Yam Seng would have lost. That is not an exercise which ITC has attempted to undertake, nor which I would be able to undertake.

219.　I think it likely that, if the misrepresentations had not been made, a distribution agreement would have been concluded between ITC and Yam Seng a few months later than the Agreement was in fact concluded, after ITC had acquired the relevant licences. In that event, however, there would not have been the same delay after the contract was made in producing the deodorant and 50ml EDT. Nor would Yam Seng have been encouraged to market the full range of products including the toiletries for as long as it did, if at all, in the expectation that they would be produced. Nor can it be assumed that the contract would have been terminated prematurely because of breaches of contract by ITC as the Agreement was. It is safe to assume that in those circumstances the expenditure incurred and sales made by Yam Seng would have been different from the actual figures. What exactly the differences would have been, however, and what would have been the net financial outcome of such a hypothetical contract is not a matter about which I can properly speculate.

220.　I conclude that Yam Seng is entitled to recover as damages for misrepresentation its net loss incurred as a result of entering into the Agreement without any reduction on account of the possibility that, if no misrepresentation had been made, Yam Seng might still have entered into a similar agreement at a later date and lost money anyway.

E. **QUANTUM OF DAMAGES**

221.　Yam Seng's calculation of its loss resulting from the Agreement is as follows:

| | |
|---|---|
| Cost of goods sold | S$235,521.08 |
| Outward freight charges | S$50,480.68 |
| Agent's charges | S$53,175.74 |
| Marketing, sales and promotion costs | S$468,115.38 |
| Less total sales | S$467,719.82 |
| Net loss: | S$339,353.06 |

These figures are supported by schedules produced by Mr Tuli.

222.　The main focus of dispute is the amount of unsold stock still held by Yam Seng. The cost of purchasing such stock has not been included in the loss calculation, which includes only the cost of purchasing the goods which Yam Seng has sold. The explanation for the omission appears to be

that, according to the response given by Yam Seng to a request by ITC for further information, the stock still held by Yam Seng after the Agreement had been terminated consisted entirely of the merchandise comprised in ITC's final invoice (in the sum of US$38,705.28) which Yam Seng has not paid. Yam Seng has not given any credit for the value of the remaining stock because it was Mr Tuli's evidence that there is no reasonable prospect of making any further sales in mitigation of Yam Seng's loss and that the products will in any event reach their expiry dates within the next few months.

223. Although Mr Tuli said that stock checks have been carried out, Yam Seng has not disclosed any list of the stock which it still has. An expert accountant instructed by ITC has, however, compared the goods purchased by Yam Seng with the goods sold (as recorded in Yam Seng's invoices) and has deduced from this comparison the quantity of each product which Yam Seng should theoretically still hold. This reconciliation exercise has demonstrated conclusively that the unsold stock does not coincide with the goods comprised in ITC's outstanding invoice as Yam Seng has claimed in its statement of case. On the one hand it is clear that some of the goods comprised in that invoice have in fact been sold. On the other hand it also appears that Yam Seng still holds stocks of products which were not included in that invoice.

224. In fact, it seems that this error may have resulted in Yam Seng understating its claim. On my calculation the total cost to Yam Seng of the goods which it purchased from ITC (excluding the unpaid invoice) is US$223,090. Converted at an exchange rate of 1.4 this is equivalent to S$312,327. This is significantly more than the sum of S$235,521 claimed as the cost of purchasing the goods sold by Yam Seng and indicates that the stock still held by Yam Seng cost correspondingly more than the amount of the unpaid invoice.

225. Numerous items included in the schedule of marketing, sales and promotion costs were contested in cross-examination of Mr Tuli. No previous notice had been given of ITC's grounds of objection to these items. Although some of the points raised were plainly not well founded, some appeared to have merit. Indeed Mr Tuli accepted that some items, for example some payments made to solicitors, have been wrongly included in the schedule. An adjustment will therefore need to be made to this element of the claim. However, there was insufficient time for the scope of any remaining issues to be identified before the end of closing submissions.

226. An item of promotional expenditure which was made the subject of a discrete claim by a re-amendment to Yam Seng's particulars of claim at the start of the trial was the cost of a particular airline promotion for which ITC had agreed to fund the prizes in a sum of HK$40,000. Liability to reimburse Yam Seng for this expense was conceded by ITC in the course of the trial.

227. I invite the parties to seek to agree the quantum of damages. If agreement cannot be reached, I will give directions after this judgment has been handed down for how any sum which remains in dispute is to be assessed.

## F. ITC'S COUNTERCLAIM

228. ITC has pleaded a counterclaim which has two elements. The first element is the amount of ITC's unpaid invoice. Yam Seng admits that it owes this amount (of US$38,705.28) to ITC. However, if this amount were paid, the effect would simply be to increase Yam Seng's entitlement to damages by a corresponding sum. The claim therefore fails for circuity of action.

229. The second element of the counterclaim is an allegation that, as a result of Yam Seng's wrongful termination of the Agreement, ITC suffered loss of profit from sales to Yam Seng that would

Case 13-1708 Document 105 03/16/2015 1461636 Page77 of 103

otherwise have occurred. This claim was abandoned in closing submissions. In any event it would have failed, as I have held that Yam Seng was justified in terminating the Agreement.

## G. CONCLUSIONS

230. My conclusions, in summary, are as follows:

(1) ITC was in breach of contract in delivering the second order placed by Yam Seng very late, in failing to make products available when promised and in acting in bad faith in misleading Yam Seng about the steps taken to ensure that the domestic retail price in Singapore was not lower than the duty free price.

(2) The last of these breaches and ITC's threat not to honour the rights granted to Yam Seng in respect of Hong Kong and Macau were repudiatory in nature and justified Yam Seng in terminating the Agreement.

(3) Yam Seng is entitled to recover its net loss resulting from the Agreement as damages for breach of contract.

(4) Yam Seng is also entitled to recover the same loss under section 2(1) of the Misrepresentation Act 1967 as damages for misrepresentation, having been induced to enter into the Agreement by false representations that ITC had a licence to manufacture and sell the products.

(5) ITC's counterclaim fails.

---

# Nash v. Paragon Finance Plc, [2001] EWCA Civ 1466



# England and Wales Court of Appeal (Civil Division) Decisions

**You are here:** BAILII >> Databases >> England and Wales Court of Appeal (Civil Division) Decisions >> Nash & Ors v Paragon Finance Plc [2001] EWCA Civ 1466 (15 October 2001)
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2001/1466.html*
Cite as: [2002] 2 All ER 248, [2002] 2 P & CR 20, [2002] 1 P & CR DG13, [2002] WLR 685, [2001] EWCA Civ 1466, [2002] 1 WLR 685, [2001] 2 All ER (Comm) 1025

[New search] [Printable RTF version] [Buy ICLR report: [2002] 1 WLR 685] [Help]

**Neutral Citation Number: [2001] EWCA Civ 1466**

Case No: B2/2001/0456 CCRT1
B2/2001/0524 CCRT1

IN THE SUPREME COURT OF JUDICATURE
COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM CENTRAL LONDON COUNTY COURT
(Mr Recorder Havelock-Allan QC)

Royal Courts of Justice
Strand, London, WC2A 2LL

15th October 2001

B e f o r e :

**LORD JUSTICE THORPE**
**LORD JUSTICE DYSON**
and
**MR. JUSTICE ASTILL**

---

**(1) GEOFFREY NASH**
**(2) JENNIFER VALERIE NASH**
and
**(1) WILLIAM STAUNTON**
**(2) MARY STAUNTON**                                              **Appellants**

-v-

**PARAGON FINANCE PLC (formerly The National Home Loans Corporation)**                         **Respondent**

---

**(Transcript of the Handed Down Judgment of
Smith Bernal Reporting Limited, 190 Fleet Street
London EC4A 2AG
Tel No: 020 7421 4040, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)**

---

**Mr E. Bannister QC and Mr D. Broatch (instructed by Joseph Aaron & Co for Mrs Nash)
Mr Nash in person.
Mr D. Falkowski (instructed by Joseph Aaron & Co) for Mr and Mrs Staunton.
Mr A. Malek QC and Mr P. Wulwik (instructed by Wragge and Co) for the Respondents in both appeals**

---

**HTML VERSION OF JUDGMENT**

---

Crown Copyright ©

Lord Justice Dyson:

Introduction

1. These appeals raise a number of points of general importance in relation to sections 137-139 of the Consumer Credit Act 1974 ("the 1974 Act"). Paragon Finance PLC ("the Claimant") claims possession as mortgagee from Mr and Mrs Nash in the first action and from Mr and Mrs Staunton in the second action on the grounds that they are in arrears with their mortgage interest repayments. Both mortgages contain variable interest clauses. The mortgagors admit the arrears of interest, but assert that, by reason of the rates of interest that they were required to pay, the loan agreements are extortionate credit bargains within the meaning of section 138 of the 1974 Act. No complaint is made that the loan agreements were extortionate credit bargains at the outset. The mortgagors say, however, that the loan agreements became extortionate at a later date when, by reason of the Claimant's failure to adjust the charging rates in line with Bank of England or prevailing market rates, the interest payable so far exceeded those rates as to be exorbitant. By their counterclaims, the mortgagors seek orders that the loan agreements be reopened under section 139 of the 1974 Act. The Claimant applied for an order that the defence and counterclaims be struck out on the grounds that they had no real prospects of succeeding at trial. In a careful and comprehensive judgment handed down on 4 September 2000, Mr Recorder Havelock-Allan QC struck out the mortgagors' pleadings in both actions, and refused applications for permission to amend to which I shall come in due course. The mortgagors appeal against the Recorder's decisions. Before I identify the issues that have been raised in these appeals, I need to set out the relevant facts.

The facts

2. Until April 1997, the Claimant was called "The National Home Loans Corporation PLC". It first entered the mortgage market in the mid-1970s. The attraction of the Claimant to would-be borrowers was that it was willing to make self-certification loans, ie loans to borrowers who vouched for their income. The company was badly affected by rising interest rates in the late 1980s, and got into serious financial difficulties. It was forced to withdraw from further lending in

Nash & Ors v Paragon Finance Plc [2001] EWCA Civ 1466 (15 October 2001)

1991. It was re-financed by a consortium of banks in 1992, and re-entered the market in 1994 via a new subsidiary company, Home Loans Direct Ltd, which in 1997 changed its name to Paragon Mortgages Ltd ("Paragon"). At the heart of both actions is the complaint that the Claimant has consistently charged interest rates which are significantly higher than those of other mortgage lenders, and has done so in order to cover the cost of its refinancing or to retrieve its financial position.

3. Mr and Mrs Nash live at 75 Clifton Road, South Norwood, London SE25. On 5 February 1987, they received an Offer of Loan from the Claimant in a sum of £45,000 by way of re-mortgage of their property. The Offer specified that the loan was to be for 25 years. The capital was to be secured by an endowment policy. The interest was to be payable monthly at a variable rate. The starting rate was stated to be 12.75%. The Offer of Loan incorporated certain Special Conditions as well as the printed General Conditions of the Claimant then current. These latter incorporated the Claimant's Mortgage Conditions (1986 edition).

4. On 30 March 1987, Mr and Mrs Nash entered into a Loan Agreement on the terms of the Offer and the loan was secured by a Legal Charge on their property. They paid the interest as required. In December 1992, they surrendered the endowment policy. They paid the surrender value to the Claimant, and converted the loan to a repayment basis, so that each monthly payment covered both interest and capital. Their financial circumstances took a turn for the worse, and they fell into arrears. By March 1999, the arrears exceeded £5000. The Claimant started proceedings on 5 May 1999.

5. Mr and Mrs Staunton live at 12 Valentines Road, Ilford, Essex. The Claimant made an Offer of Loan to them on 11 October 1990. The proposed loan was for £70,145 for a period of 25 years, with interest payable monthly at a variable rate, and repayment of capital secured by an endowment policy. The Offer also included a fee for incorporating into the Loan Agreement the provisions of the Claimant's Stabilised Rate Facility. By this Facility, the borrower was able to cap the amount of interest payable each month. Payment of interest at the variable rate ("the charging rate") in excess of the cap ("the stabilised rate") would be deferred by converting the excess into part of the capital amount of the loan. When in any month, the charging rate exceeded the stabilised rate, the difference would be credited to the borrower's mortgage account as a "monthly credit" up to a maximum figure specified in the Offer of Loan. In the case of Mr and Mrs Staunton, this figure ("the maximum deferred interest to be capitalised") was £10,500. The Offer of Loan made to them described the maximum approved loan as being £80,645 (£70,145 plus 10,500), and provided that the stabilised rate of interest was to be 10.49%.

6. On 21 December 1990, Mr and Mrs Staunton entered into a Loan Agreement on the terms of the Offer of Loan from the Claimant, including the Stabilised Rate Facility. The loan was secured by a legal charge on the property. The Loan Agreement incorporated a set of printed General conditions and the Claimant's Mortgage Conditions (1990 edition). In September 1996, they repaid some capital, and thereafter the repayments included both interest and capital. Mr and Mrs Staunton discharged all their interest liabilities under the Loan Agreement until August 1998, when, the monthly instalments due increased from £548.13 to £928.75. The Recorder said that there was no evidence as to the reason for this sudden jump, but he inferred that it was due, at least in part, to the fact that the maximum deferred interest had been exceeded, so that the Stabilised Rate Period had come to an end. Mr and Mrs Staunton fell into arrears. The Claimant started proceedings on 15 June 1999 asserting that by now the arrears amounted to approximately £6700.

The Claimant's standard Conditions

7. "General Conditions (1986) edition

> "6. INTEREST
>
> Interest will be charged from the date on which the loan is completed. The rate current at the date of this Offer of Loan is as specified in the Offer of Loan. If the rate of interest should change before the Loan is completed, the Company may give the Applicant notice of the change by any method permitted under the Company's Mortgage Conditions for the giving of notice of such change to existing Borrowers…"

7. MONTHLY PAYMENTS

> The Monthly Payment specified in the Offer of Loan is calculated on the applicable rate of interest current at the date of this offer… However, the rate of interest may change before (as well as after) the loan is completed and other factors such as insurance premiums or tax rates may affect the amount of the Monthly Payment."

8. Mortgage Conditions (1986 edition)

"1. DEFINITIONS

> 1.5 "Interest" means interest at the rate applicable to the Mortgage from time to time.
>
> 1.12 "Payment" means the monthly payment notified to the Borrower as constituting the Payment for the time being by notice given by the Company whether by any offer of loan or revision thereof prior to or at the time of the Mortgage or under these Conditions thereafter.
>
> 2. PAYMENTS
>
> 2.1 The Borrower covenants that he will pay to the Company
>
> 2.1.2 The Payment …
>
> 2.2 The Payment may be calculated so as to include all or any part of capital, interest and such costs, expenses, liabilities and moneys recoverable or payable and premiums, sums expended and costs and expenses incurred as aforesaid and may be varied to take account from time to time of any increase or decrease in any of the same or any change in the rate or incidence of any tax.

3. INTEREST

3.3 Interest shall be charged at such rate as the Company shall from time to time apply to the category of business to which the Company shall consider the Mortgage belongs and may accordingly be increased or decreased by the Company at any time and with effect from such date or dates as the Company shall determine provided that the Company will take such steps as it considers to be reasonable and appropriate to bring any such increase or decrease to the attention of the Borrower and further provided that without prejudice to the generality of the foregoing

either written notice given in accordance with the provisions in that behalf hereinafter contained or publication of such notice in at least two national daily newspapers shall constitute reasonable and appropriate notice for the purposes of this clause.

7. COMPANY'S REMEDIES

7.3 If the Borrower

> 7.3.1 is in default of the payment of any two Payments in whole or in part or for two Months in the payment of any sums ...

then in any such case all moneys secured by the Mortgage including Interest shall become immediately due and payable and all mortgagees' powers by statute as hereby applied shall immediately become exercisable by the Company and the Company may at any time thereafter and without previous notice to the Borrower and without the Borrower's agreement exercise all or any of such powers."

9. General Conditions (1990 edition)

"8. INTEREST AND MONTHLY PAYMENTS

> 8.1 The rate of interest applicable to the Loan and the monthly payment will be as specified in the Offer of Loan as varied from time to time in accordance with the applicable Mortgage Condition indicated in the Offer of Loan."

The Consumer Credit Act 1974

10. The principal conditions with which these appeals are concerned are contained in sections 137-139, which provide:

"Extortionate credit bargains

> 137.- (1) If the court finds a credit bargain extortionate it may re-open the credit agreement so as to do justice between the parties.
>
> > (2) In this section and sections 138-140, -
> >
> > > (a) "credit agreement" means any agreement between an individual ("the debtor") and any other person ("the creditor") by which the creditor provides the debtor with credit of any amount, and
> > >
> > > (b) "credit bargain" –
> > >
> > > > (i) where no transaction other than the credit agreement is to be taken into account in computing the total charge for credit, means the credit agreement, or
> > > >
> > > > (ii) where one or more other transactions are to be so taken into account, means the credit

agreement and those other transactions, taken
together.

When bargains are extortionate

138.- (1) A credit bargain is extortionate if it –

(a) requires the debtor or a relative of his to make payments (whether
unconditionally, or on certain contingencies) which are grossly exorbitant,

or

(b) otherwise grossly contravenes ordinary principles of fair trading.

(2) In determining whether a credit bargain is extortionate, regard shall be had to such
evidence as is adduced concerning –

(a) interest rates prevailing at the time it was made,

(b) the factors mentioned in subsections (3) to (5), and

(c) any other relevant considerations.

(3) Factors applicable under subsection (2) in relation to the debtor include –

(a) his age, experience, business capacity and state of health; and

(b) the degree to which, at the time of making the credit bargain, he was
under financial pressure, and the nature of that pressure.

(4) Factors applicable under subsection (2) in relation to the creditor include –

a) the degree of risk accepted by him, having regard to the value of any
security provided;

(b) his relationship to the debtor;

(c) whether or not a colourable cash price was quoted for any goods or
services included in the credit bargain.

…

Reopening of extortionate agreements

139.- (1) A credit agreement may, if the court thinks just, be reopened on the ground
that the credit bargain is extortionate –

(a) on an application for the purpose made by the debtor or any surety to
the High Court, county court or sheriff court; or

(b) at the instance of the debtor or a surety in any proceedings to which
the debtor and creditor are parties, being proceedings to enforce the credit
agreement, any security relating to it, or any linked transaction; or

(c) at the instance of the debtor or a surety in other proceedings in any court where the amount paid or payable under the credit agreement is relevant.

(2) In reopening the agreement, the court may, for the purpose of relieving the debtor or a surety from payment of any sum in excess of that fairly due and reasonable, by order –

(a) direct accounts to be taken … between any persons;

(b) set aside the whole or part of any obligation imposed on the debtor or a surety by the credit bargain or any related agreement,

(c) require the creditor to repay the whole or part of any sum paid under the credit bargain or any related agreement by the debtor or a surety, whether paid to the creditor or any other person.

(d) direct the return to the surety of any property provided for the purposes of the security, or

(e) alter the terms of the credit agreement or any security instrument…."

The issues

Mr and Mrs Nash

11. (i) Was there a breach of the express term contained in clause 3.3 of the General Conditions (1986 edition)?

Mr and Mrs Nash and Mr and Mrs Staunton

(ii) Was there an implied term that, in exercising its discretion to vary interest rates, the Claimant was bound to make its judgment fairly, honestly and in good faith, and not arbitrarily, capriciously or unreasonably?

(iii) If there was such an implied term, was the Claimant in breach of it?

(iv) Was the loan agreement an extortionate credit bargain within the meaning of section 138 of the 1974 Act?

(v) Is the counterclaim for relief under section 139 of the 1974 Act time-barred by the Limitation Act 1980?

(vi) Is the claimant's reliance on discretion to vary interest rates contrary to section 3(2)(b)(i) of the Unfair Contracts Terms Act 1977?

Mr and Mrs Staunton

(vii) Did the credit bargain grossly contravene ordinary principles of fair dealing (and was the credit bargain therefore extortionate within the meaning of section 138(1)(b) of the 1974 Act) on the grounds that the Claimant did not sufficiently explain the effect of the Stabilised Rate Facility?

12. Both appeals concern applications to strike out under CPR Rule 3.4 and under the inherent jurisdiction of the court. The grounds relied on by the Claimant are that the amended defences and counterclaims disclose no reasonable grounds of defence or are an abuse of the process of the court. The Recorder adopted the test of asking in each case whether the defence and counterclaim had any real prospect of success. It is common ground that the Recorder adopted the correct test.

*Breach of the express term in clause 3.3 of the General Conditions (1986 edition) applicable to the Nash mortgage*

13. This is a new point not taken in the court below. The proposed substitute amended defence and counterclaim alleges that there was a breach of clause 3.3 in that:

> "the Claimants applied different rates of interest to the Defendants' loan from those which were applied to later borrowers falling within the same category of business as did the Defendants, without having any or any sufficient grounds for discriminating in this way against the Defendants".

14. The particulars relied on are contained in two schedules to the draft pleading. The first is a schedule of interest rates from 1 March 1986 to 1 April 1998: it compares the Claimant's "standard" mortgage interest rates on house purchase and remortgage (payable by mortgagors such as Mr and Mrs Nash) with its "Blue Chip" remortgage interest rates. This shows that from 1986 until early 1997, the "standard" rates were about 2-3% higher than the Blue Chip rates. In 1997 and 1998, the differential rose to about 4%. The second schedule is Table 3 in the expert's report of Mr R Rosenberg dated 14 April 2000. Mr Rosenberg was the expert instructed on behalf of Mr and Mrs Nash in these proceedings. This table compares the rates of interest payable between April 1997 and May 1999 (a) by borrowers (such as the appellants) who took out mortgages with the Claimant in the late 1980s and early 1990s with (b) later borrowers who obtained mortgages from Paragon from the mid-1990s and who have benefited from the highly competitive rates then being offered by Paragon. This table shows a differential of a little above 4%. Mr Bannister QC submits that the relevant "category of business" within the meaning of clause 3.3 is "first legal charges over residential property".

15. In answer to this new case, Mr Ali Malek QC makes the following points. First, the pleading does not attempt to define the "category of business" to which Mr and Mrs Nash belong. Secondly, the first schedule does not show a breach. It compares two different products marketed by the Claimant, namely its standard loans and its "Blue Chip Home Loans". The Claimant's Blue Chip loans differed from its standard loans in that they were subject to different terms, and set a rate of interest based on LIBOR. Thirdly, as regards the table in Mr Rosenberg's report, the position is that the business written by Paragon differed from that written by the Claimant: it was lower risk, and therefore not the same category of business with that of Mr and Mrs Nash.

16. I am in no doubt that there was no breach of clause 3.3 of the Nash loan agreement. The phrase "category of business" is not a term of art and it is not defined. The clause referred to the "category of business to which the Company *shall consider* the Mortgage belongs" (my emphasis). It is clear that the Claimant considered that its standard borrowers did not belong to the same category of business as its Blue Chip borrowers, or the subsequent Paragon borrowers. It is true that the evidence is somewhat exiguous. This may be because the allegation of breach of clause 3.3 was not made in the court below. It is also true that the evidence as to the circumstances in which the Claimant withdrew from the lending market in 1991, and re-emerged in 1994 are not explained in the witness statements before the court. But there is material in the documents that are before the court from which it is possible to say with some confidence what happened. By 1991, the Claimant

was in financial trouble. One result of this was that the money markets were charging higher rates for lending to the Claimant because it was perceived as a greater risk than other mortgage lenders. Not surprisingly, these higher charges were passed on to borrowers (who were about 70,000 in number). The Claimant, therefore, decided to withdraw from the lending market. In 1994, it decided to re-enter the market through a different entity, Paragon. According to the Claimant's chief executive, the plan was to "undertake relatively low risk business which will be suitable for securitisation".

17. I cannot accept that clause 3.3 obliged the Claimant to charge the same rate of interest to all mortgagors who had borrowed money to secure first legal charges on residential property. And yet that is the effect of Mr Bannister's submission. It is a submission which ignores the fact that the clause defines the category of business by reference to the opinion of the Claimant. But it also involves the proposition that the Claimant would have agreed to charge the same rate of interest to all borrowers who had granted first charges on residential property regardless of the other terms of the loan, the credit-rating of the borrower and matters of that kind. That is a most unlikely commercial arrangement which I would not impute to the Claimant without clear express words. For these reasons, I consider that the allegation of breach of clause 3.3 has no real prospect of success, and should not be permitted by way of amendment.

Implied term

18. The amended defences and counterclaims that were before the Recorder both pleaded that the discretion given to the lender to vary the interest rate was subject to an implied term. Two alternative formulations were put forward in the pleadings, viz (a) the Claimant would determine the rate "in line with interest rates being charged from time to time by mortgage lenders within England and Wales to status borrowers"; or (b) "the interest rate would only vary in accordance with the changes in the interest rate of the Bank of England from time to time". The Recorder rejected each of these formulations, saying that they stood no real prospect of success (paragraph 127). There is no appeal from that part of his judgment.

19. It was also pleaded that upon the true construction of the variation of rate clause, the Claimant was bound to exercise its discretion to vary the interest rate "fairly as between both parties to the contract, and not arbitrarily, capriciously or unreasonably". The Recorder rejected this construction of the contract, but said (paragraph 121) that his decision would be different if the defendants had sought to achieve the same result by way of an implied term. Encouraged by this remark, the defendants in both proceedings applied to the Recorder for permission to amend their defences and counterclaims. The implied term was formulated in accordance with the Recorder's suggestion. Permission was, however, refused on the grounds that the pleadings gave insufficient particulars of breach.

20. All the appellants appeal against the Recorder's refusal to grant permission to amend their defences to plead breach of an implied term. The implied term that it is sought to plead in the substitute amended pleadings is at paragraph 6 of the amended defences, and is in these terms:

> "It was an (or a further) implied term of the contract, to be implied into the clause conferring the discretion to vary interest rates referred to at paragraph 3 above being an obvious qualification or to give business efficacy to or to give effect to the reasonable expectation of the parties that that discretion was a discretion which the Claimants were bound to exercise fairly honestly and in good faith as between both parties to the contract, and not arbitrarily, capriciously or unreasonably; and that in making a decision or decisions under the said power the Claimants would give proper

consideration to the matter, taking into account all relevant matters and ignoring irrelevant matters."

21. The breaches are alleged at paragraph 7 of the proposed pleadings. It alleges that the Claimant has exercised its discretion in a manner which is unfair and/or arbitrary and/or unreasonable by increasing the appellants' loan repayment interest rates and/or failing to decrease them (a) without reference to prevailing market rates, and/or (b) taking into account an irrelevant matter, namely its own financial difficulties. Particulars are then given comparing the Claimant's rates with the standard rates from time to time of the Halifax Building Society, these being taken as representative of the prevailing market.

22. Mr Malek submits that the appellants would have no real prospect of establishing the implied term at a trial, and in any event the Recorder exercised his discretion correctly in refusing permission to amend the pleadings on the grounds that the alleged breaches were not sufficiently particularised. Mr Bannister QC and Mr Falkowski submit that (a) the term for which they contend is to be implied, or at least that it has not been shown that there would be no real prospect of establishing such an implied term at a trial, and (b) the Recorder should have granted permission to amend to plead the implied term and the allegations of breach of it.

Was there an implied term in the terms pleaded?

23. The decision of this court in *Lombard Tricity Finance v Paton* [1989] 1 AER 918 has loomed large in the debate on this issue. In that case, the defendant borrower entered into a credit agreement with the plaintiff credit company to finance the purchase of a caravan. The agreement provided that interest would be "subject to variations by the creditor from time to time on notification as required by law". The borrower fell into arrears with his monthly payments. The lender started proceedings claiming the amount due. The judge dismissed the claim on the grounds that the agreement did not comply with the statutory requirements as to notification of variations in the rate of interest. The lender's appeal was allowed by this court. Staughton LJ gave the judgment of the court. It was common ground that the lender could vary the interest rate in its absolute discretion. If the exercise of the discretion had been subject to some fetter, that would potentially have had a bearing on the issues raised on the appeal. No doubt aware of the wider significance of the concession, the court went to some trouble to explain why in its opinion the concession had been rightly made. At page 923A, the court said:

> "On two potential issues there has been no dispute before us. The first is whether the contract does, as a matter of construction, provide that Lombard may vary the interest rate in their absolute discretion, subject only to due notice. The second, whether such a contract, if made, is lawful. Counsel for Mr Paton concedes that the answer is Yes to both questions. But as the case is of some general importance, and as his concessions mean that he is, to some extent at any rate, unable to support the reasoning of Judge Heald in the county court, we think it right to explain why in our view they were rightly made.
>
> In general 'it is no doubt unusual for a contract to provide that its terms may be varied unilaterally by one party, in his absolute discretion, to the detriment of the other; in general one would require clear words to achieve that result. But in this particular case it is, we think, part of the background, matrix or surrounding circumstances that market rates of interest are known to vary from time to time and that some variation was very likely to occur during the lifetime of the agreement. There is also provision that the borrower may bring it to an end at any time by repaying the amount

outstanding. In theory he could thus avoid the effect of an increase in the interest rate, if he found it unattractive. But we recognise that in practice this remedy is unlikely to be available, since he is unlikely to have the money, or to be able to borrow it from some other lender at less than the prevailing market rate.

Counsel for Lombard observed that the provision of credit is a competitive industry, and that the effect of competition is likely to restrain Lombard from a capricious increase in their interest rate. That is no doubt true if they increase rates by the same amount and at the same time for both new and old borrowers, as he tells us they do. Indeed if a provider of credit capriciously treated old borrowers unfavourably, one would hope that the Director General of Fair Trading would consider whether he should still have a licence under the 1974 Act. It was also suggested that the provisions of the Act relating to extortionate credit bargains might provide protection for the borrower. But counsel for Mr Paton suggested that ss137 and 138 may apply only to the original credit agreement, and not to how it is subsequently operated. It is unnecessary to express any view on that point.

Bearing all these considerations in mind, we consider that on a fair reading of the agreement it does provide, as counsel for Mr Paton accepts, that Lombard may increase the interest rate at their absolute discretion subject only to notice. A power to vary the rate is conferred in plain terms, there is no other express restriction on it and we can see no sufficient basis for any implied restriction."

24. The Recorder relied on *Lombard* in arriving at his decision that the implied terms alleged in the amended defences that were before him when he delivered his judgment on the main issues had no real prospect of success. At paragraph 126 of his judgment, he said:

"126. These points were well made by Mr Falkowski: but I do not consider that they are sufficient to justify placing the *Lombard* decision on one side. The fact is that most of the matters to which the Court of Appeal had regard as being "factual matrix" in *Lombard* apply equally here. The residential mortgage market is highly competitive. Not only do rates vary up and down during the currency of a mortgage loan but the competition between lenders and the variety of risk means that rates may not all vary at the same time or by the same amount. I recognise that it is not easy for a borrower with negative equity in his property to switch mortgage lender and re-mortgage elsewhere: but if negative equity is not a problem it is quite possible for a borrower to move from one lender to another. There is mobility in the residential mortgage market, and has been for the best part of the last decade. On the evidence I have seen, I am unable to find that either Mr and Mrs Nash or Mr and Mrs Staunton were at any time "locked in" to their Loan Agreements with the Claimant by reason of negative equity. Certainly they have no problem of negative equity now and are most unlikely to have done in the past 5 years. Furthermore, as I have already noted, neither Loan Agreement appears to have contained any early redemption penalty after the first two years. It therefore seems to me that the only factor which could have seriously inhibited the Defendants' ability to re-mortgage elsewhere was their personal creditworthiness. The problem is that this factor is precisely the factor which may justify an enhanced rate of interest being charged by the lender, when compared with market rates generally."

25. At paragraphs 127-130, he explained why he thought that an implied term such as that for which the defendants sought permission to amend at the hearing on 4 September 2000 had a real prospect

of success. He relied in particular on *Abu Dhabi National Tanker Co v Product Star Shipping Ltd (The Product Star) (No 2)* [1993] 1 Lloyd's Rep 397. That case concerned a charter party under which the Master and the Owners had a discretion in determining whether any port to which the vessel was ordered was dangerous. In the express terms of the charter, the discretion was unqualified. The question was whether any restriction on the exercise of the discretion was to be implied. In giving the leading judgment of the court, Leggatt LJ said (at page 404):

> ".....Where A and B contract with each other to confer a discretion on A, that does not render B subject to A's uninhibited whim. In my judgment, the authorities show that not only must the discretion be exercised honestly and in good faith, but, having regard to the provisions of the contract by which it is conferred, it must not be exercised arbitrarily, capriciously or unreasonably".

26. It will be seen at once that the formulation of the implied term for which the appellants now contend is closely based on this passage in the judgment of Leggatt LJ. The authorities to which Leggatt LJ was referring were charterparty cases. The Recorder said that in his view there was nothing special about charter contracts which sets them apart from other kinds of contract such as contracts of loan. As he put it: "a contract where one party truly found himself subject to the whim of the other would be a commercial and practical absurdity".

27. Mr Bannister submits that *Lombard* is not authority against the implication of the term for which he contends. It was concerned with a question of construction. No argument had been addressed to the court on the question whether any term should be implied, and it is misconceived to treat the passage at page 923F as holding that as a matter of law a variation clause *could not* be subject to an implied term. In short, he submits that this passage is both obiter and wrong.

28. Mr Malek submits that in a case such as this, a term will only be implied if the strict test of necessity has been satisfied: see, for example, per Lord Steyn in *Equitable Life Assurance Society v Hyman* [2000] 3 WLR 529, 539. He submits that this test is not satisfied in this case for a number of reasons. First, commercial considerations require a lender to behave sensibly when fixing interest rates. Market forces dictate that the interest rate must be competitive and comparable with other available interest rates, since if it is not, the borrowers will simply go elsewhere. Secondly, the regulatory framework is relevant. The Director General of Fair Trading has considerable regulatory powers, including the power to grant or withold licences under section 25 of the 1974 Act. Thirdly, neither the Nash nor the Staunton agreements prevented the borrowers from redeeming their mortgages and re-mortgaging elsewhere, although they did contain certain penalty provisions in the event of early redemption.

29. Fourthly, Mr Malek submits that it is inherently unlikely that at the date of the making of a variable interest loan agreement, a lender would agree to restrict the rates to "reasonable" rates. There are problems of determining the yardstick by reference to which reasonableness is to be judged. There are different types of loans and mortgages suitable for different kinds of borrowers. Moreover, there are different types of lending institution ranging from high street banks and building societies to so-called "tertiary" or "non-status" lenders. The latter carry out the most limited checks of the proposed borrower's financial circumstances, and they often deal with borrowers who have a poor credit rating. Mr Malek also makes the point that if the lender were precluded from demanding "unreasonable" interest rates, there would be endless disputes as to what was payable, and it is most unlikely that the lender would have agreed to a term which had that consequence.

30. I cannot accept the submission of Mr Malek that the power given to the Claimant by these loan agreements to set the interest rates from time to time is completely unfettered. If that were so, it

would mean that the Claimant would be completely free, in theory at least, to specify interest rates at the most exorbitant level. It is true that in the case of the Nash agreement, clause 3.3 provides that the rate charged is that which applies to the category of business to which the Claimant considers the mortgage belongs. That prevents the Claimant from treating the Nashes differently from other borrowers in the same category. But it does not protect borrowers in that category from being treated in a capricious manner, or, for example, being subjected to very high rates of interest in order to force them into arrears with a view to obtaining possession of their properties.

31. The Stauntons do not even have the limited protection that is afforded by clause 3.3 of the Nash agreement. In the absence of an implied term, there would be nothing to prevent the Claimant from raising the rate demanded of the Stauntons to exorbitant levels, or raising the rate to a level higher than that required of other similar borrowers for some improper purpose or capricious reason. An example of an improper purpose would be where the lender decided that the borrower was a nuisance (but had not been in breach of the terms of the agreement) and, wishing to get rid of him, raised the rate of interest to a level that it knew he could not afford to pay. An example of a capricious reason would be where the lender decided to raise the rate of interest because its manager did not like the colour of the borrower's hair.

32. It seems to me that the commercial considerations relied on by Mr Malek are not sufficient to exclude an implied term that the discretion to vary interest rates should not be exercised dishonestly, for an improper purpose, capriciously or arbitrarily. I shall come shortly to the question whether the discretion should also not be exercised unreasonably. But before doing so, I should explain in a little more detail why I would reject Mr Malek's submission that there is no need for an implied term at all.

33. Of course I accept as a general proposition that a lender must have an eye to the market when it sets its rates of interest. To do otherwise is bound ultimately to lead to commercial disaster. But commercial considerations of that kind will not necessarily deter a lender from acting improperly in all situations. They may not deter a lender from unfair discrimination against an individual borrower. They may not even avail a class of borrowers. Take the present cases. The appellants borrowed from the Claimant which withdrew from the lending business in 1991. The rates of interest offered by Paragon are highly competitive. But the history of the interest rates demanded by the Claimant in the late 1990s demonstrates how limited the deterrent argument is. The proof of the pudding is in the eating. Between 1989 and 1992, the difference between the Claimant's standard rate and the rate demanded by the Halifax Building Society was approximately 2 percentage points. By 1997, the gap was in excess of 4 points. In March 1999 it rose to 5.14, when the Claimant's rate was 12.09% and the Halifax rate was 6.95%.

34. The argument based on the existence of the regulatory powers of the Director General of Fair Trading is in my view not sufficient to deny the implied term. I note that in *Lombard*, the court said that if a lender capriciously treated old borrowers unfavourably "one would *hope* that the Director General of Fair Trading would consider whether he should still have a licence under the 1974 Act" (my emphasis). One would indeed have such a hope, but that does not seem to me to be a secure basis on which to decide that there is no need for an implied term that a lender will not exercise the discretion to set rates of interest capriciously. There are two strands to the argument that found favour with the court in *Lombard*: (a) it is implicitly accepted that the lender should not act capriciously; but (b) there is no need to impose an obligation on the lender not to act capriciously, because there is no realistic possibility that he will do so. I can see that there may be no need to impose such an obligation on a lender where it would be impossible for him to act in breach of it. But it is inter alia for the very reason that lenders can act unfairly and improperly that the Director General has the power to withdraw licences from those who provide credit to

consumers. In my judgment, the existence of the Director General and the fact that he has certain regulatory powers is not a good reason for holding that the power to set rates of interest is absolutely unfettered.

35. Finally, I must consider whether the fact that the borrowers can redeem their mortgages and seek loans from another source if the rates are set capriciously etc is a sufficient reason for acceding to Mr Malek's argument. In my view, it is not. As with the last point, this is not so much an argument against the need to imply a term as an argument that it is unlikely to be broken because the lender will be aware that it is open to the borrower to go elsewhere. But it seems to me to be obvious that there may be circumstances in which the lender will act capriciously towards an individual borrower knowing that it might compel the borrower to redeem the mortgage and go elsewhere. Indeed, the lender may have decided to increase the rate of interest for that very reason. But why should the lender be able capriciously to compel the borrower to find another lender with impunity? The borrower may find it difficult to find another lender, especially if he has fallen into arrears with the first lender as a result of that lender's interest rate policy. His employment status may have changed adversely since he entered into the first loan agreement. The process of re-mortgaging is costly. The new lender will probably require a survey. There will be lawyers' fees. And there may be a penalty for early redemption.

36. It follows that I do not agree with the obiter dicta expressed by this court in *Lombard* in the passage that I have cited. I would hold that there were terms to be implied in both agreements that the rates of interest would not be set dishonestly, for an improper purpose, capriciously or arbitrarily. I have no doubt that such an implied term is necessary in order to give effect to the reasonable expectations of the parties. I am equally in no doubt that such an implied term is one of which it could be said that "it goes without saying". If asked at the time of the making of the agreements whether it accepted that the discretion to fix rates of interest could be exercised dishonestly, for an improper purpose, capriciously or arbitrarily, I have no doubt that the Claimant would have said "of course not".

37. I come, therefore, to the question whether the implied term should also extend to "unreasonably". The first difficulty is to define what one means by "unreasonably". Mr Bannister was at pains to emphasise that he was not saying that the rates of interest had to be reasonable rates in the sense of closely and consistently tracking LIBOR or the rates charged by the Halifax Building Society. He said that what he meant by the unreasonable exercise of the discretionary power to set the rate of interest was something very close to the capricious or arbitrary exercise of that power.

38. As we have seen, in *The Product Star*, Leggatt LJ said that where A and B contract with each other to confer a discretion on A, the discretion must be exercised honestly and in good faith, and not "arbitrarily, capriciously or unreasonably". In that case, the judge held the owner acted unreasonably in the sense that there was no material on which a reasonable owner could reasonably have exercised the discretion in the way that he did. Leggatt LJ (with whom the other two members of the court agreed) found that various factors called into question the owners' good faith and strongly suggested that their decision was arbitrary. He also upheld the judge's approach to the question of reasonableness. Thus the word "unreasonably" in the passage at page 404 must be understood in a sense analogous to unreasonably in the *Wednesbury* sense: *Associated Provincial Picture Houses Ltd v Wednesbury Corporation* [1948] 1 KB 223.

39. This question whether an apparently unfettered discretion is subject to an implied limitation that it must be exercised reasonably has been considered in other contexts. They were helpfully reviewed by Mance LJ in *Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd* [2001] All ER (D) 33. That case concerned a reinsurance contract which contained a clause which provided that no settlement

or compromise of a claim could be made or liability admitted by the insured without the prior approval of the reinsurers. One of the questions that arose was whether the right to withold approval was subject to any (and if so what) restriction. The judge held that the reinsurers could not withold approval unless there were reasonable grounds for doing so. Mance LJ (with whom Latham LJ agreed) decided that the right to withold consent was less restricted. Having reviewed a number of previous authorities, Mance LJ said (paragraph 64) that what was proscribed in all of them was "unreasonableness in the sense of conduct or a decision to which no reasonable person having the relevant discretion could have subscribed". At paragraph 67, he said:

> "I would therefore accept as a general qualification that any witholding of approval by reinsurers should take place in good faith after consideration of and on the basis of the facts giving rise to the particular claim and not with reference to considerations wholly extraneous to the subject-matter of the particular reinsurance."

40. After a detailed consideration of what considerations could properly be take into account, he said at paragraph 73:

> "If there is any further implication, it is along the lines that the reinsurer will not withold approval arbitrarily, or (to use what I see as no more than an expanded expression of the same concept) will not do so in circumstances so extreme that no reasonable company in its position could possibly withold approval. This will not ordinarily add materially to the requirement that the reinsurer should form a genuine view as to the appropriateness of settlement or compromise without taking into account considerations extraneous to the subject-matter of the reinsurance."

41. So here too, we find a somewhat reluctant extension of the implied term to include unreasonableness that is analogous to *Wednesbury* unreasonableness. I entirely accept that the scope of an implied term will depend on the circumstances of the particular contract. But I find the analogy of *Gan Insurance* and the cases considered in the judgment of Mance LJ helpful. It is one thing to imply a term that a lender will not exercise his discretion in a way that no reasonable lender, acting reasonably, would do. It is unlikely that a lender who was acting in that way would not also be acting either dishonestly, for an improper purpose, capriciously or arbitrarily. It is quite another matter to imply a term that the lender would not impose unreasonable rates. It could be said that as soon as the difference between the Claimant's standard rates and the Halifax rates started to exceed about two percentage points, the Claimant was charging unreasonable rates. From the appellants' point of view, that was undoubtedly true. But from the Claimant's point of view, it charged these rates because it was commercially necessary, and therefore reasonable, for it to do so.

42. I conclude therefore that there was an implied term of both agreements that the Claimant would not set rates of interest unreasonably in the limited sense that I have described. Such an implied term is necessary in order to give effect to the reasonable expectations of the parties.

Should the Recorder have granted permission to amend?

43. The issue here is whether on the basis of the draft pleadings in their present form, the appellants have a real prospect of successfully establishing breaches of the implied term. Mr Bannister relies on paragraph 106 of the Recorder's judgment. In that paragraph, the Recorder held "not without considerable hesitation" that there was a real prospect of success for the argument that the

Claimant had contravened the "ordinary principles of fair dealing" in fixing its interest rates. At paragraph 131, he said "not without misgivings" that for much the same reasons as he had concluded at paragraph 106 that there was an arguable case that the credit bargains were extortionate that "if the correct implied term were to be pleaded, the allegation of breach is not so improbable that it stands no real prospect of success and it ought to be struck out". The "correct implied term" was that to which I have referred at paragraphs 36 and 42 above.

44. What were the factors that led the Recorder to conclude at paragraph 106 that the allegation of breach of the "correct" implied term had a real prospect of success? They were:

> "(i) whether the Claimants' witness and the Defendants' witnesses are comparing like with like when they are comparing rates of interest, and what the correct comparisons should be, (ii) the suggestion, implicit in the Defendants' criticism of the Claimants' failure to reduce rates in line with the market, that the reason why the Claimant's rates were kept high had nothing to do with the lending risk and everything to do with NHL's financial difficulties, and (iii) the statement made by Mr Rosenberg that the rate of interest charged by Paragon to new lenders is lower than that charged to customers of NHL, such as Mr and Mrs Nash and Mr and Mrs Staunton. If the difference is not explicable in terms of risk, there is at least room for an argument (I say no more) that the Claimant is not treating all of its customers fairly (see Staughton LJ in the *Lombard* case, quoted in paragraph 61 above.)"

45. But at paragraph 7 of the draft pleading that is now relied on by the appellants, the breaches alleged are that the Claimant fixed the rates of interest (a) without reference to prevailing market rates, and/or (b) taking into account an irrelevant consideration, namely its own financial difficulties. The particulars of breach that are given are based on a comparison of the Claimant's rates of interest and those of the Halifax, especially between 1995 and 2000, and a comparison of the Claimant's rates and those of Paragon after April 1997. The rates charged by the Halifax are taken as the paradigm of "prevailing market rates".

46. In my judgment, the mere fact that the rates charged were made "without reference to the prevailing rates" is not evidence from which it can be inferred that, in fixing them, the Claimant acted in breach of the implied term. It is not said by Mr Bannister that the rates set by the Claimant had to match those of the Halifax. As Mr Rosenberg points out in his report (paragraph 4.3.7), the Claimant was not regarded as a sub-prime lender; it was a centralised lender with no branch network; and relied on self-certification by borrowers. It was not in the same category of lenders as the Halifax. The real complaint is that the gap between the Claimant's rates and those charged by the Halifax widened from 1995 onwards. It widened from about 2 percentage points to 4-5 points. One of the reasons for this according to counsel for the Claimant (if not the only reason) was that the Claimant was in serious financial difficulties because many of its borrowers had defaulted, the money markets charged higher rates for lending to the Claimant because it was perceived to be a greater risk than other mortgage lenders, and these higher costs had been passed on to borrowers. It is the fact that the Claimant took this into account in deciding at what level to fix its rates that forms the basis of the second way in which the case of breach of the implied term is put. In my view, if it was the case that the rates were increased because the Claimant was in financial difficulties for reasons of that kind, that would not be a breach of the implied term. If a lender is in financial difficulty, for example, because it is obliged to pay higher rates on interest to the money market, then it is likely to have to pass those increased costs on to its borrowers. If in such circumstances the rate of interest charged to a borrower is increased, it is impossible to say that the discretion to set the rate of interest is being exercised for an improper purpose, capriciously, arbitrarily or in a way in which no reasonable lender would reasonably do.

47. On the material placed before this court, there is no evidence to suggest that the decision to widen the gap between the rates of interest charged by the Claimant to the appellants and the standard rates charged by the Halifax Building Society to its borrowers was motivated by other than purely commercial considerations. The Claimant is not a charitable institution. Its aim is to make a profit by lending money. It follows that if it encounters financial difficulties, it may feel obliged to raise the interest rates paid by its borrowers. In deciding whether to raise interest rates, it will have to make fine commercial judgments. But if it decides to take that course in order to overcome financial difficulties, it is not acting dishonestly, capriciously or in an arbitrary manner. It is not taking into account an irrelevant consideration. Nor is it acting in a way which is so unreasonable that it can be said of it that no reasonable lender would take that course if placed in that situation.

48. It follows that in my view, there is no real prospect that the appellants would be able to prove at trial that the Claimant acted in breach of the implied term in relation to either of these appellants. Accordingly, I would uphold the decision of the Recorder to refuse permission to amend.

Extortionate credit bargain?

Can variations in rates of interest be taken into account at all?

49. In summary, the Recorder held as follows. The notice of interest rate increases or decreases could not fairly be described as "transactions" so as to form part of a "credit bargain" within the meaning of section 137(2) of the 1974 Act (paragraphs 38-39 of the judgment); nor were they relevant considerations within the meaning of section 138(2)(c) in assessing whether the credit bargain was one which, after its inception, became extortionate (paragraphs 40-64); so that the appellants' causes of action (if any) accrued when they entered into the loan agreements (paragraph 64).

50. Mr Bannister accepts that the notices of changes in interest rates are not "transactions" so as to form part of a "credit bargain" within the meaning of section 137(2). But he submits that the question whether subsequent transactions are to be taken into account in determining whether a credit bargain is extortionate is a "red herring". The only inquiry required by the 1974 Act is whether a credit bargain requires the borrower to make payments which are grossly exorbitant (section 138(1)(a)) or otherwise grossly contravenes ordinary principles of fair dealing (section 138(1)(b)).

51. As regards section 138(1)(a), the appellants are plainly required by the terms of the loan agreements and mortgages (ie the credit bargains) to pay interest at the rates that have been demanded. The agreements, therefore, fall within section 138(1)(a) unless the Claimant discharges the burden on it of showing that the payments so required to be made were not "grossly exorbitant": see section 171(7) of the 1974 Act.

52. Mr Bannister submits that, quite apart from the burden of proof, there was ample evidence to support the view that the rates demanded of borrowers since the early to mid-1990s were grossly exorbitant. At paragraphs 106-107, the Recorder examined the evidence and concluded "not without considerable hesitation" that, if (contrary to his view) post-contract events were relevant, then he would not have struck out the appellants' argument that the credit bargains were extortionate.

53. Mr Malek submits that a variation in interest rates after a credit bargain is entered into does not come within sections 137-139 of the 1974 Act. The relevant inquiry should be limited to facts existing at the time of entering into the bargain. In support of this submission, Mr Malek makes the following points. First, if subsequent events were relevant to the question whether the credit

bargain is extortionate, the issue would become unacceptably uncertain. Secondly, the language of sections 137-139 is all directed to the circumstances that exist at the date of the making of the credit bargain. The present tense is used in sections 137(1), 138(1) and 139(1). The time at which the factors listed in sections 138(2)-(5) are to be applied in determining whether a credit bargain is extortionate is the time of the making of the agreement.

54. Thirdly, section 189(1) of the 1974 Act provides that "total charge for credit" is defined as meaning a sum calculated in accordance with regulations under section 20(1). The relevant regulations are the Consumer Credit (Total Charge for Credit) Regulations 1980 SI 1980/51. Regulation 2 provides that:

> "(1) Any calculation under these Regulations shall be made on the
>
> following assumptions:
>
> ....
>
> (d) in the case of a transaction which provides for variation of the rate or amount of any item included in the total charge for credit in consequence of the occurrence after the relevant date of any event, the assumption that the event will not occur; and, in this sub-paragraph, 'event' means an act or omission of the debtor or of the creditor or any other event (including where the transaction makes provision for variation upon the continuation of any circumstance, the continuation of that circumstance) but does not include an event which is certain to occur and of which the date of occurrence, or the earliest date of occurrence, can be ascertained at the date of the making of the agreement."

55. Regulation 3 provides:

> "3. Total charge for credit. For the purposes of the Act, the total charge for the credit which may be provided under an actual or prospective agreement shall be the total of the amounts determined as at the date of the making of the agreement of such of the charges specified in regulation 4 below as apply in relation to the agreement but excluding the amount of the charges specified in regulation 5 below."

56. Regulation 4(1) provides:

> "4. Items included in total charge for credit. (1) Except as provided in regulation 5 below, the amounts of the following charges are included in the total charge for credit in relation to an agreement:
>
> (a) the total of the interest on the credit which may be provided under the agreement;
> .."

57. It follows that, as the Recorder said at paragraphs 38 and 63 of his judgment, variations in the rate of interest charged in consequence of unpredictable future occurrences are to be excluded from the calculation of the total charge for credit and are excluded from being part of the credit bargain under the definition contained in section 137(2)(b).

58. The question whether a subsequent interest rate change may be relevant in determining whether a credit bargain is extortionate has been considered on a number of occasions in the county court, but never at any higher level. It is clearly a matter of very considerable importance, since credit

3/16/2015　　　　Case 13-1708, Document 105-03/16/2015 Nash & Others v Paragon Finance Plc [2001] EWCA Civ 1466 (15 October 2001) of 103

bargains commonly provide that the rate of interest shall be at the discretion of the lender. In every case but one, the county court judge held that subsequent changes in interest rates are irrelevant to the question whether the credit bargain is extortionate. The exception is *J&J Securities Ltd v Khan and Khan* (18 August 1999), a decision of His Honour Judge Altman at Bradford County Court.

59. The point has been the subject of academic comment. *Goode: Consumer Credit Law and Practice* Volume 1 paragraph 47.27 says:

> "The time as at which the bargain is to be tested. The question is whether the credit bargain is extortionate, not whether it has become unprofitable through a drop in the level of interest rates, nor whether the creditor has acted unconscionably in enforcing it. The Court has adequate powers to grant relief to the debtor from the consequences of unconscionable enforcement. Whether the credit bargain is extortionate has to be determined as at the date of the credit agreement, not in the light of subsequent events."

60. Professor Goode cites two cases in support of this last sentence: *Harris v Clarson* [1910] 27 TLR 30 and *Harrison v Gremlin Holdings Property Ltd* [1962] NSWR 112. The first is a decision under the Moneylenders Act 1900, and the second a decision under the Moneylenders and Infants Loan Act 1941 of New South Wales. With respect to Professor Goode, like the Recorder, I do not derive any support from these decisions, based as they are on a consideration of different statutes which contain language that is significantly different from that of the 1974 Act.

61. But in his commentary on section 138 of the 1974 Act in Volume 2, paragraph 5.268, Professor Goode says:

> "Is extortionate. The time at which the factors listed in the section are to be applied is the time of the agreement. This is explicit in sub-ss (2)(a) and (3)(b), and it would be neither sensible nor a natural reading of the language of the section to construe the remaining provisions otherwise".

In this passage, Professor Goode does not cite the two earlier authorities and bases his view on the language of section 138 alone.

62. *The Encyclopaedia of Consumer Credit Law (Guest and Lloyd),* Volume 1, paragraph 2-139 states that "it is possible that under subs (2)(c) [of section 138] factors arising during the agreement may be relevant". But a little later in the same paragraph the authors record that in *Lombard* the court of appeal left open the question whether ss 137 and 138 might apply to the unfair operation of a clause which empowered the creditor to vary the rate of interest unilaterally at his discretion, and state: "but it is submitted that, in principle, these sections apply only to the original credit bargain".

63. In my judgment, the Recorder was right to hold that the subsequent changes in rates of interest were irrelevant to the question whether the credit bargains were extortionate. The submission advanced by Mr Bannister is seductively simple. It is that the interest payments that the appellants were required to make were payments required to be made by the credit agreements. Accordingly, they were payments to which section 138(1) applies, and if they were grossly exorbitant, that would be sufficient to render the credit bargains extortionate. It is to be noted that Mr Bannister does not submit that changes in interest rates are capable of being "other relevant considerations" within the meaning of section 138(2)(c).

64. But I cannot accept his argument. My principal reason is that variations in rates of interest are

excluded from the calculation of the "total charge for credit" and therefore excluded from being part of the credit bargain. Section 137(1) provides that a credit agreement may be reopened if the credit bargain is extortionate. Section 137(2)(b) defines "credit bargain" by reference to the transaction or transactions that are to be taken into account in computing the "total charge for credit". It is not in dispute that the effect of section 20 of the 1974 Act and the Credit (Total Charge for Credit) Regulations 1980 is that (with exceptions that are immaterial for present purposes) subsequent variations of the rate of interest are not taken into account in determining the total charge for credit. This is the clear effect of Regulations 2(1)(d), 3 and 4 of the 1980 Regulations and section 20(1) of the 1974 Act which provides:

> "(1) The Secretary of State shall make regulations containing such provisions as appear to him appropriate for determining the true cost to the debtor of the credit provided or to be provided under an actual or prospective consumer credit agreement (the "total charge for credit"), and regulations so made shall prescribe –
>
> (a) what items are to be treated as entering into the total charge for credit, and how their amount is to be ascertained;
>
> (b) the method of calculating the rate of the total charge for credit."

65. Thus the purpose of the 1980 Regulations is to determine the "true cost to the debtor of the credit provided", and it does this by defining the total charge for credit. The definition of "credit bargain" in section 137(2)(b) is based on the transaction or transactions which are taken into account in determining the total charge for credit. The total charge for credit is central to a consideration of whether a credit bargain is extortionate. It would be extraordinary if the rules for computing the total charge for credit were to be ignored in deciding whether a credit bargain is extortionate, and yet that is the effect of Mr Bannister's submission. He submits that section 137(2)(b) serves no other purpose than that of defining the credit bargain, and ensuring that all transactions that are taken into account in computing the total charge for credit, and not merely the credit agreement, are taken into account. I agree that section 137(2)(b) does serve that purpose. But it does not follow that the rules for computing the total charge for credit can be ignored when deciding whether a credit bargain is extortionate. An important purpose of the Regulations which define the total charge for credit is to provide a measure by reference to which it can be determined whether a credit bargain is extortionate. Regulation 2 contains detailed provisions as to the assumptions that should be made in carrying out the calculation.

66. Quite apart from the argument based on the 1980 Regulations, I derive support from the language of section 138 itself. The factors that are relevant to the question whether a credit bargain is extortionate are not only the credit agreement and other transactions that are to be taken into account in computing the "total charge for credit", but also other factors present at the time when the credit bargain was made. Thus it is expressly provided in section 138(2)(a) (interest rates prevailing) and section 138(3)(b) (financial pressure) that the relevant time for considering these matters is the time of the making of the credit bargain. It is also the natural reading of section 138(3)(a) (age, experience, business capacity and state of health), section 138(4)(a) (degree of risk), section 138(4)(b) (relationship to the debtor), section 138(4)(c) (quote of a colourable cash price for goods or services included in the credit bargain) that all of these matters are to be considered as at the date when the credit bargain is made, and at no other time.

67. It might be said that, if variations in rates of interest are not to be taken into account in deciding whether a credit bargain is extortionate, then there is a glaring lacuna in the protection provided by the 1974 Act. Mr Malek was unable to suggest any policy reason why the protection should be

limited in this way. But if I am right in holding that the discretion to set variable interest rates is subject to an implied restriction that it will be exercised in the way that I have described, then the lacuna is less considerable than it might appear. Moreover, the measure of the protection that is undoubtedly afforded by the 1974 Act should not be overstated. At paragraph 47.26 of *Consumer Credit Law and Practice*, Professor Goode says:

> "Nevertheless, it seems clear that the concepts of extortion and unconscionability are very similar. 'Extortionate', like 'harsh and unconscionable', signifies not merely that the terms of the bargain are stiff, or even unreasonable, but that they are so unfair as to be oppressive. This carries with it the notion of morally reprehensible conduct on the part of the creditor in taking grossly unfair advantage of the debtor's circumstances. This element of moral culpability, in the form of abuse of power or bargaining position, is well brought out in the judgment of Sir John Donaldson MR in *Wills v Wood* [1984] CCLR 7:
>
> > 'It is, of course, clear that the Consumer credit Act 1974 gives and is intended to give the widest possible control over credit bargains which, for a variety of reasons, might be considered "extortionate". But the word is "extortionate", not "unwise". The jurisdiction seems to me to contemplate at least a substantial imbalance in bargaining power of which one party has taken advantage'.".

68. In practice, there are unlikely to be many situations in which an allegation of breach of the term that I have held should be implied would fail where the same allegation, expressed as a complaint that the rate of interest is "grossly exorbitant" so as to render the transaction "extortionate", would succeed.

Were the rates of interest grossly exorbitant?

69. In view of my conclusion that the subsequent rates of interest are irrelevant to the question whether a credit bargain is extortionate, I shall deal with this issue very shortly. The particulars relied on by the appellants are precisely the same as those relied on as particulars of breach of the implied term for which they contend. For substantially the same reasons as I have rejected their case on breach of the implied term, I would hold that the allegation that the rates of interest were grossly exorbitant has no real prospect of success. The rates are not merely required to be exorbitant. The appellants must show that they are grossly exorbitant. In my judgment, if one looks at the rates alone, the disparity between the rates that the Claimant was charging the appellants from about 1995 onwards and those charged during this period either by the Halifax or by Paragon was not such as to make the Claimant's rates grossly exorbitant. It may be said that they were high, even unreasonably high, but that is insufficient. Thus, even if the subsequent rates could be taken into account in deciding whether the credit bargains were extortionate, I am not persuaded that the appellants would have real prospects of success on this issue at trial.

The Limitation Issues

70. A number of arguments were addressed to us as to when the cause of action under section 139 of the 1974 Act first arose, and indeed as to whether the Limitation Act 1980 applies at all to such a cause of action. I mention in passing that in *Rahman v Sterling Credit Limited* [2001] 1 WLR 496, it was held by this court that a claim to reopen an agreement under section 139 is "an action upon a

specialty" for which the relevant limitation period under section 8 of the Limitation Act 1980 is 12 years. Mr Bannister submits that this decision proceeded on the basis of a concession by counsel for the borrower that a claim to relief under section 139 is an action upon a specialty, and that it is wrong. Since I have reached the clear conclusion that the appellants have no real prospect of succeeding in their claim under section 139, it is unnecessary for me to decide the limitation point, and I do not propose to do so.

Section 3(2)(b)(i) of the Unfair Contract Terms Act 1977

71. Section 3 of the Act provides so far as material:

> "(1) This section applies as between contracting parties where one of them deals as consumer or on the other's written standard terms of business.
>
> (2) As against that party, the other cannot by reference to any contract term—
>
> …
>
> (b) claim to be entitled—
>
>> (i) to render a contractual performance substantially different from that which was reasonably expected of him, or
>>
>> (ii) in respect of the whole or any part of his contractual obligation, to render no performance at all,
>
> except in so far as (in any of the cases mentioned above in this subsection) the contract term satisfies the requirement of reasonableness"

72. It is submitted on behalf of the appellants that they were reasonably entitled to expect that, in performing their side of the bargain, the Claimant would not apply rates which were substantially out of line with rates applied by comparable lenders to borrowers in comparable situations to the appellants. It is contended that the setting of interest rates is "contractual performance" within the meaning of section 3(2)(b) of the 1977 Act, and that the Claimant set interest rates that defeated that expectation.

73. The first question is whether the fixing of rates of interest under a discretion given by the contract was "contractual performance" within the meaning of section 3(2)(b). Mr Broatch submits that it is. He relies on two authorities. The first is *Timeload Ltd v British Telecommunications PLC* [1995] EMLR 459. In that case, the plaintiff set up a free telephone inquiry service, and entered into a contract with BT whereby BT provided the plaintiff with the use of a certain telephone number. There was a clause in the contract which authorised BT to terminate apparently without reason. BT gave one month's notice of termination, and the plaintiff sought an injunction to restrain BT from terminating. It was held by the court of appeal that it was at least arguable that a clause purporting to authorise BT to terminate without reason purported to permit partial or different performance from that which the plaintiff was entitled to expect, and that section 3(2) of the 1977 Act applied. But the licence agreement imposed clear performance obligations on BT. Thus, clause 1.1 obliged BT to provide the various services there set out. In these circumstances, it is not difficult to see why the court thought that it was at least arguable that a clause authorising termination of the obligation to provide those services for no good reason purported to permit a contractual

performance different from that which the customer might reasonably expect.

74. The second authority is *The Zockoll Group Ltd v Mercury Communications Ltd* [1999] EMLR 385. This was another telecommunications case. The plaintiff planned to set up a network of franchisees to provide goods and services to the public in response to telephone inquiries. It entered into a contract with Mercury under which it obtained a number of telephone numbers. Mercury wished to withdraw one number from the plaintiff and asserted that it was entitled to do so at its sole discretion. The plaintiff brought proceedings and relied on section 3(2)(b)(i) of the 1977 Act. The court held that the withdrawal of the disputed number did not render the contractual performance substantially different from what was expected. Mr Broatch points out that it is implicit in the decision of the court that it was accepted that the withdrawal of the disputed number was *capable of being* contractual performance substantially different from that which it was reasonable to expect.

75. In my judgment, neither of these authorities assists Mr Broatch's submission. In both cases, the defendant telecommunications provider was contractually bound to provide a service. The question was whether the withdrawal of the service in the particular circumstances of the case was such as to render the contract performance (ie the provision of that service) substantially different from that which it was reasonable for the other contracting party to expect. The present cases are quite different. Here, there is no relevant obligation on the Claimant, and therefore nothing that can qualify as "contractual performance" for the purposes of section 3(2)(b)(i). Even if that is wrong, by fixing the rate of interest at a particular level the Claimant is not altering the performance of any obligation assumed by it under the contract. Rather, it is altering the performance required of the appellants.

76. There appears to be no authority in which the application of section 3(2)(b)(i) to a situation similar to that which exists in this case has been considered. The editors of *Chitty on Contracts (28th edition)* offer this view at paragraph 14-071:

> "Nevertheless it seems unlikely that a contract term entitling one party to terminate the contract in the event of a material breach by the other (e.g. failure to pay by the due date) would fall within paragraph (b), or, if it did so, would be adjudged not to satisfy the requirement of reasonableness. Nor, it is submitted, would that provision extend to a contract term which entitled one party, not to alter the performance expected of himself, but to alter the performance required of the other party (e.g. a term by which a seller of goods is entitled to increase the price payable by the buyer to the price ruling at the date of delivery, or a term by which a person advancing a loan is entitled to vary the interest payable by the borrower on the loan)."

77. In my judgment, this passage accurately states the law. The contract term must be one which has an effect (indeed a substantial effect) on the contractual performance reasonably expected of the party who relies on the term. The key word is "performance". A good example of what would come within the scope of the statute is given at paragraph 14-070 of *Chitty*. The editors postulate a person dealing as a consumer with a holiday tour operator who agrees to provide a holiday at a certain hotel at a certain resort, but who claims to be entitled, by reference to a term of the contract to that effect, to be able to accommodate the consumer at a different hotel, or to change the resort, or to cancel the holiday in whole or in part. In that example, the operator has an obligation to provide a holiday. The provision of the holiday is the "contractual performance". But that does not apply here.

Mr and Mrs Staunton: the Stabilised Rate Facility

78. As I explained at paragraph 5 of this judgment, the Stabilised Rate Facility enabled Mr and Mrs Staunton to cap the amount of interest payable each month and defer payment of the excess by granting a "monthly credit" and converting the credit (up to a maximum of £10500) into part of the capital amount of the loan. The Offer of Loan incorporated certain Special Conditions in respect of the Stabilised Rate Facility. Condition 2 provided that:

> "The Company's obligation to credit any Monthly Credit shall cease if the amount of the next Monthly Credit when aggregated with Monthly Credits previously paid and amounts of Interest capitalised or accrued in accordance with Condition 5 would equal or be greater than the Maximum Deferred Interest shown on the Offer of Loan."

79. In other words, once the maximum deferred interest of £10500 was reached, Mr and Mrs Staunton ceased to be entitled to the benefit of the cap. If that occurred, they would inevitably face a jump in interest rates.

80. Mr Falkowski submits that they were not warned of the jump in interest rates that would occur once the Stabilised Rate Period came to an end. What was required was an explanation in plain and intelligible language of the way in which the Facility would operate. The failure of the contract documents to do this rendered the credit bargain extortionate, since it grossly contravened ordinary principles of fair dealing: see section 138(1)(b) of the 1974 Act.

81. In my view, there is nothing misleading or underhand about the contract documentation. It may not be especially easy for a lay person to understand. But it does clearly describe the way in which the Stabilised Rate Facility works. It does not even contravene ordinary principles of fair dealing, let alone contravene them grossly. I would reject Mr Falkowski's argument.

Conclusion

82. In my judgment, therefore, these appeals must be dismissed. This may seem a harsh result, since it is clear that the appellants have suffered serious hardship as a result of the increases in interest rates. But the 1974 Act provides borrowers with only limited protection from the working of the free market. Parliament has empowered the court to intervene only where a bargain is *grossly* unfair to the borrower, either because the payments required to be made are grossly exorbitant, or because it otherwise grossly contravenes ordinary principles of fair dealing. Nothing less will do. For the reasons that I have explained, money lending agreements which contain provisions for variable rates of interest are also subject to an implied term of limited scope, but that cannot avail the appellants in this case. If greater protection is to be accorded to borrowers, that is a matter for Parliament.

Mr Justice Astill:

I agree.

Lord Justice Thorpe:

I also agree.

Order: appeals dismissed; order made in terms of draft minute of order produced by Mr Malek QC; permission to appeal to the House of Lords refused; stay of order granted pending petition to House of Lords for leave and, in the event of petition succeeding, pending the determination of the subsequent appeal; detailed public funded costs assessment for Mrs Nash.

Case 13-1708, Document 105, 03/16/2015, 1461636, Page103 of 103
(Order not part of approved judgment.)

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2001/1466.html*